UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Glenn Fuerst, et al<br><br>Plaintiff<br><br>v.<br><br>WVSR, LLC.<br><br>Defendant | Civil Action No. 1:20-cv-00369-AJ |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE EXPERT WITNESS, GEORGE MELCHIOR, OR IN THE ALTERNATIVE, TO STRIKE CERTAIN PORTIONS OF HIS REPORT/TESTIMONY, OR ORDER A DAUBERT HEARING

Now comes the Defendant in this matter, WSVR, LLC ("Waterville Valley" or "Defendant") and now submits this memorandum of law in support of its motion to strike the Plaintiff's expert medical witness, Mr. George Melchior.

## I. Background

a. Plaintiffs' Claims:

This case arises from an alleged slip-and-fall accident on March 13, 2019. Glenn and Donna Fuerst ("the Plaintiffs"), residents of New York, arrived at Waterville Valley Ski Resort on

1

March 13, 2019 to ski. Complaint, ¶ 2. The Plaintiffs' Complaint is attached hereto as **Exhibit 1**. Plaintiffs allege that Mr. Fuerst climbed a series of exterior concrete stairs, unloaded ski equipment on a rack, and then descended back down the same set of stairs which were immediately adjacent to a skiable area of snow on the bottom of the mountain. Complaint, ¶ 8. The Plaintiffs allege that there was snow and ice on the stairs. Complaint, ¶ 10.

While Mr. Fuerst was walking down the middle of the stairs, in an area that was completely clear of observable snow, he fell and allegedly sustained injuries. Complaint, ¶ 13, 17; Glenn Fuerst's deposition at 122:1-23, 124:1-23. Glenn Fuerst's deposition is attached hereto as **Exhibit 2**. Mr. Fuerst alleged causes of action for negligence, violation of unspecified state or local building or fire code(s) and recklessness. Relying on her husband's allegations, Donna Fuerst has asserted a separate claim for loss of consortium. Complaint ¶¶ 44-46.

    b. <u>Expert Disclosure</u>:

As part of discovery in the subject action, the Plaintiffs have filed on June 11, 2021 a preliminary expert disclosure pursuant to Fed. R. Civ. P. 26(a)(2)(B) in which they identify Mr. George W. Melchior of Nashua, New Hampshire as a retained anticipated liability expert witness for trial. Plaintiffs' Expert Disclosure. Plaintiffs' Expert Disclosure is attached in its entirety hereto as **Exhibit 3**. As part of the Expert Disclosure, the Plaintiffs have included a report produced by Mr. Melchior on April 27, 2021 regarding Waterville Valley's liability for its operation of the ski aera premises as it relates to Mr. Fuerst's alleged fall. The report of Mr. Melchior is attached hereto as **Exhibit 4**. Mr. Melchior concluded that Waterville Valley failed to provide a minimum of care to prevent the conditions on the concrete stairs that allegedly caused Mr. Fuerst's fall. Id.

    c. <u>George Melchior Factual Development</u>:

As set forth herein, Mr. Melchior's opinions are guided by a covert inspection of the defendant's premises and the abject failure to obtain information from the local Building Authority having jurisdiction of the defendant's premises.

Counsel for the plaintiffs guided Mr. Melchior to perform a covert inspection of Waterville Valley's steps without notifying Waterville's counsel and without notifying Waterville either before the inspection or while he was at the premises. As detailed herein, the decision to inspect the property without providing notice to counsel or Waterville was part of a calculated analysis performed by counsel and Mr. Melchior's inspection was indeed done in such a covert manner at the direction of counsel.

Mr. Christopher Hodges is the Fire Chief and Building Inspector for Waterville Valley. As set forth herein he retains jurisdiction over the premises of Waterville Valley and is responsible for implementing and enforcing all applicable building codes. The backbone of Mr. Melchior's opinions is that the stairs were within the means of egress. Mr. Melchior did not consult or interview Mr. Hodges. Had he done so, he would have learned that the stairs in question are not within the means of egress.

## II. **Legal Standard**

The Federal Rules of Evidence set forth the general balancing test by which a court may exclude certain evidence. Under Fed. R. Evid. 403, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The Rules of Evidence also provide the standard by which to determine whether an individual qualifies as an expert witness. Under Fed. R. Evid. 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may

3

testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on <u>sufficient facts</u> or <u>data</u>; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." (Emphasis added).

In <u>Daubert v. Merrell Dow Pharmaceuticals Inc.</u>, 509 U.S. 579 (1993), the Supreme Court set forth the standard by which a trial judge assesses the admissibility of an expert witness's testimony. The Court in Daubert provided four (4) factors that may be considered in determining whether an expert's methodology is valid: (1) whether the theory or technique in question can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) its known or potential error rate and the existence and maintenance of standards controlling its operation, and (4) whether it has attracted widespread acceptance within a relevant scientific community. The Daubert standard can be extended to analyze medical expert testimony. <u>Kuhmo Tire v. Carmichael</u>, 526 US. 137 (1999).

**III.     Argument**

<u>Mr. Melchior Improperly and Covertly Inspected Waterville Valley Without Informing Counsel</u>

As set forth above, Plaintiffs' counsel has confirmed that George Melchior, visited Waterville Valley and conducted an inspection of the exterior stairs on which Mr. Fuerst allegedly fell. Email from Plaintiffs' counsel to Defendant's counsel, dated July 18, 2021. **(Exhibit 5)**. Plaintiffs' counsel had never notified Defendant' counsel in advance that Plaintiffs' liability expert would be conducting any type of visit or inspection of the subject premises. In fact, it appears that Plaintiffs' counsel directed Mr. Melchior to undertake the inspection. Based on Mr. Melchior's report, a significant portion of his knowledge of the premises and the stairs at issue is based on this

4

improper covert inspection. Mr. Melchior himself states, "I also visited the property where I observed the egress routes, exterior stairway system, and hydrologic characteristics of the surrounding area." Report of Mr. Melchior, p. 1.

Inspections by experts are commonplace and integral to the litigation process. They are routinely conducted by simple agreement between counsel who recognize their respective obligations to the litigation process. They are arranged often between counsel in a way that affords both counsel the ability to be present when an expert is inspecting property at issue. Here, that process was inexplicably abandoned.

Covert inspections without notice are also strongly disfavored in federal civil practice. Fed. R. Civ. P. 34 provides that a party may serve on another party a request to permit entry onto designated land or property controlled or possessed by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it. Rule 34(b)(1) provides rules for what the request must contain, Rule 34(b)(2) provides other rules such as time to respond to such request and the ability of the other party to object. Fed. R. Civ. P. 26(b)(2) provides safeguards against unreasonable discovery request, specifically addressing overly burdensome requests. Multiple federal courts have made rulings in support of the general procedure of seeking permission from the other party before undertaking an inspection of a premises, or enforcing a court's order forbidding such inspection if the party on the receiving end objects and the court rules in its favor. Macort v. Goodwill Indus.-Manasota, Inc., 220 F.R.D. 377, 379 (M.D. Fla. 2003); Johnson v. Mundy Indus. Contractors, Inc., No. 7:01-CV-99-BO(3), 2002 U.S. Dist. LEXIS 19346, at *4-10 (E.D.N.C. Mar. 15, 2002). Here, the Plaintiffs ignored Rule 34(b), subverting the Federal Rules of Civil Procedure.

Regarding covert inspections in particular, the U.S. District Court for the Northern District of Ohio considered a case in which a plaintiff employee suing a defendant railyard for injuries made a surreptitious inspection at night and recorded video footage in hopes of creating evidence for upcoming litigation, without any notice or assent from the opposing party, and without any court approval. Baugus v. CSX Transp., Inc., 223 F.R.D. 469, 470 (N.D. Ohio 2004). The court granted the defendant's motion in limine to exclude the evidence from trial, ruling that Fed. R. Civ. P. 34 enables a court to decide whether to permit entry for inspection, to prescribe conditions to that entry which balance the degree to which the proposed inspection would aid in the search for truth against the burdens and dangers caused by the inspection. Id. at 470. Taken together, it is clear that the Rules of Civil Procedure set forth a clear process for a party seeking entry onto land to conduct an inspection, and while not expressly mandatory, these rules and other court decisions strongly favors assent of an opposing party and notice given to that party before an inspection takes place.

Inspections onto land are considered to impose greater burdens and risk onto the opposing party than mere production of documents or other Rule 34 discovery requests, and these risks go beyond the mere relevance standard of Rule 26, and must balance the need presented by the moving party against the burdens and dangers created by the inspection. Belcher v. Bassett Furniture Industries, Inc., 588 F.2d 904, 908 (4th Cir. 1978). As viewed in the light of this balancing test, the covert inspection done by Mr. Melchior is wholly unacceptable. Defendant's counsel had no knowledge that it was taking place and had no ability to object to or limit the scope or extent of the inspection, or even observe Mr. Melchior's assessment and inspection. If Mr. Melchior was permitted to testify to his observations and conclusions based in large part on this covert inspection, Waterville Valley would be unfairly and unacceptably prejudiced.

Courts in New Hampshire have found that the practice of a party directing covert inspections of a premises without notifying the opposing party is an improper practice of discovery. In New Hampshire, decisions concerning pretrial discovery are within the sound discretion of the trial judge. Kurowski v. Town of Chester, 170 N.H. 307, 315 (2017), citing N.H. Ball Bearings v. Jackson, 158 N.H. 421, 429 (2009). State courts in New Hampshire have explained that inspection of a party's premises as part of discovery may require leave of court when parties cannot agree to terms of inspection and may require filing a motion and a court's favorable ruling on that motion for such inspection to take place. State Dep't of Envtl. Servs. v. Marino, 2005 N.H. Super. LEXIS 42, *5 (2005). In Marino, discovery was already underway, one party sought to inspect the other party's premises at issue in the action, the party seeking inspection had sought a court order permitting the inspection, and the opposing party objected to such inspection. Id. This would suggest that in New Hampshire civil practice, seeking an inspection of an opposing party's premises requires, where there is no agreement among parties, permission from a court, and should a court refuse to grant such permission, the inspection could not take place.

Other New Hampshire courts have articulated the importance of compliance with court orders and the necessity of seeking leave of court in the context of inspections of a party's premises as part of discovery. In John v. Festival Fun Parks, 2018 N.H. LEXIS 194 (2018), the Superior Court considered a trip-and-fall case involving a hole in pavement covered by carpeting on a party's premises. The plaintiff claiming injury sought and received permission from the defendant premises owner to conduct an inspection, and conducted said inspection with the plaintiff's counsel and liability expert. Id. at 2. After failing to find the alleged hole, the plaintiff later moved for another court order allowing a second inspection, and the court denied this request, ruling that

the plaintiff could not be allowed to inspect the premises again simply because the initial inspection had not been as useful for her arguments in the case as she had expected. Id. at 3. John again supports the proposition that in New Hampshire, courts are well within their discretion to forbid inspections as part of discovery, including those involving experts, and indicates that courts look favorably upon dialogue between parties that involves notice and assent to inspect, rather than the surreptitious, covert inspection as Mr. Melchior carried out in the instant case.

<u>Mr. Melchior's Methodology and Analysis is Irreparably Flawed and Render His Findings as to Liability Wholly Unreliable and Misleading</u>

Much of Mr. Melchior's finding that Waterville Valley was purportedly liable for Mr. Fuerst's injuries stems from his observations of a lack of handrails along the exterior stairs on which Mr. Fuerst allegedly fell. Mr. Melchior incorrectly stated that the stairs were "the primary patron stairway and primary egress stairway for the property." Report of Mr. Melchior, p. 2. He further claimed that such lack of handrails in an area of egress violated the state building code. Id. at 5.

However, according to the affidavit of Mr. Christopher Hodges, Director of Public Safety, Fire Chief, and Building Commissioner for the Town of Waterville Valley, New Hampshire, the exterior stairs in question are not within the emergency path of egress from the ski lodge building. Affidavit of Mr. Hodges. The affidavit of Mr. Hodges is attached hereto as **Exhibit 6**. Because the stairs are not within the means of egress, they are not subject to the New Hampshire State Building Code regarding handrails. Id. Mr. Hodges himself has made numerous inspections of Waterville Valley over the years, and attested to never having notified any person at Waterville Valley that a handrail was required for those exterior stairs, because Mr. Hodges is certain that they are not required. Id.

Thus, the local authority in building safety and inspection does not believe nor has ever communicated to Waterville Valley that handrails are required on its exterior stairs, and therefore, Waterville Valley cannot be held to a standard that the local building authority does not believe applies. As the local authority with jurisdiction does not apply a handrail rule, Mr. Melchior has improperly relied on a non-existent requirement to render his ultimately flawed opinions.

Additionally, even if handrails were present on the exterior stairs (which they are not required to be), there is no evidence that handrails would have prevented Mr. Fuerst's alleged fall. Mr. Fuerst admitted that he walked down the middle of an 11-foot-wide stairway, and not along its edges. Glenn Fuerst's deposition at 122:1-23, 124:1-23. If Mr. Fuerst fell while walking in the middle of the stairway's width, as he himself so claims, there is no chance that he would have been able to grab any handrails, and no chance that the presence of handrails would themselves have prevented his alleged fall. For the reasons set forth herein, Mr. Melchior's opinions regarding the necessity of the handrail are misguided and unsupported, and the court should not let such opinions reach the jury.

<u>Mr. Melchior is Not a Professional Meteorologist and is Not Qualified to Make Findings Based on Meteorological Science, Rendering His Conclusions Related to Weather and Snow or Ice Misleading and Unreliable</u>

Further, Mr. Melchior's analysis of meteorological conditions, snow and ice formation, and other weather-related materials in informing his conclusions is misplaced and improper. Under Fed. R. Evid. 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Mr. Melchior is not a professional meteorologist, not educated in meteorology or other weather-related science, and has never worked in a professional field involving weather. While Mr. Melchior may have a background in building safety, he is by no means an expert in weather issues, and is thus completely unqualified to testify and render his opinions as to these matters under Rule 702. Additionally, he is not an expert on the properties, formation, melting, or refreezing of snow and ice. Mr. Melchior did not undertake a detailed study of the weather at the time of Mr. Fuerst's alleged fall, and merely connected a cursory examination of weather information leading to the date of the incident and used it as a reason for why snow or ice allegedly built up on the stairs. Although Mr. Melchior claimed to have studied the angle of the sun at the time Mr. Fuerst allegedly fell, Mr. Melchior has no qualifications which could enable him to accurately process, evaluate, or utilize this information to draw reliable conclusions about the surface of a concrete stairway. Nowhere in Mr. Melchior's *curriculum vitae* does he indicate that he is a meteorologist or trained in meteorological science or other weather-related discipline. The curriculum vitae of Mr. Melchior is attached hereto as **Exhibit 7**.

Courts have supported the exclusion of purported expert witnesses who claim to be meteorological experts but not actually qualified or experienced in the field. In Charter Oak Fire Ins. Co. v. SSR, Inc., plaintiffs in a civil action involving the alleged failure of a roofing system sought to challenge the defendant's expert witness, who, despite being a roofing expert but having no qualifications in meteorology, attempted to make weather-based findings related to liability. No. 11-118-HRW, 2014 U.S. Dist. LEXIS 185878, at *3 (E.D. Ky. Sep. 29, 2014). The U.S. District Court for the Eastern District of Kentucky ruled that this individual could not testify as to

meteorological conditions that existed at the time of a roof collapse, because he lacked expertise and formal training in meteorology beyond being an experienced pilot and dealing with meteorology from that perspective. Id. at 10-15. In Amtrak v. Heritage Forest Prods. LP, plaintiff Amtrak was alleging that the defendant was responsible for causing a railroad crossing accident, and sought to exclude testimony from several of the defendant's expert witnesses, including one meteorological expert's findings about the weather conditions at the time of the accident, and one expert accident reconstructionist who included in his findings assertions about the presence of fog at the time of the accident. No. 404CV161, 2005 U.S. Dist. LEXIS 46084, at *5-10 (S.D. Ga. Oct. 6, 2005). The court ruled that the meteorological expert, who was trained and experienced in meteorology, could testify as to the weather conditions at the time of the accident, while the accident reconstructionist, a qualified expert in rail accidents, could not himself testify as to the presence of fog or other weather conditions, as he himself admitted that he had no formal education or background in weather sciences. Id.

As stated above, Mr. Melchior lacks any formal education or experience in meteorology, and he is not a qualified expert to render findings on weather conditions, precipitation, or the behavior of ice and snow. Along the same reasoning as numerous courts have excluded or limited testimony on meteorological matters when the purported experts are actually not qualified to be experts on meteorology, Mr. Melchior's lack of weather expertise should serve as another ground for this Honorable Court to exclude his testimony.

### Mr. Melchior's Finding that Waterville Valley Had No Snow or Ice Remediation Procedures was Erroneous and Misleading

Finally, Mr. Melchior's claim that Waterville Valley had no snow remediation is erroneous, and without support in law or fact. Mr. Melchior stated in his report:

Despite the high volume of patron use of the stairway, there were no written

11

procedures or policies for maintenance of the stairway system. There was no training provided to WVSR employees regarding anti-icing, deicing, types of treatment to use, quantities of treatment, and protocols for inspection, nor were there any administrative controls in place for inspections, snow clearing, and subsequent ongoing treatment of the defective stairway. Most notably, there was no specific employee assigned to inspect and maintain the heavily trafficked stairway, and, instead, every employee on duty was responsible for inspecting and treating the stairway.

Report of Mr. Melchior, p. 4.

Mr. Melchior misquoted Tim Smith, Waterville Valley's President and General Manager, in a statement Mr. Smith made about procedures for shoveling snow from the stairs. Mr. Melchior failed to quote or consider Mr. Smith's entire testimony, including when he testified:

> Q. Sure. What factors do you look at to determine if it's become a hazard or not? A. Oh, if there's not enough room to pass, if it's taking up a great deal of the staircase, if it's – if it, you know, looks – appears as though it's encroaching on the rest of the path where we would be walking. Q. How about if it's melting under a cold surface? A. No, that would be a reason to shovel. Q. What would you do in that case? A. Salt the edge.

Tim Smith's deposition at 70:20-23, 71:1-9. The deposition of Tim Smith is attached hereto as **Exhibit 8**. Regarding snow clearing, Mr. Smith also testified. "The standard operations of our staff would have placed them there first thing in the morning right after they punched in. It would have been on their opening rounds and throughout the day, the standard operations." Tim Smith's deposition at 57:18-22. He further testified:

> Q. Is there any salt or sand that's adjacent to the stairs or nearby the stairs to be used as necessary? A. Yes. Q. And where is that kept? A. Traditionally, there is a bucket of salt in the ski patrollers' locker room entrance. There's traditionally one in the entrance to the marketplace. Traditionally, there's one located near the entrance to the base lodge. There's also the bags and the bulk salt that would have been located in their storage shed for their tools, is located next to the Adaptive Center. ... Q. Sure. Is there a protocol or a standard operating procedure to actually apply salt or ice melt or sand prophylactically on the stairs? A. What do you mean by "prophylactically"? Q. To take care of ahead of time, to prevent – A. Sure. If they see any icing or things that couldn't be removed with their shovel, they would apply the correct procedure, maybe chipping or ice removal, or it could have been an application of salt, sometimes application of stand. Q. And is this something that

> they do if they see it, or is there some sort of actual way that you look at it ahead of time and, for example, that you know it's going to be – it's a warm evening before a cold front is coming through, so you need to treat it ahead of time? A. Sure, there may be many reasons why we would have treated it; the reason of the weather, as you just stated, reasons of concern, many reasons why, not just looking at it, you're correct, yes. … Q. Who is in charge of determining whether or not some sort of treatment should be applied to the stairs? A. Team members. Q. So anybody who was on the Waterville team can put down sand or salt or ice melt? A. Yes. Q. There's no one that they checked with; they'd just simply – they'd just throw it down if they think they need to do it? A. Yes. Q. Is there anyone who's checking to see if it's been done? A. Yes, the team members, others – throughout the day, the ground staff would inspect it, I would walk over it, other team members would."

Tim Smith's deposition at 58:5-23, 59:1-23, 60:1-19. Regarding notification procedures for the need to treat snowy or icy conditions on the premises, Mr. Smith testified:

> Q. Have you or are you aware of anyone reminding somebody that they need to put down salt or sand or ice melt or some other treatment because it wasn't present?
> A. Yes.
> Q. And how did that come to your attention?
> A. It would be announced over the radio; at times, it may be a phone call that an area is getting slick, it needs ice or it needs salt, it needs chipping, whatever it may be."

Tim Smith's deposition at 61:23, 62:1-10. Regarding the constant, ongoing snow and ice removal procedures, Mr. Smith testified:

> "Q. Thank you. You described Waterville Valley's snow and ice removal, and you said – correct me if I'm wrong, but basically it starts in the morning when the staff gets there and it continues throughout the day, is that right?
> A. Yes. …
> Q. And so your staff is generally or regularly walking around observing the premises, including these stairs, and clearing them throughout the day, is that right?
> A. Correct.
> Q. All right. And if there is a protocol, if there is a process, that is it; it's constantly reviewing the stairs, right?
> A. Correct."

Tim Smith's deposition at 136:8-23, 137:1-3.

Contrary to Mr. Melchior's partial selection of a single piece of Mr. Smith's testimony, this clearly establishes a system, or at least a standard procedure, for checking and monitoring the

surface of the exterior stairs and clearing snow to prevent hazards to those using them. Furthermore, Mr. Melchior failed to consider, or perhaps intentionally ignored, Mr. Smith's testimony about snow and ice removal throughout the Waterville Valley premises, in which he stated that the task of snow and ice removal was something that Waterville Valley's employees carried out throughout each day of operation, and involved members of the buildings and grounds crew regularly examining parts of the premises (including the stairs at issue) and carrying out regular cleaning. Tim Smith's deposition at 136:8-23, 137:1, 139:18-22.

It is also clear from Mr. Smith that Waterville Valley's effective regular maintenance procedures functioned as designed. Mr. Smith was extremely familiar with the stairs in question, and had used them numerous times per day since he began working at Waterville Valley in 2016 without issue, and he had never identified any incident reports going back to 2017 in which any person reported being injured on those stairs. Affidavit of Tim Smith. The affidavit of Tim Smith is attached hereto as **Exhibit 9**.

When courts are faced with purported experts who testify as to issues with which they lack expertise, or from which they fail to base their conclusions on an acceptable methodology, courts have acted as a gatekeeper and excluded or limited expert testimony. Lewis-Smith Corp. v. Chattahoochee Bay R.R., Inc., No. 1:10-CV-786-WHA (WO), 2012 U.S. Dist. LEXIS 48070, at *5-8 (M.D. Ala. Apr. 5, 2012); Khumo Tire Co., 526 U.S. at 156-58. In Khumo Tire. Co., the Supreme Court found that the lower court did not abuse is discretion by refusing to admit the testimony of a party's expert when that expert did nothing to demonstrate that their methodology was widely accepted within the tire industry. Id. In much the same way, as Mr. Melchior based much of his findings on meteorological experience he did not have, intentionally

misrepresentations of the statements made by Waterville Valley staff, and misreading of the facts underlying this action, his testimony should also be excluded by this Honorable Court.

Mr. Melchior's findings and conclusions are therefore dangerously unreliable and unsubstantiated, and if allowed to testify as to these findings and conclusions, Mr. Melchior would undoubtedly mislead a jury, make assertions for which there is no factual basis, and unfairly prejudice Waterville Valley.

### IV.  Conclusion

In conclusion, therefore, this Honorable Court should grant the Defendant's motion to strike the Plaintiffs' expert medical witness, Mr. George Melchior, because it is based on his improper, covert, and surreptitious inspection of Waterville Valley, it is reliant on substandard methodology and ignoring clearly established facts, and it is grounded on expertise that Mr. Melchior simply does not possess. Mr. Melchior's testimony would mislead a jury and prejudice the Defendant. In the alternative, the Defendant respectfully requests that this Court strike certain portions of his report/testimony, or order a Daubert hearing.

Respectfully submitted,
WVSR, LLC
By Its Attorney

Timothy W. Tapply, Esq. Bar #269918
ttapply@brandtapply.com
Brand & Tapply, LLC
555 Washington Street, Suite 6
Wellesley, MA  02482
(781) 431-7878