# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

*****************************************)
                             )

| | |
|---|---|
| Glenn Fuerst and<br>    Donna Fuerst, | |
| *Plaintiffs,* | Civ. No. ___1:20-cv-369___ |
| v. | **Jury Trial Demanded** |
| WVSR, LLC<br>d/b/a Waterville Valley Ski Resort | |
| *Defendant.* | |

*****************************************)

## COMPLAINT

**NOW COME** Glenn Fuerst and Donna Fuerst, by and through their attorneys, Welts, White & Fontaine, P.C., and respectfully file this Complaint. The Plaintiffs provide further as follows:

## INTRODUCTION

1.    Plaintiffs seek monetary damages for physical, psychological, and emotional injuries and the resulting monetary damages arising from a March 13, 2019 slip and fall on improperly maintained exterior stairs on the premises of Waterville Valley Ski Resort.

## PARTIES

2.    Glenn Fuerst and Donna Fuerst ("Plaintiffs", "Mr. Fuerst", Mrs. Fuerst) are New York residents residing at 365 O'Connor Road, North Babylon, New York 11703. They are husband and wife.

1

3.     WVSR, LLC ("Defendant" or "WVSR") is a New Hampshire business entity with a principal business office address of 1 Ski Area Road, Waterville Valley, New Hampshire 03215. Its registered agent is Tim Smith, located at 1 Ski Area Road, Waterville Valley, NH 03215.

4.     At all relevant times Defendant WVSR owned and/or operated the Waterville Valley Ski Resort located at 1 Ski Area Road, Waterville Valley, New Hampshire 03215.

## JURISDICTION AND VENUE

5.     Jurisdiction is premised upon complete diversity of the parties and an amount in controversy in excess of $75,000 as provided by 28 U.S.C. § 1332(a). Plaintiff Glenn Fuerst's medical bills collected to date exceed $50,370 and, in addition, Mr. Fuerst is claiming pain and suffering, loss of enjoyment, lost wages, permanent impairment and other damages.  Plaintiff Donna Fuerst is claiming loss of consortium.

6.     Venue is proper in New Hampshire as the slip and fall at issue occurred in New Hampshire.

## STATEMENT OF FACTS

7.     On March 13, 2019, Plaintiff, Mr. Fuerst, went to Waterville Valley Ski Resort anticipating a day of skiing with his wife.

8.     Mr. Fuerst had unloaded some ski equipment and was in the process of walking to rejoin his wife.

9.     To get to her, he had to descend a set of concrete, exterior stairs near the lodge.

10.     Much of that staircase was covered in snow, although it had not snowed at all that day.

2

11.    The snow was piled up, or placed, on one side of the staircase, completely burying the side/railing and encroaching upon the stairway:



*The staircase on the day in question (note: salt was applied by staff after Mr. Fuerst's fall)*

12.    Mr. Fuerst's downward passage placed him on or near the side of the staircase where the snow was piled up, the railing was buried in snow, and where the snow had begun to melt.

13.    During his descent, Mr. Fuerst's right foot suddenly slipped out from under him due to an accumulation of ice on the side of the stairs he was utilizing.

14.    He fell heavily onto his right hip, felt immediate pain, and went to the emergency room for evaluation.

15.    After his fall, WVSR employees hurried to put salt down on the stairs.

3

16.     Photographs taken shortly after Mr. Fuerst's fall show the snow on the stairs was melting and refreezing into black ice.

17.     Mr. Fuerst suffered a fractured right hip, requiring surgery, implanted hardware, and extensive rehabilitation.

18.     His injuries and medical treatments to date (totaling over $50,370), as well as his lost wages (totaling approximately $1,767), were a direct result of the Defendant's negligence.

19.     Mr. Fuerst has also experienced significant emotional and mental anguish due to his injuries and likely permanent physical limitations.

20.     Mrs. Fuerst lost the consortium of her husband during the time of his recovery and from his current physical limitations.

## COUNT I – NEGLIGENCE

21.     Plaintiffs incorporate the allegations above.

22.     Defendant had a duty to use reasonable care in the maintenance and operation of its premises. *Simpson v. Wal-Mart Stores,* 144 N.H. 571, 574 (1999).

23.     Additionally, Defendant had a duty to remedy or give warning of known dangerous conditions as well as dangerous conditions of which a property owner/operator should be aware through exercise of reasonable care.

24.     Defendant failed to clear snow from its exterior stairways, and failed to ensure that the stairs were otherwise safe to traverse.

25.     In addition, it was foreseeable that the sun would melt the snowpack left on or adjacent to the stairs which would then refreeze, creating ice/black ice.

26.     Defendant failed to take action despite having active or constructive knowledge of the hazard.

27.     Critically, the placement of the snow prohibited patrons from utilizing any railing that may have existed.

28.     Defendant also provided no warning, nor any safety measures, to protect its patrons from this dangerous condition.

29.     Defendant's actions and/or inactions constitute a breach of its duties as a premises owner/occupier.

30.     Said breaches constitute negligence.

31.     As a direct, proximate result of the Defendant's negligence, the Plaintiffs have suffered extensive physical, emotional, and other injury and damage.

32.     Plaintiff Glenn Fuerst's right to enjoy life has been diminished and he has suffered pain, both of body and mind, past and present, and has incurred medical bills, lost wages, permanent injury, and other losses, some of which will likely continue into the future, all to the damage of the Plaintiffs in an amount within the jurisdictional limits of this Court.

## COUNT II – NEGLIGENCE PER SE

33.     Plaintiffs incorporate the allegations above.

34.     The stairway in question was a means of egress from the Defendant's business and on its business premises.

35.     The stairway was not maintained, designed, and/or built consistent with state or local building and/or fire code requirements.

36.     Therefore, the Defendant violated state or local building and/or fire codes.

37.     Said violations proximately caused Mr. Fuerst to slip and fall and fracture his hip.

38.     Plaintiff Glenn Fuerst's right to enjoy life has been diminished and he has suffered pain, both of body and mind, past and present, and has incurred medical bills, lost

wages, permanent injury, and other losses, some of which will likely continue into the future, all to the damage of the Plaintiffs in an amount within the jurisdictional limits of this Court.

### COUNT III – RECKLESSNESS

39. Plaintiffs incorporate the allegations above.

40. The Defendant knew of the stairway's dangerous condition, and knew that it created a likelihood of harm to others.

41. Despite knowledge of this risk, the Defendant consciously disregarded it.

42. These actions or inactions were substantially more serious than ordinary negligence to the point they constitute recklessness.

43. As a direct and proximate result of the Defendant's reckless conduct, the Plaintiffs suffered injuries in an amount within the jurisdictional limits of this Court.

### COUNT IV - LOSS OF CONSORTIUM

44. Plaintiffs incorporate the allegations above.

45. As the direct and proximate result of Defendant's negligence, Mrs. Fuerst has been and will be deprived of her husband's full society, care, comfort, consortium and social relations.

46. Mr. and Mrs. Fuerst, by reason of the foregoing, seeks monetary damages in an amount to be determined within the maximum jurisdictional amounts of this court, together with interest and fees allowed by law.

### JURY TRIAL

47. The Plaintiffs, Glenn Fuerst and Donna Fuerst, hereby demand a jury trial on all Counts so triable.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

    A.  Enter judgment against Defendant on all counts;

    B.  Aware Mr. Fuerst damages, including but not limited to his medical expenses, pain and suffering, loss of enjoyment of life, lost wages, and emotional distress;

    C.  Award Mrs. Fuerst damages for the loss of her husband's full society, care, comfort, consortium, and social relations;

    D.  Award interest and costs; and,

    E.  Grant such other relief is just and proper.


Respectfully submitted,

GLENN FUERST and
DONNA FUERST
By and through their attorneys,

WELTS, WHITE & FONTAINE, P.C.


Dated: _____3-24-2020 _____          _____ */s/ Israel Piedra* _____
                                          Jack S. White, Esq. (Bar no. 2725)
                                          Israel F. Piedra, Esq. (Bar no. 267568)
                                          WELTS, WHITE & FONTAINE, PC
                                          29 Factory Street
                                          PO Box 507
                                          Nashua, NH 03061
                                          (603) 883-0797

# EXHIBIT 2

**In the Matter Of:**

GLEN FUERST and DONNA FUERST vs

WVSR

# GLEN FUERST

*March 12, 2021*



*Duffy & McKenna Court Reporters, LLC*

P.O. Box 1658 Dover, NH  03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com  (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION!

Volume: 1
Pages:  235
Exhibits:  10

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

GLEN FUERST and DONNA          )
FUERST,                        )
                               )
          Plaintiffs,          )
                               )
v.                             )  No. 1:20-cv-369-AJ
                               )
WVSR, LLC d/b/a WATERVILLE     )
VALLEY SKI RESORT,             )
                               )
          Defendant.           )
                               )
                               )

DEPOSITION OF GLEN FUERST

        This deposition taken remotely by all

parties, on Friday, March 12, 2021, commencing at

10:01 a.m.

GLEN FUERST                                                    2..5

## Page 2

```
 1                    APPEARANCES
 2  For the Plaintiffs:
 3  WELTS WHITE & FONTAINE PC
       BY:  Israel Francisco Piedra, Esquire
 4  PO Box 507
       Nashua, NH 03061
 5  (603) 883-0797
       ipiedra@lawyersnh.com
 6
 7  For the Defendant:
 8  BRAND & TAPPLY, LLC
       BY:  Timothy W. Tapply, Esquire
 9  555 Washington Street, Suite 6
       Wellesley, MA 02482
10  (781) 431-7878
       ttapply@brandtapply.com
11
12  Court Reporter:
13  Molly K. Belshaw
       RPR, LCR No. 00162
14
15  Also Present:
16  Ms. Donna Fuerst
17
18
19
20
21
22
23
```

## Page 3

```
 1                       INDEX
 2  WITNESS                                          PAGE
 3  GLEN FUERST
 4       By Mr. Tapply                               10
 5
 6
 7                     EXHIBITS
 8  NO.   DESCRIPTION                                PAGE
 9  1     Waterville Purchase Information            154
10  2     Photo of Waterville Ticket Window          163
11  3     Photo of Liability Release Sign            160
12  4     Waterville Senior Ski Ticket               165
13  5     Photos of Salomon Shoes                    168
14  6     Photos of Waterville Staircases            169
15  7     Fuerst's Photos of Staircase               184
16  8     Incident Report Form                       205
17  9     Complaint                                  206
18  10    Answers to Interrogatories                 206
19
20
21
22
23
```

## Page 4

```
 1              P R O C E E D I N G S
 2              MR. TAPPLY:  All right.  Mr. Fuerst,
 3  good morning.
 4              THE WITNESS:  Good morning.
 5              MR. TAPPLY:  We sort of introduced
 6  ourselves briefly, but, again, my name is
 7  Tim Tapply.  I represent the defendant in this
 8  matter.  We are here today to take your deposition.
 9  Before we get started, a few things we need to go
10  over.
11              Counsel and I have agreed to the
12  unusual stipulations.  Therefore, all objections,
13  except as to the form of the question, will be
14  reserved until the time of the trial.  Additionally,
15  all motions to strike will be reserved until time of
16  trial -- or, obviously, any motions in limine.
17  We'll probably deal with those as well.
18              I had formally requested of
19  Attorney Piedra that Ms. Fuerst, who is a party to
20  this matter, remove herself from her husband's
21  deposition, as she's being deposed later today.  And
22  my request specifically was that she not attend her
23  husband's deposition, although she is a party to the
```

## Page 5

```
 1  litigation, because she was a percipient witness to
 2  the events that bring us here today, and as she has
 3  her own separate lost consortium claim.  I do stand
 4  by that request.
 5              I believe fundamental fairness
 6  dictates that she present her testimony this
 7  afternoon, or as soon as we reach her, in a way that
 8  is untarnished and without being unnecessarily
 9  influenced by the testimony of her husband.  Not to
10  say that she would alter her testimony or change her
11  testimony, but I believe I'm entitled to her
12  testimony, and her memory and her memory alone, not
13  being influenced from hearing what her husband has
14  to say.
15              Attorney Piedra has indicated that he
16  disagrees with that assertion, but I'll let him
17  speak to that position, obviously.
18              MR. PIEDRA:  Thank you.  Yes, just
19  for the record, I'll say that I, obviously, have
20  denied that request.  I am not aware of any rule or
21  other authority supporting such a request.  And my
22  position is the same -- right of a party to attend
23  any witness' deposition.  I'm not sure why there
```

**Page 6**

1  would be any difference in this situation.  So
2  that's the basis.  And so that's on the record.
3           Thank you.
4           MR. TAPPLY:  And, Attorney Piedra,
5  would you permit me to voir dire Ms. Fuerst at this
6  point as to her memory of the events, so we can get
7  a baseline of her memory before we take her
8  husband's deposition?
9           MR. PIEDRA:  No.  I don't understand
10 the basis for that.
11          MR. TAPPLY:  Well, the law clearly
12 says that there is a basis to seek to exclude a
13 witness or a party from another party's deposition,
14 if there is a basis to do so.
15          Admittedly, the law says, in a
16 general sense, that although someone's testimony may
17 be influenced, it is typically not enough to allow
18 them to be precluded from attending another's
19 deposition; therefore, I think it imperative that I
20 be permitted to ask her some simple questions as to
21 the scope of her understanding and recollection of
22 the events, so that we do have a baseline.  So that
23 when her deposition does take place, if it appears

**Page 7**

1  that her memory has been changed or altered by her
2  husband's testimony, I would then have a basis to
3  preclude her from testifying in trial, because her
4  testimony would have been influenced or altered by
5  listening to her husband.
6           So, again, that's my position.  So my
7  request is that if you are refusing to simply have
8  her sit out from her husband's deposition, that I be
9  permitted to voir dire her at this point on the
10 scope of her understanding, knowledge, and
11 recollection of the events of March 13, 2019.
12          And, Molly, I apologize.  I know I
13 was going really fast.
14          MR. PIEDRA:  Again, I will reject
15 that request and note that the request to have
16 Ms. Fuerst excluded was made just this morning for
17 the first time, and that Attorney Tapply chose to
18 depose -- or noticed these witnesses' depositions in
19 the manner that he did.  And that if he wanted to
20 exclude a witness, per the federal rules, he should
21 have petitioned the court to do so well in advance
22 of this deposition.
23          MR. TAPPLY:  Would you prefer that we

**Page 8**

1  delay the depositions for today to have the court
2  hear that matter?
3           MR. PIEDRA:  That's your call.  It's
4  your deposition.
5           MR. TAPPLY:  Well, I'm prepared to
6  proceed today.  I will, however, ask that you put a
7  standing objection on the record to any testimony of
8  Ms. Fuerst, and that I will suspend both depositions
9  at the conclusion of them so that this matter can be
10 heard, should we need to do so.
11          And, also, just that I reserve the
12 right to preclude the testimony of either Mr. or
13 Ms. Fuerst, or both, at trial based on these issues.
14          So with all that as a preamble, I
15 guess, Mr. Fuerst, before we commence with your
16 deposition today, just a couple very quick
17 technological issues.
18          Are you able to hear me okay at this
19 point?
20          THE WITNESS:  Yes.
21          MR. TAPPLY:  I am in a room that has
22 kind of a loud heater that turns on from time to
23 time.  In fact, it was just on a moment ago.  My

**Page 9**

1  experience, having taken a number of deposition from
2  this location, is that it does not interfere with a
3  witness' ability to hear me when I'm asking those
4  questions.  However, if that heater comes on and
5  makes it difficult for you to hear me whatsoever,
6  just kind of give me a wave, or yell, or whatever,
7  and I will stop, wait for the heater to stop --
8  because it stops very quickly -- and I'll ask the
9  question again.
10          Does that make sense?
11          THE WITNESS:  Yes.
12          MR. TAPPLY:  And given we are all
13 doing so many of these now via Zoom, I should also
14 say that if you have any technological issues,
15 whether anything is glitching, if the video doesn't
16 work well, if you can't hear me -- if there's any
17 issue at all with the technology again, just let us
18 know, and then we will have someone assist in making
19 a better connection for you; okay?
20          THE WITNESS:  Okay.
21               GLEN FUERST
22     having been duly sworn by Ms. Belshaw,
23     was deposed and testified as follows:

GLEN FUERST                                           10..13

Page 10

1      EXAMINATION
2      BY MR. TAPPLY:
3      Q.    Mr. Fuerst, some very background rules
4   regarding a deposition.  You may have gone over
5   these with your counsel already, or perhaps you're
6   familiar with them from past experience, but I am
7   duty-bound to go over them with you again today.
8         First is, as I'm asking questions, it's
9   vitally important that you understand my question.
10  Neither I or, I can guarantee, your counsel, wants
11  you to answer any question you don't understand.  So
12  if I ask you a question and, for any reason at all,
13  you don't understand the question, just let me know,
14  and I'm happy to repeat the question or rephrase it
15  for you.
16        Does that make sense?
17     A.    Yes.
18     Q.    Also, if I ask a question and you missed
19  part of the question because you couldn't hear part
20  it, or you couldn't hear all of it, or you missed a
21  word or two for some reason -- again, you don't need
22  to answer that question.  Just let me know, and I'm
23  happy to repeat it or rephrase it for you; is that

Page 11

1   clear?
2      A.    Yes.
3      Q.    Now, if I've asked a question and you've
4   answered that question, and you did not say you
5   didn't understand it or you didn't ask me to repeat
6   it or rephrase it, then I will presume that you
7   understood the question as it was asked, and you
8   answered that question.
9         Moreover, when a transcript is created of
10  today's deposition, anyone reading the transcript
11  will be entitled to presume that you understood the
12  question when you answered it, unless you indicate
13  otherwise.  That's one of the reasons why it's so
14  important for you to let me know if you don't
15  understand the question; okay?
16     A.    Yes.
17     Q.    Okay.  Great.
18        As I'm asking questions, you may have a
19  tendency to jump in and start answering the question
20  while I'm still asking it.  You're not being rude
21  when you do this, though.  It's just, I think, the
22  way those of us up here in the greater Northeast
23  talk to each other.  But it makes the stenographer's

Page 12

1   job very difficult if two people are speaking at
2   once.
3         So, if you could, try to let me finish my
4   entire question before you jump in with an answer.
5   I will also do my best to let you finish your entire
6   answer before I jump in with my next question; okay?
7      A.    Fine.
8      Q.    Great.
9         It is important that you give verbal
10  responses.  So if I ask the question and I'm looking
11  at you, if you nod your head up and down or shake it
12  side to side, or say something like "uh-huh," I'll
13  obviously know what that means, because I'm looking
14  at you.  But a stenographer -- even one as talented
15  as Molly -- can't take down a nonverbal
16  communication in the transcripts.
17        So I would ask you to give a verbal
18  response to any question; okay?
19     A.    Yes.
20     Q.    Now, if you slip up and you nod your head
21  or something like that, what I'll do is I'll say,
22  "Sir, is that 'yes' or is that 'no'?"  When I do
23  that, I'm not trying to be a wise guy or difficult.

Page 13

1   I'm just trying to make sure that your answer gets
2   accurately captured in the transcript.
3      A.    Okay.
4      Q.    If I ask you a question and you don't know
5   the answer, I don't want you to guess.  Telling me
6   you don't know or don't remember is perfectly
7   acceptable.  I may ask you to give an estimate or an
8   approximation, if you can, but you don't need to
9   guess; okay?
10     A.    Fine.
11     Q.    If you need to take a break today for any
12  reason, let me know.  I'm happy to take as many
13  breaks as you need.  My only request is that if I've
14  asked a question, I do need you to give me an answer
15  to that question before we take a break and go off
16  the record.  All right?
17     A.    Yes.
18        MR. TAPPLY:  And, Attorney Piedra, I
19  assume that you'll be reading and signing the
20  transcript upon completion?
21        MR. PIEDRA:  Yes.
22        MR. TAPPLY:  Well, I shouldn't say
23  "you."  Your client will be.

Page 14

1              MR. PIEDRA:  My client.
2              MR. TAPPLY:  Thirty days makes sense
3    for you?
4              MR. PIEDRA:  Sure.
5              MR. TAPPLY:  Now, Mr. Fuerst, what
6    that means is once the transcript is created, a copy
7    will be sent to you either directly from the
8    stenographer or from your counsel.  And you'll be
9    asked to review the transcript, make any notations
10   of any errors in the transcription that you see, and
11   then note those errors, and then sign it and return
12   that sheet noting the errors, if there are any.
13   Typically, we give a witness 30 days to do so.  My
14   experience, however, is that if, for some reason,
15   you need more than 30 days, it's -- rarely, if ever,
16   is that a problem.
17             Just let your counsel know, and he
18   and I will come to an agreement as to the timing of
19   that reviewing and signing; okay?
20             MR. PIEDRA:  Yes.
21        Q.   Now, with all that, Mr. Fuerst, can I have
22   your full and complete name?
23        A.   Glen Louis Fuerst.

Page 15

1         Q.   Mr. Fuerst, have you ever gone by any
2    other name or alias?
3         A.   No.
4         Q.   Do you have a nickname that you go by with
5    your friends or fellow employees?
6         A.   No.
7         Q.   Sir, your date of birth?
8         A.   March 14, 1947.
9         Q.   Well, happy early birthday.
10        A.   Thank you.
11        Q.   Your current address, sir?
12        A.   365 O'Connor Road, North Babylon, New York
13   11703.
14        Q.   Sir, do you own or rent that location?
15        A.   We own the home.
16        Q.   And when you say "we," are you talking
17   about you and your wife?
18        A.   Yes.
19        Q.   Is there anyone else's name on the deed to
20   that property other than you and your wife, if you
21   know?
22        A.   No.
23        Q.   Do you have a mortgage on the property?

Page 16

1         A.   No.
2         Q.   Have you ever had a mortgage on the
3    property?
4         A.   Yes.
5         Q.   Approximately when did you last have a
6    mortgage on that property?
7         A.   I don't know, offhand.
8         Q.   Did you have a mortgage and then
9    eventually you payed it off?
10        A.   Yes.
11        Q.   Do you own any other property?
12        A.   No.
13        Q.   Approximately how long have you lived at
14   your home?
15        A.   We are living in this home 43 years.
16        Q.   And, Mr. Fuerst, I meant to ask this kind
17   of when we started, but your wife is attending this
18   deposition remotely as well.
19             Is she in the same room as you?
20        A.   No.
21        Q.   Is there anyone else in the same room as
22   you currently?
23        A.   No.

Page 17

1         Q.   Other than you and your wife, does anyone
2    else live with you there at your home?
3         A.   No.
4         Q.   How long have you been married?
5         A.   Forty-seven years.
6         Q.   Do you have any children?
7         A.   No.
8         Q.   And your marriage to Ms. Fuerst -- that's
9    your only marriage?
10        A.   Yes.
11        Q.   Where are you from originally, sir?
12        A.   Plainview, Long Island, New York.
13        Q.   Did you attend high school in Plainview?
14        A.   Yes.
15        Q.   Which high school is that?
16        A.   Plainview-Old Bethpage High School.
17        Q.   Did you graduate from Plainview-Old
18   Bethpage High School?
19        A.   Yes.
20        Q.   In what year?
21        A.   1965.
22        Q.   After graduating from high school, did you
23   go on to any college or additional education?

Page 18

| | | |
|---|---|---|
| 1 | A. | Not right away, no. |
| 2 | Q. | Eventually, did you go on to college or |
| 3 | some other educational institution? | |
| 4 | A. | Yes. |
| 5 | Q. | Where did you go? |
| 6 | A. | Went to the University of Tampa. |
| 7 | Q. | What did you study at the University of |
| 8 | Tampa? | |
| 9 | A. | I studied physical education. |
| 10 | Q. | Did you graduate from the University of |
| 11 | Tampa? | |
| 12 | A. | No. |
| 13 | Q. | Did you receive any kind of a teaching |
| 14 | certificate or teaching degree in physical | |
| 15 | education? | |
| 16 | A. | No. |
| 17 | Q. | When was it that you went to University of |
| 18 | Tampa? | |
| 19 | A. | September of 1967 through January of 1970. |
| 20 | Q. | And, Mr. Fuerst, did you serve in the |
| 21 | military? | |
| 22 | A. | No. |
| 23 | Q. | Were you drafted? |

Page 19

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | In what year were you drafted? |
| 3 | A. | I believe it was 1966. |
| 4 | Q. | So that would have been just after you |
| 5 | graduated from high school then? | |
| 6 | A. | Yes. |
| 7 | Q. | And was there a physical limitation that |
| 8 | caused you not to be able to serve after being | |
| 9 | drafted? | |
| 10 | A. | No. |
| 11 | Q. | How come you didn't serve after being |
| 12 | drafted? | |
| 13 | A. | Because I was accepted into the University |
| 14 | of Tampa, and they let me go to college. | |
| 15 | Q. | Did you apply to the University of Tampa |
| 16 | before or after you were drafted? | |
| 17 | A. | Before. |
| 18 | Q. | So you didn't learn that you were drafted |
| 19 | and then quickly applied to college? | |
| 20 | A. | No. |
| 21 | Q. | You attended the University of Tampa from |
| 22 | 1967 until early 1970; right? | |
| 23 | A. | Yes. |

Page 20

| | | |
|---|---|---|
| 1 | Q. | And how come you didn't stay at the |
| 2 | University of Tampa? | |
| 3 | A. | Well, my father became sick with |
| 4 | emphysema, and I had to leave school to take care of | |
| 5 | the family. | |
| 6 | Q. | Was your father back up in Long Island? |
| 7 | A. | Yes. |
| 8 | Q. | And have you lived in Long Island since |
| 9 | leaving the University of Tampa? | |
| 10 | A. | Yes. |
| 11 | Q. | Was it then that you entered into the |
| 12 | workforce? | |
| 13 | A. | Yes. |
| 14 | Q. | What kind of work did you start out doing? |
| 15 | A. | I started working out -- I had part-time |
| 16 | jobs, but I started working for a serious company -- | |
| 17 | serious job in 1972. | |
| 18 | Q. | What kind of a job was that? |
| 19 | A. | I was a sales representative for a tobacco |
| 20 | company. | |
| 21 | Q. | Which company? |
| 22 | A. | Lorillard Tobacco -- Lorillard Tobacco |
| 23 | products. | |

Page 21

| | | |
|---|---|---|
| 1 | Q. | How long did you work for them? |
| 2 | A. | I was with them approximately |
| 3 | twelve years -- a little less than twelve years. | |
| 4 | Q. | So that would have been from 1972 up until |
| 5 | 1983 or 1984 -- somewhere thereabouts? | |
| 6 | A. | Well, yeah, '83. |
| 7 | Q. | Did you switch jobs in 1983? |
| 8 | A. | Not right away, no. |
| 9 | Q. | Did you continue to work in the sales |
| 10 | field after 1983? | |
| 11 | A. | Yes. |
| 12 | Q. | What kind of work -- or where did you work |
| 13 | as a salesman after 1983? | |
| 14 | A. | I worked for a tobacco wholesaler, Golden |
| 15 | Tobacco. | |
| 16 | Q. | How long did you work for Golden Tobacco? |
| 17 | A. | I'm sorry? |
| 18 | Q. | How long did you work for Golden Tobacco? |
| 19 | A. | I was with Golden Tobacco for |
| 20 | approximately -- I would say maybe seven, | |
| 21 | eight years. | |
| 22 | Q. | Were you working as a salesperson for them |
| 23 | as well? | |

GLEN FUERST                                    22..25

Page 22

1      A.   Yes.

2      Q.   And then after leaving Golden Tobacco,

3   where did you go to work?

4      A.   I worked for another tobacco

5   distributor/wholesaler.  And the name of that

6   company was Center Candy.

7      Q.   How long did you work for Center Candy?

8      A.   I was with Center Candy for probably about

9   twelve years.

10     Q.   Just to make sure I have this general

11  timeline right, from 1972 to 1983, you worked in

12  tobacco sales.  From 1983 until about 1990 or '91,

13  you worked for Golden Tobacco.  And then from about

14  1990 or '91, sounds like up until 2002 or 2003, you

15  worked for Center Candy; is that correct?

16     A.   Yes.  I mean, there were jobs in between,

17  but they were part-time jobs.  I don't really

18  remember them.

19     Q.   And how come you left Center Candy in the

20  early 2000s?

21     A.   They were closing the business down.  And

22  they were -- they let me go due to seniority.  I was

23  one of the first ones to go.  And, eventually, the

Page 23

1   business went out of business.

2      Q.   And did you continue to work after Center

3   Candy shut down?

4      A.   I was out of work for -- working part-time

5   jobs again.  I was out of work for a couple years.

6   And I started -- I got a part-time job working for

7   DMR Food Broker.

8      Q.   About when was it that you started

9   part-time for DMR Food Broker?

10     A.   I would say approximately -- it was about

11  2010.

12     Q.   How long did you work for them?

13     A.   I'm still working with them.  I work

14  three days a week.

15     Q.   And have you been part-time with DMR Food

16  Broker ever since you started in 2010?

17     A.   Yes.

18     Q.   Has it always been three days per week?

19     A.   Yes.

20     Q.   So since you started with DMR Food Broker,

21  have you had any second jobs or additional jobs?

22     A.   No.

23     Q.   So for any of the companies for whom

Page 24

1   you've worked as a salesperson, starting in 1972 all

2   the way up through today, have you ever been injured

3   on the job in any of those companies?

4      A.   Are you -- you're asking me -- is this all

5   the jobs that I've worked?

6      Q.   Well, we'll start with all the salesperson

7   jobs, because I know you said you worked a bunch of

8   kind of part-time jobs in and among and between the

9   more full-time positions.

10          So just as a salesperson, were you ever

11  injured on the job as a salesperson?

12     A.   No.  The only time I was injured was at

13  Waterville Valley, when I worked for DMR.

14     Q.   Well, I think we'll probably get to that

15  in a bit, but I'm just talking about just in your

16  scope of your duties -- so the scope of your job,

17  have you ever been injured on the job at all?

18     A.   No.

19     Q.   Have you ever submitted a worker's

20  compensation claim?

21     A.   No.

22     Q.   And I understand that you were out on

23  short-term disability for a period -- short period

Page 25

1   in 2019.

2          Other than that, have you ever collected

3   short-term disability?

4      A.   No.

5      Q.   Ever collected long-term disability?

6      A.   No.

7      Q.   Now, the part-time jobs that you had in

8   and among your career as a salesperson -- what kind

9   of part-time jobs did you have?

10     A.   Well, I worked for U-Haul, and it was an

11  inside, office job.  I worked for some factories for

12  a couple of months because it was difficult finding

13  a full-time job at that time.

14     Q.   But I think you said earlier you have not

15  worked at any of those part-time jobs since at least

16  2010.

17     A.   Yes.  No, not at all, no.

18     Q.   Were you ever injured in the course or the

19  scope of your employment during any of those

20  part-time jobs?

21     A.   No.

22     Q.   All right.

23          Sir, have you ever filed for bankruptcy?

Page 26

```
 1    A.   No.
 2    Q.   You indicated you don't have a mortgage on
 3  your home.
 4         Do you have a mortgage for any other
 5  property anywhere else?
 6    A.   No.
 7    Q.   In the past five years, have you had a
 8  mortgage for any property at all?
 9    A.   No.
10    Q.   Did you take any business loans out in the
11  past five years?
12    A.   Business loans, no.
13    Q.   Any personal loans in the past five years?
14    A.   No.
15    Q.   Any educational loans that either you've
16  taken out or you're responsible for paying in the
17  past five years?
18    A.   No.
19    Q.   Have you taken on any debts of anyone
20  else -- any friends or family -- in the past
21  five years?
22    A.   No.
23    Q.   Do you or your wife currently utilize any
```

Page 27

```
 1  credit cards?
 2    A.   I have numerous cards that I use, yes.
 3    Q.   Do you know today what the approximate
 4  balance is of all those cards?
 5    A.   I would say probably $22,000 to $24,000.
 6    Q.   So going back to March of 2019 -- so just
 7  about two years ago -- do you know what your
 8  approximate balance was in total for all those
 9  credit cards then?
10    A.   No, I don't know.
11    Q.   Do you think it was substantially higher
12  or substantially lower than what it is today?
13    A.   It might have been very close to the same
14  or a little higher, because they have been paid off
15  or are being paid off.
16    Q.   Have any of your credit cards gone into
17  default or into collections in the past five years?
18    A.   No.
19    Q.   Have you been late on any credit card
20  payments in the past five years?
21    A.   Probably one, yes.
22    Q.   And what makes you think that there's
23  probably one card for which you've been late on
```

Page 28

```
 1  payments?
 2    A.   Because I was buying a new vehicle and I
 3  was turning in the vehicle to the company that I
 4  bought the new vehicle from -- or leased it.  And
 5  they were supposed to pay the company who owned the
 6  lease, and they didn't.  And instead of being paid,
 7  that monthly payment was not met until probably
 8  two weeks later.  So that showed on my credit card,
 9  yes.
10    Q.   And then -- but after that, did you get it
11  sorted out, and you were on time with payments after
12  that?
13    A.   Yes.
14    Q.   And do you currently have a vehicle loan?
15    A.   Yes.  Well, I lease a vehicle, yes.
16    Q.   And have you been current on lease
17  payments for the past five years?
18    A.   Yes.
19    Q.   And what about your wife -- does she have
20  a vehicle as well?
21    A.   Yes.
22    Q.   Does she lease that vehicle?
23    A.   Yes.
```

Page 29

```
 1    Q.   And have you been on time for any lease
 2  payments for any vehicles driven by your wife for
 3  the past five years?
 4    A.   Yes.  They've all been paid on time, yes.
 5    Q.   In your job for DMR Food Brokers, do you
 6  have a specific territory that you cover?
 7    A.   Yes.
 8    Q.   What territory is that?
 9    A.   Nassau and Suffolk counties on Long
10  Island.
11    Q.   Do you have a company car?
12    A.   No.
13    Q.   Do you track your mileage for
14  reimbursement purposes when you're driving your car
15  for work?
16    A.   No.
17    Q.   And for how long have your territories
18  included Nassau and Suffolk counties?
19    A.   I would say probably around ten years --
20  nine to ten years.
21    Q.   And at least in the last two years, those
22  have both been your counties?
23    A.   Yes.
```

GLEN FUERST                                          30..33

Page 30

1       Q.   Mr. Fuerst, have you ever been involved in
2   any other lawsuits besides this lawsuit?
3       A.   Not to my recollection, no.
4       Q.   So as far as you know, you've never sued
5   anyone else; right?
6       A.   No.
7       Q.   Let me ask you a little bit of a different
8   question then.
9            To your knowledge, have you ever sued
10  anyone else?
11      A.   I had a lawsuit back in the '70s, drinking
12  a bottle of beer, and there was a piece of glass in
13  the beer.  And, yes, there was a lawsuit there, but
14  it was settled out of court.
15      Q.   So back in the 1970s, sounds like you were
16  involved in a lawsuit with -- was it a beer
17  manufacturer or distributor?
18      A.   Yeah, beer manufacturer.  Schaefer, yes.
19      Q.   Were you injured when you drank the beer
20  and there was glass in the beer?
21      A.   No.
22      Q.   What was the subject of the lawsuit then,
23  if you were not injured?

Page 31

1       A.   Well, just that the glass wasn't supposed
2   to be there.  And at the time, I didn't know whether
3   I swallowed part of the glass or not.  And a lot of
4   stress going through it, yes.
5       Q.   Did you go to the doctor's?
6       A.   No.
7       Q.   And so I just want to make sure I have
8   this straight.
9            So back in the 1970s, you were drinking a
10  bottle of Schaefer Beer, and you discovered glass
11  inside the bottle; right?
12      A.   Yes.
13      Q.   And you were not sure if you swallowed
14  glass or not; right?
15      A.   I bit down on the glass, yes.  So I don't
16  know, if I bit down, if I swallowed anything of
17  that.
18      Q.   Being unsure whether or not you swallowed
19  any glass, you did not go to a doctor or hospital to
20  get evaluated; is that a correct statement?
21      A.   I don't think so, but I may have gone to
22  the hospital.  I just don't remember exactly.
23      Q.   But as you sit here today, looking back,

Page 32

1   do you recall having any physical injuries or
2   physical ailments as a result of perhaps swallowing
3   glass?
4       A.   After the fact, no.
5       Q.   Well, did you have any physical issues or
6   physical ailments at the time that you think you may
7   or may not have swallowed some glass?
8       A.   No.
9       Q.   But you ended up in a lawsuit with
10  Schaefer Beer Company as a result of this incident;
11  right?
12      A.   Yes.
13      Q.   Was this a class action type of a suit, so
14  it was you and multiple other people --
15      A.   No.
16      Q.   -- or just you?
17      A.   No.
18      Q.   And you sued Schaefer Beer, it sounds
19  like, mainly because of the stress involved with not
20  being sure whether or not you swallowed glass?
21      A.   Yes.
22      Q.   And it's settled out of court?
23      A.   Yes.

Page 33

1       Q.   How much money did you get?
2       A.   I got $1,200.
3       Q.   And do you know when this was in the
4   1970s?
5       A.   No, I don't know exactly what year.  I was
6   on a bowling league, and that was when it happened.
7       Q.   Did this happen to anyone else that you
8   knew?
9       A.   Not that I know of, no.
10      Q.   Did you ever have any friends or family
11  that sued Schaefer Beer, alleging that they might
12  have swallowed some glass?
13      A.   No.
14      Q.   So when I asked you if you'd ever been
15  involved in any other lawsuits, you said no, but now
16  you've recalled that you were involved in this
17  litigation in the 1970s where you sued Schaefer
18  Beer.
19           Other than that lawsuit, have you ever
20  sued anyone else?
21      A.   No.
22      Q.   Have you made any other claims against any
23  other companies for injuries that you've suffered?

Page 34

1    A.    No.

2    Q.    Okay.

3          Have you been compensated by any other

4  companies or insurance companies for any reason for

5  injuries you may have suffered?

6    A.    No, not to my recollection.  You're asking

7  me to go back 40 years.  And I only thought of the

8  Schaefer incident -- it just crossed my mind.  But,

9  no, I don't recollect any other situations like

10  that.

11    Q.    Have there been any other situations where

12  maybe you weren't hurt, but you suffered some amount

13  of stress, and then you asked to be compensated

14  financially for that distress, kind of like what

15  happened with Schaefer.

16          Has that happened with anyone else?

17    A.    No.

18    Q.    Have you made any other claims for injury

19  where you were hoping to get compensated, but in the

20  end, you didn't get any money out of it -- has that

21  happened?

22    A.    No.

23    Q.    Any other instances where you might not

Page 35

1  have been physically injured, but you suffered some

2  kind of stress or psychological issue, and you made

3  a claim hoping for financial compensation, but ended

4  up getting no money -- has that happened?

5    A.    No.

6    Q.    Now, we've talked about the entirety of

7  your recollection of the times you have sued someone

8  else.

9          Have you ever been sued?

10    A.    No.

11    Q.    Have you ever been brought to small claims

12  court, or brought to any kind of a court, by any

13  entity looking for money from you?

14    A.    No.

15    Q.    Going back to that Schaefer lawsuit.

16          Was that lawsuit in New York, if you know?

17    A.    Yes.

18    Q.    And do you know in which court that

19  lawsuit was filed?

20    A.    No.

21    Q.    I assume that you were represented by an

22  attorney in that instance, though; right?

23    A.    Yes.

Page 36

1    Q.    Did you have to provide any kind of a

2  deposition testimony, kind of like you are today?

3    A.    No.

4    Q.    Obviously, back then, it wouldn't have

5  been over Zoom, but you didn't have to sit down in a

6  room with some attorneys and get asked questions?

7    A.    They sent a bottle technician from the

8  Schaefer Beer Company.

9          He looked at the bottle, and he looked at

10  the glass, and he said that -- and he said it to me

11  -- "Schaefer was at fault."  And that's how it

12  concluded.

13    Q.    And, sir, have you been convicted of any

14  kind of a crime in the past ten years?

15    A.    No.

16    Q.    Now, you have a license to operate a motor

17  vehicle in the state of New York; is that right?

18    A.    Yes.

19    Q.    And have you ever had a license to operate

20  a motor vehicle in any other state?

21    A.    No.

22    Q.    Has your license been suspended or revoked

23  ever in New York?

Page 37

1    A.    No.

2    Q.    Have you ever had to take any kind of

3  driving education class in order to avoid your

4  license being suspended?

5    A.    No.

6    Q.    Have you had to pay -- other than a

7  standard speeding or parking ticket, have you ever

8  had to make any kind of a payment in order to avoid

9  your license being suspended?

10    A.    No.

11    Q.    How long have you been a skier?

12    A.    I started skiing when I was 45 years old.

13  So that would make it back in '92 -- 1992.

14    Q.    Where did you start out skiing back in the

15  1990s?

16    A.    Belleayre Mountain, New York.

17    Q.    Did you happen to hear about the avalanche

18  up at Belleayre earlier this year?

19    A.    Yes.

20    Q.    Did you see the pictures?

21    A.    No.

22    Q.    Pretty amazing stuff.

23          And was Belleayre, for lack of a better

1   term, your home mountain when you started skiing?
2       A.  Yes.
3       Q.  And in the 1990s, did you ski primarily at
4   Belleayre, or did you ski at other mountains as
5   well?
6       A.  No, we started skiing out west.
7       Q.  When you say "we," who is that?
8       A.  My wife.
9       Q.  Where did you go skiing out west?
10      A.  Lake Tahoe.
11      Q.  How many times have you been out skiing to
12  Lake Tahoe?
13      A.  Twenty-six years.
14      Q.  So you've gone out once a year for
15  26 years?
16      A.  Yes.
17      Q.  When you go out to Lake Tahoe, is it just
18  you and your wife, or do you go out with other
19  people as well?
20      A.  We've gone out by ourselves, but we've
21  also gone out with another couple.
22      Q.  Did you go to Lake Tahoe this year?
23      A.  No.

1       Q.  Is that because of COVID?
2       A.  It's because of COVID, but also because of
3   my hip.
4       Q.  Did you have a trip to Lake Tahoe planned
5   for this year?
6       A.  Yes.
7       Q.  Had bought tickets -- strike that.
8           Had you bought airline tickets?
9       A.  Yes.  Well, we had -- yes, yes, we did.
10  Yes.
11      Q.  Do you know when you bought the airline
12  tickets to go out to Lake Tahoe?
13      A.  Probably May or June of 2019, I think it
14  was -- or 2020.
15      Q.  When was that that you were supposed to go
16  to Lake Tahoe?  Do you know what the time frame was?
17      A.  It was in January.  President's week.
18      Q.  Did you have a place reserved to stay out
19  there in Lake Tahoe?
20      A.  Yes.
21      Q.  Is that a place that you've stayed in the
22  past?
23      A.  Yes.

1       Q.  Excuse me for one second.
2           Do you know -- the place that you had
3   reserved to stay for this trip, which would have
4   been president's week of 2021 -- is that a place
5   that you've stayed in the past?
6       A.  I think you just asked me that.  Yes.
7       Q.  I missed your answer because I was getting
8   ready for my sneeze.
9       A.  Okay.
10      Q.  Were you planning to go with anyone else
11  besides your wife this year?
12      A.  Just the two of us.
13      Q.  Were you able to roll whatever you had to
14  pay for the reservation for the place you were going
15  to stay -- were you able to roll that over to a
16  subsequent year?
17      A.  Yes.
18      Q.  And what about the airline tickets -- were
19  you able to roll those over to another year?
20      A.  Yes, within a certain amount of time.
21      Q.  Sure.
22          When you rolled your airline tickets over
23  from what would have been the trip in January of

1   2021 to a later date -- when you rolled them over,
2   did you give a reason for the need to roll them
3   over?
4       A.  You're starting to break up.
5       Q.  I'm sorry.
6           Can you hear me okay now?
7       A.  Yes.
8       Q.  When you rolled your tickets over -- your
9   airline tickets from the trip that was supposed to
10  have been in January of 2021 -- when you rolled
11  those tickets over to a later date, did you give the
12  airline a reason for the need to roll them over?
13      A.  Yes.  I told them it was COVID related,
14  yes.
15      Q.  Thank you.
16          As for the place you were going to stay
17  out in Lake Tahoe, when you rolled that reservation
18  over to a later time, did you provide them a reason
19  as to why you were rolling it over?
20      A.  No.  I didn't have to because I was told
21  that they were closed.
22      Q.  Oh.  Okay.  All right.
23          And if you had had to tell them the

1  reason, you would have just said, just like the
2  airline, you were rolling it over due to COVID;
3  right?
4      A.   Yes.
5      Q.   Other than this annual trip to Lake Tahoe,
6  are there any other ski trips that you and your wife
7  have taken out west since you started skiing?
8      A.   We skied Utah.
9      Q.   How many times have you skied in Utah?
10     A.   Once.
11     Q.   When was that, approximately?
12     A.   That was approximately -- I would say
13 early 2000s, probably -- maybe 2001, '02, or '03.
14     Q.   Do you belong to any ski groups or ski
15 clubs?
16     A.   No.
17     Q.   Do you own your own ski equipment?
18     A.   Yes.
19     Q.   And when is the last time you purchased
20 new ski equipment -- you, personally?
21     A.   Three years ago. Well, now -- it was
22 three years before -- it was about five years ago,
23 but I haven't used it the last two years.

1      Q.   And have you shopped for any new equipment
2  in the past five years?
3      A.   No.
4      Q.   So back here on the East Coast, though you
5  skied at Belleayre, have you had a season's pass at
6  any mountains since you started skiing in 1992?
7      A.   No.
8      Q.   Have you ever owned one of the passes that
9  allows you to ski at multiple mountains?
10     A.   No.
11     Q.   So when you do go skiing, you primarily
12 purchase day tickets; is that a fair statement?
13     A.   I purchase senior tickets, yes.
14     Q.   And by "senior tickets," you mean a ticket
15 that's a reduced price for seniors?
16     A.   Correct. Yes.
17     Q.   Do you have a favorite mountain to ski?
18     A.   I like Cannon in New Hampshire.
19     Q.   Cannon Mountain is about 350 yards from
20 where I'm sitting right now.
21     A.   Really?
22     Q.   Yeah.
23          How many times have you skied in Cannon

1  over the years?
2      A.   I would say about seven or eight times.
3      Q.   Why is it your favorite?
4      A.   I just think it's a very good mountain to
5  ski, and it's taken care of. It's run by
6  New Hampshire.
7      Q.   Mr. Fuerst, since you started skiing in
8  1992, are you someone that keeps track of your
9  skiing days each year?
10     A.   Yes.
11     Q.   How do you do that? How do you keep track
12 of them?
13     A.   Well, we take three ski trips each winter
14 season. I don't ski -- or we don't see on weekends,
15 so we basically ski Monday through Friday. Because
16 I don't want to deal with crazy people and crowds.
17          So, yes, I'm -- if I can ski 90 percent of
18 those 15 ski days, plus what I ski at home on day
19 trips, I can ski 20 -- a good year is 25 ski days a
20 season.
21     Q.   So just -- I want to clarify that a little
22 bit. So you said that you and your wife take three
23 ski trips each season.

1          So by a "ski trip," you mean you'd go
2  someplace and ski Monday through Friday for those
3  five days?
4      A.   Yes.
5      Q.   And then if you do that three times a
6  year, that's obviously 15 of your days; right?
7      A.   Weather permitting, yes.
8      Q.   Sure.
9          But then you also take a number of day
10 trips that would add on to that approximate 15-day
11 total; is that correct?
12     A.   Yes.
13     Q.   And when you take your day trips, where do
14 you normally go?
15     A.   We go to Belleayre. And we haven't skied
16 in Vermont, but we normally would go to
17 Southern Vermont. But we haven't been there in
18 years. So the last two years, I haven't skied at
19 all. So I can't really answer that question now
20 because of the situation.
21     Q.   Sure.
22          But, I mean, before this -- before that
23 situation, when you were taking day trips, were

GLEN FUERST                                              46..49

1   those day trips typically to Belleayre and
2   Southern Vermont, or someplace else?
3        A.    Basically just Vermont and New York.
4        Q.    Now, the three ski trips that you took
5   each season -- so there's three separate one-week
6   trips.
7              Did you have a -- specific places or areas
8   you would go during each of those three trips each
9   season?
10       A.    Yes.
11       Q.    Where were those?
12       A.    One was in Lincoln, New Hampshire.  One
13  was in Lake Placid, New York.  And Lake Tahoe.
14       Q.    Now, when you would go out to Lake Tahoe,
15  would you ski at multiple resorts?
16       A.    Yes.
17       Q.    Which resorts would you ski at at
18  Lake Tahoe?
19       A.    We would ski Heavenly.  We would ski
20  Diamond Peak.  We would ski Kirkwood.  We would ski
21  Mt. Rose, Squaw Valley.  That was in -- pretty much
22  Lake Tahoe.
23       Q.    And for each of those places, you would

1   buy a senior day ticket; right?
2        A.    Yes.
3        Q.    When you would take your week trip up to
4   Lake Placid, I presume you would ski at Whiteface?
5        A.    Yes.
6        Q.    Anywhere else, or would you spend the week
7   at Whiteface?
8        A.    Spent a week at Whiteface.
9        Q.    Where did you like to stay when you went
10  up to Lake Placid?
11       A.    Lake Placid Lodges.
12       Q.    When you would spend a week up at
13  Lake Placid, would you buy a week's worth of tickets
14  in advance, or just purchase them by the day when
15  you were there?
16       A.    I purchase them by the day.
17             Before you ask the next question, could we
18  take a break?  Because I just want to stretch my hip
19  a little.
20             MR. TAPPLY:  Absolutely.  And I
21  should say, sir, that if you need to stand up and
22  stretch and move around, you're welcome to do that
23  anytime.  And you can do it in the middle of

1   questions.  It's fine by me.
2             (Recess taken from 10:51 a.m. to 11:01
3   a.m.)
4        Q.    (By Mr. Tapply)  We were talking about
5   where you and your wife would typically take these
6   weeklong trips during the ski season.
7             You also indicated, I think, that the
8   third place you went was to Lincoln, New Hampshire;
9   is that correct?
10       A.    Yes.
11       Q.    When you would spend a week up at Lincoln,
12  where would you normally ski?  I'm going to guess
13  Cannon, but in addition to Cannon, where would you
14  ski?
15       A.    Loon, Bretton Woods.  Skied Waterville
16  Valley.
17       Q.    So we've got Cannon, Loon, Bretton Woods,
18  and Waterville.
19             Anywhere else?
20       A.    Skied Gunstock.
21       Q.    Anywhere else?
22       A.    Attitash, Wildcat, the smaller one that's
23  in North Conway.  I can't think of the name of it.

1        Q.    Cranmore?
2        A.    Cranmore, yes.
3        Q.    Any others?
4        A.    In New Hampshire, no.  That's about it.
5   We skied some in Maine -- Sunday River.  Mt. Abrams
6   is a very small mountain.
7        Q.    And when you went to these mountains
8   throughout New Hampshire and then over into Maine,
9   you would use Lincoln as your home base?
10       A.    Yes.
11       Q.    Now, in addition to skiing, are there any
12  other athletic endeavors that you enjoy besides
13  skiing -- hiking, bowling, or anything else?
14       A.    Well, I bowled -- I haven't bowled in a
15  couple years.  I stopped bowling about maybe three,
16  four years ago.  But I ride my bike as often as I
17  could.  And I played some senior baseball,
18  softball -- senior leagues.  When I was younger, I
19  played in softball leagues.  And I used to jog a lot
20  more than I can now.  But just taking walks around
21  Belmont Lake, where we live.
22       Q.    Have you ever belonged to a bowling
23  league?

GLEN FUERST                                      50..53

1    A.   Yes.
2    Q.   When did you last belong to a bowling
3  league?
4    A.   I would say -- this is 2021.  I would say
5  probably around 2014, maybe 2015.
6    Q.   How come you stopped competing in a
7  bowling league after 2014 or 2015?
8    A.   Because it became more of a job.  I used
9  to bowl Thursday nights, so I knew I was bowling
10 Thursday nights.  If it was Thursday night, I wasn't
11 going to be home.  I was going to be out bowling.
12 And I just -- it got tiresome after a while, and I
13 just wasn't as good as I was before.
14   Q.   And have you bowled at all since you
15 stopped playing in a league?
16   A.   No.
17   Q.   You ever get injured bowling?
18   A.   No.
19   Q.   Ever throw out your back, or throw out a
20 hip -- anything like that while you were bowling?
21   A.   No, no.
22   Q.   You said you used to play in the softball
23 leagues, but that sounds like that was a long time

1  ago; right?
2    A.   That's probably about 40 years or so ago.
3    Q.   You also said that you played some senior
4  baseball and then senior softball.
5    A.   Yes.  That was -- well, more senior
6  softball.  That was back maybe ten, 15 years ago.
7    Q.   How come you stopped?
8    A.   I couldn't throw the ball anymore.
9    Q.   Was there an injury that resulted in you
10 being unable to throw the ball?
11   A.   No.  No, nothing happened.  I just
12 couldn't -- I wasn't as accurate as I used to be.
13   Q.   Did you ever suffer any shoulder injuries
14 playing softball?
15   A.   No.
16   Q.   Any shoulder injuries playing baseball?
17   A.   No.
18   Q.   What about shoulder injuries doing any
19 other sports -- bowling, or skiing, jogging, or
20 biking -- anything like that?
21   A.   The only time I hurt my left shoulder is
22 when I fell on it skiing.
23   Q.   When was that?

1    A.   That was -- this is 2021.  I would say
2  that was probably around 2015.
3    Q.   Where were you skiing when you injured
4  your left shoulder?
5    A.   Whiteface.
6    Q.   Did you have to have any surgery to your
7  left shoulder?
8    A.   No.  It was just a bruise.
9    Q.   Have you ever torn either of the rotator
10 cuffs in your shoulders?
11   A.   Not that I'm aware of.
12   Q.   Have you ever been diagnosed with
13 degenerative tearing of the rotator cuff in either
14 shoulder?
15   A.   I don't know.  I don't know.  I don't
16 remember if I did.
17   Q.   All right.  You also said that you like to
18 jog.
19        What kind of jogging do you do?
20   A.   Well, I just jogged around the block in
21 our neighborhood.  I wasn't into anything
22 competitive.  It was just exercise.
23   Q.   And about how many days a week would you

1  jog around the block in the neighborhood?
2    A.   Two to three.
3    Q.   How far -- strike that.
4        How long would it take for you to jog
5  around the block?
6    A.   Oh, I would say probably about 20 minutes,
7  half an hour.
8    Q.   Did you have any friends or a group with
9  whom you ran?
10   A.   No.
11   Q.   Did you ever track your time, track your
12 mileage, keep a logbook, or anything like that?
13   A.   No.
14   Q.   Do you have any documents or records of
15 any kind that would show how often you jogged around
16 the block?
17   A.   No.
18   Q.   When's the last time you jogged around the
19 block with any regularity?
20   A.   Around the block?  I would say probably
21 around four, five years ago.
22   Q.   How come you stopped jogging four or
23 five years ago?

GLEN FUERST                                    54..57

1     A.    Because of the accident.
2     Q.    Which accident was that?
3     A.    My right hip.
4     Q.    Is that the incident up at Waterville?
5     A.    Yes.
6     Q.    So you -- four or five years ago,
7  though -- that's when you stopped jogging?
8     A.    Yes.
9     Q.    You also mention that you like to ride
10 your bike.
11          What kind of bike riding do you do?
12    A.    I ride around the neighborhood.  Nothing
13 in the mountains or anything like that.
14    Q.    Do you do that with anyone else, or mostly
15 by yourself?
16    A.    Sometimes myself; most of the time, with
17 Donna.
18    Q.    How many times a week do you do that?
19    A.    Weather permitting, couple times a week.
20 And, again, that's weather permitting.
21    Q.    Do you track your mileage or track your
22 bike rides?
23    A.    No.  I have nothing like that on my bike.

1     Q.    Do you have a watch that tracks your
2  mileage?
3     A.    No.  I don't wear a watch at all.
4     Q.    And you still ride your bike with your
5  wife when you can now?
6     A.    Not so much now because of the cold
7  weather.  I wouldn't want to ride in 30-, 40-degree
8  weather.
9     Q.    When it warms up here in a couple short
10 weeks, will you start riding your bike again with
11 your wife?
12    A.    Yes.
13    Q.    And riding your bike is something you can
14 do with your hip?
15    A.    Yes, for a short duration -- not a long
16 time.  Not as long as I used to be able to.
17 Everything -- right now, everything is in a
18 shortened duration as far as what I can do.
19    Q.    You said, sir, that when you rode bikes,
20 you used to just ride around the neighborhood with
21 your wife.
22    A.    Correct.
23    Q.    How far would you ride when you were

1  riding around the neighborhood?
2     A.    I don't know.  Maybe quarter of a mile.
3     Q.    So when you would go riding with your wife
4  previously, you'd ride about a quarter of a mile,
5  but now you ride a little bit less; is that right?
6     A.    No, no.  I still ride the quarter of a
7  mile, but I used to ride longer than that.
8     Q.    How far did you used to ride?
9     A.    I probably rode -- instead of going around
10 the short block, I used to take a long block around
11 the neighborhood.  It could have been a half a mile
12 to three quarters of a mile.
13    Q.    And you would just do that once?
14    A.    I do it whenever -- the weather
15 permitting, yes.
16    Q.    Well, when you would go out to ride and
17 you would ride that block of somewhere between half
18 and three-fourths of a mile, you would do it once as
19 opposed to multiple times; right?
20    A.    Yeah.  Yeah, basically just -- yes, just
21 going around once, looking at what neighbors are
22 doing to their homes, so to speak.
23    Q.    And then after this injury to your hip at

1  Waterville Valley, now you ride just a short block,
2  which you think is about a quarter of a mile?
3     A.    Yes.
4     Q.    Now, before this injury at Waterville,
5  there were no problems with your hip that limited
6  your bike riding; right?  You didn't have any
7  problems?
8     A.    No.
9     Q.    So before this injury at Waterville
10 Valley, you were able to ride your bike as long as
11 you wanted without any hip problems; is that a
12 correct statement?
13    A.    Yeah.  As long as I wanted, yes.
14    Q.    And then the same with jogging?  You used
15 to jog around the block.  And prior to this incident
16 at Waterville, you were able to jog around the block
17 with no problems in your hips at all?
18    A.    No.
19    Q.    So going back to some of the skiing that
20 you've enjoyed doing, when you buy the senior
21 tickets, would those always be day tickets?  Or
22 would you buy, like, a senior's punch card or
23 senior's pass for these mountains?

**Page 58**

1     A.   We normally buy senior day tickets.  I
2  don't buy a five-day lift ticket, a three-day lift
3  ticket, because I don't know what the weather is
4  going to be like.  I will not ski if it's raining
5  out.
6     Q.   That makes two of us.  All right.
7          And the tickets over the years -- probably
8  when you started out skiing, they were always the
9  same kind of tickets that were a sticker that you'd
10 fold over the wicket and attach that to your jacket
11 or pants; right?
12    A.   Yes.
13    Q.   And then over the years, some ski areas
14 have moved more towards the hard plastic cards that
15 you just stick in your pocket; right?
16    A.   Yes.
17    Q.   Now, there's some people who like to
18 collect all their day tickets.
19         Do you collect all your day tickets and
20 keep those over the years?
21    A.   No.
22    Q.   And what about the plastic cards that
23 you're given in some ski areas?  Do you collect

**Page 59**

1  those over the years?
2     A.   No.
3     Q.   What do you normally do with them -- the
4  plastic cards?
5     A.   I throw them out.
6     Q.   Now, some mountains ask you to turn them
7  in at the end of the day.
8          Do you normally do that, or do you just
9  throw them out?
10    A.   I throw them out.
11    Q.   Now, you mentioned earlier, sir, that at
12 one point, you had injured -- you bruised, I think
13 you said, your left shoulder while skiing.
14    A.   Yes.
15    Q.   And that was at Whiteface?
16    A.   Yes.
17    Q.   In what year was that?
18    A.   That was -- I would say that was about
19 2015, maybe 2014-ish.
20    Q.   Did you have to get treated by ski patrol
21 there at Whiteface?
22    A.   No.
23    Q.   Did you go to the hospital up there in the

**Page 60**

1  Lake Placid area after this injury?
2     A.   No.
3     Q.   Did you get any medical treatment at all
4  for this left shoulder injury that you suffered at
5  Whiteface in 2014 or '15?
6     A.   No.
7     Q.   So you never went to see, like, your
8  primary care physician, or a physical therapist, or
9  anything like that?
10    A.   Not because of that, no.
11    Q.   So other than falling while skiing and
12 bruising your left shoulder, have you ever been
13 injured skiing on any other occasion?
14    A.   While I was skiing, no.
15    Q.   Did you make any claim against Whiteface
16 for your left shoulder injury?
17    A.   No.  That was my fault.
18    Q.   Now, during your ski trips, when you go
19 and you go skiing at those mountains, do you
20 normally pack a lunch, or do you normally buy the
21 lunch there at the ski area?
22    A.   We'll buy the lunch at the ski area.
23    Q.   Now, there's lots of ski areas now that

**Page 61**

1  are offering different services.  Some have mountain
2  coasters; some have tubing.
3          Do you and your wife partake in those
4  other activities when you go to ski areas?
5     A.   No.
6     Q.   So you just enjoy the skiing, and that's
7  it?
8     A.   Yes.
9     Q.   And how would you classify yourself as a
10 skier -- beginner, intermediate, or advanced?
11    A.   Intermediate.
12    Q.   Would you say you're a strong intermediate
13 skier?
14    A.   Stronger?  Yes, yeah.
15    Q.   What kind of trails do you like to ski?
16 Kind of the steeper trails, or kind of the easier
17 trails, or something else?
18    A.   No.  I will start out skiing greens, and
19 then I will advance to connecting blues with those
20 greens.  And then, as the day goes on and I feel
21 comfortable, I go to the top.
22    Q.   So you go to the top.
23         You mean you go to, like, the black

Page 62

```
1  diamonds?
2       A.   Yes.
3       Q.   Do you like to ski the bumps?  Or do you
4  normally stay on the groomed trails?
5       A.   I do not ski bumps, no.
6       Q.   How come?
7       A.   I just don't feel comfortable on them.  I
8  never learned how to ski them, and I'm too old to
9  learn now.
10      Q.   And what about in the glades of the
11 woods -- do you like to ski in the glades?
12      A.   No.
13      Q.   So when you get to a ski area, will you
14 take a look at the trail map and kind of figure out
15 where you do and you don't want to go?
16      A.   Yes.  My wife and I both do it, yes.
17      Q.   Now, if -- like those trips you've taken
18 to Lincoln, New Hampshire -- will you have it
19 planned out in advance which mountains you're going
20 to go to on each day, or do you decide that as the
21 days come?
22      A.   No, we pretty much know what the
23 promotions at each ski mountain has.  So Bretton
```

Page 63

```
1  Woods has a Monday promotion.  Cannon has a Tuesday
2  or a Thursday promotion.  And Waterville -- we just
3  went because we hadn't been there in quite a few
4  years.
5       Q.   So if you were going to go to Cannon on a
6  Tuesday, for instance, on Monday night, would you
7  pull up the trail map and kind of make a plan as to
8  where you wanted to ski throughout the day?
9       A.   No.  We'd skied it already, so we know
10 exactly where we're going and what we're doing.
11      Q.   And what about if it was a mountain that
12 you hadn't been to in a while?  Would you pull up
13 the trail map the night before and kind of plan out
14 your ski day?
15      A.   I won't do anything the night before.  I
16 wait until I get to the mountain to make sure what's
17 been groomed and what hasn't been groomed.
18      Q.   I see.  Okay.
19           So you mention this left shoulder bruise
20 that you got, which sounds like it wasn't a very
21 serious injury; is that correct?
22      A.   No, not at all.
23      Q.   It was a bruise.
```

Page 64

```
1            And you said you had no medical treatment
2  for that left shoulder at all; is that right?
3       A.   None at all, no.
4       Q.   I asked you a poor question, so let me ask
5  you a better one.
6            I'm just confirming what I heard you say
7  earlier, which is you never had any treatment for
8  your left shoulder after you fell skiing; is that a
9  true statement?
10      A.   Yes.  Yeah.
11      Q.   So other than that left shoulder, in the
12 past -- let's say since the year 2000, so roughly
13 the last 20 years, any hospitalizations for any
14 reason?
15      A.   From what?
16      Q.   For any reason.  So since the year 2000
17 up until today, with the exclusion of what happened
18 at the Waterville, have you been hospitalized for
19 any reason?
20      A.   No.
21      Q.   Same time period -- so from the year 2000
22 up until today -- any surgeries?
23      A.   No.  Other than what happened at
```

Page 65

```
1  Waterville, no.
2       Q.   And in the past 20 years, have you been
3  under the care of any medical specialist for any
4  diseases, or ailments, or any kind of issue?
5       A.   Diseases?  No, no.
6       Q.   I presume you have a primary care
7  physician?
8       A.   Yes.
9       Q.   And who is that?
10      A.   Dr. Nakhjavan.
11      Q.   And do you know how to spell that offhand?
12      A.   I'll have to get it.
13      Q.   That's okay.
14           Just for Molly's benefit, it says
15 N-A-K-H-J-A-V-A-N; does that sound right?
16      A.   Yes, N-A-K-J-A-V-A-N (sic).
17      Q.   And how long has Dr. Nakhjavan been your
18 primary care physician?
19      A.   I would say 30 years.
20      Q.   Prior to this injury at Waterville Valley,
21 did you ever have to treat with an orthopedist for
22 any reason?
23      A.   I had some minor issues with a pain on my
```

Page 66

```
1    right side.
2         Q.   Where on your right side?
3         A.   Well, at that time, it was on the inside,
4    but it was on my right side in the area of where my
5    femur is -- in that area.
6         Q.   So near your right hip?
7         A.   Yes, sir.
8         Q.   When did you start having pain in your
9    right hip?
10        A.   Oh, I would say -- and it was very mild.
11   It wasn't -- I mean, on a scale of one to ten, I
12   would say the pain was maybe a four.  But it was
13   back probably -- and, again, I'm guessing.  I don't
14   know exactly what year it was.  It was probably
15   around maybe 2013, 2014.
16        Q.   That's when the pain began or developed in
17   your right hip?
18        A.   Slightly developed, yes.  Again, it was
19   mild.
20        Q.   Sure.
21             So the mild pain that slightly developed
22   in your right hip started around 2013 or 2014?
23        A.   Yeah, maybe.  Maybe a little later,
```

Page 67

```
1    because I did get a cortisone shot for it.  And I
2    haven't had a problem with that hip since.
3         Q.   So since you got a cortisone shot in your
4    right hip, from that point up until the time that
5    you had the injury at Waterville Valley, you had no
6    problems in your hip at all?
7         A.   No.
8         Q.   So no pain, no discomfort -- your hip was
9    completely fine after the cortisone shot; is that
10   right?
11        A.   Yes.
12        Q.   So do you know when it was that you got
13   the cortisone shot?
14        A.   Yes.  That was in November of 2017.
15        Q.   So the right hip pain developed somewhere
16   in the 2014 time frame.  And by the time you got to
17   2017, you got a cortisone shot in your right hip; do
18   I have that correct?
19        A.   Yes.  It wasn't constant pain.  It was
20   pain that would come and go.
21        Q.   And we'll get to that.
22             But my question is just -- it started in
23   2014.  And then in 2017, you had the cortisone shot;
```

Page 68

```
1    is that a correct statement?
2         A.   Yes.
3         Q.   From 2014 to 2017, did the pain in your
4    right hip get worse, get better, or stay the same?
5         A.   It stayed the same to get maybe a little
6    better.
7         Q.   Was there one particular activity, or were
8    there activities, plural, that caused the pain in
9    your hip to get worse?
10        A.   No.
11        Q.   What about driving?  Did that aggravate
12   your hip pain at all?
13        A.   No.
14        Q.   What about walking?  Did that aggravate
15   your right hip pain at all?
16        A.   No.
17        Q.   So up until the time you had this
18   cortisone shot, you could drive, and you could walk,
19   and that did not aggravate your hip pain; is that a
20   true statement?
21        A.   No, it didn't.  No, it did not aggravate
22   it, no.
23        Q.   Now, did you curtail any of your skiing
```

Page 69

```
1    activities due to the right hip pain prior to this
2    cortisone shot?
3         A.   No, because it only -- I didn't concern
4    myself with skiing, because the hip pain was almost
5    gone by the time I would -- ski season was.
6         Q.   Now, which doctors did you see for the
7    right hip pain prior to this cortisone injection?
8         A.   Dr. Cappellino.  He's an orthopedic
9    surgeon.
10        Q.   How many times did you see Dr. Cappellino
11   before you had the cortisone injection?
12        A.   Before?  Maybe two, three, maybe four.  No
13   more than four, if that.
14        Q.   So you had this right hip issue.
15             You had a cortisone injection in November
16   of 2017, and that essentially cured your right hip
17   problems; right?
18        A.   As of today, yes.
19        Q.   Did you ever go to any physical therapy
20   for your right hip before the injury at Waterville?
21        A.   Yes.  Yes, I had been to -- yes.
22        Q.   Where were you going to PT?
23        A.   It was in Babylon Village.  I don't
```

GLEN FUERST                                          70..73

1   remember the name of it exactly.
2      Q.   And why were you going to physical therapy
3   in Babylon Village?
4      A.   Just to try and relieve -- see if they can
5   relieve the pain altogether.
6      Q.   And that's the pain in your right hip;
7   correct?
8      A.   Yes.
9      Q.   When was it that you went to that physical
10  therapist?
11     A.   I would say -- I don't really know, to be
12  honest with you.  It was around the time before I
13  had the cortisone shot.
14     Q.   And other than -- well, strike that.
15          How many different physical therapy
16  locations did you visit prior to having the
17  cortisone injection?
18     A.   Just one.
19     Q.   So you went to a physical therapist and
20  you saw an orthopedist before the cortisone
21  injection.
22          Did you see any other medical providers
23  for the issue with your right hip?

1      A.   No.
2      Q.   Other than your right hip, before the
3   incident at Waterville, did you have any other
4   physical ailments for which you sought medical
5   treatment?
6      A.   No.
7      Q.   Any issues with your spine?
8      A.   I had lower back pain issues, yes.
9      Q.   You did.  Okay.
10          So where -- did you get medical treatment
11  for the lower back?
12     A.   Yes.  I went to my family doctor, and he
13  suggested I see a pain management doctor in Good Sam
14  Hospital on Long Island.  And he suggested I have an
15  epidural.
16     Q.   When did you first go to see the doctor at
17  the Good Samaritan Hospital in Long Island?
18     A.   I would say that was about -- in the 2017
19  area.  I think I got confused with -- okay.
20          I told you it was 2017 with the hip
21  problem.  That was closer to 2018.  And that was --
22  go ahead.
23     Q.   You told me that you had a cortisone

1   injection in November of 2017.
2          Do you still believe it was 2017, or was
3   it some other time?
4      A.   No, it was November of 2018.
5      Q.   So November of 2018, you had a cortisone
6   injection.
7          Do you know who did that cortisone
8   injection?
9      A.   Dr. Cappellino -- his PA, I believe.  Yes.
10     Q.   How many different cortisone injections
11  did you have in your right hip or leg?
12     A.   Just one.
13     Q.   Did you give Dr. Cappellino a reason as to
14  why you needed the cortisone injection?
15     A.   Well, I told him that I was going skiing
16  in a couple months, and that I was feeling slight
17  pain there.  And he suggested a cortisone shot in
18  the hip area.
19     Q.   So the pain in your hip was bad enough
20  that you felt you needed a cortisone injection in
21  order to go skiing; right?
22     A.   No, the pain -- I only went to see the
23  doctor because I was going to be skiing in

1   two months, and I didn't want to be going there and
2   the pain is worse.  The pain was mild in November of
3   that year.  I just didn't want to get to Lake Tahoe
4   and have serious issues.  And that's why --
5      Q.   Now, in the ski season of 2019, 2020, did
6   you go out to Lake Tahoe that year?
7      A.   Yes.
8      Q.   And did you go that same week -- that
9   president's week in January?
10     A.   I believe -- I think it might have been
11  January of that year we went.
12     Q.   So that would have been January of 2019?
13     A.   Yes.
14     Q.   So in January of 2019, you were going to
15  Lake Tahoe, so you had the cortisone injection the
16  prior fall, November of 2018; is that right?
17     A.   No.  I'm -- let me just change that again,
18  because I'm trying to put all these dates in my
19  head.
20     Q.   And, sir, I'm just looking for your best
21  memory; okay.  And like I said, I don't want you to
22  guess.  If you don't know, you can tell me you don't
23  know or don't remember.  That's fine.

GLEN FUERST                                    74..77

Page 74

1     A.    No, I'm not guessing.  I'm just trying to
2  materialize it in my head as far as what month it
3  was.  I know what year it was.  And we went to Tahoe
4  in president's week of 2019.
5     Q.    You first said that you had this injection
6  in November of 2017, but now you believe it was in
7  November of 2018; is that right?
8     A.    Yes.
9     Q.    But your testimony still is once you had
10 that cortisone injection -- once you got that, you
11 had no further pain or discomfort in your hip; is
12 that a correct statement?
13    A.    Yes -- I had no pain, no.  Exactly, yes.
14    Q.    And so if the cortisone injection was in
15 November of 2018, when was it that you went to
16 physical therapy for your hip?
17    A.    I don't know exactly.
18    Q.    Do you know if it was before or after the
19 cortisone injection?
20    A.    It was probably just before.
21    Q.    Now, when you went to physical therapy,
22 would I be correct in saying that they asked you
23 questions about how you were feeling and how your

Page 75

1  hip was feeling?
2     A.    Yes.
3     Q.    And did you answer those questions?
4     A.    Yes.
5     Q.    Did you answer them honestly?
6     A.    Yes.
7     Q.    So you answered the physical therapist's
8  questions honestly, just like you're answering my
9  questions honestly today; is that correct, sir?
10    A.    I believe so, yes.  Yes.
11    Q.    Now, you said -- strike that.
12          After you had the cortisone injection with
13 Dr. Cappellino's office, did you get any further
14 medical treatment for your right hip at all until
15 the time -- until the Waterville Valley incident?
16    A.    No.
17    Q.    Prior to having the cortisone injection,
18 was your right hip discomfort such that it caused
19 you to limp?
20    A.    No.
21    Q.    And what about after the cortisone
22 injection -- did your right hip discomfort cause you
23 to limp at all then?

Page 76

1     A.    No.
2     Q.    Was Excel Rehab the place where you went
3  to physical therapy?
4     A.    Yes.
5     Q.    That's the place -- I'm sorry.
6          You said Westbourne?
7     A.    It's in Babylon Village.
8     Q.    Now, you mentioned to me, sir, that you
9  went to a pain management physician at Good
10 Samaritan Hospital on Long Island.
11    A.    Yes.
12    Q.    Did you end up getting an epidural
13 injection for your low back there?
14    A.    Yes.
15    Q.    How many times did you visit that
16 facility?
17    A.    Three times.
18    Q.    When's the last time you were there?
19    A.    It would be sometime in December of 2017.
20    Q.    Are you currently under the care of any
21 medical provider for your lower back now?
22    A.    No.
23    Q.    And when's the last time you sought any

Page 77

1  kind of a medical provider of any kind for your
2  lower back?
3     A.    Well, I didn't go to see Dr. Nakhjavan,
4  but we talk about it, and that's the extent of it.
5  But, no, I haven't been to any sort of specialist
6  regarding my back.
7     Q.    Now, has any medical provider of any kind
8  -- so whether your primary care physician, an
9  orthopedist, physical therapist, or any other
10 provider -- have they ever told you that you should
11 not ski due to your hip or your lower back?
12    A.    No one ever told me that.
13    Q.    Did anyone ever tell you you shouldn't
14 bowl or you shouldn't ride a bike because of your
15 hip or lower back?
16    A.    No.
17    Q.    Did anyone tell you that there are any
18 activities you should avoid due to your hip or low
19 back?
20    A.    No.
21    Q.    All right.  Sir, let's move to the ski
22 season of 2018-2019.
23          Do you know -- so during December of 2018,

Page 78

1   did you go skiing anywhere during that month?
2       A.   No.
3       Q.   Now, you've talked about how you went out
4   to Lake Tahoe during January of 2019.
5           So before that trip to Lake Tahoe that
6   year, did you go skiing anywhere?
7       A.   No.
8       Q.   So when you went out to Lake Tahoe in
9   January of 2019, that was the first time you went
10  skiing that ski season?
11      A.   Yes.
12      Q.   When you went out to Lake Tahoe, did you
13  bring your own equipment?
14      A.   Yes.
15      Q.   Did you have to get any medical treatment
16  or medical care while you were out at Lake Tahoe
17  that year for any reason?
18      A.   Could you just ask that question again?
19      Q.   Sure.
20           So when you were at Lake Tahoe over
21  president's week in January of 2019, did you have to
22  get any medical treatment for any reason?
23      A.   No.

Page 79

1       Q.   Now, before you would go skiing, did you
2   do any exercises to kind of, like, loosen up your
3   body, get warmed up, anything like that?
4       A.   I do exercises every morning, yes.  And
5   even at that time, yes.
6       Q.   Before you would go skiing, would you take
7   any medication for your hip or back?
8       A.   No.
9       Q.   And that's because you said once you got
10  that cortisone injection, you had no further pain in
11  your hip at all; right?
12      A.   I got the cortisone injection and I
13  started doing exercises at my home.
14      Q.   And between those two things, that
15  eliminated your hip pain; right?
16      A.   Yes.
17      Q.   Any falls or injuries that occurred when
18  you were at Lake Tahoe in January of 2019?
19      A.   No.
20      Q.   You came back from Lake Tahoe.
21           And then do you recall taking any day
22  trips that year, between the Lake Tahoe trip and
23  then when you were up at Waterville?

Page 80

1       A.   I don't recall any, no.
2       Q.   You told me, sir, that typically you would
3   take three weeklong trips per year -- one to
4   Lake Tahoe, one to Lake Placid, and one up to
5   Lincoln.
6           Had you gone up to Lake Placid in between
7   the Tahoe trip and the ski day at Waterville?
8       A.   No.
9       Q.   Was that trip planned for later in the
10  season?
11      A.   No.
12      Q.   Now, would you have it -- in a typical
13  year, when you took these three trips, would you
14  have an order in which you took them?  Like you
15  always went to Lake Tahoe in January, and then
16  Lake Placid in February, and Lincoln in March, or
17  anything like that?
18      A.   It all worked on availability.  So
19  whatever the availability was there, we took
20  advantage of that.  If there was nothing available
21  at Lake Placid, obviously, we weren't going.
22      Q.   So that particular year, you went up to
23  Lake Tahoe, and then you did not take another

Page 81

1   weeklong trip until the Lincoln trip in March?
2       A.   Yes.
3       Q.   Do you know if you took any day trips
4   between Lake Tahoe and Lincoln, New Hampshire?
5       A.   No.
6       Q.   Now, on these trips to Lincoln,
7   New Hampshire, in the past, where you would do day
8   trips to various mountains, did you and your wife
9   have a system normally when you would get to an
10  area -- you would unload the skis and she would park
11  the car, or something like that?
12      A.   Well, that would depend on the location,
13  but, yes.
14      Q.   When you went to Waterville previously,
15  what would you normally do?  You would unload the
16  skis and she would park, or vice versa?
17      A.   We both would unload the cars, yes.  And I
18  would park, yes.
19      Q.   Now, how many times have you skied at
20  Waterville over the years?
21      A.   Before 2019?
22      Q.   Well, let's just say how many times have
23  you skied at Waterville total in your life?

GLEN FUERST                                    82..85

Page 82

1      A.   I would say probably about four.  Maybe
2  five times, but definitely four.
3      Q.   And over what time period or what years
4  does the four to five times cover?
5      A.   I would say probably in a ten-year span.
6      Q.   When is the last time you had been at
7  Waterville prior to March of 2019?
8      A.   Again, I can tell you when.  It was the
9  last year they didn't add on that additional
10 mountain that they built to the left.  So I don't
11 know when the first year that was, but the last year
12 we were there was just before they built that
13 mountain -- all of those trails.
14     Q.   Now, when you go to Waterville, is there
15 one particular area that you like to ski over
16 others?
17     A.   Well, we'll ski to the area to the left,
18 which is greens, to start.  And as my wife gets
19 comfortable, we'll move on to different trails.
20     Q.   And when you normally get to Waterville,
21 on the four or five times you've been there, would
22 you kind of drive up and pull up to the unload area
23 and unload, and then go park?  Or would you go park

Page 83

1  and then unload everything before you parked?
2      A.   No, no, no.  I drop it off at the drop-off
3  zone.  And then Donna would wait for me there, and I
4  would go park the car and walk back.
5           Before you ask another question, can we
6  take another break?
7      Q.   Sure.  Do you want to just stand up and
8  stretch where you are, and we'll keep going, or do
9  you need to go off the record?
10     A.   Let me just see how I feel.
11          Do you mind if we took a five-minute
12 break?
13          MR. TAPPLY:  No, that's fine.
14     (Recess taken from 11:42 a.m. to 11:48
15     a.m.)
16          THE WITNESS:  I just wanted to get
17 one thing straight.  Because with all these dates
18 and everything, I didn't pick up that we were
19 talking about 2019 before we took a break.
20          And I think I was saying that we were
21 in Lake Tahoe in January of 2019.
22     Q.   (By Mr. Tapply)  Well, sir, you said
23 repeatedly that you were in Lake Tahoe in January of

Page 84

1  2019.
2      A.   Yes.
3      Q.   We've taken a break, and you've come back,
4  and you're offering a change of testimony.
5           Sir, with whom did you speak during the
6  break?
7      A.   I was thinking about it and I spoke to my
8  wife.
9      Q.   So after speaking to your wife, now you're
10 coming back and offering to change your testimony?
11     A.   Well, I think I said that I wasn't sure of
12 the dates, but, yes.
13     Q.   Is there anyone else with whom you need to
14 consult before providing us your testimony that's
15 supposed to be your recollections and your
16 recollection only?  Anyone else you need to talk to,
17 or can we get your testimony on the record as far as
18 you now?
19          MR. PIEDRA:  Objection.
20          THE WITNESS:  No.  It was just my
21 wife and I were in here.
22          MR. TAPPLY:  Well, I'm going to ask
23 you, sir, that during the breaks, you not consult --

Page 85

1  you can certainly consult with your counsel, but not
2  to consult with anyone else who's going to influence
3  your testimony.  And I'm going to reserve the right
4  to seek to question you at a later date, during a
5  separate deposition, as to all conversations you've
6  had with either counsel, or your wife, or anyone
7  else, should there be further testimonial changes
8  once you come back from breaks.
9           MR. PIEDRA:  You don't need to
10 respond to that.
11          MR. TAPPLY:  My rights are reserved
12 to that degree.
13     Q.   (By Mr. Tapply)  So, sir, now that we're
14 back, is there any other testimony that you feel you
15 need to change at this time?
16     A.   No.  That was basically it.
17     Q.   So, now -- so were you or were you not in
18 Lake Tahoe in January of 2019?
19     A.   In January of 2019, we were in -- skiing
20 around Gunstock Mountain in New Hampshire.
21     Q.   Let's go back to the beginning of the
22 2018-2019 ski season; okay?
23     A.   Okay.

GLEN FUERST                                        86..89

Page 86

1    Q.   Do you know, during that ski season, where
2    is the -- do you know where you skied, what
3    mountains you skied at prior to March of 2019?
4    A.   Yes.
5    Q.   Where had you skied prior to March of
6    2019?
7    A.   Skied in Gunstock in January.
8    Q.   How many days did you ski at Gunstock in
9    January?
10   A.   We skied at Gunstock two days.
11   Q.   Do you know when?
12   A.   It was a Monday and possibly a Thursday,
13   because it was a rainy week.
14   Q.   You testified earlier, sir, that your
15   normal routine each ski season was to go out to
16   Lake Tahoe during January of each year, and you've
17   done that for 26 years.
18       Why did you not go out to Lake Tahoe in
19   January of 2019, as you had in previous years?
20   A.   No, I said that availability -- when there
21   was availability.  We would go whenever there was
22   availability.  It could be in January or in
23   February.  That's what I said.

Page 87

1    Q.   Okay.  Well, the record is going to
2    reflect what you said or what you didn't say.
3        I'm asking you now, though -- would you
4    normally go out to Lake Tahoe in January, or would
5    it depend on when availability would allow?
6    A.   It would depend on availability, but we
7    would like to go out to Lake Tahoe in February.
8    Q.   Did you go out to Lake Tahoe at all during
9    the 2018-2019 ski season?
10   A.   You're talking -- when you say
11   "2018-2019," I look at it as 2019.
12       You're talking about the last month of
13   2018?
14   Q.   Sure.  Between December of 2018 and March
15   of 2019 -- during that time frame -- during those,
16   really, three months of December, January, and
17   February -- did you go out to Lake Tahoe?
18   A.   Yes.
19   Q.   When did you go out to Lake Tahoe that
20   year?
21   A.   We were out at Lake Tahoe in that year,
22   2019 -- was in February -- in February.
23   Q.   Did you go out with your wife in February

Page 88

1    of 2019?
2    A.   Yes.
3    Q.   Did you go out with anyone else to
4    Lake Tahoe besides your wife?
5    A.   No.
6    Q.   Did you meet up with any friends at
7    Lake Tahoe that year?
8    A.   No.
9    Q.   When you were out in Lake Tahoe in what is
10   now February of 2019, did you have any injuries?
11   A.   No.
12   Q.   Did your lower back limit your skiing at
13   all in Lake Tahoe in February of 2019?
14   A.   No.
15   Q.   Did your right hip limit your skiing at
16   all when you were out at Lake Tahoe in February of
17   2019?
18   A.   No.
19   Q.   And that's because you said after you had
20   the cortisone injection, between the cortisone and
21   exercises, your hip pain was resolved; is that
22   correct?
23   A.   Yes.

Page 89

1    Q.   You got back from Lake Tahoe in February
2    of 2019.
3        And then between the Lake Tahoe trip in
4    February and then your trip to Waterville, did you
5    ski anywhere else that year?
6    A.   No.  I don't recall any ski trips in
7    between them.
8    Q.   So let's talk about the trip up to
9    Waterville Valley in 2019.
10       That was in March of 2019; right?
11   A.   Yes.
12   Q.   When did you first get up to the Lincoln
13   area?
14   A.   We got up there on Sunday afternoon, which
15   would have been -- I don't know the date off the top
16   of my head, but we got there about four o'clock.
17   Q.   Did you stay in Lincoln the whole time?
18   A.   Yes.
19   Q.   And did you stay at the same facility in
20   Lincoln the entire time?
21   A.   Yes.
22   Q.   Where else had you skied that week before
23   going to Waterville?

GLEN FUERST                                          90..93

Page 90

1      A.   We skied at Bretton Woods.
2      Q.   Do you recall on which day you skied at
3  Bretton Woods?
4      A.   Monday.
5      Q.   And did you ski anywhere on Tuesday?
6      A.   No.
7      Q.   And then what day was it that you went to
8  Waterville?
9      A.   Wednesday.
10     Q.   And how come you skied no place on
11  Tuesday?
12     A.   Because the weather wasn't ideal and we
13  just didn't ski.
14     Q.   Sir, when you went to Waterville, you told
15  me that normally, you would drive up to the unload
16  area, unload all the gear.  Your wife would wait,
17  and then you would go park the car.
18          That's what you normally did at
19  Waterville; right?
20     A.   Yes.
21     Q.   And then when you would unload the gear,
22  would you leave it there at the unloading section,
23  or would you kind of walk it up the set of stairs up

Page 91

1  to kind of the base area and leave your gear there?
2      A.   We would leave the gear at the drop-off
3  station.
4      Q.   So going back to that week, you skied at
5  Bretton Woods on Monday.
6          Do you still have your ticket from Bretton
7  Woods?
8      A.   No.
9      Q.   Do you recall -- did Bretton Woods, at
10  that time, 2019 -- did they use the type of day
11  ticket that was kind of sticky on one side, and
12  you'd put it on the wicket and fold it over on your
13  jacket or your pants?
14     A.   You do not get something like that for a
15  senior pass.  They just give you a paper pass
16  because it's good for one day.
17     Q.   So at Bretton Woods, they gave you some
18  sort of a paper ticket?
19     A.   Yes.
20     Q.   Would you affix that paper ticket to your
21  jacket or pants anywhere?
22     A.   Sure, yes.
23     Q.   How did you do that?  How would you affix

Page 92

1  it to your jacket or pants?
2      A.   To the zipper on my right jacket.
3      Q.   And was it a sticky thing, or was it
4  something that you punch through with kind of like a
5  zip tie?
6      A.   It was kind of like a zip tie, yes.
7      Q.   And, now, so you didn't ski at Cannon that
8  week then; right?
9      A.   No.
10     Q.   Back then, do you know -- was Cannon using
11  the hard plastic tickets that you would stick in
12  your pocket, or the kind of paper tickets that you
13  have on the outside of your clothing?
14     A.   They would have been paper tickets.
15     Q.   Now, when you got your tickets for
16  Waterville, did you buy those online before going up
17  -- I'm sorry.  Strike that.
18          Before you went to Bretton Woods, did you
19  buy your tickets online?
20     A.   No.
21     Q.   So you bought them there when you got
22  there that day?
23     A.   Yes.

Page 93

1      Q.   And what about at Waterville that week --
2  did you buy your tickets in advance online, or there
3  when you got there?
4      A.   Night before, online.
5      Q.   Who did that transaction?  Was that you or
6  your wife?
7      A.   My wife.
8      Q.   Do you know what kind of a device she
9  used?
10     A.   I believe it was her iPad.
11     Q.   Now, were you there next to your wife or
12  with her when she was making the purchase, or did
13  you just let her take care of it?
14     A.   Well, I was there, but she takes care of
15  it, yes.
16     Q.   Have you ever bought tickets yourself at
17  Waterville, either in person or online?
18     A.   I don't remember.
19     Q.   The prior four or five times you'd been to
20  Waterville, do you know -- did you go up and buy
21  your tickets at the ticket window?  Did you buy them
22  online that day or the day before?  Or do you just
23  not remember for any of the days?

Page 94

1      A.   No, we normally would buy them at the
2 ticket window.  That was the first time we bought
3 them online -- was on March 13.
4      Q.   Do you happen to remember why you chose to
5 buy them online that time as opposed to the previous
6 occasions?
7      A.   Because Waterville Valley doesn't have any
8 kind of promotions.  So we went online and checked,
9 and they were selling certain tickets at -- a
10 certain number of tickets at a certain price, and
11 that's what we bought.
12     Q.   And you bought the senior tickets;
13 correct?
14     A.   Yes.
15     Q.   Now, when your wife went through the
16 online purchasing process, she would have filled out
17 your name and your information, and then credit card
18 information?
19     A.   Yes.  I believe so, yes.
20     Q.   And, obviously, she had authority to buy a
21 ticket for you?
22     A.   Of course, yes.
23     Q.   And she had authority to enter your

Page 95

1 personal information, and click through the
2 necessary pages to purchase the tickets?
3      A.   Yes.
4      Q.   At no point did you tell her, "You don't
5 have authority to purchase a ticket for me.  I want
6 to do it."  You didn't say anything like that;
7 right?
8      A.   No.
9      Q.   And during the ticket purchasing process,
10 in clicking through the various pages on the
11 website, she had authority to click through all
12 those pages and enter your information, and your
13 initials, if necessary -- she had authority to do
14 that for you?
15     A.   I don't know how many pages were involved
16 that you're talking about.  So to answer your
17 question, I can't -- you know, I don't know if it
18 was one page or 21 pages, but she had authority,
19 yes.
20     Q.   So whether it was one page or 21 pages --
21 whatever it was, she had authority to do it for you;
22 is that correct?
23     A.   Yes.

Page 96

1      Q.   Okay.  Good.  All right.  So she purchased
2 the tickets the night before.
3           Did you do any kind of planning for the
4 trip to Waterville, like look at the trail map and
5 strategize where you were going to ski that day?
6 Did you do anything like that the night before?
7      A.   I just showed her a trail map that I had
8 from previous years just to remind her of the
9 mountain again.  But, again, we don't make any
10 decisions where we're skiing until the morning we're
11 there, because we don't know what's been groomed and
12 what hasn't been groomed.
13     Q.   Sure.
14          Now, the trail map from Waterville Valley
15 that you showed your wife on the evening of March 12
16 -- was that a physical, paper trail map, or was it
17 something you showed her online?
18     A.   No, it was a -- one of the little pocket
19 trail maps you get from Waterville.
20     Q.   And that's something you had from the last
21 time you were there?
22     A.   Yes.  Probably, yes.
23     Q.   Do you still have that trail map -- the

Page 97

1 one that you showed your wife on March 12, 2019?
2      A.   I don't think so, no.
3      Q.   Where is it?
4      A.   In the garbage.
5      Q.   So that night, March 12 -- strike that.
6           So March 12, you said you did not --
7      A.   You broke up.  I didn't hear you.
8      Q.   On March 12 -- you said you did not ski
9 March 12; is that correct?
10     A.   Yes.
11     Q.   What did you do that day besides skiing?
12     A.   We drove around, sightseeing.
13     Q.   Do you recall where you went?
14     A.   No.  We stopped and had -- we were
15 probably in North Conway.
16     Q.   So you traveled from Lincoln over to
17 North Conway, and then returned to Lincoln later
18 that night?
19     A.   Yes, later that afternoon.
20     Q.   Sure.
21          Do you remember what sights you saw over
22 in North Conway on March 12?
23     A.   Just the different shops.  And we went to

GLEN FUERST                                98..101

Page 98

1  the outlets.
2       Q.   Did you have lunch over there?
3       A.   Yes.
4       Q.   Do you recall where you ate lunch?
5       A.   No.
6       Q.   Do you recall if you consumed any alcohol
7  at lunch that day?
8       A.   No.
9       Q.   You don't recall it, or you did not?
10      A.   I don't drink and drive, no.
11      Q.   So you were the one driving back to
12 Lincoln?
13      A.   Yes.
14      Q.   You said you got back to Lincoln that
15 afternoon.
16           Did you have dinner someplace that evening
17 in Lincoln?
18      A.   Yes.  We probably did, yes.
19      Q.   Do you remember where you had dinner in
20 Lincoln on March 12?
21      A.   Not exactly, no.
22      Q.   Do you remember what you had to eat?
23      A.   Not really, no, because we ate most of the

Page 99

1  time out in Lincoln.
2       Q.   Do you recall what you had to drink that
3  night, March 12?
4       A.   Probably a soda.
5       Q.   Do you normally enjoy beer, or wine, or
6  some other alcohol?
7       A.   If I'm driving, I don't drink beer.
8       Q.   Wherever you ate dinner that night, was it
9  someplace you had to drive back to whenever you were
10 staying, or were you able to walk back?
11      A.   No.  Well, it would have been a long walk,
12 but, no, we drove.
13      Q.   Do you remember where you were staying in
14 Lincoln in March of 2019?
15      A.   Yeah.  InnSeason at Pollard Brook.
16      Q.   So for the next day, you had already
17 purchased your tickets.
18           Do you know if you purchased your tickets
19 after you got home from dinner, or before you went
20 to dinner?
21      A.   No.  Probably after dinner, yes.
22      Q.   And then what about the next morning?
23 What time did you leave to go to Waterville the next

Page 100

1  day?
2       A.   Don't know, off the top of my head.
3       Q.   Who was driving?
4       A.   I was.
5       Q.   Did you have any breakfast that morning?
6       A.   Yes.  I had oatmeal.
7       Q.   Did you have that there in the hotel or
8  someplace else?
9       A.   No, I had it at InnSeason -- in the hotel.
10      Q.   And you left -- you don't recall what time
11 you left that morning?
12      A.   No.
13      Q.   Did you do anything that morning before
14 you left, like go to the gym, go for a run or a
15 walk, or anything like that?
16      A.   No.
17      Q.   Did you take any medications that morning?
18      A.   The only medication I take in the morning
19 is pills -- vitamins.
20      Q.   So you said vitamins -- is that what you
21 said?
22      A.   Vitamins.
23      Q.   Were you prescribed any medication back in

Page 101

1  March of 2019 which you were supposed to be taking
2  on any kind of a daily or weekly basis?
3       A.   Well, it would have been on a daily basis.
4  I probably was taking cholesterol pills.
5       Q.   And who prescribed you the cholesterol
6  medication?
7       A.   My family doctor.
8       Q.   How long had you been taking that
9  particular cholesterol medication?
10      A.   I have been taking it for quite a few
11 years.
12      Q.   Had there been any change in either the
13 medication or the dosage within the prior year?
14      A.   No.
15      Q.   Did that medication for cholesterol have
16 any side effects that you experienced?
17      A.   No.
18      Q.   All right.  So you left to go to
19 Waterville.
20           Do you know what time you got to
21 Waterville?
22      A.   We pulled in about 9:15.
23      Q.   And that's 9:15 a.m., obviously?

**Page 102**

1  A.  Yes.  On March 13, 2019.
2  Q.  Were you in your vehicle or a rental
3  vehicle?
4  A.  No, we were in our vehicle.
5  Q.  Which vehicle were you in?
6  A.  It was a Ford Escape.
7  Q.  Were you planning to rent any equipment at
8  Waterville that day?
9  A.  No.
10  Q.  You pulled in about 9:15.
11      And what was the weather like when you got
12  there?
13  A.  As far as what?  Temperature-wise?
14  Q.  Just whatever your recollection was of the
15  temperature.  Was it sunny?  Was it light?
16  A.  The sun was out.
17  Q.  Do you remember, actually, what the
18  temperature was when you got there?
19  A.  No.
20  Q.  Do you know if you were planning on it
21  being an extraordinarily warm or extraordinarily
22  cold day?
23  A.  No, but I dress in layers.  So whatever I

**Page 103**

1  wasn't going to need, I would leave in the car.
2  Q.  Now, when you got to Waterville, do you
3  know -- were you already wearing your ski clothing,
4  such as the pants and jacket?
5  A.  Pants, I was.  Jacket, I don't wear while
6  I'm driving, right.  Yes.
7  Q.  So you had, like, your ski pants or
8  warm-up pants -- you had those on?
9  A.  Yes.
10  Q.  You got to Waterville.  You think it's
11  about 9:15.
12      And you said it's a nice, sunny day?
13  A.  It was a sunny day, yes.
14  Q.  Do you know -- had it snowed at all the
15  night before?
16  A.  I don't know.  I wasn't in Waterville the
17  previous day or the day before that, so I don't
18  know.
19  Q.  Well, as you were driving to Waterville
20  that morning, did you notice whether there was
21  freshly fallen snow on the road or the roadside?
22  A.  Well, there was snow on the grounds on the
23  road, but I don't know when it snowed.

**Page 104**

1  Q.  Was the snow on the road sufficient that
2  you had to drive more slowly than you normally
3  would?
4  A.  I would drive slowly anyway, if I see
5  snow.
6  Q.  So as you've driving to Waterville that
7  day, there was snow on the side of the road and in
8  the road, and you drove slowly and more carefully
9  because of the snow; is that a fair statement?
10  A.  Yes.
11  Q.  Now, when you got to the drop-off area,
12  about how much traffic was there?
13  A.  When we pulled in, I think there wasn't a
14  car in front of us, so we were the only ones there
15  at that time.
16  Q.  And did you unload all of your equipment
17  yourself, or were there people there that help you
18  unload?
19  A.  No, we both unloaded our equipment.
20  Q.  And I presume you each unloaded a pair of
21  skis and a pair of poles; right?
22  A.  Right.  And ski boots.
23  Q.  Did you have ski bags that had boots, and

**Page 105**

1  clothes, and stuff in there?
2  A.  Yes.
3  Q.  Did you each unload a ski bag, or was
4  there just one ski bag that you unloaded?
5  A.  No, we both had ski bags.
6  Q.  And based on your prior testimony, you
7  said you normally would unload all the equipment
8  with your wife at the unload area, and then you
9  would go park; correct?
10  A.  Yes.
11  Q.  Do you know what time the lifts were
12  scheduled to open that day?
13  A.  No.  They usually open at 9:00.
14  Q.  So you'd gotten there a little bit after
15  the time the lifts open?
16  A.  Right.
17  Q.  Was it -- were you normally planning to
18  get there before the lifts open?
19  A.  It's not that important.  It's a weekday.
20  It's not a weekend.
21  Q.  Right.  All right.  So you unloaded
22  everything, and then you went and parked.
23      About how far away did you have to park?

GLEN FUERST                                  106..109

1      A.   I would say I parked about 50 yards.
2      Q.   And was it there up on the other upper
3   level, or did you have to drive down and around to
4   one of the lower levels?
5      A.   I drove down and around.
6      Q.   Now, when you parked the car, did you
7   carry anything from the car up to where your wife
8   was standing with the gear?
9      A.   No.
10     Q.   What were you wearing when you walked from
11  the car up to where your wife was standing?
12     A.   My jacket.  I put had my jacket on.
13     Q.   How many sets of stairs did you have to
14  ascend between where the car was parked and where
15  your wife was waiting with the equipment?
16     A.   None.  It was all walkway -- driveway.
17     Q.   It was.  All right.  So you get to where
18  your wife was waiting.
19          Now, had she -- while she was waiting for
20  you, had she gone and moved some of the gear, or was
21  she still standing in the same spot?
22     A.   Standing in the same spot.
23     Q.   What did you do after that?

1      A.   We decided to take the equipment, each of
2   us, and walk it up to the next ski rack, which would
3   have been below the start of walking up the stairs.
4   And we left it there and then we decided what we
5   were going to do from that point on.
6      Q.   So did you have to take more than one
7   trip, or was this all done in one trip?
8      A.   Done in one trip.
9      Q.   So from the spot where you unloaded the
10  gear from the car to the spot where you brought it
11  to the racks, how many stairs did you ascend in that
12  trip?
13     A.   I think it was one curb from the road.
14     Q.   Now, the location where you brought your
15  equipment, where you said that you were going to
16  stop and decide what to do -- describe what that
17  area looked like for me.
18     A.   It's a grassy area that had some covering
19  on it.  And that was basically it.
20     Q.   Were there any buildings in that area?
21     A.   Well, there was -- ski patrol was to the
22  left.  To the left of them was a ski shop where you
23  could buy clothing and so forth.  And straight up

1   ahead was the lodge.
2      Q.   So from the parking lot where you dropped
3   off your gear up to this spot where the racks were,
4   where there was a ski shop and the ski patrol and
5   the lodge -- between those two spots, the only stair
6   you ascended was the curb; is that your testimony?
7      A.   From the road, yes.
8      Q.   You don't remember a set of stairs going
9   from the road up to that base level -- you don't
10  remember any stairs there?
11     A.   I don't remember, no.
12     Q.   Once you got up to kind of that base area,
13  you said it was a grassy area with snow covering.
14          If the snow was covering the ground, how
15  do you know that it was a grassy area?
16     A.   Because it wasn't concrete.  Stepping on
17  it, my foot was giving into the snow on the grass.
18  So if it was --
19     Q.   I'm sorry.  Go ahead.
20     A.   No, I was done.
21     Q.   So where you were setting your skies in
22  the rack, you were standing on snow, and your foot
23  was going down into the grass below the snow; do I

1   have that correct?
2      A.   That's what it seemed like, yes.
3      Q.   Now, at that time, you were wearing on
4   your feet -- what?
5      A.   I had Salomon ski shoes -- snow shoes.
6      Q.   When you say "snow shoes," are you talking
7   about, like, the shoes that you strap onto your
8   feet to walk through deep snow?
9      A.   No, these are -- they have, like --
10  they're called -- well, you can walk on snow with
11  them.  Go ahead.
12     Q.   How long had you owned those shoes?
13     A.   I've had them probably about ten years.
14     Q.   Ten years as of today?  Or ten years as of
15  the time that this incident happened?
16     A.   I would say probably eight years then.
17     Q.   So as of the time of this incident, you've
18  had them for about eight years?
19     A.   Yes.
20     Q.   And are these the shoes you primarily wear
21  when you are -- during the wintertime?
22     A.   No.
23     Q.   When do you normally wear these shoes?

Page 110

1    A.    When I go skiing and I walk to the ski
2  mountain.
3    Q.    Do you use them any other time or for any
4  other reason?
5    A.    No.
6    Q.    Okay.  So you had on these Salomon snow
7  shoes, as you've described them.
8          You carry your skis and poles over to a
9  rack, and you put the skis and poles in the rack; is
10  that right?
11    A.    Yes.
12    Q.    And as you're doing that, you're standing
13  in the snow, and your feet have sunk down to the
14  grass?
15    A.    Well, you know, it felt like I sunk down.
16  I can't say that -- you're asking me if there was
17  concrete there.  I don't know if there was concrete.
18  It felt like grass, but I can't say, honestly, that
19  it was grass.
20    Q.    That's fine.  You said it was a grassy
21  area, sir, so I'm just trying to figure it out --
22  where that information came from.  So that's fine.
23          But, regardless, you were standing on snow

Page 111

1  which you kind of sunk down into as you were putting
2  the skis up; right?
3    A.    Yes.
4    Q.    So once you put the skis away, where did
5  you go from there?
6    A.    We talked, and my wife said she would take
7  the ski boots up to the lodge, get a table for us to
8  change into our ski equipment, and she would pick up
9  the lift tickets.  And what I was going to do was
10  take one pair of skis and one pole, and start
11  walking toward the steps.
12    Q.    Now, the steps -- where were they in
13  relation to where you put the skis on the rack?
14    A.    To my right side.
15    Q.    So did your wife, in fact, go inside to
16  put things down and pick up the tickets?
17    A.    Yes.  She walked through the door, yes.
18    Q.    Did she go through the door down on that
19  same floor level, or did she go up the stairs into
20  into the door?
21    A.    No.  She went on that floor level.
22    Q.    Now, if you got to Waterville and pulled
23  in at about 9:15, which is what you said earlier, by

Page 112

1  the time that you had this conversation with your
2  wife about her going in to pick up the tickets, and
3  you bringing the skis up to a higher level, what
4  time was it then?
5    A.    I would say in the area of 9:30.  Well,
6  no, because I pulled in -- I would say close to
7  quarter to.
8    Q.    So you pulled in about 9:15.  And by the
9  time you were having this conversation with your
10  wife at the ski rack, it was about 9:45; is that
11  true?
12    A.    Yes.  After parking the car, yes.
13    Q.    So about 9:45 a.m., your wife heads
14  inside.
15          And then what did you do?
16    A.    I proceeded to -- with a pair of skis and
17  poles in my hands, proceeded to walk up the stairs
18  to the right.
19    Q.    Do you know -- were you carrying your skis
20  or your wife's skis?
21    A.    I believe they were my skis.
22    Q.    And whose poles were you carrying?
23    A.    I believe mine.

Page 113

1    Q.    And you hadn't changed your shoes -- you
2  were still wearing the same shoes; right?
3    A.    Yes.
4    Q.    So walked off of the snow-covered area
5  at the ski racks and onto the stairs; is that right?
6    A.    Yes.
7    Q.    And the stairs that you went up -- of what
8  material were they constructed?
9    A.    I think they were concrete.
10    Q.    Now, when you were standing in the snow,
11  putting your skis in the rack and then taking your
12  skis off the rack to carry them up the stairs, did
13  you get snow down inside your shoes at all?
14    A.    No.
15    Q.    So you walk up the stairs -- these
16  concrete stairs.
17          And about how wide are the stairs?
18    A.    The whole staircase?
19    Q.    Yeah.  About how wide were they?
20    A.    From left to right, you're asking me?  I
21  don't know what you're asking me.
22    Q.    Okay.  Well, it's -- your observation is
23  you're going up the stairs.

GLEN FUERST                                    114..117

Page 114

1          Either from left to right or right to
2    left -- either one you choose -- about how wide were
3    the stairs?
4         A.   I would say the stairs were 12, possibly
5    15 feet wide.
6         Q.   And you said that you were -- you headed
7    up the stairs.
8              And how many sets of stairs did you go up?
9         A.   There was approximately -- to the right, I
10   went up, and there was approximately -- maybe ten
11   steps.
12        Q.   I didn't ask you what side you went on.
13             I asked you how many steps -- I asked you
14   how many sets of stairs were there.
15        A.   I said ten.  About ten, yes.
16        Q.   There were ten sets of stairs, or ten
17   stair steps?
18        A.   Ten stair steps.
19        Q.   But how many sets of stairs were there?
20        A.   Well, there were -- I don't know exactly.
21   I know there's definitely the one, but there might
22   have been two.  Yeah, there was two.
23        Q.   So you went up two sets of stairs?

Page 115

1         A.   No, I didn't say that.  I walked up one
2    set of stairs to the next ski rack.
3         Q.   So you went up one set of stairs.  And
4    then when you got to the top of that set of stairs,
5    there was another ski rack.
6              Where was that next ski rack?
7         A.   To the left side.
8         Q.   And that's the left as you're walking up
9    the stairs?
10        A.   Yes.  It would have been to the right
11   side.  No.
12             As I'm walking up, it would have been to
13   the left, yes.
14        Q.   So you walk up the first set of stairs,
15   which is about ten steps.  Then you walk out to the
16   rack.
17             And the rack is out in the snow; right?
18        A.   Yes.
19        Q.   And you stand there in the snow, and you
20   put your skis down and your poles down in that rack?
21             MR. PIEDRA:  Objection to form.
22             THE WITNESS:  Yes.
23        Q.   (By Mr. Tapply)  Well, I want to make sure

Page 116

1    I'm understanding what you're doing.
2              So you come up the concrete stairs, and
3    then you walk out to the rack, which is on the snow;
4    is that right?
5         A.   Yes.
6         Q.   And you set -- on the rack, you set your
7    skis and your poles; is that correct?
8         A.   Yes.
9         Q.   And then your plan was to go back down and
10   collect your wife's skis and poles and bring them up
11   to the same rack?
12        A.   That was the plan, yes.
13        Q.   So as you're standing there at this upper
14   ski rack, standing on the snow, you set your
15   equipment down.
16             And what did you do next?
17        A.   I turned around and proceeded to walk down
18   the steps, going back to my wife's skis.  And that's
19   when my -- I slipped and my foot went out from
20   underneath me.
21        Q.   When you turned from the ski rack, about
22   how far was the ski rack to the concrete stairs?
23        A.   Oh, I would say probably about maybe six,

Page 117

1    maybe ten feet.  No more than that.
2         Q.   Sure.
3              So you kind of crossed the six to ten feet
4    of snow from the rack to the concrete steps; right?
5         A.   Uh-huh.
6         Q.   Is that a "yes"?
7         A.   Yes.
8         Q.   And then you started descending those ten
9    steps?
10        A.   Down -- down, yes.
11        Q.   And about how many people -- were there
12   any other people kind of on the stairs at the same
13   time as you?
14        A.   There were people walking up -- sometimes
15   they were walking up in counts of two, three people.
16   And then sometimes there would be a break for
17   ten seconds, and then there were more people walking
18   up.
19        Q.   So did you have to stop there at the top
20   of the stairs and wait for people to come up before
21   you descended?
22        A.   No, because I started walking right down
23   when I saw that it was fairly safe to walk down.

1  Yes.
2      Q.    And when you started walking down the
3  stairs, did you walk down the left or the right-hand
4  side of the stairs?
5      A.    I walked down the middle of the stairs.
6      Q.    How come?
7            MR. PIEDRA:  Excuse me.  Can we just
8  clarify just from the vantage point when you're
9  talking about left and right, just so we don't get
10 confused on that, please?
11     Q.    (By Mr. Tapply)  Well, you said you walked
12 down the middle of the stairs, and we'll go back to
13 the left and the right in a second.
14           How come you chose the middle of the
15 stairs as opposed to some other part of the stairs?
16     A.    Because the snow was -- and this is as I'm
17 walking down the stairs, so this would be my right
18 side -- there was a pile of snow that was shoveled.
19 And it was shoveled from the left side -- from my
20 direction, and it looked like it was just pushed all
21 the way over to the right and left there.  And in
22 some cases, it was pushed up and over the walkway.
23     Q.    So as you're walking -- getting ready to

1  walk down the stairs, you observed snow on the
2  right-hand side of the stairs as you're facing down;
3  correct?
4      A.    Yes.
5      Q.    And so you chose to walk down the middle
6  of the stairs?
7      A.    I didn't hear.  You broke up.
8      Q.    Sure.
9            When you observed snow on the right-hand
10 side of the stairs, that's when you chose to walk
11 down the middle of the stairs; is that right?
12     A.    Yes.
13     Q.    And when you were -- you said that you
14 observed snow had been shoveled from the building
15 side of the stairs over to the outside of the
16 stairs; is that correct?
17     A.    Yes.
18     Q.    Did you see that that snow had been
19 shoveled -- did you observe that as you were walking
20 up the stairs, or just when you were walking down
21 the stairs, or both?
22     A.    No, I didn't notice it, because I was just
23 walking up the stairs and being cautious about

1  anybody in front of me.  I wanted to make sure he's
2  okay.
3      Q.    But my question is, you observed that snow
4  had been shoveled from one side of the stairs to the
5  other side.
6            When did you make that observation?
7      A.    When I turned around from -- after
8  dropping the skis and the poles off.
9      Q.    So you observed that snow had been
10 shoveled to the side and, in some cases, been
11 shoveled over the bank or the snowbank; right?
12     A.    Yes.
13     Q.    With that observation that snow had been
14 shoveled over the snowbank, did you make that
15 observation before you started descending the
16 stairs?
17     A.    I don't understand your question.
18     Q.    When did you make the observation that
19 snow had been shoveled over the snowbank?
20     A.    When I started walking towards the bottom
21 part, heading down towards the steps.
22     Q.    So when you were coming from the ski rack
23 towards the steps, that's when you saw that snow had

1  been shoveled over the snowbank?
2      A.    Not right away, because I was looking at
3  it to see if I could go down the same way I came up,
4  but there were people walking up on that side.
5      Q.    Was there anyone else in front of you that
6  was also going down the stairs?
7      A.    No.
8      Q.    So when you were -- going back a minute,
9  sir, when you were going up the stairs, you said
10 that these stairs were, I think, 12 to 14, maybe 15
11 feet wide.
12           When you were going up the stairs, did you
13 observe that there was some snow over on the
14 left-hand side, but no snow on the right-hand side
15 as you were going up?
16     A.    No.  I told you that before.  I wasn't
17 looking over there.  I was watching the person who
18 was in front of me walking up the stairs.
19     Q.    When you walked from the ski rack in the
20 snow over to the top of the stairs before you came
21 down, did you step on the snow on the side of the
22 stairs as you were coming down the stairs?
23     A.    On what side?

GLEN FUERST                                    122..125

1      Q.   As you were coming down the stairs, you
2  told me that it was clear to the left, and that the
3  snow had been shoveled off the stairs and off to the
4  right.
5      A.   Yes.
6      Q.   Did you walk through the snow that was in
7  the snowbank off to the right -- did you walk
8  through that snow as you were going down the stairs?
9      A.   Not at all, no.
10     Q.   After dropping off the skis, you turn
11 around.  You walk six to ten feet across the snow.
12 You get to the stairs to go down, and you choose to
13 walk down the middle of the steps; is that all
14 correct so far?
15     A.   I walked across the snow -- after I
16 dropped the skis off, I walked across the snow that
17 was alongside the -- what do you call it?  The ski
18 rack.  I didn't walk through any snow that was near
19 the pile of snow that was shoveled in that
20 direction.
21          I walked and I just happened to end up --
22 I was in the middle, I didn't see any snow there,
23 and that's why I walked down the middle.

1      Q.   Well, sir, you just told us a few minutes
2  ago that from the top of the stairs, you observed
3  that snow had been shoveled off the stairs and over
4  to the right and, in some instances, over the
5  snowbank.  That's what you said just a few minutes
6  ago.
7          But now you're telling me you didn't
8  observe any snow on the stairs?
9      A.   Not where I was in the middle, no.  That's
10 what I said.
11     Q.   Was there any snow on the stairs at all
12 that you observed from the top looking down?
13     A.   Yes, to the right.
14     Q.   And how far to the right was the snow?
15     A.   I would say it was probably a good
16 six feet -- five, six feet.
17     Q.   Five to six feet from where?  From where
18 you were standing?
19     A.   No, from the right -- going to the right
20 of the ski wall there, five, six feet in was piled
21 with snow.
22     Q.   I guess I'm confused.
23          If you're standing at the top of the

1  stairs, okay, on the left is the side of the lodge;
2  right?
3      A.   Correct.
4      Q.   And you said that the stairs were 12 to
5  15 feet wide; correct?
6      A.   About that, yeah.  I had no idea.  Yes.
7      Q.   How far from the left, from the wall over,
8  were the stairs clear before there started to be
9  snow on the stairs?
10     A.   I would say probably about seven to
11 eight feet.
12     Q.   So there's a seven- to eight-foot span
13 where there was no snow on the stairs; right?
14     A.   Yes.
15     Q.   Now, when you started walking down the
16 stairs, how far away were you from the wall on the
17 left?
18     A.   I would say I was probably about maybe
19 five feet away.
20     Q.   And then how far were you from the snow
21 that was over on the right-hand side?
22     A.   I was probably about maybe two to
23 three feet away, I thought.

1      Q.   Now, on the other side of the snowbank off
2  to the right, that's kind of still a skiable area
3  over there; correct?
4      A.   On the walkway?
5      Q.   No, off the walkway, off to the right
6  beyond the snowbank -- that's a skiable area; right?
7      A.   I guess so.  I don't know.
8      Q.   Well, have you ever skied down there at
9  the end of the day -- skied down that little area
10 over there?
11     A.   No.
12     Q.   Now, just going back from when you dropped
13 off your skis.
14          And then from that point, once you dropped
15 off your skis, did you do anything else -- stop and
16 do anything from the time you dropped them off until
17 the time you started down the stairs?
18     A.   I don't follow exactly what you're asking
19 me.  Just -- if you can repeat.
20     Q.   Absolutely, thank you.  And thanks for
21 letting me know.
22          And so you drop off your skis and poles at
23 the rack, where you're standing on the snow;

Page 126

1  correct?
2      A.  Yes.
3      Q.  And then you turned around to start to
4  head back down the stairs; is that right?
5      A.  Yes.
6      Q.  Did you go directly to the stairs, or did
7  you go into the lodge, or go someplace else?
8      A.  No, I went directly to the stairs.
9      Q.  Did you stop and call your wife, or check
10 your phone, or do anything between dropping off the
11 skis and walking to the stairs?
12     A.  No.
13     Q.  And if it was only six to ten feet of snow
14 between the rack and the stairs, how long did it
15 take you to walk from the rack to the stairs?
16     A.  Probably five seconds.  I don't know
17 exactly -- seconds.
18     Q.  So it's just a direct shot from the rack
19 to the stairs -- you just walked directly?
20     A.  Well, I didn't run towards the stairs, if
21 that's what you're asking me, no.
22     Q.  No, no.  I'm just making sure that there
23 wasn't any stopping.

Page 127

1          You just went directly from the rack to
2  the stairs?  That's all I'm trying to figure out.
3      A.  I did not stop at all.
4      Q.  So you started going down the stairs.
5          And then what happened?
6      A.  I walked down and -- I walked down a
7  couple of steps -- three, four, five.  I don't know.
8  I wasn't counting the steps.  But my right foot was
9  planted, and I brought my left foot down to come
10 down to get to the next step, and I felt my right
11 foot go right out from underneath me.  And I fell --
12 went up in the air a little bit and I fell on my
13 femur area -- right hip area.
14     Q.  Did you have anything in your hands?
15     A.  No.
16     Q.  You said that there were people coming up
17 the inside -- the left side of the stairs as you
18 were going down.
19         When you fell, did you hit any of those
20 people or bump into any of those people?
21     A.  No.
22     Q.  I'm sorry.
23         You said you think you took two or three

Page 128

1  steps down those stairs before you fell?
2      A.  I don't know exactly how many steps I
3  took.  It wasn't the first step.  It wasn't the
4  second step.  No, it was probably four to five
5  steps.
6      Q.  Before, when you dropped -- strike that.
7          Before, when you grabbed your skis and
8  poles and you went up the steps, was there anything
9  that was impeding your vision -- anything in your
10 way, in your field of vision that stopped you from
11 being able to see all the steps as you're walking up
12 them?
13     A.  No.
14     Q.  And you said that it was when you started
15 going up the steps that you observed they were about
16 12 to 15 feet wide; right?
17     A.  Well, I could see that walking up to the
18 steps -- how wide they were.
19         I wasn't sitting there walking up and
20 thinking, "Well, these steps are 12, 15 feet wide."
21 No.  I saw that before I started walking up.
22     Q.  Now, when you walked up the stairs, how
23 come you chose to walk on the right side as opposed

Page 129

1  to the middle or the left side?
2      A.  I always walk to the right side.  It's
3  like driving a car.  You drive one way on the right
4  side, and you drive the other way on the left side.
5  I assume the other side, you go down.
6      Q.  Well, you guys from Long Island -- I don't
7  know what side of the road you drive on, but -- I'm
8  just kidding.  All right.
9          So, sir, you said you felt your right foot
10 go out from underneath you, and you fell and landed
11 on your right hip.
12         Can you just walk me through what happened
13 next?
14     A.  Well, I was completely -- I know -- I
15 slipped.  And when I started -- when I got my wits
16 about me and I started looking around, I could see
17 that there was ice to -- where I was laying, on the
18 right side of me.  I couldn't move until later on,
19 but I didn't know what was on the other side of me.
20         And I just -- I know people were walking
21 up, and I wanted to get myself up.  I didn't want
22 anybody tripping over me.  I didn't know how far my
23 feet were across because I just -- when I hit the

Page 130

1 hip, my leg was straight out. And I just tried to
2 get up and tried to get off this ice, because I
3 didn't want to fall again, possibly.
4    Q.   Once you landed, do you know where on the
5 stairs you were when you landed?
6    A.   I was pretty much in the same spot I was
7 when I was walking down.
8    Q.   And you said that you had taken a few
9 steps -- probably more than two steps down when you
10 fell.
11    A.   Right.
12    Q.   So you would have landed at about --
13 somewhere between three and five steps down is where
14 you would have landed?
15    A.   In that area, yes. I don't know exactly.
16 Yes.
17    Q.   And you said you were walking down in the
18 middle of the stairs, and there was no snow there in
19 the middle stairs where you were walking down.
20         There was no snow there; right?
21    A.   No.
22    Q.   And when you fell and you landed, you
23 weren't laying in snow -- there was no snow where

Page 131

1 you were laying; correct?
2    A.   No. I basically fell where I was walking
3 down. And that's when I -- when I did get my
4 awareness about me, I saw that I had fallen on ice,
5 because there was ice --
6    Q.   Where was the ice?
7    A.   The ice was on the right side of me. So I
8 was laying right in the ice.
9    Q.   So which direction were you facing when
10 you observed this ice to your right?
11    A.   After the fall?
12    Q.   Yes.
13    A.   Probably facing a little -- my right foot
14 was facing a little to the left.
15    Q.   Well, if the -- if you're walking down the
16 stairs and the lodge is to your left, and that
17 skiable area is off to your right, once you fell and
18 you say you recovered and got your wits about you,
19 which direction were you facing?
20    A.   I was facing pretty much down center,
21 maybe just a touch to the left of that.
22    Q.   Okay. Well, which direction were you
23 looking when you got your wits about you?

Page 132

1    A.   What do you mean "what direction"? I
2 don't follow that.
3    Q.   So you said that you got your wits about
4 you and you observed ice. I'm trying to figure out
5 where the ice was.
6         Were you looking out towards the skiable
7 area and saw the ice down there? Were you looking
8 back towards the building and saw ice there? Were
9 you looking back up the stairs and saw ice, or
10 looking down the stairs and saw ice?
11    A.   I was walking straight down and I was
12 looking straight down.
13    Q.   Great.
14         But once you fell -- you told me a minute
15 ago that once you fell and then you kind of got your
16 wits about you and collected yourself, that's when
17 you observed ice. I'm just trying to figure out
18 which direction you were looking and you saw ice.
19    A.   I was looking straight ahead.
20    Q.   Straight head in which direction, though?
21 I mean, were you looking towards the parking lot, up
22 the mountain, at the lodge --
23    A.   If I'm walking in the middle of the

Page 133

1 walkway, I'm looking straight ahead in the middle.
2 I'm not looking to the left where the other railing
3 would be, or to the right where the lodge -- where
4 the lodge would be to the left, or whatever -- the
5 ski patrol to the right. I was looking right down
6 the middle.
7    Q.   That's when you were walking.
8         But then you fell?
9    A.   Yes.
10    Q.   Did you observe the ice before you fell?
11    A.   No.
12    Q.   So once you fell -- it was only after you
13 fell that you observed the ice; correct?
14    A.   Yes.
15    Q.   Were you laying down when you first
16 observed the ice, or had you gotten up?
17    A.   No, I was laying down.
18    Q.   Were you laying down with your right hip
19 on the stairs?
20    A.   Yes.
21    Q.   And your right shoulder was on the stairs?
22    A.   No. My right shoulder was up in the air,
23 so I must have broken my fall with my right hand.

## Page 134

1    Q.    When you observed the ice, you were still
2    laying down; correct?
3    A.    Yes.
4    Q.    When you observed the ice, your right hip
5    -- your right side was still in contact with the
6    stairs; is that correct?
7    A.    Yes.
8    Q.    And your torso was facing kind of in the
9    same direction as your hips, which means you were
10   looking straight ahead when you observed the ice;
11   correct?
12   A.    Yes.
13   Q.    So if you're laying on your right side on
14   the stairs, your head would have been kind of facing
15   up towards the mountain, and your feet would have
16   been down towards the parking lot; correct?
17   A.    My feet were facing the parking lot, yes.
18   Q.    So if you're laying on your right-hand
19   side, behind you -- kind of behind your back, and
20   shoulders, and buttocks -- that would have been the
21   building way back there; right?
22   A.    No.  That probably would have been where
23   the chairlift is -- my back.

## Page 135

1    Q.    So where your back was was the chairlift.
2    If you were looking straight out in front
3    of you as you're laying on your right side on the
4    stairs -- straight out in front of you, what were
5    you seeing?
6    A.    I could see parked cars.
7    Q.    And you said you observed ice.
8    Where did you observe the ice as you were
9    laying with your right side on the stairs, looking
10   out, observing parked cars?
11   A.    I saw it on my right side, as my hand was
12   in the ice, along with my hip.
13   Q.    How far away were you from the snowbank
14   off on the side of the stairs when you were laying
15   there on the steps?
16   A.    I would say probably four feet.
17   Q.    Could you reach out and touch the
18   snowbank?
19   A.    No.
20   Q.    What did you do next?
21   A.    I tried to get up.
22   Q.    Were you able to get up?
23   A.    Yes.  In a lot of pain, but I did get up.

## Page 136

1    And I worked my way up so I was off that step,
2    because I knew there was ice on that step.  So I
3    worked my way up, and I got my buttocks area on the
4    next step, and then the next step after that.  And
5    that's when I got up.
6    Q.    Did anybody offer to help you?
7    A.    Yes.
8    Q.    Did you accept the help of anyone?
9    A.    No.
10   Q.    How come?
11   A.    Because I didn't think, number one, it was
12   as bad as it turned out to be.  I thought I might
13   have just bruised it.  But I didn't want anybody
14   picking me up because I don't know who he is.
15   Q.    So you work yourself up to the top of the
16   stairs and then you stand up.  And when you stood
17   up -- strike that.
18   When you worked yourself up those stairs,
19   you were still on the concrete -- you weren't on the
20   snow; right?
21   A.    Yeah.  I worked up, maybe, in two steps.
22   That was it.  I was still basically on the stairway.
23   Q.    So you were on the stairway.

## Page 137

1    And there was no snow in that part of the
2    stairway; right -- the snow was off to the side, you
3    said, at least four feet away?
4    A.    It was off to my right, yes.
5    Q.    So you stand up.
6    And then what did you do next?
7    A.    I noticed that there was someone who
8    looked at me -- was looking at me trying to get up.
9    She was in the balcony overhead.  And she asked me
10   if I was okay.
11   And I says, "I don't know."  I said to
12   her, "I think I slipped on ice."  And she didn't say
13   anything.
14   She just asked me if I -- "do you need a
15   chair to sit down?  Do you need an ibuprofen for the
16   pain?"
17   And I said, "Well, if you can just let my
18   wife know that I fell, she's in the lodge area at a
19   table."  And I just told her what jacket she was
20   wearing.  And she went in and got my wife.
21   Q.    And the woman you observed kind of up on
22   the deck -- was that a Waterville Valley employee,
23   or just a patron?

Page 138

1      A.   No, I believe she was a -- she belonged --
2  there was a senior ski club there that they called
3  the Silver Streakers, and I believe she was one of
4  them.
5      Q.   Why do you think that?
6      A.   Because she told me.
7      Q.   So did she go in and get your wife?
8      A.   Yes.  I believe so, yes.
9      Q.   And did she come back out again?
10     A.   I don't remember seeing her, but I did see
11 a chair that came out.  So I don't know -- I'm
12 assuming -- I don't know if my wife brought it out
13 or the woman brought it out, but I don't remember
14 seeing her anymore after that.
15     Q.   When did this woman tell you that she was
16 a member of the Silver Streakers?
17     A.   Because I asked -- well, just when we were
18 talking about -- I asked her if she saw --
19          "Did you see me fall?"
20          And she said, "No."  And she said, "I
21 didn't see anything.  I just saw you trying to get
22 up."  And so that's when she just talked about being
23 a member of the Silver Streakers here.

Page 139

1      Q.   About how long of a conversation did you
2  have with this woman?
3      A.   I don't remember.  Was it long?  No.
4      Q.   But it was long enough to talk about what
5  happened, and describe your wife, and for her to
6  tell you she was a member of the Silver Streakers --
7  it was long enough for all that to happen?
8      A.   Probably, yeah.  I mean, I was in shock,
9  so I don't really know time as a factor as, you
10 know, how long things took.  I could tell you what
11 happened, but I couldn't tell you how long it took
12 to happen.
13     Q.   During the time that you were talking to
14 this woman who was standing up on the balcony, did
15 you warn any other patrons?
16          So, say, "Hey, that's a slippery step.  Be
17 careful.  Watch out for the ice."  Did you
18 say anything like that to anybody?
19     A.   No.
20          Yes, I did.  I did.
21     Q.   Who did you warn?
22     A.   It was a young kid.  He had to be maybe
23 four years old, in boots and ski gear.  And he just

Page 140

1  flew down the mountain where I fell.
2          And I told him, "Be careful."  And he kind
3  of, like, looked at me like I had two heads and just
4  took off.
5      Q.   Let me back up here.
6          So you've now gotten yourself back up to
7  the top of the stairs.  You're standing there.
8  You're in this conversation with a woman who
9  identifies herself as a member of the Silver
10 Streakers.
11          And while you're doing that, a
12 four-year-old skies by --
13     A.   I didn't say "skies."  I said he walked
14 by.  He ran down the stairs.
15     Q.   Oh.
16          So a four-year-old went past you and ran
17 down the stairs?
18     A.   Yes.
19     Q.   And you told him -- that young
20 four-year-old boy -- you told him to watch out, the
21 stairs were slippery?
22     A.   Yes.
23     Q.   Did you tell him that before or after he

Page 141

1  ran down the stairs?
2      A.   Well, I tried telling him as he was
3  running down the stairs.  I don't know if he even
4  heard me.
5      Q.   Well, I thought you told me that he turned
6  around and looked at you like you had two heads?
7      A.   Yeah.  Well, I don't know why -- yeah.  I
8  don't know if he thought I was a stranger or what.
9      Q.   So the little boy who you yelled, "Watch
10 out for the stairs" -- well, did you yell?  Or did
11 you just tell him as he was passing by you?
12     A.   No, I just, you know, said something to
13 him.
14          I said, "Be careful," and that was the
15 extent of it.
16     Q.   Did you say, "Be careful," as he was
17 passing by you, or as he was already going down the
18 stairs?
19     A.   I really don't remember the whole
20 situation.
21     Q.   Well, at what point did he turn around and
22 look at you like you had two heads?  Is it before or
23 after he descended the stairs?

## Page 142

1    A.    He was long gone.

2    Q.    Well, how do you know he turned around and

3 looked at you like you had two heads, if he was long

4 gone?  I guess I'm confused.

5    A.    He was down at the bottom of the steps.

6    Q.    So he ran down the steps.

7          And he didn't fall; right -- he didn't

8 have any problems?

9    A.    No.

10   Q.    So the little boy -- four-year-old boy who

11 ran down the steps -- you said, "Be careful."

12         And once he got to the bottom of the

13 steps, he turned around and looked back up at you

14 and looked at you like you had two heads?

15   A.    Yes.  He just wasn't going to talk to me,

16 and that was the extent of it.  Yes.

17   Q.    And -- I'm sorry.

18         What was he wearing, again?

19   A.    Ski equipment -- ski boots and ski

20 jackets.

21   Q.    So he didn't have skis on, but he had

22 everything else on?

23   A.    No, he had just boots on.

## Page 143

1    Q.    And in his ski boots, he descended those

2 stairs without any trouble; right?

3    A.    Yes.

4    Q.    As you were going up the stairs earlier

5 that day, were there people coming down the stairs

6 at the same time you were going up?

7    A.    I don't remember seeing anybody, no.

8    Q.    As you started going down the stairs, was

9 there anybody in front of you also going down the

10 stairs?

11   A.    No.

12   Q.    So you have the conversation with the

13 woman who's in the Silver Streakers.

14         And by the way, what does she look like?

15   A.    She was probably in her 70s, and gray

16 hair.  And that was it.

17   Q.    Do you know what race or ethnicity she

18 was?

19   A.    She was white.

20   Q.    Do you know what she was wearing?

21   A.    No.

22   Q.    So you have this conversation with the

23 woman in the Silver Streakers.  The four-year-old

## Page 144

1 has come and gone.

2          And what happens next?

3    A.    Well, I notice that someone comes out and

4 starts putting treatment down on the concrete walk

5 stairway up to the mountain.

6    Q.    So, Mr. Fuerst, at some point, did your

7 wife come out from the lodge?

8    A.    Yes.

9    Q.    You also mention that at some point,

10 someone brought a chair out for you.

11   A.    There was a chair there.  She asked me if

12 I needed a chair.  And I assumed that she brought

13 it, but I didn't see her bring it out.

14   Q.    Which arrived first -- your wife or the

15 chair?

16   A.    Probably my wife.

17   Q.    Now, you indicated a moment ago that

18 someone came out and started putting some treatment

19 down on the stairs; is that what I heard you say?

20   A.    Rock salt, ice melt, yes.

21   Q.    When did you see that happen?

22   A.    That happened probably three to four -- a

23 couple of minutes after that woman walked in to talk

## Page 145

1 to my wife.

2    Q.    Did the person come out to start putting

3 rock salt or something on the stairs before or after

4 your wife got out there?

5    A.    She was just -- she got there just before

6 my wife got out.

7    Q.    And the person who was putting the rock

8 salt or whatever it was down on the stairs -- was it

9 a man or a woman?

10   A.    It was a woman.

11   Q.    Do you know what she was wearing?

12   A.    She had a ski jacket on with the

13 Waterville Valley logo on it.

14   Q.    Now, you're familiar with the outfits that

15 ski patrol or first aid use out on the mountain;

16 right?

17   A.    Yes.

18   Q.    They typically wear a jacket.  A lot of

19 times, it's red.  It usually has a big cross on the

20 back.

21   A.    Right.  This wasn't a red jacket, no.

22   Q.    It wasn't.  Okay.

23         So this was a woman, but wearing

Page 146

1    Waterville Valley attire; right?
2        A.    Yes.
3        Q.    And what about her attire signified to you
4    that she was a Waterville Valley employee?
5        A.    Because she had a Waterville tag on her
6    jacket.
7        Q.    About how old of a woman was she?
8        A.    I would say she was probably in her late
9    teens, maybe early, early 20s.
10       Q.    And what race or ethnicity was she?
11       A.    White female.
12       Q.    Do you know any distinguishing
13   characteristics such as long hair, or short hair, or
14   anything like that --
15       A.    No.
16       Q.    -- that you were able to see?
17       A.    No.
18       Q.    Did she have any scars, marks, or tattoos
19   that you were able to see?
20       A.    No.
21       Q.    Any piercings you were able to observe?
22       A.    No.
23       Q.    And she came out.

Page 147

1            You said that she put down some sort of a
2    rock salt or ice melt type of material; right?
3        A.    Yes.  Well, she was throwing it on the
4    walkways on -- yeah.
5        Q.    What was she using to throw it on the
6    walkways?
7        A.    She had a little scooper, I believe.
8        Q.    Was she carrying a bucket, or a bag, or
9    something?
10       A.    Carrying a bucket, I believe.
11       Q.    And you were able to observe this as you
12   were standing at the top of the stairs, waiting for
13   your wife to come out?
14       A.    It wasn't that far away.
15       Q.    Well, that wasn't my question.
16            My question is just whether you were able
17   to observe it from where you were standing.
18       A.    Yes.
19       Q.    Did you have any conversation with this
20   woman?
21       A.    No.
22       Q.    So you're waiting for your wife.  Your
23   wife comes out.

Page 148

1            What happens then?
2        A.    She asked me how I'm feeling and so forth.
3    And shortly -- very quickly after she came out, ski
4    patrol came over.
5        Q.    How many ski patrol members came over?
6        A.    I think there was only one to start.
7        Q.    Was it a man or a woman?
8        A.    It was a woman.
9        Q.    About how old was she?
10       A.    I would say, again, very late teens, maybe
11   somewhere in her 20s.
12       Q.    What did she look like?
13       A.    Long-ish -- well, she had a hat on, so I
14   couldn't really tell the color of her hair or
15   anything, but -- I really don't remember exactly
16   what she looked like.
17       Q.    She came over.
18            And what happened when she got there?
19       A.    She asked me how I was feeling.
20            I says, "I fell on some ice, and I fell on
21   my right hip."
22       Q.    Did she ask you how a fall occurred?
23       A.    No.  If she did, I don't remember.  My

Page 149

1    wife might have mentioned it to her, but she didn't
2    talk so much to me at that point on.
3        Q.    But you told her that -- how you had
4    fallen -- you told her that; right?
5        A.    Yes.
6        Q.    And did you tell her that you were waiting
7    at the top of the stairs, you didn't want to wait
8    for all the people coming up the stairs, so you
9    walked out into the snow on the right side and down
10   the stairs?  Did you tell her that?
11       A.    No.  That never came up in the
12   conversation, no.
13       Q.    It didn't.  Okay.
14            And you remember every word that was
15   conversed between you and the member of first aid --
16   do you remember every word that was said?
17       A.    No.
18       Q.    So you don't remember every word.  Good.
19            So how long -- at the point that the first
20   aid came over, were you already sitting in the
21   chair, or were you still standing?
22       A.    No, I was probably sitting in the chair.
23   And when I saw them come over, I probably stood up.

1    Q.   Now, did you stay there at the stairs, or
2  did you go down to first aid?
3    A.   No.  I was talking to them at the stairs,
4  and they asked me if I would be able to walk over.
5         And I says, "No.  I can't put any weight
6  on my right side."  So they were going to bring a
7  sled over.
8    Q.   And did they bring a sled over?
9    A.   Yes.
10   Q.   Did you take the sled?
11   A.   Yes.
12   Q.   You remember taking the sled over from the
13 stairs to first aid?
14   A.   Yes.
15   Q.   You do.
16        What do you remember about taking the sled
17 over to first aid from the stairs?
18   A.   The pain I was in and so forth, yes.
19   Q.   Did you sit down or lay down in the sled?
20   A.   I laid down.  No, I'm sorry.  I think I --
21 I don't remember laying down.  I think I sat down
22 somewhat.  I'm not 100 percent sure.
23   Q.   You think you sat down somewhat in the

1  sled?
2    A.   Yes.
3    Q.   Isn't it possible, sir, that you actually
4  didn't take a sled over -- you refused the sled and
5  instead, the two first aid people kind of stood on
6  either side of you, and you used them as crutches to
7  get over to the first aid?
8         Don't you remember that happening?
9    A.   No.
10   Q.   I just heard someone else say, "No."
11        Is your wife there in the room with you
12 right now?
13   A.   No.
14   Q.   Well, when I asked the question, someone
15 said, "No," and then you shook your head and said,
16 "No."
17        Whose voice was that?
18   A.   I don't know.
19   Q.   So your memory -- your distinct memory is
20 that you sat in the sled and were transported from
21 the stairs to first aid in the sled; that is your
22 memory?
23   A.   Yes.  I can't -- I was in so much pain, I

1  can't honestly say to you that I was walked over
2  there by two other people.
3    Q.   So now you're not sure if you took a sled
4  or if you were walking?
5    A.   No, what I'm saying is you're saying that
6  two people walked me over.  And I don't remember
7  that, because I couldn't put any weight on my right
8  side.  So how could I walk over there?
9    Q.   So your memory that you took a -- that you
10 were put in a sled and taken over by a sled -- is
11 that memory just as clear as your memory walking
12 down the stairs?
13   A.   No.  No, no at all.
14   Q.   Which memory is more clear -- walking down
15 the stairs and falling, or taking the sled over to
16 first aid?
17   A.   Walking down the stairs.  I wasn't in any
18 pain walking down the stairs.
19   Q.   So your memory of walking down the stairs
20 is clearer, but you meant that your memory of going
21 over to first aid is unclear; is that a fair
22 statement?
23   A.   Yes.  Because of the pain I was in, yes.

1    Q.   When you were having the conversation with
2  first aid there at the top of the stairs, was it at
3  that point where you first told them that you were
4  going to sue the mountain?  Or did you first tell
5  them that later?
6    A.   I didn't say that at all.
7    Q.   What about your wife?  Did you hear your
8  wife say that there at the top of the stairs?
9    A.   Not at all.
10   Q.   So you were taken down to first aid.
11        And then what happened from there?
12   A.   They must have called the emergency patrol
13 -- emergency technicians -- EMTs, because they were
14 there quickly.  And he just checked me over and he
15 -- he didn't think it was broken, touching me here,
16 and touching this and that.
17        He said, "It's probably just a bad
18 bruise."
19   Q.   And were you offered to take the ambulance
20 to Speare Memorial Hospital?
21   A.   Yes.
22   Q.   Did you accept that offer or decline that
23 offer?

## Page 154

1    A.   No, we declined it.

2    Q.   How come?

3    A.   Because when he told me that he doesn't

4  think it's broken, my wife is not familiar with the

5  area, so I drove with her.  And we just...

6    Q.   Now, when you were taken from the stairs

7  down to first aid, was your wife with you?

8    A.   Yes.

9    Q.   And did she stay with you the entire time

10 in first aid?

11   A.   Yes.

12   Q.   And then from first aid to your car, did

13 the EMTs and first aid people help you from the

14 first aid building to your car?

15   A.   I don't believe so.  To be honest, no, I

16 don't know.  I kind of remembered the car was right

17 there.  So I got off the table and I sort of just,

18 like, limped over to it.

19        (Pre-marked Deposition Exhibit Number 1

20        introduced.)

21   Q.   (By Mr. Tapply)  Sir, I'm going to share

22 my screen with you here in just a second here.  I'm

23 going to show you what I've premarked as Exhibit

## Page 155

1  Number 1 and ask you -- let's sort of zoom in a

2  little bit.  So what I've marked as Exhibit Number 1

3  is a printout of the purchase information.

4        It indicates on a couple different pages

5  here -- I'm sorry -- on page two of Exhibit

6  Number 1, it says that a transaction was conducted

7  on March 12 of 2019.  The customer was Glen Fuerst.

8  And a senior one-day ticket was purchased for

9  Waterville for a price of $29.

10        Is that your recollection of the amount

11 that was paid for your ticket on March 12?

12   A.   Yes, in that area.  It was what I would

13 consider paying, being a senior, yes.

14   Q.   Now, it also says down here that the

15 payment method -- it says "VI," which I'm going to

16 guess is "Visa," with a credit card number starting

17 at "9416."

18        Sir, do you know -- do you have a Visa

19 credit card beginning with those four numbers?

20   A.   That's the last four numbers.

21   Q.   Oh, the last four?  Okay.

22   A.   Yes.

23   Q.   And then down a little bit, down below at

## Page 156

1  the bottom of page two of Exhibit 1, it says the

2  transaction was conducted on March 12, 2019, it

3  looks like just at about 8:20 p.m.

4        And, sir, that's consistent with your

5  recollection that you think you bought the tickets

6  after you had gone to dinner that night?

7    A.   I believe so, yes.

8        It says "8:20"?

9    Q.   It does.  I'll zoom in a little bit more

10 so that you can see it here.  Down here -- it's kind

11 of, right now, about in the middle of the page.

12        It says "Transaction date."

13   A.   Yes.

14   Q.   Do you see where it says, "March 12, 2019,

15 at 8:20:47 seconds"?

16   A.   Yes.

17   Q.   And that's consistent with your

18 recollection of about when you bought the tickets?

19   A.   Yeah.  Well, I think I said it was

20 probably after dinner.

21   Q.   Now, you did not go in yourself and pick

22 up the tickets -- your wife did that; right?

23   A.   Yes.

## Page 157

1    Q.   Now, before you got to the stairs, did you

2  observe anywhere any signage for Waterville

3  Valley -- perhaps some trail signs; did you see

4  anything like that?

5    A.   What do you mean, "trail signs"?

6    Q.   Well, you got out of the car.  You walked

7  to put your skis down.  And you had the conversation

8  with your wife about where she was going to go and

9  where you were going to do.  And then you took your

10 skis and poles and went up the stairs.

11        During any point in that course of events,

12 did you observe any signage there at Waterville?

13   A.   No.

14   Q.   Did you take the opportunity to read any

15 of the postings or signs that were there in that

16 area?

17   A.   Not while I was walking up with the skis,

18 no.

19   Q.   At any point during your visit to

20 Waterville Valley that day, did you view any of the

21 signage that was posted anywhere?

22   A.   I wasn't inside.  So I would say outside,

23 I saw nothing.

GLEN FUERST                                    158..161

Page 158

1    Q.   And kind of a silly question, but you were
2  there at Waterville to go skiing that day; right?
3    A.   Yes.
4    Q.   And kind of as soon as you got there, you
5  dropped yourself off, kind of everything you were
6  doing was as part of the ski day.  I mean, you were
7  there to drop off stuff, and you were moving your
8  skis up there so that you guys could get to the lift
9  and go skiing; right?
10           MR. PIEDRA:  Objection to form.
11    Q.   (By Mr. Tapply)  You can answer the
12  question.  It's okay.
13    A.   Can I?
14           MR. PIEDRA:  You can answer it, if
15  you understand it.
16           THE WITNESS:  No, you can rephrase
17  it.
18           MR. TAPPLY:  I was just saying,
19  that's a perfect indication from your counsel to
20  tell me that you don't understand the question,
21  which is fine, because I only want you to answer
22  questions that you understand.
23    Q.   (By Mr. Tapply)  So when you got to the

Page 159

1  mountain, you unloaded all your ski equipment as the
2  first step in your ski day; right?
3    A.   First step in our ski day -- for that day,
4  yes.
5    Q.   For that day, yeah.  I guess some would
6  say driving to the mountain was part of your ski
7  day, but for you, getting to Waterville, and
8  unloading your equipment, and starting to move your
9  equipment up the mountain -- up the stairs was the
10  beginning of your ski day then; right?
11    A.   Yes.
12    Q.   Now, after you parked in the drop-off
13  area, you utilized the kind of -- Waterville's
14  drop-off area so you didn't have to carry your gear
15  all the way from where you parked; right?
16    A.   Yes.
17    Q.   And that's kind of a -- it's easier for
18  one, when they get to Waterville, to stop in the
19  unload area, take advantage of that facility, and
20  drop off your gear -- it's easier to do that than to
21  park and lug all your gear up from your parking
22  spot; correct?
23           MR. PIEDRA:  Objection to form.

Page 160

1           THE WITNESS:  Yes.
2    Q.   (By Mr. Tapply)  And some mountains have
3  that service, and some mountains don't have that
4  service; is that your experience?
5    A.   Yes.
6    Q.   So part of Waterville's service, anyway,
7  was giving you a spot to pull over and unload your
8  gear, so you didn't have to carry it up from the
9  parking lot; right?
10    A.   Well, me and anyone else who was skiing at
11  Waterville that day, yes.
12    Q.   Sure.  Okay.
13           After you unloaded your gear, did you use
14  the restroom at all before you started carrying your
15  stuff up the stairs?
16    A.   No.
17           (Pre-marked Deposition Exhibit Number 3
18           introduced.)
19    Q.   (By Mr. Tapply)  I'm going to show you
20  what I've marked as Exhibit Number 3 here.  Exhibit
21  Number 3 is a sign -- I want to make sure you can
22  see it.
23           You're able to see that, at the bottom of

Page 161

1  the sign, it says "Waterville Valley Resort"?
2    A.   Yes.
3    Q.   And at the top, there's a stop sign and it
4  says, "Please read carefully"; do you see that?
5    A.   Where is this sign?
6    Q.   Well, hopefully, it's right in front of
7  you on the screen.
8    A.   I'm talking about at Waterville Valley.
9    Q.   Well, I'm just asking right now, sir, do
10  you see where it says "Stop" at the top, and it
11  says, "Please read carefully" -- you can see that
12  now; right?
13    A.   I see a sign in front of me, yes.  I don't
14  know where the sign came from.
15           It says "Waterville Valley," but -- I see
16  a sign, yes.
17    Q.   Okay.  Good.  That's all I'm asking -- is
18  if you're able to see the exhibit that's there in
19  front of you, Exhibit Number 3.
20           Do you recall seeing this sign anywhere at
21  Waterville on any of your visits?
22    A.   Yes.
23    Q.   Where do you recall seeing this sign?

Page 162

1    A.    You usually see them when you pick up your
2  lift ticket.
3       Q.    And do you recall seeing this sign at the
4  ticket window at Waterville during the prior four or
5  five visits to the mountain?
6       A.    I don't remember.
7       Q.    But you're familiar that you normally see
8  this kind of a sign at ski areas when you pick up
9  your tickets at the ticket booth, though; right?
10      A.    Yes.
11      Q.    And you agree with me that most mountains
12 have a sign like this posted at their ticket windows
13 when you've picked up your tickets during previous
14 ski days?
15      A.    Yes.  Some a little different, but, yes.
16      Q.    When you say it's all a little different,
17 you mean each mountain might use a little bit
18 different language on their signs?
19      A.    Correct.  Yes.
20      Q.    But you're familiar that the signs that
21 says something like "Liability release" or "waiver"
22 -- that kind of signage, you've seen at most ski
23 areas?

Page 163

1    A.    Yes.
2       (Pre-marked Deposition Exhibit Number 2
3       introduced.)
4       Q.    (By Mr. Tapply)  Going back up to Exhibit
5  Number 2 -- just a second to rotate this for you,
6  and I'll zoom in a little bit.
7       Now, sir, I'll represent that this is one
8  of the ticket windows at Waterville Valley; do you
9  recognize this ticket window?
10      A.    No.
11      Q.    Now, if you look, you can see some of the
12 reflections out from the window -- the area kind of
13 behind the position of the person taking the
14 picture.
15      Looking in the reflections and seeing the
16 area and then seeing these windows, do you recognize
17 this as one of the ticket windows at Waterville?
18      A.    It could be, but I didn't see it, no.
19      Q.    And you see -- when I zoom in, you can see
20 that the sign I showed you that's marked as Exhibit
21 Number 3 -- you can see that sign right here in the
22 middle of the window on Exhibit Number 2.
23      You see that sign; right?

Page 164

1    A.    I see a sign, yes.
2       Q.    And it's the same sign I showed you that
3  says "Liability release"?
4       A.    Yes.
5       Q.    In the previous times that you've picked
6  up your tickets at Waterville Valley -- picked up
7  your senior ticket, you recall seeing this sign on
8  those occasions; right?
9       A.    I don't remember, no.
10      Q.    But you do recall -- basically every other
11 ski area you've been to, you recall seeing signage
12 like this at the ticket windows?
13      A.    Yes.  I know what they are, but -- yes.  I
14 wouldn't say everyone, but -- every mountain, but,
15 yes, I've seen them.
16      Q.    When you say you know what they are, you
17 mean you know that they are a liability release and
18 a waiver; right?
19      A.    Yes.  To a certain degree, yes.
20      Q.    And it generally says by using the
21 mountain and the facilities, you are releasing the
22 mountain from all claims.
23      You're familiar with that; right?

Page 165

1    A.    To a certain degree, yes.
2       Q.    So do you know -- was your wife able to
3  pick up the tickets that day?
4       A.    Yes.
5       On March 13, you're saying; right?
6       Q.    Yes.
7       On March 13, your wife picked up the
8  tickets?
9       A.    Yes.
10      Q.    And she was inside picking up the tickets
11 as you were moving the ski equipment; right?
12      A.    Yes.
13      Q.    Had she handed you your ticket before you
14 fell?
15      A.    No.
16      Q.    Do you still have the tickets that your
17 wife picked up that day?
18      A.    I don't know where they are, no.
19      Q.    Have you been back to Waterville since?
20      A.    No.
21      (Pre-marked Deposition Exhibit Number 4
22      introduced.)
23      Q.    (By Mr. Tapply)  I'm going to show you

1  what's been marked as Exhibit Number 4, which is --
2  page number one is the front, and page number two
3  will be the back of the Waterville senior lift
4  ticket.
5          Do you recognize that image that's there
6  on the screen, which is page number one of Exhibit
7  Number 4?
8      A.  No.
9      Q.  I'm sorry if I asked you this earlier.
10         But when was the last time you were at
11 Waterville before March 13, 2019?
12     A.  I would say probably around 2014, maybe
13 2015.
14     Q.  And when you were there in 2014 or 2015,
15 do you know -- were they using these -- this kind of
16 a ticket at that point?
17     A.  I don't know.
18     Q.  I'm just going to show you the back of the
19 Waterville ticket.
20         Do you recognize that?
21     A.  Yes, yeah.
22     Q.  And what do you recognize it to be?
23     A.  It's probably the back of the lift ticket;

1  correct?
2      Q.  And you recognize it because it's got some
3  of that same language -- that liability release
4  language that you observed on the signs throughout
5  the ski industry?
6      A.  Yes.
7      Q.  And is it fair to say that in all the
8  other day tickets you've gotten at other mountains,
9  most other mountains have similar release language
10 on the back of their day tickets as well; right?
11     A.  Yes.
12     Q.  So when you were going to Waterville that
13 day, is it fair to say that when you got your ticket
14 or when you would have gotten your ticket, you would
15 have expected that the back of the ticket had this
16 kind of liability release language on the ticket;
17 right?
18     A.  I would assume so, yes.
19         MR. TAPPLY:  Now is probably a great
20 time to take a little bit of a break.
21         MR. PIEDRA:  Sure.
22         (Recess taken from 1:15 p.m. to 1:48 p.m.)
23

1      (Pre-marked Deposition Exhibit Number 5
2      introduced.)
3      Q.  (By Mr. Tapply)  So, first I'm showing you
4  what I've premarked as Exhibit Number 5.
5          Do you recognize the image there on page
6  one of Exhibit 5?
7      A.  Yes.
8      Q.  What are we looking at there?
9      A.  Those are my Salomon snow shoes that I
10 wear.
11     Q.  Were those the shoes that you were wearing
12 on March 13, 2019?
13     A.  I have this pair and I have a black pair.
14 At that time, I was wearing the black pair.
15     Q.  So the picture we have here is of a pair
16 of shoes, but not the shoes you were wearing on
17 March 13, 2019; is that right?
18     A.  It's the same exact shoe.  Just the color
19 is different.
20     Q.  But to be clear, these aren't the ones you
21 were wearing that day; right?
22     A.  No.
23     Q.  Where are the black ones that you were

1  wearing that day?
2      A.  I have them downstairs in the basement.
3      Q.  And you don't plan on getting rid of those
4  for any reason; right?
5      A.  No, not at all.
6          (Pre-marked Deposition Exhibit Number 6
7          marked for identification.)
8      Q.  (By Mr. Tapply)  Now I'm showing you what
9  I've premarked as Exhibit Number 6.
10         So page number one of Exhibit Number 6 --
11 do you recognize the image that appears here?
12     A.  Yes.
13     Q.  What is it?
14     A.  It's the stairway that I walked up on the
15 right side to get to the ski ramp on the left.
16     Q.  And is what we see on page one of
17 Exhibit 6 -- does this look substantially similar to
18 the way that it looked the day that you've reported
19 you fell on the stairs?
20     A.  Somewhat.  I have closer pictures that
21 show that the snow was -- more snow showing than it
22 is here.  I don't know when these were taken.
23     Q.  But you can see here that there are

Page 170

1  several flights of stairs.
2          Do you know on which flight of stairs you
3  were when you fell?
4      A.   I was on the first flight of stairs --
5  first row of stairs walking down.
6      Q.   So I'm zooming in here a bit on Exhibit
7  Number 6, page number one, and you can see here that
8  there's this first set of steps.  It looks to be
9  about twelve steps or so.
10         Is it on these first -- this first set of
11 steps where you claim to have fallen?
12     A.   Yes.
13     Q.   Now, you can see there -- up on the
14 left-hand side, there's some ski racks.
15         Are those ski racks in generally the same
16 place that they were on the day that you were
17 injured on the stairs?
18     A.   I believe so, yes.
19     Q.   Now, you say that you have some
20 photographs that show more snow.
21         What do you mean by "more snow"?
22     A.   Well, the snow was coming more over in the
23 middle -- toward the middle, but not in the

Page 171

1  middle-middle -- that I took on the day it happened.
2  I don't know when these were taken.
3      Q.   So, you, yourself, took pictures on the day
4  that this occurred?
5      A.   No, my wife did.
6      Q.   I thought you just said that you took
7  them, but you did not take --
8      A.   Well, I told her to take the pictures,
9  yes.
10     Q.   When did you tell your wife to take
11 pictures?
12     A.   Pretty much after I fell.
13     Q.   Well, were you still there up on the
14 stairs when you told your wife to take picture, or
15 were you now down --
16     A.   No, that was before the girl who put out
17 the ice melt and so forth -- that was before she got
18 there and, eventually, the ski patrol.
19     Q.   So while you were -- I'm just trying to
20 clarify the timeline.
21         So before the woman got there -- the ski
22 patrol got there, and before the woman got there to
23 put down the ice melt or rock salt, that's when you

Page 172

1  asked your wife to take the pictures?
2      A.   Yes.
3      Q.   And that is when she took the pictures;
4  right?
5      A.   Well, the pictures were taken before the
6  girl was actually out there.  She was out there a
7  short time after my wife took the pictures.
8      Q.   Believe me, sir, I'm not trying to be
9  difficult.  I'm just trying to make sure.
10         When you say "the girl" -- because you
11 said the first aid was a young woman, and the person
12 working for Waterville was a young woman.
13     A.   Yes.
14     Q.   So before the woman got out there and put
15 down the rock salt and whatnot, your wife took
16 pictures; right?
17     A.   I believe it was at that time.  I can't
18 say that's exactly how it was.  She took the
19 pictures.  I asked her to take the pictures because
20 I was not -- I was in a lot of pain and I had -- I
21 couldn't do it.  And I just asked her to take the
22 pictures.
23     Q.   I'm not questioning that, sir.  I was just

Page 173

1  making sure I understand what you were saying.
2          And what you said a second ago is that
3  before the girl got there, your wife took the
4  pictures -- so that's the way you remember it
5  happening?
6      A.   Somewhat -- yeah, I don't know if my wife
7  took the pictures as the girl was putting the rock
8  salt, or if it was done before she got there.  I
9  don't know.  All I know is I saw the girl there
10 putting rock salt and ice melt down in the area --
11 it was below where I had fallen, but in that area.
12     Q.   And you saw her after you had had this
13 conversation with your wife about taking pictures?
14     A.   I believe it was then, yes.
15     Q.   Now, as you're sitting there, and you said
16 you're in a lot of pain, you asked your wife to take
17 pictures.
18         Why did you ask your wife to take
19 pictures?
20     A.   Because I just couldn't believe that the
21 walkway was like this, and I just wanted to have
22 pictures of it, yes.
23     Q.   So you were already contemplating suing

Page 174

1  Waterville at that point; right?
2      A.  Not at all.  I was going to probably just
3  show them to my friends, in all likelihood.
4      Q.  So I just want to make sure I understand
5  this.
6          So as you're standing at the top of the
7  stairs, as you told me earlier today, in shock due
8  to the amount of pain you were in, you had the
9  desire to have your wife take pictures of the stairs
10 so you could share them with your friends; is that
11 what you're telling me under oath today, sir?
12     A.  Well, I had no -- well, you asked me
13 before if I had any intentions of suing Waterville
14 Valley, and I had none at that time, no.
15     Q.  So why take the pictures then?
16     A.  Because I just wanted to have the
17 pictures.
18     Q.  Well, did you take any other pictures that
19 day?
20     A.  I didn't ski that day.
21     Q.  So the answer to my question is no, you
22 took no other pictures that day?
23     A.  No.

Page 175

1      Q.  But why take pictures of those stairs
2  then?
3      A.  Because I just wanted to show them to
4  people.  Yes, my friends.
5      Q.  Did you take any pictures of when you were
6  in and around North Conway the day before?
7      A.  Yes.
8      Q.  Did you share those with your friends?
9      A.  If they wanted to see our vacation, yes.
10     Q.  Did you take any pictures that morning as
11 you were driving to Waterville?
12     A.  No.
13     Q.  You said it was a beautiful, sunny day.
14         Did you take any pictures of the
15 mountains, or the snow, or the trees as you were
16 driving to Waterville that day?
17     A.  No.
18     Q.  Did you take any pictures as you were
19 unloading the equipment and getting there to
20 Waterville?
21     A.  No.  I was planning on taking pictures of
22 -- on the ski mountain when I was skiing, yes.
23     Q.  But the only pictures you actually took --

Page 176

1  your wife took were of the stairs, as you were
2  standing there in so much pain that you were in
3  shock; right?
4      A.  On that particular day, yes.
5      Q.  And the reason you -- at that moment, as
6  you're in that much pain that you're in shock, the
7  reason you directed your wife to take the pictures
8  was purely because you wanted to share pictures of
9  stairs with your friends?
10     A.  I wanted to show them what the stairs
11 looked like.  Yes, if I explained it to anyone, they
12 would have asked me -- or I would have --
13         "Did you take pictures of it?"
14         And I would have said, "No."  I took
15 pictures of it.
16     Q.  Who -- which of your friends did you share
17 these pictures with?
18     A.  Skiers -- people that ski.
19     Q.  Who?
20     A.  Neighbors.
21     Q.  Who?
22     A.  People that I have skied with.  I didn't
23 show it to everybody.

Page 177

1      Q.  What are their names, sir?  What are the
2  names of the people with whom you've shared the
3  pictures?
4      A.  I showed pictures to Robert Ganser.
5      Q.  How do spell "Ganser"?
6      A.  G-A-N-S-E-R.
7      Q.  Where does he live?
8      A.  He lives in North Babylon.
9      Q.  What's his address, if you know?
10     A.  He's across the street, but I don't know
11 the exact number address.
12     Q.  But he lives on the same street as you?
13     A.  Yes.  O'Connor Road, yes.
14     Q.  Do you happen to know his phone number?
15     A.  No.
16     Q.  Do you have his phone number saved in your
17 cell phone?
18     A.  Oh, he doesn't give out his cell phone.
19 Only to people that he -- he owns his own business.
20 So, no, I don't have his phone.
21     Q.  So you have no way to call Mr. Ganser,
22 then?  You don't know his phone number?
23     A.  I'm not going to give out anyone's phone

Page 178

1 number to just -- to you until I talk to him about
2 it.
3      Q.   Well, I appreciate that position, sir, but
4 that wasn't my question.
5           My question was just whether or not you
6 have his phone number.  And you just gave me some
7 story about he has his business and he doesn't share
8 it with anyone.
9      A.   I have his phone number, yes.
10     Q.   Good.  Okay.  So I just want to remind
11 you, sir, that you took an oath to tell the truth
12 today.
13          And telling the truth, when I ask you, "Do
14 you have his phone number," is not telling me some
15 story about him having some business and he doesn't
16 like to share it.  You can just simply tell me you
17 have his phone number.
18          Because then my follow-up question is
19 "Will you share it?"  And you can say yes or no, and
20 we'll discuss those things.
21          But the truthful answer to my question is
22 yes, you do have his phone number.  So let's try the
23 truth.

Page 179

1           You have Robert Ganser's phone number;
2 right?
3      A.   Yes, I do.
4      Q.   Will you share it with me?
5      A.   Not today, no.
6      Q.   And I'll certify that question.
7           With whom else did you share these
8 photographs?
9      A.   Probably nobody else, really.  He's really
10 the only skier that I ski with.  I wouldn't show
11 them to just anybody unless they were a skier.
12     Q.   What device did your wife use to take the
13 pictures?
14     A.   Her cell phone.
15     Q.   It was her cell phone or yours?
16     A.   I think it was hers, but I'm not sure.
17     Q.   Do you still have the same phone now that
18 you had on March 13, 2019?
19     A.   I believe so, but, again, it's probably
20 her phone.  I don't -- she got a new phone, but I
21 don't remember when she got it.
22     Q.   Have you looked on your phone -- looked
23 back to see if you have pictures from your phone of

Page 180

1 this staircase?
2      A.   Yes.  She transferred them over to me,
3 yes.
4      Q.   How many photographs did your wife take?
5      A.   I believe there was about five -- four or
6 five.
7      Q.   Did she take any pictures of any parts of
8 Waterville Valley other than the stairs?
9      A.   That day?
10     Q.   Yeah, that day.
11     A.   No.
12     Q.   I'm showing you page three of -- I think
13 it's six.  This is just looking from the top of the
14 stair down.
15          Do you recognize this image, sir?
16     A.   No, I don't know what's -- I don't know
17 what's at the very -- I'm looking at -- I see the
18 snow towards the top of this picture, but I can't
19 see anything beyond there.  I don't know where this
20 picture was.
21     Q.   You don't know.  Okay.  I'm just going to
22 go back to the second picture of Exhibit 6 here.
23          So if you look at the second picture,

Page 181

1 second page of Exhibit Number 6, along the
2 right-hand side you can see this concrete kind of
3 curb right next to the building; do you see that?
4      A.   Yes.
5      Q.   Can you see a hookup for the -- what's
6 probably a hookup for the fire department there
7 along the wall on the right-hand side?
8      A.   Yes.
9      Q.   And then you see -- if I zoom in a little
10 bit here, you can see on the right-hand side there's
11 a small piece of plywood -- looks like particleboard
12 along the right-hand side; do you see that?
13     A.   If you could just show me that again,
14 because you went to a different picture.
15     Q.   See right here in the middle?  I'm just
16 zooming in on the same picture.
17          You see that piece of particleboard there
18 on the right-hand side -- can you see that?
19     A.   Yes.
20     Q.   So now if I -- that's page two of Exhibit
21 Number 6.  If I go to page three of Exhibit 6, back
22 to the image we were on, do you see that this is
23 just the same set of stairs, but from the top

Page 182

1  looking down?  And you know that because you see the
2  particleboard, now on the left.  You see the curb
3  next to the wall on the left, and you see the fire
4  department hookup there on the left.
5        You see all that; right?
6     A.  Yes.
7     Q.  Can you identify for me where you were
8  when you walked down the stairs on March 13, 2019?
9     A.  Can I point to it with anything, or
10  just...
11    Q.  Unfortunately, based on where we are, I'm
12  not going to be able to see if you point.  I'm not
13  going to try to have you draw on it.  I'm not sure
14  that would work.
15        But if you could -- first of all, which
16  step were you on when you fell?  Are you able to
17  identify that?
18    A.  I was about maybe the third to fourth --
19  probably about the third step down.
20    Q.  About the third step down.  So I'm just
21  going to zoom in the picture a little bit.
22        And do you see any marks or any
23  identifying features on that third step that would

Page 183

1  indicate about where you were when you fell?
2     A.  Can you go to the top?  Because I'm seeing
3  half of a step here.  I don't know exactly what's
4  above that.
5     Q.  I'm zoomed out on this picture as far as I
6  can, sir.
7        I'm just asking you -- do you see any
8  identifying spots on that third step that would
9  indicate where you were when you fell?
10    A.  On this, it was the fifth step down --
11  fourth or fifth step down.
12    Q.  So the fourth or fifth step down?
13    A.  Yes.
14    Q.  Do you see any spot or identifying mark on
15  the fourth or fifth step down where you fell?
16    A.  No, not really.  Could have been in the
17  middle to maybe just a touch to the right.
18    Q.  And you agree with me that the fourth or
19  fifth step down in the middle, just a step to the
20  right -- there's no snow in this picture on that
21  spot; correct?
22    A.  I never said there was snow there.  I said
23  there was ice.

Page 184

1     Q.  But I'm just asking you what you see now.
2        And you don't see any snow there, do you?
3     A.  No, there's no snow there at all, no.
4        (Pre-marked Deposition Exhibit Number 7
5        introduced.)
6     Q.  (By Mr. Tapply)  Moving on to Exhibit
7  Number 7, sir, do you recognize this picture?
8     A.  Yes.
9     Q.  What is that?
10    A.  That is where I walked up, but I was more
11  right of that picture.
12    Q.  Well, when you say you "walked up" -- but
13  are these the set of stairs at Waterville that you
14  walked up?
15    A.  I believe so, yeah, because I see the ski
16  rack that I walked over to.
17    Q.  And to which ski rack did you walk and put
18  your skis?
19    A.  I believe it was straight ahead.  As I got
20  to the top step, you see the ski rack with the pins
21  sticking out or points sticking out?  I went to that
22  ski rack.
23    Q.  So there's several light blue and then

Page 185

1  several green ski racks.
2        Did you go to a blue or a green ski rack?
3     A.  I don't see a green ski rack.  I see a
4  blue and then another blue.  The green is up above
5  that by the chairlift.
6     Q.  I'm just asking -- did you go to a blue
7  ski rack or a green ski rack?
8     A.  I went to a blue ski rack.
9     Q.  And we see one blue ski rack that's got a
10  pair of skis leaning up against it, and then we see
11  another blue ski rack in the upper left-hand corner
12  of page one, Exhibit 7.
13        Do you know to which blue ski rack did you
14  travel?
15    A.  I believe I walked to the ski rack
16  straight ahead to my -- well, to the left of that
17  skier.
18    Q.  So we see a skier that's got a red jacket
19  on and black pants, and he appears to be walking up
20  the set of stairs; right?
21    A.  Yes.
22    Q.  And you referred to him as a "skier"
23  because he probably is there skiing that day; right?

Page 186

1    A.   I would assume so.
2    Q.   We can probably -- just for purposes of
3  conversation, we can agree that the people that are
4  there going up the stairs carrying their stuff --
5  we'll just refer to them all as "skiers"; does that
6  make sense to you?
7    A.   Yes.
8            MR. PIEDRA:  Objection to form.
9    Q.   (By Mr. Tapply)  So the blue rack that's
10  got a pair of skis on it -- that is the rack where
11  you go in there -- as a skier that day, you walked
12  to that rack; right?
13    A.   Yes, I believe so.  Yes, yes.
14    Q.   Just below the rack, there's a bunch of
15  snow.
16        And it's this snow that you traveled
17  before coming back to the stairs?
18    A.   Yes.
19    Q.   Is this one of the pictures that your wife
20  took?
21    A.   Yes.
22    Q.   Page two of Exhibit 7 -- is this also one
23  of the pictures that your wife took?

Page 187

1    A.   Yes.  It looks like it, yes.
2    Q.   On either of the pictures, are you able to
3  tell me on which step you fell?
4    A.   I would say it was probably the fourth or
5  fifth step down.
6    Q.   Well, the first three steps have -- are
7  metal grate, and then it becomes concrete.
8    A.   Yes.
9    Q.   Did you fall on the third or fourth
10  concrete step, or the third or fourth step in total?
11    A.   Third or fourth step in total.
12    Q.   So it would have been, like, the second
13  concrete step?
14    A.   Yes, probably -- yes.
15    Q.   Are you able -- as you look at these
16  pictures, are you able to see the specific spot
17  where you fell?
18    A.   No.
19    Q.   And is that because the specific spot you
20  fell was more towards the middle of the stairs;
21  right?
22    A.   Well, can you rephrase that question?
23  Because I don't really understand what you're

Page 188

1  asking.
2    Q.   Sure.
3        I asked you if in these pictures that are
4  marked as Exhibit Number 7 -- if they show you the
5  spot that you fell.
6        And you said, "No."
7        Is that because the spot you fell was
8  outside of the frame of these pictures?
9    A.   No, they were not out -- no.
10    Q.   But these pictures don't show the spot
11  where you fell --
12    A.   Yes, they do.  Yes.
13    Q.   Okay.  Well, you just said a second ago
14  they don't.  So why don't you tell me --
15    A.   You said, "Outside the frame."  That's
16  what you said.
17    Q.   I asked you first if these pictures show
18  the spot where you fell, and you said, "No."  Let me
19  ask you that again.
20        Do these pictures show the spot where you
21  fell?
22    A.   Yes.
23    Q.   All right.

Page 189

1        Where did you fall?
2    A.   I fell on the second -- if you're counting
3  the three steps above, I fell on the second concrete
4  step.
5    Q.   In any of these pictures, do you see the
6  spot where you planted your right foot when it
7  slipped out from under you?
8    A.   No.  I have no idea at all.  I was -- no,
9  not at all.
10    Q.   Is there any reason you didn't have your
11  wife take a picture of all the stairs -- the full
12  width of the stairs?
13    A.   I thought we did.
14    Q.   You agree with me that the pictures you
15  just saw just show the narrow portion -- or the
16  left-hand part of stairs; they didn't show the full
17  width of stairs?
18    A.   Well, that was only two pictures.
19    Q.   Well, I can tell you that all of the
20  pictures that have been produced to me -- none of
21  the pictures show the full width of the stairs.
22        Do you recall seeing pictures that your
23  wife took that are the full width of the stairs?

Page 190

1    A.   I thought we did.  I don't know for sure.
2    Q.   So we talked about the timeline earlier.
3 You said that you got dropped off -- you dropped
4 your wife off about 9:15.  And then by the time your
5 wife went inside and you started walking up the
6 stairs, it was about 9:45.
7         So do you know about what time it was that
8 you fell?
9    A.   It could have been around ten o'clock.
10    Q.   So, sir, you ended up -- your wife driving
11 you to Speare Memorial.
12         Did you call anyone or have any
13 conversations with anyone on the way to Speare
14 Memorial?
15    A.   Not that I know of, no.
16    Q.   When you got to Speare Memorial, did they
17 ask you about, obviously, what happened?
18    A.   Well, yes, but, again, that's -- I was
19 there, but my wife was doing most of the talking
20 regarding that.
21    Q.   Did they ask you about your prior medical
22 condition?
23    A.   I don't remember that.

Page 191

1    Q.   Did they ask you if you had any prior
2 issues or problems with your right hip?  Did they
3 ask you about that?
4    A.   I don't remember that, no.
5    Q.   Sir, if you don't mind just kind of
6 walking me through your medical treatment from that
7 point forward.
8    A.   From getting to the hospital?
9    Q.   Yes, please.
10    A.   Okay.
11         We went to the emergency room and they
12 took an x-ray.  And some time after they took the
13 x-ray, they came out to us and told me that I had
14 fractured my femur.
15    Q.   And then you eventually had surgery?
16    A.   Well, I had to have surgery there, yes.
17    Q.   And you were inpatient for over two days;
18 is that right?
19    A.   It was Wednesday night, Thursday night --
20 three nights, I believe.
21    Q.   And then you return back home to
22 Long Island?
23    A.   Yes.

Page 192

1    Q.   And then from that point forward, you took
2 some period of time off from work; right?
3    A.   Yes.
4    Q.   About how long were you out of work?
5    A.   It was about six, not quite seven weeks.
6    Q.   Now, after surgery -- so you had surgery
7 in March, and then you underwent physical therapy;
8 right?
9    A.   Yes.
10    Q.   How long did you go to PT?  Do you
11 remember?
12    A.   Well, I went back to the --
13 Dr. Cappellino.  I had to have the staples removed.
14 So that was about two weeks after getting home.  And
15 then he proceeded to set up physical therapy for me
16 at Excel.
17    Q.   And Excel is the same place where you had
18 gone previously?
19    A.   Yes.
20    Q.   Now, you used a phrase earlier in the
21 deposition today, sir, that -- you described the
22 level of pain you had in your hip before you had
23 that cortisone injection.  I think you said about a

Page 193

1 four out of ten.
2         Am I remembering that correctly?
3    A.   Yes.
4    Q.   And on that pain scale that you used, zero
5 would be no pain, and ten would be like the worst
6 pain you can imagine; right?
7    A.   Yes.
8    Q.   So using that same pain scale that you,
9 yourself, used earlier today, by the time you got to
10 see Dr. Nakhjavan -- and I'm sorry if I pronounced
11 that incorrectly -- but by the time you got to see
12 your primary care physician -- well, strike that.
13         You told me you went to see Dr. Cappellino
14 to have the staples removed.  So using that same
15 pain scale that you used earlier today, zero to ten,
16 when you went to see Dr. Cappellino to have the
17 staples or stitches removed, what was your pain
18 level then?
19    A.   I would say probably four, maybe five.
20    Q.   Would Dr. Cappellino or one of his
21 assistants ask you to rate your pain on a scale of
22 zero to ten?
23    A.   Yes.  They have it right there in their

Page 194

```
 1  office, yes.
 2      Q.   And you -- when you answered that
 3  question, you would have been honest with them;
 4  right?
 5      A.   I believe so, yes.  I don't know if it was
 6  four or if it was five, but it was in that area,
 7  yes.
 8      Q.   And whatever you told them, you gave them
 9  an honest answer; right?
10      A.   Oh, yes.
11      Q.   So by the time you got to Cappellino, your
12  pain was at that level.  And then you started Excel
13  PT.
14           And for about how long did you go to Excel
15  Physical Therapy?
16      A.   I don't know exactly, but it might have
17  been maybe four weeks or so.  Multiple times.
18      Q.   By the time you were done treating at
19  Excel Physical Therapy, what was your pain level, if
20  any, for your hip, on that same zero-to-ten pain
21  scale you used earlier?
22      A.   After I was done with Excel?
23      Q.   Yes, when you were done at Excel.
```

Page 195

```
 1      A.   I would say probably three-ish.
 2      Q.   Now, do you recall going to see
 3  Dr. Cappellino in the middle of your physical
 4  therapy just to check in and see how you were doing?
 5      A.   Yes.  Well, after the staples were
 6  removed, I had a follow-up.  I think it was, but I'm
 7  not sure exactly -- I think it was, like, six weeks.
 8      Q.   If I were to tell you that you visited
 9  Dr. Cappellino on April 23 of 2019, does that sound
10  about right?
11      A.   Well, I think that's when I had the
12  stitches removed.
13      Q.   No.  Actually, you had the stitches
14  removed on March 28 of 2019.
15      A.   Okay.
16      Q.   And then you went back to Dr. Cappellino
17  about a month later on April 23, 2019.
18           Do you remember that visit?
19      A.   Okay.  Well, I knew I went back to him a
20  second time.  I didn't know exactly how many weeks
21  it was.
22      Q.   And when you went back to Dr. Cappellino's
23  office for the follow-up in April, you probably were
```

Page 196

```
 1  asked how your pain level was.
 2           You were asked that again; right?
 3      A.   Yes.
 4      Q.   And when you answered that question, you
 5  gave an honest assessment of your pain?
 6      A.   Yes.
 7      Q.   Now, is it fair to say that after you had
 8  the surgery, for some period of time, you were
 9  walking with a limp; right?
10      A.   Can you just ask that again?  You broke up
11  a little.
12      Q.   Of course I can.  Thank you for letting me
13  know.
14           After you had the surgery, you walked with
15  a limp for a period of time; correct?
16      A.   After surgery, yes.
17      Q.   For about how long did you walk with a
18  limp after the surgery?
19      A.   Well, I'm still walking with a limp, so
20  almost two years.
21      Q.   Did you ever walk with a limp before you
22  fell at Waterville Valley?
23      A.   No.
```

Page 197

```
 1      Q.   Did you ever report to your doctors that
 2  you had -- you limped before you fell at Waterville
 3  Valley?  Well, let me ask you maybe a different
 4  question.
 5           Were you ever treated for a limp prior to
 6  your fall at Waterville Valley?
 7      A.   I don't believe so, no.
 8      Q.   And as you sit here today, you're certain
 9  you've never had a limp.  That's something you'd
10  remember, obviously; right?
11      A.   Well, my wife would have told me, yes.
12      Q.   Well, either your wife telling you or you
13  remembering, but you've certainly never walked with
14  a limp before the fall at Waterville, but now you
15  do; right?
16      A.   No.
17      Q.   And I asked you kind of a poor question,
18  so I'm going to correct it.
19           Before the fall at Waterville, did you
20  ever walk with a limp?
21      A.   When you say "limp," are you talking about
22  dragging my foot, or...
23      Q.   Why don't you tell me what a limp is.
```

1      A.   Well, a limp, to me, is just when I take a
2  step, I limp on my -- the one side that I'm
3  favoring.
4      Q.   Did you ever do that before you broke your
5  femur at Waterville -- did you ever do that before?
6      A.   No, no.
7      Q.   Now, do you have any medical treatment
8  still scheduled for your hip?
9      A.   For my what?
10     Q.   For your hip.  For your hip or your leg --
11 your right leg -- do you have any medical treatment
12 scheduled?
13     A.   No.
14     Q.   Now, before you fell at Waterville, did
15 any of your medical providers ever discuss with you
16 that you would need a hip replacement?
17     A.   Yes.
18     Q.   And who told you that?
19     A.   Dr. Cappellino told me that.  And the
20 orthopedic surgeon in New Hampshire mentioned that I
21 will need it, but not right now.
22     Q.   Sure.
23          What about before the fall at

1  Waterville -- did any doctor tell you you would need
2  a hip replacement?
3      A.   Probably sometime later on in my life,
4  yes.  There was nothing right now.
5      Q.   Who told you that you would need one?
6      A.   Dr. Cappellino.
7      Q.   Do you know when it was that he first told
8  you you would need a hip replacement?
9      A.   No.
10     Q.   But it was some point before March 13 of
11 2019 that he told you that; correct?
12     A.   Oh.  Well, yeah, yes.
13     Q.   Well before then, he told you --
14     A.   Yes, yes.
15     Q.   Did any of your doctors tell you that you
16 suffered from severe degenerative joint disease in
17 your right hip?
18     A.   Yes.  Probably Dr. Nakhjavan and, I'm
19 assuming, Dr. Cappellino too.
20     Q.   Do you remember when they told you that?
21     A.   I don't know exactly.  I would say maybe
22 five, six years or so ago.
23     Q.   Sir, do you have a scar as a result of the

1  surgery?
2      A.   I did in the beginning.  I don't believe I
3  have one now, no.
4      Q.   Sir, when you -- this happened in March of
5  2019.
6          So in the summer of 2019, did you play any
7  golf?
8      A.   No.
9      Q.   Why not?
10     A.   I was in the process of healing.  I was
11 told not to do anything that I used to do for about
12 a year.
13     Q.   Now, the following ski season -- so that
14 would have been the December of 2019 into 2020 --
15 did you do any skiing that season?
16     A.   No.
17     Q.   Did you have a trip planned to go out west
18 to Lake Tahoe that year?
19     A.   No.
20     Q.   Why not?
21     A.   Because I had just had the accident and I
22 wasn't planning on skiing for at least a year.  And
23 -- no.

1      Q.   And what about going back to golf?  Once
2  COVID hit in kind of March 2020, from March 2020 up
3  until today, have you played any golf?
4      A.   I have played some golf in the fall of
5  2020.  And I played, basically, nine-hole golf, just
6  to see how my hip would hold up.
7      Q.   What about this spring?  Have you played
8  any golf this spring?
9      A.   No.
10     Q.   And how come?
11     A.   Because I don't like to play in cold
12 weather.
13     Q.   But if it was a warm day, you'd go out and
14 play golf, though; right?
15     A.   I would try, yes.
16     Q.   And have you tried to swing a golf club
17 yet this year?
18     A.   Yes.
19     Q.   Where did you do that?
20     A.   On my front lawn.
21     Q.   And you were able to do that pain-free;
22 right?
23     A.   Yes.  Pretty much minor pain, but very,

GLEN FUERST                                    202..205

Page 202

1  very limited.
2       Q.   When you play golf, where do you normally
3  play?
4       A.   I play -- well, since the accident, I've
5  only played nine-hole courses, so I basically play
6  at Peninsula Golf.  And there's a nine-hole golf
7  course in Islip Terrace -- I'm trying to think of
8  the name of it.  I'm having a senior moment, but I
9  basically played there most of the time.
10      Q.   Do you have a membership at any golf
11 clubs?
12      A.   No.
13           The name of that course was Gull Haven.
14      Q.   Thank you very much.
15           Have you ever had a membership at any
16 clubs?
17      A.   No.
18      Q.   Do you belong to a gym?
19      A.   No.
20      Q.   Have you ever?
21      A.   No.
22      Q.   There at your house on O'Connor Road, who
23 takes care of the snow removal in the winter?  Do

Page 203

1  you contract that out?  Do you have a snowblower?
2  Do you pay some local kids?  What do you do?
3       A.   I have a snowblower.
4       Q.   Does your wife run the snowblower, or is
5  that something you do?
6       A.   I do.
7       Q.   And then do you have a lawn?
8       A.   Yes.
9       Q.   Do you pay a landscaper to take care of
10 the lawn, or do you take care of that?
11      A.   No, I pay a landscaper.
12      Q.   Have you paid a landscaper for a while, or
13 is that something new?
14      A.   Just for the last three, four years.
15      Q.   Do you and your wife use a house
16 cleaner -- so someone that comes in and cleans the
17 house?
18      A.   No.  No, we do it, or I help her or
19 whatever.
20      Q.   How do you split up the duties there at
21 the house -- cooking, and cleaning, and laundry, and
22 stuff like that?
23      A.   She does most of the cooking because she's

Page 204

1  a better cook than I am, obviously.  And I'll do
2  most of the cleaning up.
3       Q.   Is that the way it's always been for the
4  two of you?
5       A.   Yes.  Pretty much, yes.
6       Q.   Now, you told me earlier today, sir, that
7  you had a trip out to Lake Tahoe that was planned
8  for this year, 2021, but you delayed it to next
9  year -- to 2022.
10           Have you had any other trips in the past
11 year -- past two years that were scheduled, but
12 you've delayed?
13      A.   And just -- I'm just trying to get my year
14 straight.
15           So we're talking about -- and when you
16 talk about 2021, I'm thinking of only '21, because I
17 only ski January through March.
18      Q.   Okay.
19      A.   So, yes, we had planned to go out to
20 Lake Tahoe, but the ski mountain was -- not the ski
21 mountain -- the resort was closed.
22      Q.   Other than that trip which you've been
23 able to put off until next year, are there any other

Page 205

1  trips that were scheduled that you've had to delay?
2       A.   No.  We didn't book any trips because of,
3  number -- and basically, the COVID was number one,
4  but my hip was at a second -- number two.
5       Q.   Are there any trips that you would have
6  planned, but for your hip and COVID?
7       A.   Yes, I would have probably tried to ski
8  Massachusetts for the first time, because it's got
9  smaller mountains, and I could see if I'd be able to
10 ski, if at all.
11      Q.   And that's something you have not tried
12 because of COVID; right?
13      A.   I have not tried because of COVID, plus I
14 was also healing that first year.
15      Q.   In winter -- so the winter of 2021, you
16 did not ski because of COVID; correct?
17      A.   More so COVID, yes.
18           (Pre-marked Deposition Exhibit Number 8
19           introduced.)
20      Q.   (By Mr. Tapply)  All right, sir.  I'm
21 going to show you what's been marked as Exhibit
22 Number 8.
23           It's a document called the "incident

1  report form." There's a signature right here in the
2  middle of the form. I'm not sure if you're able to
3  see that. I can zoom in a little bit more if you
4  need me to.
5      A.   Okay.
6      Q.   So it says at the top of the Exhibit
7  Number 8 -- it says "Incident report form." And it
8  says, "Waterville Valley Resort, March 13, 2019.
9  Day of the week: Wednesday." And down below, kind
10  of in the middle of the page, there's a signature.
11        It appears to me to say "Glen Fuerst";
12  sir, is that your signature there?
13     A.   Yes.
14        (Pre-marked Deposition Exhibit Number 9
15        introduced.)
16     Q.   (By Mr. Tapply)  Exhibit Number 9, sir, is
17  a copy of the complaint that's been filed in this
18  matter. I'll get back to that in just a minute.
19        (Pre-marked Deposition Exhibit Number 10
20        introduced.)
21     Q.   (By Mr. Tapply)  In Exhibit Number 10,
22  there's a document that's titled -- your answers to
23  interrogatories, which are your answers to written

1  questions. I am scrolling down to interrogatory
2  number five. But before I get there, I'm just going
3  to go to the very end. Because at the very end,
4  there's a signature page.
5        The answers to interrogatories were
6  provided to my office with your signature,
7  "Glen Fuerst," and the signature is dated
8  December 21, 2020.
9        Will you just confirm that this is your
10  signature, sir?
11     A.   Yes.
12     Q.   Now, before you signed your answers to
13  interrogatories, might I presume that you reviewed
14  them and ensured that the answers were accurate?
15     A.   And this was after the accident?
16     Q.   These are your answers to interrogatories.
17  These are something that is created in the course of
18  this litigation. They are written questions and
19  written answers. And your signature certifies that
20  these are your answers that you produced to the best
21  of your ability.
22        My question is, did you review the answers
23  before you signed these answers to interrogatories?

1      A.   I would believe I did, but I don't know.
2      Q.   Okay. Well, let's just start at number
3  one.
4        Number one -- it says your name is "Glen
5  Fuerst. Occupation: Salesman"; that's correct;
6  right?
7      A.   Yes.
8      Q.   It says the employer is "Duncan, Minton,
9  Reading Associates, Inc."; is that right?
10     A.   Yes.
11     Q.   So far that's accurate. Scrolling down to
12  interrogatory question number five.
13        In question number five, you're asked to
14  state the basis of your allegations in the complaint
15  where you say that Waterville Valley, my client,
16  violated state or local building or fire codes, and
17  that resulted in an injury to you.
18        And then you answer and you say that you
19  "believe that the premises/stairs in question were
20  not maintained and/or constructed in accordance with
21  the applicable building and/fire codes relevant to
22  means of egress and ingress."
23        Sir, do you have any understanding of the

1  State of New Hampshire fire codes?
2      A.   No.
3      Q.   Have you ever read the New Hampshire fire
4  codes?
5      A.   No.
6      Q.   What about the New Hampshire building
7  codes -- have you ever read or have any
8  understanding of the New Hampshire building codes?
9      A.   No.
10     Q.   Do you have any evidence, Mr. Fuerst, that
11  the stairs on which you claim to have fallen were
12  not constructed in accordance with either building
13  or fire codes -- do you have any evidence of that?
14     A.   Well, I have evidence in the pictures,
15  yes.
16     Q.   What about the pictures tells you that
17  those stairs were not conducted in accordance with
18  building or fire codes?
19     A.   Okay. So I don't understand what you're
20  asking me.
21     Q.   Well, you've certified in this answer,
22  which you signed -- and you say that the stairs were
23  not constructed in accordance with the applicable

Page 210

1  building or fire codes.
2          I'm asking you what about the stairs
3  violates the building code or the fire code -- do
4  you know?
5      A.  No.
6      Q.  You have no idea; right?
7      A.  No, I don't -- to be honest with you, when
8  would I have signed this?
9      Q.  Well, you signed this on December -- I
10  just showed you your signature.  It was December 21,
11  2020, so just a couple months ago.
12      A.  Okay.
13      Q.  When you signed it, you certified that the
14  stairs were not constructed in accordance with the
15  building or fire codes.
16          I'm just wondering -- do you have any
17  information that supports that position that you've
18  taken?
19      A.  No.  I just think...
20      Q.  Moving on to number six.  Interrogatory
21  number six, you are asked to describe your injury
22  and description of the injury, how it was caused,
23  whether you still suffer pain, et cetera.

Page 211

1          And you say in here in your answer on
2  paragraph number two, "I still suffer from pain as a
3  result of the subject incident when I attempt to jog
4  and certain other activities"; do you see that where
5  I read that, sir?
6      A.  Yes.
7      Q.  Other than attempting to jog, what other
8  activities cause you your pain in your hip?
9      A.  Well, I can't put up Christmas ornaments
10  anymore where I have to get on a ladder.
11      Q.  You were able to get on a ladder and put
12  up Christmas ornaments before the fall?
13      A.  Yes.
14      Q.  Did the condition of your hip or lower
15  back in any way impact your ability to get up and
16  down a ladder before the fall?
17      A.  No.
18      Q.  Okay.
19          You also say -- well, you say, "Attempt to
20  jog and certain other activities."  Besides putting
21  up Christmas lights, are there any other activities
22  that cause you to have pain in your hip?
23      A.  Yes.  If I was to go jogging, which I

Page 212

1  tried to in the beginning, as my foot -- my right
2  foot, in particular, impacted on the blacktop or
3  whatever I was running on, I would feel pain in my
4  right hip.  So I just stopped jogging.
5      Q.  So you did try to go jogging after
6  recovering from the fall and the surgery?
7      A.  Yes.
8      Q.  How many time did you try?
9      A.  I tried a couple times.
10      Q.  So two?
11      A.  Yes.
12      Q.  When is the last time you tried to go
13  jogging?
14      A.  Oh, I would say probably a year ago.
15      Q.  And you have not tried it since?
16      A.  No.
17      Q.  You also say down below that, "I now walk
18  with a limp, which I did not have prior to the
19  subject incident."  And we already talked about that
20  earlier today.
21          And you agree you now have a limp, but
22  before the fall at Waterville, you did not have a
23  limp; that's your position?

Page 213

1      A.  No.  None whatsoever, no -- no limp.
2      Q.  No limp before the accident.  Got it.
3      A.  Correct.
4      Q.  Perfect.
5          I'm scrolling down now to interrogatory
6  number 14.  In interrogatory number 14, you're asked
7  to describe, in great detail, the incident that took
8  place.  And I'm just going to highlight a section
9  for you, sir.  In your answer, you say -- I'm going
10  to try to highlight it.  I'm just sort of circling
11  this sentence here, just to focus in your attention
12  onto interrogatory number 14.  I've just highlighted
13  this area.
14          You say, "As I was walking up, I noticed
15  that the snow was pushed all the way over to the
16  left side of the stairs along, and at several
17  places, up and over, the railing.  I knew I would be
18  unable to come down the stairs on that side"; do you
19  see where I just read that, sir?
20      A.  Yes.
21      Q.  Now, you testified today, on multiple
22  occasions, that when you were walking up the stairs,
23  there was nothing impeding your view, but you said

## Page 214

1  you did not notice the snow on the stairs as you
2  were walking up; do you remember that from earlier
3  today?
4       A.   Yes.
5       Q.   But here in your answers to
6  interrogatories, which you signed and certified that
7  they were accurate, you said specifically that as
8  you were walking up, you did notice the snow pushed
9  all the way over to the left side, and you knew you
10  couldn't walk back down that side.
11       A.   Yes.
12       Q.   Now, that's different from what you've
13  said today.
14            So which is true?
15       A.   What I said earlier today was I was not
16  focusing on what's to the left, walking up the
17  stairs.  I did see the snow there, but I was
18  basically watching people in front of me to make
19  sure that they were getting up the stairs in front
20  of me okay.  It wasn't until I came down the stairs
21  -- started to come down the stairs when I saw how
22  much snow was there, and how much of it was there.
23       Q.   So now that you've seen your sworn answers

## Page 215

1  to interrogatories, now you admit that as you were
2  walking up the stairs, you did see snow over on the
3  left-hand side; right?
4       A.   Somewhat, yes, but I didn't focus on it.
5  Yes.
6       Q.   All right.
7            But you did see it?
8       A.   Yes, somewhat.  I saw it glancingly.
9       Q.   Glancingly.
10            Well, you didn't use the word "glancingly"
11  in your answers to interrogatories anywhere, unless
12  I missed it, and please tell me if I did.
13            What I see is a very clear sentence that
14  says, "As I was walking up, I noticed that snow was
15  pushed all the way over to the left side of the
16  stairs along, and at several places, up and over,
17  the railing."  Now, that's not a glance.
18            You noticed and you saw that not only was
19  the snow pushed over to the side, but also that it
20  was, in several places, pushed up over the railing.
21            MR. PIEDRA:  Objection to form.
22            THE WITNESS:  Yes.
23       Q.   (By Mr. Tapply)  Mr. Fuerst, in all

## Page 216

1  honesty, when you were walking up the stairs on
2  March 13, 2019, you saw the snow on the left-hand
3  side of the stairs as you were going up; right?
4       A.   I saw some snow there, yes.
5       Q.   And we're at a ski area, so you're hoping
6  to see some snow; right?
7       A.   On the ski mountain -- not the walkway.
8       Q.   But you know that there's going to be snow
9  at the ski area?
10       A.   On the mountain, yes.
11       Q.   And you know that there's -- because
12  you've been to Waterville before and you saw that
13  area, you knew that there was snow next to the
14  stairs -- you saw that; right?
15       A.   The times I had been to Waterville
16  earlier, the stairway was never in that condition.
17       Q.   Well, I asked you earlier, on the other
18  occasions you've been to Waterville, where you
19  picked up your tickets.  You didn't remember that.
20            I asked if you could -- how many times
21  you'd gone up and down the stairs at Waterville.
22  You weren't sure of that.
23            But now you're telling me that in the four

## Page 217

1  or five times you'd been to Waterville in total --
2  and you hadn't been there since 2015 -- you remember
3  that the stairs had less snow on them five years ago
4  than the day that you were there?
5            Do you really remember that?
6       A.   Yes.
7       Q.   And that's your answer under oath and an
8  oath to tell the truth?
9       A.   Yes.  I saw the snow, yes.
10       Q.   Let's read on in your sworn answers to
11  interrogatories.  Not only did you see snow as you
12  were walking up the stairs.
13            You also saw it enough to say, quote, "I
14  knew I would be unable to come down the stairs on
15  that side."  So that's more than just a glance over
16  there.
17            You knew that there was such snow over
18  there that you couldn't come down that side; right?
19       A.   Yes.
20       Q.   So the snow and next to the snow where you
21  fell -- you saw that as you were going up the stairs
22  before you came back down; right?
23       A.   Yes, somewhat.  I wasn't walking up the

GLEN FUERST                                    218..221

1   stairs and staring at it.  I did see it, yes.
2       Q.   Sir, since that day, have you had any
3   conversations with anyone affiliated with Waterville
4   Valley?
5       A.   Regarding what?
6       Q.   Anything.
7       A.   No.
8       Q.   Have you had any conversations with any
9   insurance companies affiliated with Waterville
10  Valley since that day?
11      A.   No, I did -- no.
12      Q.   Have you, personally, met with any
13  individuals that you believe will be serving as
14  expert witnesses for you in this litigation?
15      A.   Have I met them?
16      Q.   Yes, have you met them?
17      A.   Probably, yes.
18      Q.   Who are those people?
19           MR. PIEDRA:  I'm going to object.
20  How is this reasonably calculated to lead to
21  admissible information?
22           MR. TAPPLY:  Because I'm entitled to
23  know what information was provided to the experts,

1   what information was provided directly by
2   Mr. Fuerst -- whether he produced any documents or
3   records to them.  Certainly, I'm entitled to
4   everything that the experts have in their possession
5   to render their opinions.  And if he was involved in
6   that process, I'm entitled to know it.
7       Q.   (By Mr. Tapply)  So with that, sir, did
8   you meet any experts in person -- that's my first
9   question -- who you believe will serve as experts in
10  this case?
11      A.   No.
12      Q.   Did you meet with any experts over Zoom or
13  a video conference like we're using today?
14      A.   Yes.
15      Q.   How many persons did you meet over video
16  or Zoom conference?
17      A.   One.
18      Q.   Was it a man or a woman?
19      A.   You broke up.
20      Q.   Was it a man or a woman?
21      A.   It was a man.
22      Q.   What was his name, or what is his name?
23      A.   I don't have it in front of me.  I don't

1   remember.
2       Q.   Do you know -- was he an engineering or
3   architectural-type expert, or a ski area
4   maintenance-type expert?
5       A.   No -- I don't know that, no.
6       Q.   What information did you provide to that
7   individual?
8       A.   Just basically what happened, like what
9   we're talking about today.
10      Q.   Now, I'm going to guess that your attorney
11  was involved in that call as well; is that correct?
12      A.   Yes.
13      Q.   So I'm not asking you for any
14  communications you had with your attorney.  I'm just
15  asking for what information you provided that
16  individual.
17           How long did this videoconference meeting
18  last?
19      A.   Well, my lawyer was there, so I can't
20  really answer that.
21      Q.   Well, you can tell me how long it lasted.
22      A.   Well, I don't know.  I can't tell you
23  exactly how long it was, but, yes, there was a

1   meeting.
2       Q.   Can you tell me approximately how long the
3   meeting was?
4       A.   Maybe it was 30 minutes.
5       Q.   And in 30 minutes, you relayed to that
6   individual all of the information that you've
7   relayed today over the course of nearly five hours?
8           MR. PIEDRA:  I'm going to object to
9   this line of questioning, but you can continue for
10  now.
11           MR. TAPPLY:  Thank you.  I appreciate
12  that.
13      Q.   (By Mr. Tapply)  Sorry.  Go ahead.
14      A.   He didn't ask me about what I did earlier
15  in my life and so forth.  So, no, it was not
16  five hours.
17      Q.   Is that individual -- did he focus on the
18  incident itself, or the medical components of your
19  injuries?
20      A.   Both.
21      Q.   Did if appear that that individual -- did
22  it appear that he was in a medical setting?  Like,
23  was he wearing a doctor's coat or a lab coat?

Page 222

1    A.   No, I -- no.
2    Q.   Did you understand that this person with
3  whom you were speaking was a medical doctor?
4    A.   No.
5    Q.   So it wasn't a medical doctor, then?
6    A.   No.
7    Q.   Okay.
8         Do you know where this person was -- from
9  what state they were when you spoke to them?
10   A.   No.
11   Q.   So you don't know if it was New Hampshire,
12 New York, Massachusetts, or Idaho?  You don't know?
13   A.   No, it wasn't Idaho.  It wasn't New York.
14 It was probably New Hampshire.
15   Q.   Why do you think that?
16   A.   Because I know he wasn't in New York.
17   Q.   Well, there's several other states besides
18 New York.
19        So if he wasn't in New York, what makes
20 you think that he was in New Hampshire?
21   A.   I just assumed that, you know, with
22 everything that's going on in New Hampshire, that's
23 where he was from.  Other than that, I don't know.

Page 223

1    Q.   Does the name George Melchior ring a bell?
2    A.   Possibly.
3    Q.   Other than speaking to the individual for
4  about 30 minutes, did you provide him any records or
5  documents?
6    A.   When you say "records," as far as what?
7    Q.   Anything -- did you provide him anything
8  physical at all?  Pictures, papers, anything?
9    A.   No.
10   Q.   Did you give that individual any
11 information that you haven't given me today?
12   A.   No.
13   Q.   Approximately when did this meeting take
14 place?
15   A.   Some months ago.
16   Q.   I'm sorry.
17        Did you say "some months ago"?
18   A.   Some months ago.
19   Q.   About two months ago?
20   A.   Two months ago.
21   Q.   You know that Waterville refunded your
22 ticket price from that day?
23   A.   Yes, I was told that.

Page 224

1    Q.   How did you learn that?
2    A.   I believe from my wife.
3    Q.   All right.  I'm getting close to wrapping
4  up here.
5         I'm just going to share with you, I think,
6  Exhibit Number 9, which is a copy of the complaint
7  that has been filed in this action.  Scrolling down
8  to paragraph number 12.
9         In paragraph number 12, you allege in your
10 complaint that your downward passage placed you on
11 or near the side of the staircase where the snow was
12 piled up, the railing was buried in snow, and where
13 the snow had begun to melt.
14        Now, you testified earlier that you didn't
15 walk down the side of the stairs.  You walked down
16 the middle of stairs; is that correct?
17   A.   Yes.
18   Q.   It also says here that "the railing was
19 buried in snow."
20        Were you aware of whether there was an
21 actual handrailing on the side of the stairs on the
22 location where you fell?
23   A.   I would assume that there would have been

Page 225

1  a railing there, but, no.  Because it was buried in
2  snow, I didn't know.
3    Q.   You didn't know.  On page six of your
4  complaint, paragraphs 54 through 46, count four is a
5  loss of consortium claim.
6         And you and your wife have sued a loss of
7  consortium claiming that your wife has been and will
8  be deprived of your "full society, care, comfort,
9  consortium, and social relations."
10        What did you mean by that?
11   A.   Well, as far as she's taken on more of
12 what has to be done around here, especially after I
13 was healing and so forth.  So, yeah, she -- where I
14 used to do some of the cooking, as we talked
15 earlier -- outside, she's taken on more of a cooking
16 role.  I help with the dishes and stuff like that.
17 Stuff that's done around here, she tries to help me.
18   Q.   Well, you testified earlier that in your
19 relationship, your wife does the majority of
20 cooking.
21        And your words were "because she's a much
22 better cook, obviously."  Those were the words that
23 you used.

GLEN FUERST 226..229

1     A.   Yes.

2     Q.   Now you're telling me that after the
3   incident your wife did more of the cooking, but it
4   sounds like she did all of the cooking all along.

5     A.   No.  I used to cook on the grill outside.
6   I probably didn't say that because it doesn't happen
7   very often.

8     Q.   So other than perhaps cooking on the grill
9   outside, which doesn't happen very often, how else
10  has your relationship with your wife been changed as
11  a result of this incident?

12    A.   Well, it's just my handicap.  I don't move
13  around.  I'm not able to do what I was able to do
14  before the accident.

15    Q.   Like what?

16    A.   I'm sorry?

17    Q.   I said like what?  What can you not do now
18  that you were able to do before the accident that
19  she has had to take on?

20    A.   Does more of the cleaning that -- I used
21  to do the majority of the cleaning.  She's doing
22  more of that.  I try to help her, but she sees me
23  limping around and she ends up doing it herself.

1     Q.   What part of the cleaning did you used to
2   do that your wife now does?

3     A.   The vacuuming and so forth.

4     Q.   So other than vacuuming, what else?

5     A.   Clean windows.

6     Q.   How often did you vacuum the house versus
7   your wife before this incident?

8     A.   I vacuumed all the time.

9     Q.   What kind of vacuum do you own?

10    A.   A Hoover.

11    Q.   A Hoover.

12         Is it an upright, or a different kind of
13  vacuum?

14    A.   It's an upright.

15    Q.   What color is it?

16    A.   Black.

17    Q.   Where do you store it?

18    A.   In the basement.

19    Q.   When's the last time you replaced the bag
20  on your vacuum?

21    A.   Oh, about two weeks ago.

22    Q.   Two weeks ago.

23         And your Hoover upright vacuum actually

1   has a bag?

2     A.   Yes.

3     Q.   How sure are you of that?

4     A.   I'm positive, because I changed a bag.

5     Q.   So your wife vacuums more now where you
6   used to vacuum before.  Your wife cooks outside when
7   you used to cook on the grill.

8          What other responsibilities, if any, has
9   your wife taken on that you used to do?

10    A.   I'm in pain more often, so it's stuff that
11  -- she tries to help me out with whatever possible.

12    Q.   Can you give me any specifics or any
13  details of things that your wife now does that she
14  did not do before because of your accident?

15    A.   Well, she'll do most of the driving, where
16  I used to drive periodically before.  We'd alternate
17  driving.  But if we go shopping or if we go
18  traveling somewhere to someone's house, she does
19  most of the driving now, if not all of it.

20    Q.   Well, sir, part of your job as a
21  salesperson is driving around to different
22  locations -- grocery stores, if I'm not mistaken --

23    A.   Yes.

1     Q.   -- and meeting with those customers.

2          You do all the driving then; right?

3     A.   Yes, but that's why she does the driving
4   then, because I'm in somewhat pain and I can't do
5   driving when I'm working and when we're driving to
6   wherever we might be going.  It limits my driving.

7     Q.   Isn't it true, sir, that before you fell
8   at Waterville, driving hurt your hip anyway?  Isn't
9   that true?

10    A.   It did until I had the cortisone shot.

11    Q.   Did driving hurt your hip after the
12  cortisone shot?

13    A.   Not that I recall, no.

14    Q.   Part of loss of consortium, or a component
15  of loss of consortium between a husband and a wife
16  typically includes a change in the marital
17  relations, and, namely, a change in sexual
18  relations.

19         If that is a component of your claim, I
20  need to know that now, because I will have questions
21  about your sexual history with your wife.  If that
22  is not a component of your claim, then I will have
23  no questions along that line.

Page 230

1       And if you need a take a minute to talk to
2  your counsel, I'm happy to let you do so.
3       A.   Okay.
4            (Recess taken from 2:59 p.m. to 3:05 p.m.)
5            MR. TAPPLY:  I think your counsel is
6  just going to make a quick statement on the record.
7            MR. PIEDRA:  Just for the record, I
8  will represent and state that we -- my clients are
9  not making any consortium claim for loss of marital
10 relations, aka sex life.
11      Q.   (By Mr. Tapply)  Mr. Fuerst, you
12 identified several medical providers with whom you
13 met after this incident.  One, being your primary
14 care physician.  The second being Dr. Cappellino.
15 Also went to Excel Rehab or Excel Physical Therapy.
16 And you were treated right after the incident at
17 Speare Memorial Hospital.
18           And then are there any other providers
19 with whom you met for any reason since this incident
20 happened?
21      A.   Well, no one other than other people that
22 were in the physical therapy office.  It wasn't -- I
23 worked with Steve and other people.

Page 231

1       Q.   Sure.
2            So there's no other providers that you've
3  seen for other issues or ailments, whether it be
4  heart conditions or anything like that?
5       A.   No.
6       Q.   Have there been -- has there been any
7  conversation with any of your providers about the
8  need to remove the hardware that was installed
9  during the initial surgery?
10      A.   No.
11      Q.   Since this accident happened, have you
12 been injured in any way?
13      A.   Any way what?
14      Q.   At all.  Have you been injured at all
15 since the accident?
16      A.   No.
17      Q.   Do you recall reporting to the physical
18 therapist at Excel that you injured your lower back
19 and your lumbar spine?
20      A.   I don't know what date we're talking
21 about.
22      Q.   Do you remember re-injuring your lower
23 back at all since you fell at Waterville?

Page 232

1       A.   No, not really.  I mean, I do wake up with
2  stiffness in my lower back every morning, but when I
3  do my physical therapy -- my own -- I'm fine.
4       Q.   And the stiffness in your lower back --
5  that's something that you've had for many years;
6  right?
7       A.   Yes.
8       Q.   Do you and your wife have any vacations
9  planned for the summer?
10      A.   No.
11      Q.   And other than the trip to Lake Tahoe
12 that's been delayed for a year, do you have any
13 other trips planned?
14      A.   No.
15      Q.   Finally, my question before we suspend the
16 deposition and wrap up for the day, is you've sued
17 my client for monetary damages.
18           What are you seeking?
19           MR. PIEDRA:  Objection.
20           You can answer still.
21           THE WITNESS:  Oh.  Okay.
22           I don't know.
23           MR. TAPPLY:  With that, sir, I have

Page 233

1  no further questions at this point.  And your
2  counsel may have some questions for you.
3            MR. PIEDRA:  I don't have any
4  questions.
5            MR. TAPPLY:  With that, as indicated
6  earlier, we'll suspend today's deposition.
7            (The deposition was suspended at 3:09
8            p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

GLEN FUERST                                234..235

Page 234

1          GLEN FUERST

2

         I have read the transcript of the

3   deposition taken on March 12, 2021, taken remotely,

    and make the following additions or corrections:

4

5   PAGE   LINE   CORRECTION AND REASON FOR CORRECTION:__

6   ____   ____   _____   _____

7   ____   ____   _____   _____

8   ____   ____   _____   _____

9   ____   ____   _____   _____

10  ____   ____   _____   _____

11  ____   ____   _____   _____

12  ____   ____   _____   _____

13  ____   ____   _____   _____

14  ____   ____   _____   _____

15  ____   ____   _____   _____

16  ____   ____   _____   _____

17  ____   ____   _____   _____

18                _____

19          GLEN FUERST

20

21

22

23

Page 235

1          C E R T I F I C A T E

2        I, Molly K. Belshaw, a Licensed Shorthand
    Reporter for the State of New Hampshire, and

3   Registered Professional Reporter, do hereby certify
    that the foregoing is a true and accurate transcript

4   of my stenographic notes of the proceeding taken at
    the place and on the date hereinbefore set forth to

5   the best of my skill and ability under the
    conditions present at the time.

6

        I further certify that I am neither

7   attorney or counsel for, nor related to or employed
    by any of the parties to the action in which this

8   proceeding was taken, and further, that I am not a
    relative or employee of any attorney or counsel

9   employed in this case, nor am I financially
    interested in this action.

10

        The foregoing certification of this

11  transcript does not apply to any reproduction of the
    same by any means unless under the direct control

12  and/or direction of the certifying reporter.

13

14

15

16

17

18

19

20  Molly K. Belshaw
    RPR, LCR No. 00162

21

22

23

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Glenn Fuerst and | ) | |
| Donna Fuerst, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Civ. Action No. 1:20-cv-369-AJ |
| v. | ) | |
| | ) | |
| WVSR, LLC | ) | |
| d/b/a Waterville Valley Ski Resort | ) | |
| | ) | |
| *Defendant.* | ) | |

## PLAINTIFFS' EXPERT DISCLOSURE

NOW COME the Plaintiffs, Glenn and Donna Fuerst, by and through their attorneys, Welts, White & Fontaine, P.C., and hereby submit the following preliminary expert disclosure pursuant to FRCP 26(a)(2)(B) as follows:

### I.  Preliminary:

This disclosure is preliminary in nature, as discovery has not yet been fully completed.  Accordingly, the Plaintiffs reserve the right to supplement this disclosure through the addition of other experts or additional opinions should new and/or previously unknown information or opinions develop during discovery.

### II.  Retained Expert Disclosure:

1.  George W. Melchior, R.A., P.E. LEED AP

GWM Consulting
601 Islington Street, Suite 202
Portsmouth, NH 03801
(603) 828-8168

The Plaintiffs anticipate calling Mr. George Melchior as a retained premises liability expert witness at trial either live or by videotape. Mr. Melchior's testimony will be based on his education, training, and experience and will be consistent with the opinions expressed in his attached report.

Specific information regarding Mr. Melchior's education, training, and experience is set forth in his curriculum vitae, which is attached along with his fee schedule.

2.   David C. Morley, Jr., MD

817 Merrimack Street
Lowell, MA 01854
(978) 453-9345

The Plaintiffs anticipate calling Dr. David Morley, Jr. as a retained medical expert witness at trial; either live or by videotape. Dr. Morley's testimony will be based on his medical education, training, and experience and will be consistent with the opinions expressed in his attached report. Specific information regarding Dr. Morley's medical education, training, and experience is set forth in his curriculum vitae, which is attached along with his fee schedule.

3.   Response and Rebuttal.

Plaintiffs' experts are expected to respond to additional issues which may result from further discovery and/or at trial and to rebut, or comment upon, any opinions offered by other expert witnesses; including those, if any, proffered by the Defendant. Plaintiffs' reserve the right, if necessary, to amend/supplement this disclosure or rebut Defendant's expert's opinions(s).

Respectfully Submitted,
GLENN FUERST and
DONNA FUERST

By their attorneys,
WELTS, WHITE AND FONTAINE, P.C.


Dated:  06/11/2021               BY_____/s/ Jack S. White_____
                                 Jack S. White, Esq. (Bar no. 2725)
                                 Israel F. Piedra, Esq. (Bar no. 267568)
                                 29 Factory Street, PO Box 507
                                 Nashua, NH 03061
                                 (603) 883-0797
                                 jwhite@lawyersnh.com
                                 ipiedra@lawyersnh.com


CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing Plaintiffs' Preliminary Expert Disclosure was e-mailed to Timothy Tapply, Esq., counsel for Defendant in this matter.


Dated:  06/11/2021               BY_____/s/ Jack S. White_____
                                 Jack S. White

H:\angsham\Documents\Fuerst - IFP-cml\Experts\Expert Disclosure - Fuerst - 06.11.2021.doc

# EXHIBIT 4



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP

601 Islington Street
Suite 202
Portsmouth, NH  03801

Voice:  603.828.8168
gwmelchior3@gmail.com

June 8ᵗʰ, 2021

Welts, White & Fontaine, P.C.
ATTN:  Jack White, Esq.
29 Factory Street
Nashua, NH  03061

Re:   _Glenn and Donna Fuerst v. WVSR, LLC d/b/a Waterville Valley Ski Resort_

Attorney White,

Herein is my assessment of the snow and ice maintenance of the primary patron access and egress stairway for the Waterville Valley Ski Resort in Waterville, NH.  In generating this report, I interviewed Glenn Fuerst regarding the circumstances of his fall.  I also visited the property where I observed the egress routes, exterior stairway system, and hydrologic characteristics of the surrounding area.  In addition, I reviewed the following information sent by your office:

- Complaint
- Plaintiff's Initial Disclosures
- Plaintiff's Answers to Interrogatories
- Defendant's Automatic and Initial Disclosures
- Defendant's Answers to Interrogatories
- Defendant's Answers to RPD
- Deposition Transcript of Tim Smith [30(b)(6) witness for WVSR – President/ Gen. Manager]
- Incident Report dtd March 13, 2019
- Photographs

For my analysis, I reviewed weather history; soil characteristics; site topography and drainage characteristics; and historical satellite imagery for the Waterville Valley Ski Resort.  In reviewing these materials, I relied on my 20+ years of experience in the industry in which I am educated and licensed both as a Registered Architect (RA), and a Professional Engineer (PE), and have assessed and designed numerous exterior pedestrian facilities, accessible facilities, exterior walkways and stairways for commercial and residential properties throughout the northeastern U.S.   Specifically, as an architect, I relied on my extensive education and experience with human factors in the building environment, and associated codes and safety standards for preservation of the health, safety and welfare of the public, including codes and standards for accessibility and safe egress.  Specific to this matter, I also relied on my specific education in occupational ergonomics and human factors, as well as my ongoing education in biomechanics and human factors as a graduate student with the University of New Hampshire School of Kinesiology.  As an engineer, I relied on my education and experience in site design and maintenance, including hydrology, thermodynamics, and material properties. Additionally, I relied on my training as a certified Advanced Snow Manager (ASM);  a certified New Hampshire Salt Applicator (RSA 489-C); and an ANSI/NFSI qualified Walkway Auditor Certificate Holder (WACH #183); as well as my experience as a Facilities Management Director for the Department of the Navy, where I was a Level III Certified Facilities Engineer with extensive experience in snow and ice management operations for millions of square feet of exterior walking surfaces for hundreds of government facilities across New England, including mountain-side facilities and associated exterior egress systems.  I also relied on my specific knowledge and experience gained as an engineering officer in the U.S. Navy, where I received extensive training in meteorology including conditions of precipitation and surface heat transfer.  Lastly, I relied on my extensive training and experience as a consultant with the nation's largest parking consultancy, where I assessed, designed and developed operating and maintenance procedures for millions of square feet of exterior facilities across New England and the U.S.

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

In my analysis of the aforementioned materials, I applied my knowledge of design, construction, operations and maintenance of the exterior built environment, including life-safety codes, human factors, thermodynamics, meteorology, hydrology, and the industry consensus methods and standards for ice management. Specifically, I assessed the physical conditions and characteristics of the exterior egress stairway system at the Waterville Valley Ski Resort, and I performed a weather analysis along with associated thermodynamic and hydraulic analyses of the exterior stairway system to calculate the surface temperature and the likelihood of a melt-refreeze condition on the stairway walking surfaces leading up to Glenn Fuerst's fall. Additionally, I considered the operation and maintenance procedures outlined by WVSR in the 30(b)(6) testimony of Tim Smith. Lastly, I performed a code analysis to determine the egress requirements for the facility, and what, if any, prescriptive measures should have been applied to the stairway in the maintenance of that system. I performed these analyses to determine if WVSR should have known of the hazardous conditions on the exterior stairway prior to patrons' use of the stairway during normal and expected hours of operation, as well as the applicable means and methods with which WVSR should have maintained the stairway as measured against the consensus industry standards for wintertime maintenance.

The focus of my analysis was centered on the adequacy of the snow and ice maintenance of the exterior stairway system on the south side of the base lodge at the ski resort. In summary, during the time leading up to, and immediately preceding Glenn Fuerst's fall, WVSR specifically failed to provide the minimum standard of care in that they failed to reasonably anticipate and prevent, or otherwise treat the icy conditions on the concrete stairway that lay in the foreseeable path of pedestrian and patron travel during normal and expected hours of use. Additionally, WSVR failed to provide handrails on the concrete stairway system, which was also the primary patron stairway and primary egress stairway for the property. In doing so, WVSR also failed to maintain the egress stairway in a safe and slip-resistant condition for patrons as explicitly required by the New Hampshire State Fire Code. On the morning of March 13th, 2019, while descending the stairway in a reasonable and foreseeable manner, Glenn Fuerst slipped on dangerously inconspicuous, untreated ice that formed from the refreeze of melted snow which had encroached into the stairway system. As a result, Mr. Fuerst fell violently onto the stairway and sustained serious injury.

## BACKGROUND

During the time leading up to, and on March 13th, 2019, the date of injury (DOI), the ski resort in Waterville, NH (hereafter referred to as *the property*) was owned and operated by WVSR, LLC d/b/a Waterville Valley Ski Resort (hereafter referred to as *WVSR*). Glenn and Donna Fuerst were patrons on the property during normal and expected hours of ski resort operations on the morning of the DOI.

Site: The property is a typical ski resort with numerous hillside ski trails, several chair lift systems, and a central lodge facility known as the *Base Lodge*. The trails are on the east side of the mountain such that skiers are generally traveling downhill from west to east, and the base lodge is located at the apex of nearly all of the groomed trails on the property. On the DOI, there was a series of stairways on the south side of the base lodge building which connected the primary patron drop-off area and parking lot to the base lodge facility and the chair lifts beyond. Based on the configuration and location of the stairway system, the entire stairway was part of the means of emergency egress from both the base lodge facility and the mountainside trails (Ref. Illustrations 1 & 2, enclosed).

The stairway system was altered between the DOI and my site visit. However, during my site visit, I observed that the upper flights of stairs on the property were the same as those in place on the DOI. Specifically, comparison of the stairway observed during my visit to the stairway system depicted in photographs taken on the DOI reveal that the handrail system on the upper stairway was the same during my visit as was shown in the photos from the DOI. Closer inspection of the upper stairway handrail system reveals that the handrail

2

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

system was constructed of a horizontally laid piece of dimensional lumber, known as a *rail cap*, which overlaid a balustrade and a vertical piece of dimensional lumber, known as a *rail*. The rail cap was a nominal 2 inch (in.) by 8 in. (2x8) piece of board lumber, and the vertical rail was a 2x6 piece of board lumber. As a result of the rail construction, the actual perimeter of the handrail system was 14 in.[1] As seen in the photographs of the stairway system taken on the DOI, there was an identical handrail system at the top of the lower flight of stairs as well. The handrail system extended for just the first few steps of the lower flight of stairs. Mr. Fuerst slipped on an icy step just beyond the end of the lower handrail system (Ref. Illustration 3, enclosed).

Based on the photographs taken on the DOI, the top three steps of the lower flight of stairs in the stairway system were constructed of wood with a metal grated tread, and the handrail system extended for those three steps. Below the three wooden steps at the top of the flight of stairs (hereafter referred to as *the stairway*) were eleven concrete steps, and there were no handrails on either side of the concrete steps in the stairway. As seen in the photographs taken on the DOI, there was a significant amount of stockpiled snow encroaching onto the concrete steps of the stairway. Based on the vantage point of the photographs provided, the approximate dimensions of the encroachment may be determined from the photographs using *photogrammetry*. Photogrammetry is the science of determining actual measurements from photographs using scaled reference and is commonly used in the design and construction profession to determine unknown dimensions based on known reference dimensions. *Scale* is the ratio of size or distance of a feature on the photo to actual size. As a result of the camera angle, no radial correction is necessary, and the scaling ratio can be determined using the relief displacement method. Specifically, using the known actual width of the 2x8 rail cap and 2x6 rail and comparing it to the measured width of the stairs as seen in plane in the photographs, the encroachment of the snow pile may be determined as a ratio of actual size to photograph measurement. The width of a 2x8 rail cap is 7 ¼ in. and based on that scaling element, the snow pile is, on average, approximately 3 ft. into the stairway. The total width of the concrete stairway is approximately 12 ft., which equates to approximately 25% encroachment into the stairway system. For perspective, fire codes and building codes prescribe a minimum 0.3 in. of stairway width per intended occupant. Review of satellite imagery reveals that the patron parking lot had a capacity of approximately 1,000 vehicles leading up to the DOI. Assuming every single vehicle was a single-occupant vehicle, and the base lodge facility had ample internal egress (primary for the building), the minimum expected (and required) occupant capacity for exterior stairway use would be 600 patrons, equating to a minimum stair width of 15 ft. On the DOI, as a result of encroachment of the snowbank onto the concrete steps, the maximum available stairway width was only approximately 9 ft., 40% less than the bare minimum width required by industry (Ref. Illustrations 4 & 5, enclosed).

Weather:  The average air temperature leading up to the DOI was 23 degrees Fahrenheit (˚F), with an average high of 33˚F (1˚F above freezing), and an average low of 10˚F (22˚F below freezing). On the day before the DOI, the region experienced light snowfall and the temperature rose to 40˚F under partly sunny skies in the afternoon. The temperature then dropped to 32˚F by midnight and continued to drop to 13˚F by 6:00 a.m. on the morning of the DOI. Of note, it is unknown if WVSR manufactured snow on the eve of the DOI. On the morning of the DOI, the weather was mild under clear skies, and the air temperature rose to 32˚F by approximately 10:00 a.m. At that time, the approximate solar position of the sun was at an azimuth of 143 degrees (deg.) and an elevation of 38 deg. such that the sun was to the southeast of the encroaching embankment of snow on the concrete steps. According to the incident report, the weather was clear at the time of Mr. Fuerst's fall.

---

[1] A 2x8 is 1.5 in. x 7.25 in., a 2x6 is 1.5 in. x 5.25 in.; the 2x8 was laid across the top of the vertical 2x6, such that the exposed perimeter to the stairway side of the rail consisted of the 7.25 in. width of the rail cap, the 1.5 in. depth of the rail cap, and the 5.25 in. depth of the rail, the sum of which is 14 in.

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

According to the testimony of Tim Smith, President and General Manager of WVSR leading up to and on the DOI, approximately 75% of the patrons whom visit the property use the exterior stairway on the south side of the main lodge facility each day.[2]  Additionally, Mr. Smith confirmed in testimony that in the area of Mr. Fuerst's fall, the defective and ungraspable handrail was not available at all as it terminated prior to the step where Mr. Fuerst slipped.[3]  Despite the high volume of patron use of the stairway, there were no written procedures or policies for maintenance of the stairway system.[4]  There was no training provided to WVSR employees regarding anti-icing, deicing, types of treatment to use, quantities of treatment, and protocols for inspection, nor were there any administrative controls in place for inspections, snow clearing, and subsequent ongoing treatment of the defective stairway.[5]  Most notably, there was no specific employee assigned to inspect and maintain the heavily trafficked stairway, and, instead, every employee on duty was responsible for inspecting and treating the stairway.  According to Mr. Smith, patrons would routinely step through or slide down the adjacent embankment of shoveled snow, causing snow to fall back on to the stairway system.  Though, review of the photographs provided from the DOI clearly illustrate that the embankment of snow encroached at least 3 ft. into the stairway, and there is no evidence in the photographs that snow was pushed down onto the stairway by patrons.  Regardless, according to Mr. Smith:[6]

> Q.  If the snow slides down constantly, do you expect your employees to shovel it off the stairs?
> A.  No
>
> Q.  It just gets left there until when?
> A.  Until [the employees] get back to it - - until they - - until someone says it's a problem or that it starts to become a hazard.

Not only was the informal, verbal protocol void of any specifications for treatment, the procedure described by Mr. Smith did not include the specific inspection, acceptance and continuing maintenance criteria which are typically included in winter maintenance endeavors as contained in consensus industry standards; specifically, ASTM F2966-13, *Standard Guide for Snow and Ice Control for Walkway Surfaces*, and ANSI/SIMA-10, *Standard Practice for Procuring and Planning Snow and Ice Management Services*.  Specifically, WVSR did not address recurring inspections of the known egress stairway, or responsibilities for ice removal and mitigation during hours of operation.  Nor did WVSR identify specific snow stockpiling requirements based on proximity to the stairway, pitch of the adjacent grade, lack of drainage systems, and lack of handrails on the stairway.   Additionally, the WVSR's laissez faire procedure was void of any weather monitoring or considerations for melt-refreeze events, identification of service priorities or special areas of consideration including accessible routes and egress systems, and timeframes of maintenance including known periods of melt-refreeze in New England.  Despite the fact that the property was operated as a ski resort, and the knowledge that 75% of patrons would use the egress stairway system on any given day, many of them with restrained biomechanical movement of their ankles as a result of ski boots, the summary of Mr. Smith's entire testimony is that there was, in essence, no winter maintenance procedure in place leading up to and on the DOI.

At approximately 10:20 a.m. on the DOI, Mr. Fuerst was visiting the property with his wife.  Upon arriving at the property, Mr. Fuerst carried a set of skis up to one of the ski racks at the top of the stairway.  He was not wearing ski boots, but instead was wearing appropriate winter shoes with heavy tread.  After dropping off the skis, he descended back down the stairway system.  After taking just a few steps in descent, Mr. Fuerst's right

---

[2] Smith Depo, Pg. 54
[3] Smith Depo, Pg. 36
[4] Smith Depo, Pg. 23
[5] Smith Depo, Pgs. 60-64
[6] Smith Depo, Pgs. 76

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

foot struck dangerously inconspicuous and untreated ice which had formed across the treads of the stairway. As a result, Mr. Fuerst slipped and lost his balance on the stairway. Without a handrail to grasp, he had no means by which to regain his balance and arrest his fall. Consequently, Mr. Fuerst fell on the stairway, causing him to sustain serious injury.

## <u>ANALYSIS</u>

In this case, WVSR specifically failed to provide the minimum standard of care in that they failed to reasonably anticipate and prevent, or otherwise treat the icy conditions on the concrete stairway that lay in the foreseeable path of pedestrian and patron travel during normal and expected hours of use.[7] Additionally, WSVR failed to provide handrails on the concrete stairway system, which was also the primary patron stairway and primary egress stairway for the property. In doing so, WVSR also failed to maintain the egress stairway in a safe and slip-resistant condition for patrons as explicitly required by the New Hampshire State Fire Code.

According to the CDC, unintentional fall-related injuries account for over 9 million visits to the emergency room annually in the U.S. and are the third leading cause of unintentional deaths in the home and community.[8] Over 10% of those falls are stairway slip-and-falls. As such, walking surfaces shall be maintained so as to provide safe walking conditions and shall be slip resistant.[9] To meet this requirement during wintertime in New England, property owners, operators and wintertime maintenance contractors must implement a comprehensive snow and ice management plan that contains, among other attributes, a deliberate focus on pedestrian safety. Due to the high annual rate of injury and loss resulting from ice-induced slips and falls in the U.S.[10], industry has developed widely accepted minimum standards for effective ice and snow management. These standards, as collected and summarized by industry experts such as the American Society for Testing and Materials (ASTM), and the Snow and Ice Management Association (SIMA), represent the minimum level of care owed to lawful users of premises, and serve as the basis of analysis for Mr. Fuerst's fall.[11,12]

Reasonable effort should be made prior to, and after a winter weather event (precipitation; thaw-refreeze) to ensure that exterior walkways and stairways are maintained free of ice and safe for pedestrian use. Reasonable ice management begins with planning the work such that it can be accomplished in a timely manner based on known and foreseeable patron use of the grounds and stairways. For property owners, reasonable planning requires knowledge of the premises, including identification of poor drainage and other special areas of consideration for treatment; and knowledge of current and upcoming weather conditions, air temperature trends, and, most importantly, surface temperature trends. The property owner is then expected to deliver, in a timely and deliberate manner, execution of planned work, which would include inspections, anti-icing, de-icing, and treatment for refreezing.[13]

As such, effective planning requires a strong understanding of the freezing process.[14] Simply put, for ice to form, temperatures must be below freezing, and moisture must be present. The rate at which ice forms on a

---

[7] ASTM F2966-13, *Standard Guide for Snow and Ice Control for Walkway Surfaces*; Section 5.1.2-5.1.3, 5.1.7
[8] National Center for Injury Prevention and Control, CDC; (https://webappa.cdc.gov/cgi-bin/broker.exe); Data Source: Consumer Product Safety Commission (CPSC) NEISS Program; 2014
[9] ASTM F1637-10, *Standard for Safe Walking Surfaces*; Section 5.7; 2010
[10] *Managing Slip, Trip and Fall Risks in Snow and Ice Prone Regions*; Zurich Service Corporation; 2011; Page 4
[11] *Best Practices Checklist for Snow & Ice Management*; Snow and Ice Management Association (SIMA); March 2013
[12] ASTM F2966-13, *Standard Guide for Snow and Ice Control for Walkway Surfaces*; 2013
[13] ASTM F2966-13, *Standard Guide for Snow and Ice Control for Walkway Surfaces*; Section 5.1.2-5.1.3, 5.1.7
[14] *Surface Temperatures are Key to Deicing Strategies*; Keep, Dale; GoPlow.Com; October 2011

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

surface depends on many variables but is most dependent on surface temperature. Based on the stockpiles of snow immediately adjacent to the stairway and the weather preceding Mr. Fuerst's fall, it stands to reason that ice would have been prevalent on the stairway walking surfaces at the time of his fall. Specifically, the common conditions necessary to promote *black ice* formation were present. The term *black ice* refers to the formation of a thin, clear layer of ice on a surface.

In this case, the ground surface temperatures were influenced by two of the three modes of heat transfer: conduction and radiation. Because heat moves from hot to cold, air temperature will influence surface temperature and vice versa through *conduction*, the transfer of energy (heat) between two substances in contact. The rate of heat flow through conduction is described by Fourier's Law, and can be measured based on the temperature difference between hot and cold, the thickness of the material, and the *thermal conductivity* of the material. A material's thermal conductivity is simply the measure of ability to allow heat to flow through it. There are two important concepts to remember with heat flow: First, heat travels from hot to cold until the temperature of the two substances are equal, a state known as *thermal equilibrium*; Second, materials do not instantaneously achieve equilibrium, but instead reach equilibrium over some period of time based on temperature differential and material properties.

Prior to the DOI, the average air temperature was 23°F, with an average low of 10°F. As such, ground temperatures below the concrete steps of the stairway would have remained below freezing, at approximately 20°F on the morning of the DOI.[15] The concrete surface was subject to a short period of conductive heating from the warmer air on the day before the DOI, as well as radiant heating from the afternoon sun. However, the majority of that heat would have radiated back into the cold atmosphere under clear skies overnight, a process known as *reverse radiation*. In this case, the region experienced reverse radiation into the early morning hours of the DOI, causing air temperatures to drop rapidly over the preceding 12 hours from 40°F down to 13°F. Based on an average air temperature below the point of freezing for days leading up to the DOI, the reverse radiation from the surface at night and an air temperature of 13°F in the early morning hours, the concrete surface temperature of the stairway would have been 18°F - 22°F on the morning of the DOI.[16]

As previously stated, for ice to form on a cold surface, moisture must be present. In this case, the source of moisture was snowmelt from the adjacent stockpiles which encroached several feet into the concrete stairway. Based on the height of the base lodge building and the movement of the sun, the snow embankment on the south side of the stairway would have been exposed to radiant heat from the sun for 2 hours. Because snow is far less dense that concrete, the snow would have experienced approximately ½ in. of melt before the sun could warm the concrete surface temperature above freezing. Based on the approximate size and surface area of the snow embankment as determined using photogrammetry, the snowmelt would have yielded approximately 2 gallons of moisture per concrete step.[17] Photographs of the stairway on the DOI reveal that significant amounts of moisture from snowmelt encroached further into the stairway system.

Leading up to Mr. Fuerst's fall, moisture was present as a result snowmelt from the encroaching snow embankment, and the surface temperature of the concrete stairway was below freezing. Based on review of the historic weather leading up to and on the DOI, the hydrologic characteristics of the stairway system

---

[15] Analysis based on Fourier's Law of Heat Transfer and Newton's Law of Cooling. Concrete *thermal conductivity* of 0.43 btu/ft.hr.deg F; assumed thickness of 12 inches; *Thermal conductivity* of soil = 0.5 btu/ft·hr°F; ground temps steady at 55°F at 4 feet; Time-averaged air temperature for 3 week period preceding fall; assumed 50 btu/hr heat contribution from building wall heat loss

[16] Analysis based on Fourier's Law of Heat Transfer; and Steffan-Boltzmann Principle of Radiation. Concrete *thermal conductivity* of 0.43 btu/ft.hr.deg F, and an *emissivity constant* of 0.83

[17] *Snow Melt and Flooding*; National Oceanographic and Atmospheric Association (NOAA); October 2011; based on wet density associated with nor'easter storms in New England, and interpolated for average temperature of 30°F, which is a compilation between the air temperature and the concrete surface temperature under radiant heating from the sun; 3 in. of snow ~ 1 in. of water. Approximately 8 s.f. of snow surface area per step ~ 2.6 gallons

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

observed during my site visit, and the photographs of the stairway system taken on the DOI, it is very likely that snowmelt from the stockpiled snow froze to form black ice on the sub-freezing concrete stairway walking surfaces. Based on the severity of injuries sustained from ice-induced falls, and the likelihood of ice formation on the subfreezing concrete stairway, WVSR should have reasonably anticipated and prevented, or otherwise treated the icy conditions on the stairway surface prior to known patron use of the stairway on the DOI.

WVSR should not have stockpiled snow adjacent to and on the foreseeable walking surfaces of the exterior egress stairway. In addition, WVSR should have identified the egress stairway as a special area that required frequent observation and treatment, especially given that the stairway had no handrails, and many patrons would be using the stairway with ski boots. Ski boots, by design, lock the ankles and are constructed with smooth soles. At a minimum, given the high volume of patrons using the exterior stairway on any given day, WVSR should have posted an *ice watch* at the property.[18] An ice watch is a designated person who visually inspects the property at a high frequency to identify and treat the formation of ice. The most important inspection periods include mornings, evening, and after any known precipitation event, including low pressure storms, dew point convergence, and snowmelt conditions. Had WSVR posted an ice watch to make frequent inspections and treatment of the defective exterior stairway during the morning hours and ahead of known use of the stairway, then the dangerous icy condition would have been identified and adequately mitigated, and Mr. Fuerst's fall would more likely than not have been avoided.

In addition to routine inspections of the property, WSVR should have recognized the aforementioned conditions for ice formation and labored to either prevent the formation of ice (anti-icing) or treat the ice (deicing) on the foreseeable walking surfaces with the appropriate type of salt. In this case, WSVR should have applied chemical treatment for anti-icing and deicing. Specific to this case, based on the surface temperatures on the DOI, the use of NaCl, otherwise known as "rock salt", would have been marginally effective, but not ideal. That is because NaCl is *endothermic*, meaning it absorbs heat from its surroundings when reacting with water. Additionally, NaCl erodes and damages concrete surfaces over time. Given the lack of drainage and the concrete construction of the stairway, a more appropriate anti-icing and deicing chemical would have been either Calcium Chloride (CaCl), or an ice melt blend because CaCl is *exothermic*, meaning it releases heat to the surface when reacting with water, thus warming the surface on which it is applied. Regardless of the salt used, special consideration would have to be given to the method of application as salts are soluble in water, so snowmelt which flowed across the stairway walking surfaces would dilute, absorb, and otherwise wash the chemicals away over time. Additionally, over application of pellet forms of the NaCl or CaCl could have created a slipping hazard similar to a "marble effect". As such, WSVR should have lightly applied the salt across the surface and then labored to refresh the salt periodically as it washed away by snowmelt. Of note, there are no logs or evidence of any treatment of the stairway on the day before the DOI or the morning of the DOI preceding Mr. Fuerst's fall. WSVR did treat the stairway with NaCl *after* Mr. Fuerst's fall.

If chemical treatment was not a viable option on the DOI, then during the time immediately preceding, and during the known hours of patron use on the morning of the DOI, WSVR should have applied a judicious amount of sand to the stairway surfaces. The coefficient of friction of untreated ice is 0.25, well below the minimum requirement of 0.5. With the addition of sand, an abrasive, the coefficient of friction will increase to 0.58.[19] As such, sanding is an effective treatment of icy conditions. However, sanding operations must be performed correctly, or the sand will be ineffective. To this end, timing is of paramount importance when applying sand to icy walking surfaces. Sanding any time before the refreeze of melted snow will render the sand ineffective, because it would drop below the top surface of the ice. It is for this very reason that sand salt

---

[18] *Doing Your Duty*; Accredited Snow Contractors Association; January, 2012; Owners' & contractor's duty to prevent refreezing
[19] *Snow Engineering: Recent Advances- Proceeding of the 3rd International Conference*; Izumi, Nakamura, & Sack; May, 1996; Section 3.2, Table 1

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

mixtures are not recommended.  Use of a sand salt mixture guarantees that the user will be at least half wrong, as the salt and sand work in opposition to each other.  In this case, failure to prevent or abate the ice before known use of the stairway should have prompted the continuous application of sand or a similar abrasive on the foreseeable walking surface during known and expected hours of use.

*Failure to Maintain Safe Egress Stairs*:

The analysis of the dangerously defective stair condition is based on the applicable human factors as defined in the National Bureau of Standards' (NBS) widely accepted *Guidelines for Stair Safety*.[20]   Specifically, according to the NBS' *Guidelines to Stair Safety*, there are four phases to successful use of stairs:  Expectation, Perceptual, Negotiation, and Adjustment.  If a person fails in any of the four phases, they are subject to a loss of balance, fall, and possible injury.[21]  In the *expectation phase*, a person has an internalized image of stairs in general and their own ability to negotiate stairs in particular.  In the *perceptual phase*, the person then compares the actual stairway identified with the sensory to the internalized image of the stair to ensure they correspond.  After the person has completed the perceptual test, and has sufficient understanding of the stair, they enter the *negotiation phase*, where they adjust their gait to the stairs, and test the adequacy of their perception.  Lastly, during the *adjustment phase*, the person may have to adjust responses and gait to deviations between their perception of the stair and actual stair conditions.  In other words, the likelihood of a person's successful use of the stairs lies in their ability to accurately assess the condition of the stair relative to their experiences with past stair environments and adjust their gait accordingly.

The increased instability in a person's gait with ascending or descending stairs, and the importance of perceptual accuracy in assessing the condition of stairs prior to use are the foundation of the numerous codes and consensus industry standards that painstakingly regulate stairs in the built environment.   Given the importance of handrails as both a gait-assist apparatus, and a means to regain balance and prevent falls, handrails have long been, and remain one of the most prominent requirements for stairs in industry.  According to the NBS, there are at least four critical uses of a handrail on a stair:[22]

- To slide a hand while monitoring one's progress and stability
- To use as a pivot at corners
- To provide support for an elderly or infirm user
- To grab onto for support in the event of an accident

As previously explained, the concrete stairway where Mr. Fuerst fell in this case was also part of the means of egress from the building, specifically the *exit discharge*.[23]   As such, the stairway was also subject to the continuous maintenance provisions of the National Fire Protection Association (NFPA) 101 (aka *The*

---

[20]   The National Bureau of Standards (NBS), now known as the National Institute of Standards and Technology (NIST), was commissioned in 1978 by the CPSC to perform a comprehensive study of stair safety which included the common causes of injury, and recommendations to mitigate those conditions.  According to the CPSC, an estimated 2 million people fell on stairs annually from 1971-1976, with over half a million people a year suffering severe injury or death.  In 1979, the NBS published the *Guidelines for Stair Safety*, and those guidelines have been widely adopted by industry, and incorporated into modern codes and standards.

[21]   The National Bureau of Standards (NBS), *Guidelines for Stair Safety*; Section 1.2.4 – Model of Stair Safety and Use; 1979

[22]   The National Bureau of Standards (NBS), *Guidelines for Stair Safety*; Section 2.3.1 – Continuous Handrails; 1979

[23]   IBC 1027.6 Access to a Public Way:  The exit discharge shall provide direct access to the public way.  Exception:  Where access to a public way cannot be provided, a safe dispersal area shall be provided where all of the following are met:  1.) The area shall be of a size to accommodate at least 5 sq.-ft. per person; 2.)  The area shall be located on the same lot at least 50 ft. away from the building; 3.)  The area shall be permanently maintained and identified as a safe dispersal area; 4.)  The area shall be provided with safe and unobstructed path of travel from the building

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

*Life/Safety Code*), as adopted by the State of New Hampshire (RSA 153:5), and the egress code contained in the International Building Code (IBC) as modified and adopted by the state of New Hampshire (RSA 155-A:2). In this case, on the DOI, the stairway failed to meet the following minimum requirements:

- IBC 1001.3 – Means of egress shall be maintained in accordance with the New Hampshire State Fire Code

- NFPA 101, 4.6.13 – Means of egress systems required by code shall be continuously maintained in a code compliant condition

- NFPA 101 7.1.10 – Means of egress shall be continuously maintained free of all obstructions or impediments to full instant use in the case of fire or other emergencies

- NFPA 101, 7.1.6.4 – Slip Resistance: Walking surfaces shall be slip resistant under foreseeable conditions. The walking surface of each element of a means of egress shall be uniformly slip resistant along the natural path of travel

- NFPA 101 7.2.5.6.2 Outdoor Conditions – Outdoor stairways and outdoor approaches to stairway shall be designed so that water will not accumulate on walking surfaces

- NFPA 101 7.2.2.4.1.1 – Handrails: Existing stairs shall have at least one handrail; the handrail shall be between 34 and 38 in. in height

- NFPA 101 7.2.2.4.4.6, Handrail Graspability – Handrails shall have one of the following features:
  - A circular cross-section with an outside diameter of not less than 32 mm (1 ¼ in.) and not more than 51 mm (2 in.)
  - A shape other than circular with a perimeter dimension of not less than 100 mm (4 in.) but not more than 160 mm (6 ¼ in.)

*"A proper means of egress allows unobstructed travel at all times. Any type of barrier including, but not limited to, the accumulations of snow and ice in those climates subject to such accumulations is an impediment to free movement in the means of egress" NFPA 101, A7.1.10.1 Commentary, 2003*

Due to the age of the stairway system, it is prudent to address exceptions and relief to the aforementioned codes and standards on virtue of the long-existing conditions of the facility. Based on review of the discovery as well as review of historic imagery, the exterior stairway system appears to have been constructed in the 1990s. Therefore, as an alternative, this analysis will also consider the hazardous condition as a condition that existed prior to the adoption of current building and life-safety codes. Such a condition is known as *grandfathering*, which is the legal concept of protecting lawfully pre-existing, non-conforming used of land from later-enacted codes and regulations.

Building codes, including the Building Official Code Administration (BOCA) codes adopted by the State of New Hampshire prior to 2001, have required handrails on egress stairways for at least 5 decades prior to the DOI. On the DOI, the egress system should have been maintained to the provisions of the state fire code. There are no exceptions in the state fire code for age of the facility, nor does the fire code defer to past building codes. Simply put, the state fire code provides two standards of maintenance: new construction and existing facilities. To summarize, the stairway was not constructed to the minimum standards of the prevailing

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

building codes and was otherwise not maintained to the minimum prescriptive requirements for safe stairways as prescribed by the state fire code. As determined in *Fisher v. Building Code Review Board*, grandfathering does not excuse the health, safety and welfare of the public in anyway; nor does grandfathering preserve an unsafe condition that was the result of a lack of maintenance or failure to repair.[24]    Specifically, the NH Supreme Court determined that the provisions for existing facilities contained in the most current, enacted version of the fire code apply without exception, and regardless of the age of the existing facility.

*Human Factors*:

Analysis of the dangerously defective stairway requires an understanding of human factors associated with the use of stairways, and of the mechanics of the stairway walking surfaces.  *Human factors* are the means and methods in which humans interact with components of a system such as the built environment.  The system, in this case, was the exterior egress stairway.  Stairs serve a specific safety function in that they're intended to provide flush, stable walking surfaces which are dimensionally compatible with human scale and locomotion when ascending or descending a change in elevation.  As such, specific human factors considered in the analysis of stairway are components of human *anthropometry* and gait.[25,26,27] Anthropometry is the measure of physical characteristics of humans that inform design and construction.  The anthropometric data compiled by the NBS and published in NBSIR 76-1132, *Personnel Guardrails for the Prevention of Occupational Accidents*, as well as that published in the *Human Factors and Ergonomics Design Handbook, 3rd Edition* is used as a basis in this analysis.[28]

*Gait* is the measured pattern of movement of one's limbs as they move across a surface (i.e. walking), and is largely a function of their *base of support*.  Standing upright, a person's base of support is the area under their feet, including the area between their feet.  Generally, this area is traced from toe to toe and heel to heel.  When a person is standing still, the only force acting on their body is the Earth's gravity.  Against the pull of gravity, the larger the base of support, the more stable the body becomes in place.  When walking across a level surface, a person's *center of gravity*, the point through which the entire weight of a body is concentrated, is in front of the body's base of support in order to initiate and maintain motion in the forward direction.  As such, the horizontal vector component of the applied force at the point where the foot meets the walking surface is directed to the back of the body.  With the center of gravity forward, and the foot pushing to the rear, the body will temporarily be in an unstable position.  Therefore, in order to maintain an upright posture when walking, a person's stability then becomes a function of their ability to reestablish their base of support with each step.[29]    This motion is described by five successive phases of a gait: *heel strike* phase; *early flat foot* phase; *early heel rise* phase; *toe off* phase; and the *swing* phase.  After the person steps forward, stability is regained in the early flat foot phase (foot is down, ahead of center of gravity), and the body is most unstable during the toe off and swing phase (body pushes off with big toe, lifts foot and swings forward).

---

[24] *Fisher v. Building Code Review Board, 154 N.H. 585 (2006);* "There is no such thing as an inherent or vested right to imperil the health or impair the safety of the community"
[25] *The Human Factors and Ergonomics Design Handbook, 3rd Ed.*; Pgs 555-683, Human Factors Data; Tillman, Fitts, Woodson, Rose-Sundholm; 2016
[26] *Adaptability of Human Gait:  Implications for the Control of Locomotion.*; Pg 167-185, Mechanics of Human Gait; Patla, Aftab; 1991
[27] *Designing For People, An Introduction to Human Factors Engineering*; Chap 16, Safety Management; Lee, Wickens, Liu, Boyle; 2017
[28] *The Human Factors and Ergonomics Design Handbook, 3rd Ed.*; Pgs 555-683, Human Factors Data; Tillman, Fitts, Woodson, Rose-Sundholm; 2016
[29] *Adaptability of Human Gait:  Implications for the Control of Locomotion.*; Pg 173-185, Maintenance of balance; Patla, Aftab; 1991

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

Contrary to walking on a level surface, when a person intentionally descends down an incline or stairs, they want their center of gravity behind of their base of support, and the applied force between the foot and the walking surface is applied toward the front of the body to resist the downhill pull of gravity. Specifically, and contrary to walking across a horizontal surface, the foot lands on a stair tread in descent with the toe first, known as a *toe-strike* in lieu of a heel-strike. In the early stance of descent, the toes are put down before the heel and, as such, the transfer of energy between the foot and the underlying stair tread occurs at the forepart of the foot and, specifically, the ball of the foot. Additionally, the base of support is much smaller, because the swing let must extend downward to land on the surface at a lower elevation than, and closer to the plant leg. Because a person must descend against the pull of gravity, and they must do so with a smaller base of support, the body is more unstable and vulnerable to slipping during the toe-strike phase of the gait when descending stairs than is otherwise experienced when walking across a flat plane.

To prevent the body from falling, it is absolutely critical that the person be able to establish an adequate base of support. To do so in descent down a stairway, it is imperative that a person achieves a stable toe-strike to promote an uninterrupted transition into the flat foot phase of their gait on the stair tread. However, the surface contact area of the toe-strike is relatively small compared to that of the flat foot, and as such, the toe-strike phase of the gait is most dependent on adequate traction with the contact point on the walking surface.[30] This traction is a function of the physical contact between the bottom of the foot and the walking surface as the force applied to the surface by the foot changes with rotation about the ankle, known as ankle *extension* and *flexion*. Traction is especially important on an inclined surface where the toe-strike must accommodate both the impact force associated with ambulation, and the vector component of the Earth's gravity. The most critical component of a stable toe-strike is traction between the contact point of the foot and the surface of the stair tread. This traction is a function of the *friction*, or resistance to sliding between the bottom of the foot and the walking surface. If a person loses their balance when descending a stair, they can no longer rely on their gait to regain balance. In that case, only a handrail can help stop the descending fall in progress or prevent it from being extended further down the stair.[31] For that reason, handrails are an essential and necessary fall prevention apparatus in stairways.[32] They don't just help a person keep their balance, they also provide graspable support to regain balance and arrest falls.

## CONCLUSION

As previously stated, reasonable ice management starts with planning, which includes knowledge of the property drainage characteristics, and conditions necessary for the formation of ice. Ice-related falls remain one of the leading causes of wintertime pedestrian injuries. The formation of ice from the thaw and refreeze of residual snow is a common phenomenon throughout the winter months in New England, and proper wintertime maintenance necessarily requires provisions for ice control and abatement in areas where snowmelt may accumulate and refreeze on foreseeable walking surfaces. Given the likelihood and severity of injury from icy surfaces, property owners must exercise deliberate and diligent maintenance on exterior walking surfaces in ice-prone regions, such as Waterville Valley, NH.

In this case, WVSR should have repaired the dangerous stairway prior to the winter. Specifically, WVSR should have provided graspable handrails on both sides of the stairway, as well as intermediate handrails (~ $1,000). Graspable handrails, if made available, would have provided an opportunity for Mr. Fuerst to reestablish his base of support, regain his balance and arrest his fall. In addition to repairing the dangerously defective stairway, WVSR should have stockpiled snow away from the stairway, and labored to inspect and

---

[30] *Biomechanics of Human Gait – Slip and Fall Analysis*; TE Lockhart; Virginia Tech Univ.; 2013
[31] *Pedestrian Falling Accidents in Transit Terminals*; Federal Transit Administration; February, 1985; Section 2.2.2
[32] *Guidelines for Stair Safety*; National Bureau of Standards; NBS Building Science Series 120; Section 2.3; 1979

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

treat the known stairway walking surfaces so as to prevent the formation of ice, or otherwise melt ice from the surface in accordance with the standards of practice promulgated by SIMA, or as described in ASTM F2966-13, *Standard Guide for Snow and Ice Control for Walkway Surfaces*. Specifically, the WVSR should have been aware of the encroachment of snow stockpiles onto the egress stairway, and WVSR should have responded to weather forecasts and the likelihood of snowmelt and refreeze. With this knowledge of the encroachment of snow stockpiles onto the stairway and the weather conditions commensurate with melt-refreeze, WVSR should have inspected the surfaces at known times of ice accumulation in New England, including mornings, evenings, and after melt-refreeze events, and applied treatment to melt ice from the surface. Instead, based on review of the discovery, WVSR operated with a *snow bias* – a skewed emphasis on snow removal with an under-emphasized, if not absent protocol for ice management. Owners, operators and contractors who operate and maintain properties with a snow bias forget the cardinal rule of wintertime safety: Ice is dangerous.

Had the WVSR repaired the defective stairway, and labored to clear, treat, inspect, and maintain the foreseeable walking surfaces in accordance with industry codes and standards, Mr. Fuerst's injuries would more likely than not have been avoided. Instead, as a result of the WVSR's lack of winter maintenance procedures, its complacent attitude towards snow accumulation on the egress stairway, and its failure to clear, treat, inspect, and maintain the stairway during known freezing events, Mr. Fuerst, while descending the stairway in a reasonable and foreseeable manner, slipped and fell on dangerously inconspicuous, untreated ice and sustained serious injury.

This concludes my analysis of the snow and ice maintenance of the primary patron access and egress stairway for the Waterville Valley Ski Resort in Waterville, NH. I certify that my opinion is accurate to a reasonable degree of architectural and engineering certainty, and I certify that this disclosure accurately states the subject matter(s) on which I expect to testify, the substance of the facts and opinions to which I expect to testify, and a summary of the grounds for the opinions to which I expect to testify at trial.

Signed under the pains and penalties of perjury

George W. Melchior, R.A., P.E., LEED AP, ASM, WACH #183

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 1:  Arial image of the property showing the stairway in relation to the main building, and the approximate location of Mr. Dill's fall (red circle)



Illustration 2:  Image of stairway system in relation to the main lodge building and associated egress doors; of note, image was taken *after* WVSR altered the stairway (constructed mid-landing platform) following the DOI

Enclosure (1)

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 3:  Image of the stairway system taken on the day after the DOI; note the handrail system on the upper flight of stairs and the top of the lower flight of stairs are identical in construction [red circle illustrates approximate location of Mr. Fuerst's fall]

Enclosure (1)

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 4:   Image of the stairway system taken on the DOI showing encroachment of the snow pile, and melt on the stairway system; of note, the salt seen in the photograph was applied *after* Mr. Fuerst's fall [Red circle illustrates approximate location of fall]

Enclosure (1)

# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP



Illustration 5:  Image of the stairway system taken on the DOI showing encroachment of the snow pile, and melt on the stairway system; of note, the salt seen in the photograph was applied *after* Mr. Fuerst's fall

# EXHIBIT 5

## Timothy Tapply

| | |
|---|---|
| **From:** | Israel Piedra <ipiedra@lawyersnh.com> |
| **Sent:** | Sunday, July 18, 2021 12:38 PM |
| **To:** | Timothy Tapply |
| **Subject:** | RE: George Melchiore |

Tim, Since it was a brief, non-destructive, visual inspection of existing exterior stairs we did not think it necessary to coordinate.  Let me know if you want to discuss further
Thanks
Israel

**Israel F. Piedra, Esq.**
Welts, White & Fontaine, P.C.
29 Factory Street
Nashua  NH  03061
Tel  (603) 883-0797
www.lawyersnh.com


**From:** Timothy Tapply <ttapply@brandtapply.com>
**Sent:** Friday, July 16, 2021 1:27 PM
**To:** Israel Piedra <ipiedra@lawyersnh.com>
**Subject:** George Melchiore

Israel:  I do not recall your office giving me advance notice that your expert would be visiting Waterville Valley to do an inspection.  Kindly forward the communication from your office in which you provided my office such notice.

Tim

Timothy W. Tapply, Esq.
Brand & Tapply, LLC
555 Washington Street, Suite 6
Wellesley, MA 02482
ttapply@brandtapply.com
781-431-7878 x14 t.
781-431-7844 f.

NY office:
5 Penn Plaza, 23rd Floor
New York, NY 10001

*If you are receiving this email at an odd hour, please excuse the interruption.  Unless otherwise discussed, I do not anticipate a reply until the next regular business hours.*

This email contains information from Brand & Tapply, LLC, which is confidential and/or privileged. This information is intended to be for the use of the addressee named on this email. If you are not the addressee, note that any disclosure, photocopying, distribution, or use of the contents of this information is prohibited. If you have received this email in error, please immediately notify us at 781-431-7878 or forward said email back to us.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Glenn Fuerst, et al | | |
| | Plaintiff | |
| v. | | Civil Action No. 1:20-cv-00369-AJ |
| WVSR, LLC. | | |
| | Defendant | |

### AFFIDAVIT OF CHRISTOPHER HODGES

1. I, Christopher G. Hodges, am the Director of Public Safety, Fire Chief, and Building Commissioner for the Town of Waterville Valley, NH.  The following is within my personal knowledge.

2. I have been employed by the Town of Waterville Valley, NH since  2001

3. I have been made aware of a lawsuit against Waterville Valley Ski Area having to do with a fall happening in March of 2019 on a set of exterior concrete stair next to the base lodge.  I am very familiar with these stairs having visited Waterville Valley personally and professionally many, many times.  The photograph attached as Exhibit A represents the concrete stairs on which, I understand, the plaintiff in this matter had fallen.

4. Those concrete stairs have been in place at Waterville for many years.  They have been there since at least the early 1990's.

5. In my position I am familiar with the New Hampshire State Building Code, the International Building Code, as well as the BOCA Building Code.

6. We routinely conduct Life Safety Inspections at Waterville Valley.  Those inspections include all means of egress and would identify any building code violations, if one existed.

7. The concrete stairs in question are not included within the emergency path of egress from the building.  Because they are not within the means of egress, they are not subject to the New Hampshire State Building Code regarding handrails.  As such, despite multiple inspections and visits to Waterville Valley, I have never notified anyone at Waterville Valley Ski Area that a railing is required because I do not believe such a railing is a requirement.

8. The path of egress from the lodge would be to exit the building, proceed down a short flight of stairs from the deck and then out into the courtyard (past the blue ski racks in the attached photograph). The path of emergency egress would not take someone down those stairs.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _30_ DAY OF JULY, 2021.

CHRISTOPHER G. HODGES

# EXHIBIT 7



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP

601 Islington Street
Suite 202
Portsmouth, NH  03801

Voice:  603.828.8168
Email: gwmelchior3@gmail.com

# Curriculum Vitae

### *AREAS OF EXPERTISE:*

- Building Codes and Standards
- Facility Operations
- Construction Safety
- General Industry Safety
- Construction Defects
- Snow and Ice Maintenance
- Interior/ Exterior Walking Surfaces & Stairways
- Traffic Analysis
- Structural Analysis
- Building Life Safety Systems
- Marine Engineering and Safety Systems

### *QUALIFICATIONS:*

- Registered Architect (RA)
- Professional Engineer (PE)
- ANSI/ NFSI Walkway Auditor Certificate Holder (WACH) #183
- LEED Accredited Professional (LEED AP BD+C)
- Advanced Snow Manager (ASM)
- NH DES Certified Salt Applicator (per RSA 489-C)
- Certified DAWIA Level III Facilities Engineer
- LEAN/ Six Sigma Green Belt
- OSHA Certification – Construction
- OSHA Certification – General Industry
- EM-385 Certification (DoD Construction Safety)
- Warranted Contracting Officer (DoD)



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP

### *EDUCATION:*

- <u>Masters of Business Administration</u> (Honors) 2007 – University of New Hampshire, Durham, NH

- <u>Bachelor of Architecture</u> (Honors) 1998 – Illinois Institute of Technology, Chicago, IL

- <u>Bachelor of Science Civil Engineering</u> (Honors) 1998 – Illinois Institute of Technology, Chicago, IL

- <u>Minor in Naval Science</u> 1998 – Illinois Institute of Technology, Chicago, IL

- <u>Naval Surface Warfare School – Naval Architecture and Marine Engineering Systems</u> 1999; 2002 – US Navy Surface Warfare School, Newport, RI

- <u>Graduate Certificate – Advanced Occupational Ergonomics</u> 2020 – Colorado State University

### *CONTINUING EDUCATION:*

- Navy Facilities Engineering 40-hour Construction Safety Certificate
- OSHA Voluntary Protection Program Member (OSHA Star site)
- Operation Risk Management (ORM) for Industrial Activities
- Construction Contracting (Defense Acquisition University)
- Construction Contract Law (Defense Acquisition University)
- Snow and Ice Management Association (SIMA) Continuing Education
- Green SnowPro – UNH Technology Training Center
- ANSI/SIMA-10, Standard Practice for Procuring and Planning Snow and Ice Mgt Services

### *AFFILIATIONS:*

- National Safety Council (NSC)
- Snow and Ice Management Association (SIMA)
- National Floor Safety Institute (NFSI)
- Illuminating Engineering Society (IES)
- Fenestration and Glazing Industry Alliance (FGIA) Professional Member
- International CPTED Association (ICA)
- Gait and Clinical Movement Analysis Society (GCMAS)



# GWM Consulting

George W. Melchior, R.A., P.E., LEED AP

## *WORK EXPERIENCE:*

**SPITBANK DESIGN,  November 2018 – Present**                    **Portsmouth, NH**

- <u>Design and Consultation</u> -- Architectural and engineering design for residential, commercial, and government markets; facility planning; facility assessments; walkway auditing; liability consulting

**NAVY FACILITIES ENGINEERING COMMAND,  May 2009 – November 2018      Kittery, ME**

- <u>Construction Management</u> – Responsible for design reviews; constructability reviews; cost and schedule analysis; safety oversight; and quality control for over $100M in facility construction, utility, and civil works projects across the northeastern U.S.

- <u>Health and Safety</u> – Managed robust facilities safety program in support of current OSHA Volunteer Protection Program (VPP) Star status for a 200+ year old heavy industrial nuclear shipyard.   Responsible for prioritization, programming and adjudication of more than 400 facility and installation-wide health and safety deficiencies annually.   Oversee construction risk and safety program in support of $120M/year construction program.

- <u>Facilities Management</u> – Oversaw facilities management efforts for 20 military installations throughout the northeast.  Responsibilities included planning; project programming and development; code analysis; design review; construction safety and quality assurance; facilities assessments; OSHA compliance for workplace safety; and facilities operations and maintenance, including snow and ice management.   Major occupancies included heavy industrial manufacturing, global communications, military training, retail, tourism, storage and office.  Total asset value for facilities under management exceeds $2B.

- <u>Cultural Resources</u> – Reviewed all projects, initiatives and real estate transactions to ensure compliance with the Secretary of Interior's Standards for Historic Preservation and associated mandates as prescribed by the Sections 103 and 106 of the National Historic Preservation Act (NHPA).

- <u>Architectural Branch Head</u> – Managed architectural branch responsible for multi-disciplinary design in support of $45M/ year in facilities construction projects.



**GWM Consulting**

George W. Melchior, R.A., P.E., LEED AP

**WALKER PARKING CONSULTANTS,  March 2007 – May 2009**                    **Boston, MA**

- <u>Parking Consultant</u> – Provided consulting services to various private and municipal clients throughout the northeastern United States.  Consultation included the areas of functional design; architectural and structural design; code compliance; pedestrian safety; crime prevention; access control systems; and operations and maintenance

- <u>Project Manager</u> – Responsible for functional, architectural and structural design and construction administration of 15 parking structures throughout the United States and abroad. Aggregate construction value: $280M.  Projects included:

- <u>Project Architect/Engineer</u> – Performed integrated architectural and structural design on 11 precast and cast-in-place concrete parking garages, and more than a dozen building restoration projects, including structural retrofits and building envelope repair.  Projects included:

**US NAVY (Active Duty),    Prior to March 2007**

- <u>Construction Manager</u> – Managed design and construction projects ranging in value from $150K to $25M.  Responsible for all aspects of construction contract administration and management with specific emphasis on site safety and quality assurance.  Examples of projects managed include:

- <u>Military Engineer</u> – Performed battle damage analyses during combat operations; post-combat infrastructure assessments; engineering feasibility studies; and provided construction oversight and management in hostile regions of Fallujah, Najaf and Baghdad, Iraq

- <u>Surface Warfare Officer, US Navy</u> – Engineering officer on several ships responsible for engineering plant operations and maintenance for cogeneration gas turbines, boilers, and diesel engine plants.  Responsibilities included shipboard safety at sea; fire fighting and damage control; engineering analysis; troubleshooting; casualty control; maintenance scheduling; and personnel management in support of safe navigation and plant operations and maintenance.   Qualified Surface Warfare Officer (SWO); and Engineering Officer of the Watch (EOOW) on both gas turbine cogen plant, and diesel plant

# EXHIBIT 8

*In the Matter Of:*

GLENN and DONNA FUERST

VS

WVSR

---

TIMOTHY SMITH

May 10, 2021

---



**Certified
Videographers & Court Reporters
VIDEOCONFERENCING**

**603-666-4100
Toll Free: 1-888-212-2072**

814 Elm Street * Suite 400 * Manchester, NH  03101
Fax: 603-666-4145 * Email: info@avicorereporting.com
Website: www.avicorereporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * *
                         *
GLENN and DONNA FUERST    *
                         *
        vs.              *   No. 1:20-cv-369-AJ
                         *
WVSR, LLC                *
                         *
* * * * * * * * * * * * * *
```

DEPOSITION OF TIMOTHY SMITH

Deposition taken by agreement of
counsel via Zoom on Monday,
May 10, 2021, commencing at 9:30
a.m.

Court Reporter: Sandra Day, LCR
            LCR #27 (RSA 310-A:161-181)

---

**2**

1                   APPEARANCES
2   For the Plaintiffs:   WELTS, WHITE & FONTAINE, PC
                          29 Factory Street
3                         Nashua, NH  03061
                          By:  Jack White, Esq.
4                         Israel F. Piedra, Esq.
                          (603) 546-1652
5                         jwhite@lawyersnh.com
                          Ipiedra@lawyersnh.com
6
    For the Defendant:    BRAND & TAPPLY, LLC
7                         555 Washington Street, Suite 6
                          Wellesley, MA  02482
8                         By:  Timothy Tapply, Esq.
                          (781) 431-7878
9                         ttapply@brandtapply.com
10                  STIPULATIONS
11          It is agreed that the deposition shall
12  be taken in the first instance in stenotype and when
13  transcribed may be used for all purposes for which
14  depositions are competent under New Hampshire
15  practice.
16          Notice, filing, caption and all other
17  formalities are waived.  All objections except as to
18  form are reserved and may be taken in court at time
19  of trial.
20          It is further agreed that if the
21  deposition is not signed within thirty (30) days
22  after submission to counsel, the signature of the
23  deponent is waived.

---

**3**

```
1               I N D E X
2
3   WITNESS:    Timothy Smith
4
5   EXAMINATION                                Page
6   By Mr. White                                 5
7   By Mr. Tapply                              134
8   By Mr. White                               139
9   By Mr. Tapply                              141
10  By Mr. White                               142
11
12  EXHIBITS FOR IDENTIFICATION:
13  Smith          Description               Page
14  Exhibit 1      Notice of Rule 30(b)(6)     12
                   Deposition dated 4-14-21
15
    Exhibit 2      Interrogatories             14
16
    Exhibit 3      Incident Report Form dated  14
17                 3-13-19
18  Exhibit 4      Photograph                  65
19  Exhibit 5      Photograph                  67
20  Exhibit 6      Photograph                  69
21  Exhibit 7      Photograph                  72
22  Exhibit 8      Photograph                  73
23  Exhibit 9      Photograph                  98
```

---

**4**

```
1   Exhibit 10     Photograph                 100
2   Exhibit 11     Photograph                 105
3   Exhibit 12     Photograph                 105
4   Exhibit 13     Photograph                 111
5   Exhibit 14     Photograph                 111
6   Exhibit 15     Photograph                 124
7
8
    (Electronically marked exhibits provided to all
9   counsel.)
```
10
11
12
13
14
15
16
17
18
19
20
21
22
23

5

1          TIMOTHY SMITH
2 having been duly sworn by the court reporter,
3 under RSA 310-A:181, Limited Notarial
4 Function, was deposed and testified as
5 follows:
6          EXAMINATION
7 BY MR. WHITE:
8    Q.    Could you please state your name and
9 address for the record.
10    A.    Tim Smith, 97 Border Path, Waterville
11 Valley, New Hampshire.
12    Q.    So this is a bit unusual because
13 normally we would be in the same room, but we're
14 obviously doing this by video, so just a few ground
15 rules besides some of the usual ground rules.
16      So as we talked about just before we
17 went on camera here, if you could wait for me to
18 finish my question, I'll wait for you to finish your
19 answer so we don't talk over each other. Is that
20 understood?
21    A.    Yep.
22    Q.    And I'm going to assume, if you answer
23 the question, that you understood my question. Is

6

1 that also agreed?
2    A.    Yes.
3    Q.    If at any time I've asked a question
4 you don't understand, will you let me know and I'll
5 try to rephrase it?
6    A.    Yes.
7    Q.    If you need to take a break at any
8 time, that's perfectly fine; just please answer the
9 question and then we can take a break.
10    A.    Okay.
11    Q.    And then finally, is there anybody with
12 you in the room or anyone else around that's going to
13 be in this deposition with you?
14    A.    No.
15    Q.    And is your computer turned off, other
16 than just the video portion?
17    A.    I have another monitor running. Do you
18 want me to turn that off?
19    Q.    Would you mind?
20    A.    It's off.
21    Q.    Thank you. Do you have any questions
22 before we begin?
23    A.    No.

7

1      MR. WHITE: So, Tim, standard
2 stipulations?
3      MR. TAPPLY: That's fine. And, Jack, I
4 think you said a moment ago when you just came on the
5 record you referenced a conversation that you had
6 before we went on the record, and I don't think there
7 was any conversation before we came on the record
8 because I hadn't joined yet, but it probably doesn't
9 matter much but just wanted to clarify.
10      MR. WHITE: Well, the conversation was
11 actually Ms. Day just reminded Tim about the
12 importance of not talking over each other because
13 Zoom will cut off the audio. That's what I was
14 referring to.
15      MR. TAPPLY: I see. Thank you.
16 BY MR. WHITE:
17    Q.    So, Tim, could you tell me your
18 occupation and title.
19    A.    I'm president and general manager of
20 Waterville Valley Resort.
21    Q.    And when did you take on that role?
22    A.    2016.
23    Q.    And have you remained in that role

8

1 throughout to the present?
2    A.    Yes.
3    Q.    Have you previously given any
4 depositions?
5    A.    Yes.
6    Q.    Do you recall when?
7    A.    I think it was 2014. It would have
8 been the summer.
9    Q.    What case was that?
10    A.    A case from Crotched Mountain Ski area
11 where a young person had fallen from the chairlift
12 and the mother had fallen, also.
13    Q.    Was that the Jean Perry case?
14    A.    Yes, it was.
15    Q.    Any other depositions you've been
16 involved in?
17    A.    No.
18    Q.    Have you ever testified in court?
19    A.    Yes.
20    Q.    In what capacity?
21    A.    I was a manager of a case at
22 Mt. Holiday where I was a witness -- or a character
23 witness to the defendant.

9

1    Q.    Were you offering factual testimony or
2 for expert testimony?
3    A.    Can you please define the difference.
4    Q.    Sure.  Were you offering something that
5 would be beyond the knowledge of the average person
6 in your testimony, or was it something that you
7 actually just personally saw?
8    A.    It was a bit of both.
9    Q.    Can you tell me a little bit about what
10 you testified to.
11    A.    It was a sexual harassment case that
12 was brought up due to an incident between a manager
13 and a subordinate in a lift shack.
14    Q.    Any other time you testified in court?
15    A.    No.
16    Q.    Ever been on a jury?
17    A.    No.
18    Q.    Can you just tell me briefly any
19 educational courses or training you've had since,
20 let's say, 2018.
21    A.    2018, I go to LMS every year, a lift
22 maintenance seminar in Massachusetts.  So I would
23 have gone to that.  I normally attend NSAA seminars,

10

1 the fall seminar which is held in, I believe, Sunday
2 River, and the winter seminar which rotates between
3 Mt. Snow and Killington by -- every two years they
4 rotate.
5         I'm trying to think.  We also had some
6 managerial education courses here at Waterville that
7 were put on by MEMIC, and then we had another
8 managerial course put on by -- I forget her name --
9 Laura Moriarty.  I'm trying to think what else.  I
10 think that covers it from 2018.
11    Q.    And can you tell me what those acronyms
12 are, what they mean, what you just referenced.
13    A.    National Ski Areas Association and Lift
14 Maintenance Seminar.
15    Q.    What was the WENAC (phonetic) one?
16    A.    WENAC?
17    Q.    Yes.
18    A.    MEMIC, are you talking MEMIC?
19    Q.    Oh, yes.
20    A.    MEMIC is a workmen's comp insurance
21 company that does -- that we have our workmen's comp
22 through and we do a training through.
23    Q.    Did they provide you with written

11

1 materials?
2    A.    Yes, they did.
3    Q.    And do you have copies of those written
4 materials from those courses that you attended?
5    A.    I no longer do.
6    Q.    Is that because you threw them away, or
7 what happened to them?
8    A.    Yeah, I recently moved my office.
9    Q.    Do you have syllabuses for those
10 courses that you attended?
11    A.    Most likely in my e-mail.  I'm not -- I
12 can't recall.
13        MR. WHITE:  Tim, would you ask
14 Mr. Smith, when we're done the deposition, to provide
15 me with those syllabuses for those courses he's taken
16 since 2018?
17        MR. TAPPLY:  I'll review the request
18 and review -- there could be confidentiality
19 agreements relative to some of those trainings and
20 seminars.  So I'd have to review that, but it's
21 certainly something we'll continue to discuss off the
22 record after the depo for sure.
23        MR. WHITE:  Thank you.

12

1 BY MR. WHITE:
2    Q.    Did any of the courses that you
3 attended since 2018 have anything to do with winter
4 maintenance of exterior stairs or walkways?
5    A.    No.
6    Q.    What licenses do you currently hold,
7 Mr. Smith?
8    A.    Outside of a driver's license, none.
9    Q.    Okay.  So I'm going to ask the steno to
10 mark Exhibit 1, which is the Notice of the Rule
11 30(b)(6) Deposition, which is populated to the screen
12 just to refresh your memory.
13        (Smith Exhibit No. 1 referenced.)
14 BY MR. WHITE:
15    Q.    So do you remember receiving this?
16 It's a four-page document or five-page document.  Do
17 you remember seeing this document, Mr. Smith?
18    A.    Yes.
19    Q.    And did you have a chance to review it?
20    A.    Yes.
21        MR. WHITE:  So could we have this
22 marked as Exhibit 1, please.
23

**13**

1 BY MR. WHITE:

2    Q.    So it's fair to say you've known about
3 this deposition for several months, is that correct?

4    A.    Yes.

5    Q.    And you've known some of the topics we
6 were going to discuss as well?

7    A.    Yes.

8    Q.    What did you do to prepare for this
9 deposition?

10    A.    I reviewed the Exhibit 1 that you're
11 displaying now.  I reviewed the accident report and I
12 spoke with Tim Tapply.

13    Q.    Okay.  Did you review your
14 interrogatory answers as well?

15    A.    The answers in this report?

16    Q.    Well, the answers to questions that we
17 had sent you back in -- early in the case.

18    A.    Yes.

19    Q.    Okay.  So why don't we mark the -- keep
20 the record straight, would you bring up the
21 interrogatory answers, which are the next exhibit.

22         You've had a chance to review those as
23 well?

**14**

1    A.    Yes.

2         MR. WHITE:  Why don't we mark that as
3 Exhibit 2, please.

4         (Smith Exhibit No. 2 referenced.)

5 BY MR. WHITE:

6    Q.    And then you said you also reviewed the
7 incident report.  Could you bring that up, please,
8 which I think is the next exhibit.

9         Is that correct, Mr. Smith, you
10 reviewed this exhibit?

11    A.    Yes, I did.

12         MR. WHITE:  Could we have that marked
13 as Exhibit 3, please.

14         (Smith Exhibit No. 3 referenced.)

15 BY MR. WHITE:

16    Q.    And I don't want you to tell me
17 anything you talked to Mr. Tapply about, but other
18 than these documents and your conversation with
19 Mr. Tapply, you did not do anything else to prepare
20 for the deposition?

21    A.    No, I did not.

22    Q.    So I take it you did not interview
23 anyone else that might have been involved in this

**15**

1 incident?

2    A.    Correct.

3    Q.    When you reviewed Exhibit 2, the
4 interrogatory answers, were there any answers that
5 you need to revise or update?

6    A.    Yes.

7    Q.    Can you tell me which ones.  Would you
8 like me to bring up the document for you?

9    A.    Yeah, if you don't mind.

10    Q.    Can you bring up Exhibit 2.  Please
11 tell us when to stop.

12    A.    Stop.  Question two -- oh, sorry, no,
13 that's not it.  Keep going down.  Four.  Upon further
14 review of time cards, we found that Billy and Charlie
15 were not the individuals at the -- responsible for
16 the staircase that day; it was Chris Pitmen and Tim
17 Kirwin.

18    Q.    So Krista?

19    A.    Chris.

20    Q.    Last name?

21    A.    Chris Pitmen.

22    Q.    Spell it.

23    A.    Oh, P-i-t-m-e-n.

**16**

1    Q.    M-e-n?

2    A.    Yeah.

3    Q.    The other person?

4    A.    Tim Kirwin.

5    Q.    K-i-r-w-i-n?

6    A.    Yep.

7    Q.    And when you say "we reviewed time
8 cards," who is "we"?

9    A.    Allison Gillmen, HR manager.

10    Q.    And how do you spell Allison's last
11 name?

12    A.    G-i-l-m-e-n.

13    Q.    And when did you speak with Allison and
14 uncover this mistake?

15    A.    Oh, I believe that was in the
16 wintertime.  So that would have been maybe a month or
17 two ago, two months.  It was a while back; it could
18 have been further.

19    Q.    Other than this discussion you had with
20 Allison regarding the correct employees who were
21 taking care of maintenance, did you have any other
22 conversations with her?

23    A.    No -- well, I should say yes, I did

17

1 have other conversations, not regarding this case.
2    Q.    That's fine.  Thank you for clarifying
3 that.
4          Other than interrogatory four and
5 correcting the answer, are there any other
6 corrections we should make?
7    A.    No.
8    Q.    Thank you.  So just for the record,
9 other than your conversations with Attorney Tapply,
10 reviewing interrogatory answers and the incident
11 report, you've not done anything to prepare for this
12 deposition?
13    A.    Correct.
14          MR. WHITE:  Can we bring up Exhibit 3
15 for a second.
16          THE REPORTER:  Yes.
17 BY MR. WHITE:
18    Q.    This Exhibit 3, Incident Report Form,
19 is this the only documentation of the incident that
20 exists?
21    A.    That I'm aware of.
22          MR. WHITE:  Read back the question.
23          (Question and answer read.)

18

1 BY MR. WHITE:
2    Q.    Other than the Incident Report Form,
3 what other documents might exist out there that you
4 might not be aware of but could exist?
5          MR. TAPPLY:  Objection.
6          THE WITNESS:  Am I to answer?
7 BY MR. WHITE:
8    Q.    Yes, please.
9          MR. TAPPLY:  You can answer the
10 question.
11          THE WITNESS:  I don't know.  I just
12 don't want to speculate that it could be the only one
13 that exists.  I'm unaware of any others that would
14 exist.
15 BY MR. WHITE:
16    Q.    Thank you.  So turning now to the
17 corporate structure, employee hierarchy at Waterville
18 Valley, can you walk me through that hierarchy.  Are
19 you the top person on the chart, for example --
20    A.    I am below the CEO and chair of the
21 board, John H. Sununu.
22    Q.    And so would it be easy for you to draw
23 a chart, Tim, or could you take me through it

19

1 verbally?  I'm just trying to understand and I'm
2 trying just to make it simple.  I'm trying to
3 understand what department heads report to you, and
4 eventually I'm trying to make my way down to the
5 parties or people that would be responsible for
6 maintenance of these stairs and the walkways.
7    A.    Okay.  So I am -- I have direct --
8 three direct reports of senior directors; one for
9 lodging, one for operations, and one for marketing
10 and sales.  I also have plant team members, of which
11 we have -- that are direct reports to me --
12 accounting, human resources, food and beverage
13 direction and other departments.
14          But the operations senior director,
15 Barry St. Cyr, would be the direct report to me that
16 would have buildings and grounds department under
17 him.  Buildings and grounds department has a -- at
18 that time, had a manager and below that manager would
19 have had employees for the mountain facilities.
20    Q.    Okay.  And those employees for the
21 mountain facilities would be the ones who would do
22 the actual physical work on the stairs at issue?
23    A.    Correct.

20

1    Q.    And so, for example, Chris Pitmen and
2 Tim Kirwin would have reported to the manager?
3    A.    I believe at that time Tim would have
4 been the supervisor on duty; Chris would have been
5 the staff member.
6    Q.    Okay.  And Barry would have been Tim's
7 boss, then?
8    A.    Yes, I believe so.
9    Q.    Is Barry St. Cyr still with the
10 company?
11    A.    Yes, he is.
12    Q.    Is there a reason that you didn't talk
13 to Barry St. Cyr to prepare for this deposition?
14    A.    No reason.
15    Q.    I mean he's available, correct?
16    A.    Yes, I spoke to him this morning.
17    Q.    But not about this case?
18    A.    Correct.
19    Q.    And you also could have talked -- and I
20 assume could have talked to Tim Kirwin or Chris
21 Pitmen as well, correct?
22    A.    I could have, yes.
23    Q.    Is there a reason that you didn't?

21

1    A.    No.
2    Q.    So who would have the -- let me back
3  up.  I just want to make sure I say this correctly.
4  So if I did a vertical line of kind of
5  responsibility, starting with you, Mr. St. Cyr
6  reports to you, correct?
7    A.    Correct.
8    Q.    Tim Kirwin reports to Mr. St. Cyr,
9  correct?
10    A.    Oh, sorry, there's one missing, Doug
11  Franklin at that time.
12    Q.    And where does he fit in that --
13    A.    He's the manager of buildings and
14  grounds -- at that time, was the manager of buildings
15  and grounds.  He no longer works for the company.
16    Q.    Okay.  So let me say it again.  So that
17  the chain of command for these stairs -- and we're
18  talking about the stairs where Mr. Glenn Fuerst fell.
19  You know what stairs I'm referring to?
20    A.    Yes, I do.
21    Q.    So from a vertical standpoint starting
22  with you, operations is led by Barry St. Cyr,
23  correct?

22

1    A.    Correct.
2    Q.    And beneath him is the buildings and
3  grounds manager, which was then Doug Franklin,
4  correct?
5    A.    Correct.
6    Q.    And beneath Mr. Franklin, is that Tim
7  Kirwin, who was the supervisor, correct?
8    A.    Correct.
9    Q.    And then Chris Pitmen would be a worker
10  who would be below Tim Kirwin?
11    A.    Correct.
12    Q.    When did Mr. Franklin leave the
13  company?
14    A.    Where or when?
15    Q.    When?
16    A.    Oh, probably six to eight months ago.
17    Q.    Do you know why he left?
18    A.    He was dissatisfied in his job.
19    Q.    Do you know where he lives these days?
20    A.    I do not.
21    Q.    I assume HR would have his address
22  because they would have sent him recently a W-2 for
23  work?

23

1    A.    Yes.
2        MR. WHITE:  Tim, would you provide me
3  with his address?
4        MR. TAPPLY:  I'll analyze that and get
5  back to you.
6  BY MR. WHITE:
7    Q.    Did you speak to Mr. Franklin about
8  this incident?
9    A.    No.
10    Q.    So of the people we just spoke about in
11  that vertical line, can you tell me how, on a
12  day-to-day basis -- strike that.
13        Who, in this line of command or chain
14  of command, on a day-to-day basis would have
15  responsibility for the safe maintenance of the stairs
16  at issue in this case?
17    A.    All of us.
18    Q.    Is there any policy or procedure as to
19  how those stairs are maintained?
20    A.    There's no written policy or procedure.
21    Q.    Is there any written policy or
22  procedure for any of the exterior walkways or stairs
23  at Waterville Valley?

24

1    A.    No.
2    Q.    How about for interior stairs or
3  walkways?
4    A.    No.
5    Q.    Are there any safety policies or
6  procedures for these walkways or exterior stairs?
7    A.    Written, no.
8    Q.    What is the unwritten policy?
9    A.    They are to be visually inspected upon
10  arrival of the buildings and grounds team and
11  throughout the day by staff members as they use the
12  facilities.
13    Q.    So I'm going to ask you names of some
14  other people that were noted in your disclosures
15  provided to us by your attorney and ask you if these
16  people had knowledge of this event because we've
17  identified two people that apparently were not
18  disclosed, but -- so I just want to see if these
19  people maybe were offered by mistake.  Jennifer
20  Shields, who is Jennifer Shields?
21    A.    Ski patroller.
22    Q.    And was she involved in this incident?
23    A.    Yes.

25

1      Q.      And what was her role?
2      A.      She was the reporting ski patroller.
3      Q.      Do you know if she was the first person
4  on scene or what her role was?
5      A.      I'm --
6              MR. TAPPLY:  Objection.  Sorry,
7  objection.  You can answer.
8              THE WITNESS:  I'm unsure if she was the
9  first person on scene, but I know she filled out the
10  accident -- or the incident report.
11  BY MR. WHITE:
12      Q.      And she's still employed by Waterville
13  Valley?
14      A.      Not currently.
15      Q.      No, I'm sorry.  Is that because the
16  season has ended?
17      A.      Yes, the season is over.  I don't
18  believe she was a ski patroller for us last year,
19  however.
20      Q.      Do you have her current address and
21  everything?
22      A.      We have -- we have an address on file.
23      Q.      Billy Hubert?

27

1  things of that sort.
2      Q.      What's a typical rate of pay for
3  Mr. Hubert or Mr. Pitmen?
4      A.      I'm not sure what their rate of pay is
5  in that department.
6      Q.      Do you know approximately what it is?
7      A.      I would say at that time between 10,
8  $15 an hour.
9      Q.      Are they seasonal employees, or do they
10  stay on?
11      A.      They stay on year-round.  Sometimes
12  they are changed between departments.
13      Q.      And are Chris Pitmen and Tim Kirwin
14  currently working at Waterville?
15      A.      Yes, they are.
16      Q.      Charlie Zachary, is that also somebody
17  who actually was not -- he was listed -- he was not
18  on duty that day?
19      A.      Correct.
20      Q.      And Doug Franklin, we just talked about
21  Doug.  He was the former manager of this department,
22  correct?
23      A.      Correct.

26

1      A.      Yeah.
2      Q.      Was he involved in this incident?
3              MR. TAPPLY:  Objection.
4              THE WITNESS:  At this time, I don't
5  believe so.
6  BY MR. WHITE:
7      Q.      Okay.  And that's because, looking at
8  the worker time cards, it turns out that Mr. Hubert
9  was not on duty that day?
10      A.      Correct.
11      Q.      And would Billy Hubert be equivalent to
12  a Chris Pitmen?
13      A.      Yes, he would.
14      Q.      So he's a worker?
15      A.      Correct.
16      Q.      And what type of role and
17  responsibility does Chris Pitmen have or Bill Hubert
18  have?  What are their typical day-to-day duties?
19      A.      Shoveling when snow falls, removing
20  trash, keeping general cleanliness of the facilities,
21  while also reporting to repairs or incidents that may
22  need attention around the buildings and grounds, also
23  doing projects of either carpentry or light plumbing,

28

1      Q.      I'm going to make an assumption, here.
2  Barry St. Cyr is in charge of operations, correct?
3      A.      Correct.
4      Q.      And he oversees lift operations, as
5  well as building and grounds and other areas, is that
6  fair to say?
7      A.      Correct.
8      Q.      And building and grounds, which was
9  formerly managed by Doug Franklin, who is the current
10  manager?
11      A.      Current manager is Toby Copo -- what's
12  his last name?  Capo, Copo.
13      Q.      Could you spell it?
14      A.      I cannot spell that one.  I think it's
15  C-o-p-y, something along those lines.
16      Q.      Okay.  Is he currently employed?
17      A.      Yes, he is.
18      Q.      So this incident happened on
19  March 13th, 2019.  Do you agree with that?
20      A.      Yes.
21      Q.      Were you present that day at Waterville
22  Valley?
23      A.      I don't recall, but it's a Wednesday,

---

29

1 as reported on the incident report, so I would have
2 been here most likely.
3     Q.    What do you recall about that day?  Let
4 me back up.  That's too general a question.  Let me
5 be more specific.
6         Do you recall when you first became or
7 made aware of this incident?
8     A.    No, I do not.
9     Q.    Do you recall who first told you about
10 this incident?
11    A.    No, I do not.
12    Q.    I'm looking at topic one on Exhibit 1.
13 Do you want to -- I'll read it to you.
14    A.    Sure.
15    Q.    It's asking Waterville's response to
16 the Subject Incident, including names, addresses, and
17 titles of any and all persons who responded to, or
18 were otherwise involved with, the incident or
19 Mr. Fuerst's injuries, and information regarding
20 those persons' actions pertaining to the same.
21         Are you able to address the question
22 about what actions pertaining to the same transpired?
23        MR. TAPPLY:  Objection.

---

30

1         THE WITNESS:  Can you repeat the
2 question?
3 BY MR. WHITE:
4     Q.    Sure.
5        MR. WHITE:  Could the court reporter
6 bring up Exhibit 1.
7 BY MR. WHITE:
8     Q.    Do you see Roman numeral I, Mr. Smith?
9     A.    Yes.
10    Q.    I'll let you just read it to yourself.
11 Are you able to answer that question?
12        MR. TAPPLY:  Objection.  I don't think
13 there's a question posed here; it's just a list of
14 information.
15 BY MR. WHITE:
16    Q.    Are you able to provide all the
17 information requested, Mr. Smith, in that topic?
18    A.    Without resources, no.
19    Q.    What do you mean "without resources"?
20 What do you mean?
21    A.    I don't know everyone's address.  I can
22 try to list who I can recall as being the people that
23 were included as names.

---

31

1     Q.    You had this question before you for
2 several months now.  Is there some reason why you
3 didn't gather this information by checking with
4 people?
5        MR. TAPPLY:  Objection.  I think he's
6 saying he doesn't have the addresses memorized, if
7 that's what you're asking him.  If you're asking him
8 to list off all the addresses and names from memory,
9 I think all he's saying is he doesn't have the
10 addresses memorized.  I guess I'm a little unclear as
11 to what you're asking, but...
12 BY MR. WHITE:
13    Q.    Are you able to tell me, as you sit
14 here today, the actions the various people took
15 pertaining to this incident?
16    A.    Please repeat the question.
17    Q.    Sure.  As we sit here now, are you able
18 to tell me the actions of the various people at
19 Waterville Valley took regarding this incident?
20        MR. TAPPLY:  Objection.
21        THE WITNESS:  Yes.
22 BY MR. WHITE:
23    Q.    Okay.  And how did you come to know

---

32

1 that?
2     A.    Well, there's been discussion of this
3 incident within the company; I just can't recall
4 exactly when and who, who, what, where and when it
5 was first notified to.
6     Q.    When do you think you first became
7 aware of the incident, approximately?  I mean a week
8 after it happened, a month?
9     A.    Oh, no, I would say it would be that
10 week, during that week; it could have been that day.
11    Q.    And can you tell me, as best you
12 recall, in the sequence that you learned what you
13 learned about this incident and from whom?
14    A.    I know I had a discussion with Jeff
15 Hayes; I can't recall when.  Jeff Hayes is the patrol
16 director.  We discussed this case particularly
17 because he knew that the -- he knew that there was
18 pictures being taken of the staircase after the
19 accident, and that made him aware and concerned so he
20 brought it to my attention.  I remember that
21 conversation.  When I had that conversation, I don't
22 recall.
23         And then throughout the questioning

33

1 from our insurer, I've had many conversations
2 regarding this incident with many of the staff
3 members while I'm gathering information.
4        Q.    So who else besides Jeff Hayes have you
5 talked to about this incident, and what did he tell
6 you?
7            MR. TAPPLY:  I'm going to instruct
8 Mr. Smith that if I was involved in any of those
9 conversations, he need not disclose any of the
10 substances of or the existence of those
11 conversations; but with that, you can go ahead and
12 answer.
13           THE WITNESS:  Sure.  So I would have
14 had had conversations with our insurance company, and
15 I believe it was Justin at that time.  I would have
16 had conversations, I believe, with Katie Smith, our
17 accounting manager.  I would have had conversations
18 with Allison Gillmen, HR manager.  I would have had
19 conversations with -- I'm sure I would have had
20 conversations with Doug and with Charlie and Billy
21 and Tim and those guys at some point; I don't recall
22 exactly when or what the context was.
23

34

1 BY MR. WHITE:
2        Q.    But you don't recall the timing of
3 those conversations, I mean whether it was within a
4 day, a week or a month?
5        A.    No.
6        Q.    Did you take any notes of those
7 meetings?
8        A.    No.
9        Q.    So there's nothing in writing to
10 memorialize or represent what you guys talked about?
11       A.    Correct.
12       Q.    What do you understand happened to
13 Mr. Fuerst?
14       A.    My understanding is that he slipped and
15 fell and hurt his hip.
16       Q.    Were you aware that he fractured his
17 hip?
18       A.    Yes, I was made aware of that.
19       Q.    Do you recall the level of patron
20 activity that morning or that day at Waterville?
21       A.    I don't recall.
22       Q.    Is that information that you have
23 available?

35

1        A.    Yes.
2        Q.    Would you have any objection providing
3 that to me?
4            MR. TAPPLY:  Are you asking me or are
5 you asking Mr. Smith?
6            MR. WHITE:  I'm asking Mr. Smith, and
7 you can certainly object or agree.
8            MR. TAPPLY:  I guess I would need to
9 have a better understanding of the phrase "patron
10 activity."
11           MR. WHITE:  Well --
12           MR. TAPPLY:  We can certainly talk
13 about that off the record.
14 BY MR. WHITE:
15       Q.    But you have no objection, Mr. Smith,
16 correct?
17       A.    No, not at all.
18       Q.    Do you recall the weather that day at
19 Waterville?
20       A.    I do not.  All I -- I did review the
21 incident report; it said it was clear.
22       Q.    Do you know what step he fell on?
23       A.    I do not.

36

1        Q.    Do you know where, in relation to the
2 stairs, he fell?
3        A.    I do not.
4        Q.    Do you know which direction he was
5 headed, up or down?
6        A.    Just what I've read, saying, I believe,
7 he was heading down the stairs.
8        Q.    Do you know where he fell if there was
9 a handrail available to be used?
10       A.    There's no handrail available.
11       Q.    During your interview, did you come
12 across any eyewitnesses?
13       A.    No, not during any of my interviews,
14 no.
15       Q.    Do you know if anybody else did?
16       A.    I am unaware of anyone else.
17       Q.    Do you know who actually responded to
18 the incident?
19       A.    I know Jennifer Shields did; it was on
20 the incident report.
21       Q.    Anyone else?
22       A.    Not that -- I don't know.  I'm sure
23 there were others on the incident, other ski

---

**37**

1 patrollers, most likely, but I'm unsure of who.
2     Q.     Do you know what actions they took or
3 in what sequence?
4     A.     No, I do not.
5     Q.     So is it fair to say that your role and
6 involvement in this matter was after it had already
7 happened and Mr. Fuerst had left the mountain?
8     A.     Yes.
9     Q.     Now, you mentioned that you discussed
10 the case with Jeff Hayes, and what is his role?
11     A.     Jeff Hayes is our ski patrol director.
12     Q.     And do you know why Mr. Hayes would
13 have been involved, the ski patrol director, in this
14 incident?
15     A.     He reviews all accidents and incident
16 reports.
17     Q.     And you said he knew pictures had been
18 taken.  Do you know what that meant, what that remark
19 was referencing?
20     A.     Yeah.  When we see pictures taken of a
21 scene, it normally will bring up a -- somewhat of a
22 red flag to the care providers.
23     Q.     Why is that?

---

**38**

1     A.     Because they think they may be
2 litigious.
3     Q.     So if you see somebody taking a
4 picture, you think there's -- litigation may follow?
5     A.     Sometimes.
6     Q.     So what does that cause you to do?
7     A.     Just make sure that we're looking
8 through what happened, try to find out as much
9 information as we can on the incident.
10     Q.     Do you know if anybody investigated
11 this incident before you got involved?
12     A.     Jeff Hayes.
13     Q.     And did you speak with him in order to
14 be able to answer the questions in this 30(b)(6)
15 deposition?
16     A.     Yes.
17         MR. TAPPLY:  Objection.  Sorry,
18 objection.  You can answer.
19         THE WITNESS:  Yes.
20 BY MR. WHITE:
21     Q.     And when did you speak with Jeff Hayes?
22     A.     Shortly after the incident, sometime in
23 that preceding day or week.

---

**39**

1     Q.     Do you mean following day or week, not
2 preceding?
3     A.     Oh, sorry, following, yes, sorry.
4     Q.     And have you talked to him since?
5     A.     Yes.
6     Q.     When was that?
7     A.     Last time I talked to Jeff would have
8 been a week ago.
9     Q.     And did you talk about this case at any
10 point?
11     A.     Nope.
12     Q.     So the last time you talked about this
13 case was about a day or a week following the event?
14     A.     No, we spoke about this case, I'm sure,
15 multiple times.
16     Q.     And what did he tell you?  What
17 conversations --
18         MR. TAPPLY:  Objection.  To the extent
19 that those conversations took place in my presence or
20 the presence of your insurer while litigation was
21 reasonably anticipated, Mr. Smith, you need not
22 answer those questions.
23         THE WITNESS:  It was simply of the

---

**40**

1 accident report and then of the fact that it was
2 being litigated.  That was really all I can recall.
3 BY MR. WHITE:
4     Q.     Did Mr. Hayes prepare any or take any
5 notes about this event?
6     A.     Not that I'm aware of.
7     Q.     And in a situation like this, is it
8 typical that you would ask Mr. Hayes to do the
9 investigation, as opposed to someone else?
10     A.     Can you repeat that question?
11     Q.     Sure.  I'm just trying to understand.
12 You indicated that whenever an incident occurs and
13 pictures were taken, you think litigation may follow,
14 and you oftentimes will have -- get someone involved
15 to look at the particular event or look at the
16 incident, and is that usually Jeff Hayes who does
17 that?
18     A.     Yes.
19         MR. TAPPLY:  Objection.
20 BY MR. WHITE:
21     Q.     And why is it usually Jeff Hayes?
22     A.     He's my patrol director.  It's in his
23 job duty.

---

**41**

1        MR. TAPPLY:  Sandra, could I ask a
2 favor real quick.
3        THE REPORTER:  Yes.
4        MR. TAPPLY:  Can we take the exhibit
5 down, unless Jack's going to use it obviously?
6        MR. WHITE:  No, that's fine.  In fact,
7 let's take a three-minute bathroom break for me,
8 okay?
9        MR. TAPPLY:  Sure.
10        MR. WHITE:  Thank you.
11        (Recess.)
12 BY MR. WHITE:
13      Q.    So, Mr. Smith, we're back on the
14 record.  We were talking about -- can I actually have
15 the last question read back so I don't repeat myself.
16        (Question read.)
17 BY MR. WHITE:
18      Q.    So, Mr. Smith, do you know why
19 Mr. Hayes took the pictures -- strike that.
20        Did Mr. Hayes take these pictures that
21 you've produced?
22      A.    I'm unsure of who exactly took the
23 pictures.

---

**42**

1      Q.    And you did not ask Mr. Hayes how the
2 pictures came to be?
3      A.    No.
4      Q.    Did you just assume it was just part of
5 the SOP of Mr. Hayes to take pictures whenever
6 someone else takes pictures?
7        MR. TAPPLY:  Objection.
8        THE WITNESS:  No, it's not always Jeff
9 Hayes.
10 BY MR. WHITE:
11      Q.    If it wasn't Jeff Hayes, who would have
12 taken these pictures?
13      A.    I'm unsure of exactly what pictures
14 you're speaking of.
15      Q.    Sure.  These are pictures that you or
16 Waterville Valley produced as part of your
17 disclosures.  Do you recall those pictures?
18      A.    I recall many pictures of those stairs.
19 I don't recall exactly which pictures you are
20 speaking to.  I believe I even took some pictures of
21 those stairs at one time.
22      Q.    Do you know -- okay.
23        MR. TAPPLY:  Do you have the pictures

---

**43**

1 you can show him?
2        MR. WHITE:  I will eventually.  Yes, I
3 do.
4 BY MR. WHITE:
5      Q.    So you took some pictures, you're
6 saying, Mr. Smith?
7      A.    I believe I took some pictures of those
8 stairs at one time.
9      Q.    And do you recall the approximate
10 timing of when you took the pictures?
11      A.    It was during the summer.
12      Q.    Okay.
13      A.    Or spring.
14      Q.    So it was well after the event had
15 happened?
16      A.    Yes.
17        MR. WHITE:  Can you bring up -- let's
18 see, we'll get to that in a minute.
19 BY MR. WHITE:
20      Q.    So as we're talking now, you don't know
21 what day Mr. Hayes took pictures of the stairs at
22 issue?
23      A.    Correct.

---

**44**

1      Q.    But you think it was sometime following
2 the event, but not necessarily the day of the event?
3      A.    Correct.
4      Q.    Now, going back to --
5        MR. WHITE:  Can you bring up the
6 Exhibit 3, please.
7        THE REPORTER:  Yes.
8        THE WITNESS:  Jack, I just remembered
9 Toby's last name; it's Compo.
10 BY MR. WHITE:
11      Q.    How do you spell it?
12      A.    C-o-m-p-o.
13      Q.    Thank you.  Exhibit 3, the Incident
14 Report Form, appears to have been prepared by
15 Jennifer Shields; is that your understanding?
16      A.    Yes.
17      Q.    It appears to be all of her
18 handwriting, except for Mr. Fuerst's signature?
19      A.    Correct.
20      Q.    Now, this incident -- the form says
21 prepared on March 13th, 2019, correct?
22      A.    Correct.
23      Q.    Is this Exhibit 3 reviewed by anybody

45

1 before it's completed or --
2     A.    Sorry, can you repeat the question?
3     Q.    Is there any review process to
4 Exhibit 3 before it is finalized or completed?
5     A.    Yes, Jeff Hayes reviews incident
6 reports.
7     Q.    And you know that because that's the
8 SOP, or you know that because you talked to him and
9 he told you he reviewed this report?
10    A.    Both.
11    Q.    And this report was completed the day
12 of the event, correct?
13    A.    I believe so.
14          MR. WHITE:  Do you want to show the
15 bottom of the form to Mr. Smith.
16          THE WITNESS:  According to the form, it
17 was completed on that date.
18 BY MR. WHITE:
19    Q.    And is that Jennifer's signature, or is
20 that somebody else's signature?
21    A.    I believe that's Jennifer's signature.
22    Q.    Okay.  Are there notes made by
23 Mr. Hayes or other people investigating the incident

46

1 that are then taken and put onto this form?
2     A.    Sometimes.
3     Q.    Do you know if there were in this case?
4     A.    I am unaware.
5     Q.    Does anybody keep those notes or
6 those --
7     A.    Jeff.
8     Q.    Did you ask Jeff if he has any notes
9 regarding this incident beyond this report form?
10    A.    I believe that question was asked of
11 Jeff, yes.
12    Q.    What was his answer?
13    A.    I believe there are no other notes.
14    Q.    So is it fair to conclude that Jeff
15 Hayes led the investigation of this incident?
16    A.    Yes.
17    Q.    Is there any procedure or protocol as
18 to how you go about conducting an investigation at
19 Waterville, for instance, such as this?
20    A.    Yes, I believe so.
21    Q.    And what is that; is it a writing
22 someplace?
23    A.    Standard scene investigation, I

47

1 believe, would traditionally follow a case where they
2 may feel that red flags were presented that it could
3 be escalated.
4     Q.    And that's a form or a document that
5 you have at Waterville Valley at the time this
6 incident happened?
7     A.    I would have to review with Jeff, but,
8 yes, I would...
9     Q.    Would you review and produce that form
10 if it exists?
11    A.    Yes.
12    Q.    So what documents are used to
13 memorialize an incident like this, besides this
14 report form?
15    A.    The Incident Report Form, then there's
16 witness statements, there are incident investigation
17 forms that we use.
18    Q.    Is it a fair statement that there are
19 no witness statements or other incident investigation
20 forms in this matter?
21    A.    Correct.
22    Q.    Do you know why?
23    A.    I am unsure.

48

1     Q.    Is that an atypical situation, that
2 those forms or statements don't exist?
3     A.    No.
4     Q.    So when do they exist and when do they
5 not exist?
6     A.    When many red flags, as I call them,
7 are presented; when the patrollers feel as though the
8 mechanism of injury may be high enough that the case
9 may be -- or the incident may be further investigated
10 and they want more substance around it; when the
11 injured party may be speaking to them in a hostile
12 manner; when I ask for it, that would have been for
13 one; when Barry would ask for one, that would be
14 another reason that they would do one.  You know,
15 there's many red flags that could be brought up of
16 the reason why they would do one.
17    Q.    So in this case, there are no red flags
18 other than the photographs, apparently?
19    A.    That I know of.
20    Q.    Well, would somebody falling on ice on
21 your stairs fracturing their hip, would that normally
22 have more forms completed than just this Incident
23 Report Form?

49

1       MR. TAPPLY:  Objection.  You can
2 answer.
3       THE WITNESS:  Are you telling me to
4 answer, Tim?
5       MR. TAPPLY:  I just noted my objection
6 and said you can answer.
7       THE WITNESS:  Okay.  A fractured hip --
8 can you repeat the question?  I'm sorry.
9 BY MR. WHITE:
10      Q.    Sure.  When somebody, as in this case,
11 falls on the staircase next to the base lodge on ice
12 and fractures their hip, would you normally expect
13 there to be more forms or witness statements or other
14 documentation of the event than just this single-page
15 Incident Report Form?
16      A.    No, I don't have any reason to think of
17 that.  I have never had a hip injury -- a fractured
18 hip on the stairs.
19      Q.    But that's certainly a significant
20 event, isn't it?
21      A.    It's hard to say.  It's hard to say
22 what exactly the scene was like.
23      Q.    Okay.  And this is just a single-sided

50

1 form, this Exhibit 3, correct; there's no back side
2 to it?
3       A.    Correct.
4       Q.    Is there a different protocol if the
5 injury had taken place on the ski slope as opposed to
6 on exterior staircase?
7       A.    No.
8       Q.    Is there a different protocol if the
9 injury had taken place on a ski lift as opposed to --
10      A.    Yes.
11      Q.    -- an exterior staircase?
12      A.    Yes.
13      Q.    Why is that?
14      A.    The Tramway Board has incident forms
15 that need to be filled out and reported back to the
16 New Hampshire Tramway.
17      Q.    They have their own forms they want
18 filled out?
19      A.    Correct.
20      Q.    So just ask you some questions about
21 the exterior staircase at issue.  When were the
22 stairs constructed, do you know?
23      A.    I do not.

51

1       Q.    Who would know that?
2       A.    Tom Day may have been the manager or
3 Bob Fries may have been the manager at that time.
4       Q.    Do you know what time frame we're
5 talking?
6       A.    I believe in the '90s.
7       Q.    Early '90s, late '90s?
8       A.    I'd say mid '90s.
9       Q.    So mid '90s, I'm sorry, I apologize.
10 Does that mean both the concrete stairs and the
11 wooden stairs were built by the same time?
12      A.    No, the wood stairs would have been
13 built that year.
14      Q.    And what about the concrete stairs,
15 when were they built?
16      A.    They would have been built in the mid
17 '90s, I believe.
18      Q.    I apologize.  When would the wood
19 stairs have been built?
20      A.    Oh, the wood stairs would have been
21 built that year, I believe.
22      Q.    So both sets of stairs were built in
23 approximately the mid '90s?

52

1       A.    Wood was built that season, the 2019
2 season.
3       Q.    Oh.
4       A.    The concrete would have been built in
5 the mid '90s.
6       Q.    Okay.  And why were the wooden stairs
7 added in 2019?
8       A.    We had removed the upper patio section
9 during construction for the base lodge.
10      Q.    And is this a primary egress for people
11 wanting to go up to the ski area?
12      A.    Yes.
13      Q.    Are there alternate stair systems to
14 access the slopes, or is this the primary one?
15      A.    There are alternate staircases, yes.
16      Q.    But they're not as accessible, not as
17 used?
18      A.    No, they're used just as much.
19      Q.    How do you access the mountain if you
20 were coming from the parking lot?  What are your
21 choices to get up to the area where the ski racks
22 are?
23      A.    Are you speaking of the -- there's

53..56

### 53

1 multiple ski rack locations throughout the base area.
2 Which ski racks are you specifically referring to?
3     Q.    Sure.  The ones in front of the lodge.
4     A.    There's three locations of ski racks in
5 front of the lodge.
6     Q.    Okay.  Let me be more specific.  In
7 fact, let me just rephrase the whole question.
8         The stairs where Mr. Fuerst fell, we
9 agree, are a primary way to access the slopes,
10 correct?
11     A.    Correct.
12     Q.    You could also access the slope by
13 going into the building, correct?
14     A.    Correct.
15     Q.    How many other exterior stairways are
16 there to access the slopes?
17     A.    Exterior?
18     Q.    Yes.
19     A.    There's the one that we call Sense of
20 Arrival that you would walk up into the courtyard and
21 then you'd be able to access the slopes that are
22 adjacent to the courtyard and there would be ski
23 racks there, and that's the only other staircase.

### 54

1     Q.    Thank you.  Do you have any
2 approximation as to how many people access this
3 staircase at issue during an average day?  Is it
4 70 percent, 80 percent of the skiers, 90 percent, 10
5 percent; what percentage?
6     A.    I'd probably say 75 percent of our
7 guests use those staircase during their day.
8     Q.    Am I correct that the wooden stairs
9 were erected before this incident happened?
10     A.    Yes.
11     Q.    Now, you told me there's nothing in
12 writing regarding the winter's maintenance of this
13 exterior staircase from a safety perspective, but
14 people are told to do certain things.  Did I
15 understand that correctly?
16     A.    Correct.
17     Q.    And I think you told me that they are
18 to check them when they first arrive and then to
19 check them periodically during the day as they
20 perform their duties, is that correct?
21     A.    Correct.
22     Q.    What time do the people, employees,
23 generally arrive at Waterville to start their daytime

### 55

1 duties?
2     A.    Depends on their position and the
3 conditions.
4     Q.    Do you know what it would have been
5 this day, on March 13th, 2019?
6     A.    Who are we speaking about in
7 particularly?
8     Q.    The people who would have
9 responsibility for these stairs.
10     A.    I don't know the exact time that they
11 came in that morning.
12     Q.    Approximate time?
13     A.    That was a Wednesday.  We would have
14 opened at 9:00; probably 7:00.
15     Q.    Would their time cards tell you exactly
16 when they arrived?
17     A.    Yes.
18     Q.    And you've seen those time cards,
19 correct?
20     A.    I have seen their data in the computer,
21 yes; it's a screen in the computer.  I don't recall
22 it, exactly what time.
23     Q.    I understand.  And you have no

### 56

1 objection to producing that, correct?
2     A.    No, not at all.
3     Q.    And can you tell me which -- well, am I
4 correct -- let me ask you this:  Am I correct that
5 Chris and Tim would have been the ones who would have
6 -- well, let me ask you:  Who would have been the
7 first person to inspect the stairs?  Is there some
8 sort of protocol or SOP that morning or any
9 morning --
10     A.    That would have been Chris and Tim, the
11 employees in buildings and grounds.
12     Q.    And when you say "inspect," what would
13 they do?
14     A.    They would look for any snow that had
15 built up from the grooming, looked for any natural
16 snowfall or icing or need for salt, to salt anything.
17 They would have checked the garbages.  They would
18 have looked at the -- the general conditions of the
19 facilities.
20     Q.    And do you know what they did that day,
21 as far as these stairs are concerned?
22     A.    I do not.
23     Q.    Is there any record that we can

57

1   determine what they did, as far as these stairs are
2   concerned, that day?
3       A.   No, there is not.
4       Q.   Is there any way to tell the sequence
5   of their movements that day?
6       A.   No, there is not.
7       Q.   So I take it that there's no way we can
8   reconstruct what was done or not done that day to
9   these stairs?
10      A.   Correct.
11          MR. TAPPLY:  Objection.  You're just
12  asking about documentation?
13          MR. WHITE:  No.  I was asking him both
14  ways, both documentation and otherwise, because
15  that's why we're here today, to find out because
16  under the 30(b)(6) deposition, we can ask him that,
17  to be able to tell us.
18          THE WITNESS:  The standard operations
19  of our staff would have placed them there first thing
20  in the morning right after they punched in.  It would
21  have been on their opening rounds and throughout the
22  day, the standard operations.
23  BY MR. WHITE:

58

1       Q.   But we don't know as to that day what
2   they did, other than what they typically would do,
3   correct?
4       A.   Correct.
5       Q.   Is there any salt or sand that's
6   adjacent to the stairs or nearby the stairs to be
7   used as necessary?
8       A.   Yes.
9       Q.   And where is that kept?
10      A.   Traditionally, there is a bucket of
11  salt in the ski patrollers' locker room entrance.
12  There's traditionally one in the entrance to the
13  marketplace.  Traditionally, there's one located near
14  the entrance to the base lodge.  There's also the
15  bags and the bulk salt would have been located in
16  their storage shed for their tools, is located next
17  to the Adaptive Center.
18      Q.   So is there a protocol to apply any
19  sort of treatment to the stairs prophylactically?
20      A.   Sorry, can you rephrase that?
21      Q.   Sure.  Is there a protocol or a
22  standard operating procedure to actually apply salt
23  or ice melt or sand prophylactically on the stairs?

59

1       A.   What do you mean by "prophylactically"?
2       Q.   To take care of ahead of time, to
3   prevent --
4       A.   Sure.  If they see any icing or things
5   that couldn't be removed with their shovel, they
6   would apply the correct procedure, maybe chipping or
7   ice removal, or it could have been an application of
8   salt, sometimes application of sand.
9       Q.   And this is something that they do if
10  they see it, or is there some sort of actual way that
11  you look at it ahead of time and, for example, that
12  you know it's going to be -- it's a warm evening
13  before a cold front is coming through, so you need to
14  treat it ahead of time?
15      A.   Sure, there may be many reasons why we
16  would have treated it; the reason of the weather, as
17  you just stated, reasons of concern, many reasons
18  why, not just looking at it, you're correct, yes.
19      Q.   And is there any record of how -- if
20  that happened at all?
21      A.   No.
22      Q.   You don't keep any records as far as
23  what you do for your maintenance of your stairs?

60

1       A.   No.
2       Q.   Is there a reason why not?
3       A.   No.
4       Q.   Who is in charge of determining whether
5   or not some sort of treatment should be applied to
6   the stairs?
7       A.   Team members.
8       Q.   So anybody who was on the Waterville
9   team can put down sand or salt or ice melt?
10      A.   Yes.
11      Q.   There's no one that they checked with;
12  they'd just simply -- they'd just throw it down if
13  they think they need to do it?
14      A.   Yes.
15      Q.   Is there anyone who's checking to see
16  if it's been done?
17      A.   Yes, the team members, others --
18  throughout the day, the ground staff would inspect
19  it, I would walk over it, other team members would.
20      Q.   Is there any record of these sweep logs
21  or maintenance logs?
22      A.   No.
23      Q.   Do you have any safety meetings at

61

1 Waterville Valley about the exterior walkways or
2 stairs?
3     A.    I don't believe we do.  I'd have to
4 check with human resources if we have any documented
5 safety meetings.  We do talk at safety meetings of
6 trips and falls; I had one this morning.
7     Q.    Are there records or minutes kept of
8 those meetings?
9     A.    If it would have been a required
10 meeting, yes.
11     Q.    Would you check your records to see if
12 there are any in the couple of months preceding this
13 event?
14     A.    Sure.
15     Q.    Who would be in charge of running those
16 meetings?
17     A.    Supervisors or managers that are within
18 the Breakfast Club.
19     Q.    So that would be Tim Kirwin, in this
20 case?
21     A.    Yes, I believe so.  I believe he was a
22 part of the Breakfast Club that season.
23     Q.    Have you or are you aware of anyone

62

1 reminding somebody that they need to put down salt or
2 sand or ice melt or some other treatment because it
3 wasn't present?
4     A.    Yes.
5     Q.    And how did that come to your
6 attention?
7     A.    It would be announced over the radio;
8 at times, it may be a phone call that an area is
9 getting slick, it needs ice or it needs salt, it
10 needs chipping, whatever it may be.
11     Q.    Are those types of reminders ever
12 cataloged or kept records of?
13     A.    No.
14     Q.    When it comes to, for example, grooming
15 ski slopes, do you maintain logs as to what trails
16 you groomed and what amount of snow, for example, was
17 made on a particular trail?
18     A.    We don't have logs of how much snow was
19 made on a particular trail.  We do have logs stating
20 what trails were groomed and by whom.
21     Q.    And the logs, I assume, show the date
22 and time of the work done on the ski trails?
23     A.    Yes.

63

1     Q.    Does it also record that snow was made
2 on the ski trails?
3     A.    Yes.
4     Q.    Have you reviewed the weather reports
5 for the day before and the day of this event?
6     A.    I have not.
7     Q.    Do you recall generally what the
8 weather was the day before or the day of?
9     A.    Just from the report that we're looking
10 at now, clear, zero to 32 and calm winds.
11     Q.    Are there any records that you know of
12 that could tell us what the stairs looked like, other
13 than the photographs taken?
14     A.    No.
15         MR. TAPPLY:  Objection.
16 BY MR. WHITE:
17     Q.    Is there a protocol or an SOP or policy
18 as to what to use in a given situation on the stairs?
19         MR. TAPPLY:  Objection.
20         THE WITNESS:  No.
21 BY MR. WHITE:
22     Q.    How does a Chris Pitmen or a Tim Kirwin
23 make the decision whether to use sand or salt or ice

64

1 melt or chip, how is that determined?
2     A.    That would be trained by their
3 supervisor.
4     Q.    Is there some training manual or
5 materials that you provide them?
6     A.    No.
7     Q.    Is there a preference as to what is to
8 be used on the stairs?
9     A.    It depends on where in the resort.
10     Q.    Let's talk specifically about these
11 stairs, the ones that are at issue.
12     A.    It would depend on the condition of the
13 stair.  Traditionally, we would use mostly salt on
14 those stairs; however, if snow were to build up and
15 turn slippery, we would be using shovels or chipping.
16     Q.    What conditions are conducive for black
17 ice forming?
18         MR. TAPPLY:  Objection.
19         THE WITNESS:  I would only be assuming.
20 I don't know the exact scientific explanation of how
21 black ice forms, but I would assume -- I would be
22 assuming it would be water, drainage water, maybe,
23 water running from an area onto a cold area.

<table>
<tr><td>

**65**

1 BY MR. WHITE:
2    Q.    And you would agree with me that black
3 ice is difficult to see?
4    A.    Yes.
5        MR. WHITE:  Let's mark Exhibit 4.  It's
6 the first photograph.
7        (Smith Exhibit No. 4 referenced.)
8 BY MR. WHITE:
9    Q.    Do you recognize this as the stairs
10 that we've been talking about?
11    A.    Yes.
12    Q.    And I think you testified that you
13 don't know precisely where Mr. Fuerst fell, but do
14 you understand it to be somewhere in this area?
15    A.    Yes.
16    Q.    And do you understand who took these
17 pictures or this picture?
18    A.    No.
19    Q.    I'll represent to you this was taken
20 by, I believe, Mrs. Fuerst about the time of the
21 event.  The wooden stairs toward the top of the
22 picture, those are the ones that had been recently
23 constructed?

</td><td>

**67**

1 encroaching on the stairs in the upper set of stairs,
2 as opposed to the stairs which are the primary part
3 of the picture?
4        MR. TAPPLY:  Objection.
5        THE WITNESS:  Can you restate the
6 question?  Is there --
7 BY MR. WHITE:
8    Q.    Sure.  Do you agree with me that the
9 amount of snow encroaching on the upper set of stairs
10 in the upper right-hand corner of Exhibit 4 is
11 certainly less than the amount of snow encroaching on
12 the lower set of stairs?
13    A.    I can't tell from this perspective.
14    Q.    Okay.  In other words, you can't tell
15 from looking at this picture?
16    A.    Correct.
17        MR. WHITE:  Let's mark the next
18 photograph, please, Exhibit 5.
19        (Smith Exhibit No. 5 referenced.)
20 BY MR. WHITE:
21    Q.    Does it appear to you that in
22 Exhibit 5, that those stairs have been cleared off
23 adequately?

</td></tr>
<tr><td>

**66**

1    A.    Yes.
2    Q.    Looking at Exhibit 4, the upper
3 staircase, it's fully shoveled off.  Do you see that?
4    A.    No.  When you refer to "fully shoveled
5 off" --
6    Q.    Strike that.  I withdraw the question.
7 I'll rephrase it.
8        Looking at the top right-hand corner of
9 the picture, you see a staircase that goes up to the
10 ski slope, correct?
11    A.    Correct.
12    Q.    And there's snow against the left-hand
13 railing, correct?
14    A.    Correct.
15    Q.    There's no snow encroaching or on the
16 stairs, correct?
17    A.    No, there's snow encroaching on the
18 stairs; you can see it.
19    Q.    Is that what you're seeing in the
20 shadows there?
21    A.    Yes, and at the bottom of the stairs.
22    Q.    Is there a reason why there is -- what
23 I would consider to be a much smaller amount of snow

</td><td>

**68**

1    A.    Yes.
2    Q.    And does it appear to you that
3 shoveling had taken place that morning of those
4 stairs?
5    A.    It's hard to say if it was that
6 morning.
7        MR. TAPPLY:  That's your representation
8 as to what time this photograph was taken?
9        MR. WHITE:  It was about the time
10 shortly after Mr. Fuerst fell.
11        MR. TAPPLY:  Thank you.
12 BY MR. WHITE:
13    Q.    So looking at Exhibit 5, you agree with
14 me there does not appear to have been any shoveling
15 done?
16    A.    No.
17    Q.    You don't agree with me?
18    A.    Correct.
19    Q.    Why do you say -- where do you see
20 shoveling?
21    A.    Well, the bank was cut back at some
22 point.
23    Q.    I apologize.  On the day this picture

</td></tr>
</table>

---

69

1 was taken, does it appear shoveling had been done to
2 those stairs?
3    A.   I can't tell.
4         MR. WHITE:  Could we have the next
5 picture marked; I think it's 7.
6         THE REPORTER:  Do you want 6 or 7?
7         MR. WHITE:  6.
8         (Smith Exhibit No. 6 referenced.)
9 BY MR. WHITE:
10    Q.   Does this picture, Exhibit --
11        MR. WHITE:  This is Exhibit 7, correct?
12        THE REPORTER:  6.
13 BY MR. WHITE:
14    Q.   Does this look like shoveling has been
15 done?
16    A.   At some point, yes, there had been
17 shoveling done to that stair.
18    Q.   That morning, does it appear shoveling
19 had been done to these stairs?
20    A.   I can't tell.
21    Q.   What would you need to tell in order to
22 -- what would be evidence if shoveling had taken
23 place?  What would you have seen in the picture?

---

70

1    A.   I would have to have seen it early in
2 the morning right after the team had gone through.
3    Q.   And why is that?
4    A.   Because people step down those banks
5 all the time; they slide down, as evidence of the
6 footprints and the boot marks.
7    Q.   If the snow slides down constantly, do
8 you expect your employees to shovel it off the
9 stairs?
10    A.   No.
11    Q.   It just gets left there until when?
12    A.   Until they get back to it -- until they
13 -- until someone says it's a problem or that it
14 starts to become a hazard.  We're only seeing a small
15 portion of the stair.
16    Q.   What are the facts that determine if
17 it's a hazard?
18    A.   What are the facts?  Please repeat the
19 question.
20    Q.   Sure.  What factors do you look at to
21 determine if it's become a hazard or not?
22    A.   Oh, if there's not enough room to pass,
23 if it's taking up a great deal of the staircase, if

---

71

1 it's -- if it, you know, looks -- appears as though
2 it's encroaching on the rest of the path where we
3 would be walking.
4    Q.   How about if it's melting under a cold
5 surface?
6    A.   No, that would be a reason to shovel
7 it.
8    Q.   What would you do in that case?
9    A.   Salt the edge.
10    Q.   In the pictures that we looked at, does
11 it appear that any salt, sand, ice melt or other
12 treatment is put down?
13    A.   Yes.
14    Q.   And where do you see it?
15    A.   On the staircase, I can see white
16 flakes on the staircase where the staircases look
17 wet.
18    Q.   And do you know if that was put down
19 before Mr. Fuerst fell?
20    A.   I do not.
21    Q.   Do you know if it was put down after he
22 fell?
23    A.   I do not.

---

72

1    Q.   Does this exhibit, the one we're
2 looking at currently, does it suggest to you that the
3 upper set of stairs has very little snow, in
4 comparison, encroaching on the stairs?
5    A.   No, it does not.
6    Q.   You can't see the amount of snow
7 encroaching or not in the upper set of stairs?
8    A.   It's perspective.  You're really close
9 to the bottom stairs and really far away from the
10 other stairs.
11        MR. WHITE:  Now, the next exhibit,
12 please, could we have that marked.
13        THE REPORTER:  That will be 7.
14        (Smith Exhibit No. 7 referenced.)
15 BY MR. WHITE:
16    Q.   Looking at Exhibit 7, do you see
17 evidence of treatment for ice?
18    A.   Yes.
19    Q.   And is the treatment -- for example, if
20 I'm looking at the bottom of the picture, counting
21 about two steps up, is that where you're alleging
22 seeing ice melt or salt?
23    A.   I'm seeing it on every stair that --

73

1          (Clarification by the court reporter.)
2          THE WITNESS:  I'm seeing it on the
3  first stair, the second stair, the third stair, the
4  fourth stair, the fifth stair.  The sixth stair, I
5  can't really tell; it's -- the angle of the picture,
6  it looks like it's flat.
7  BY MR. WHITE:
8     Q.    And do you know, if this is ice melt,
9  who would have put it down?
10    A.    No.
11    Q.    You've never asked that question, as to
12 who applied this treatment?
13    A.    No.
14    Q.    Do you know if Mr. Hayes knows --
15    A.    I do not.
16    Q.    -- from his investigation?
17    A.    I do not know.
18          MR. WHITE:  Next exhibit, please.
19          THE REPORTER:  That's 8.
20          MR. WHITE:  Thank you.
21          (Smith Exhibit No. 8 referenced.)
22 BY MR. WHITE:
23    Q.    And does it appear to you, in

74

1  Exhibit 8, that the snow is in fact creating some
2  water or moisture runoff?
3     A.    Yes.
4     Q.    Would that, if that was on a cold
5  surface, would that create a slip hazard?
6     A.    I don't know.
7     Q.    Did Chris Pitmen, Tim Kirwin or anyone
8  else involved in the maintenance of these stairs that
9  we've been talking about, do they have any training
10 for winter maintenance, safety training or anything
11 of that nature?
12    A.    Only in-house.
13    Q.    And what in-house training does that
14 consist of?
15    A.    The traditional training of on-site
16 training, of on-the-job training.
17    Q.    You don't believe there's any written
18 materials for that on-the-job training?
19    A.    No.
20    Q.    Okay.  And you said there's no way to
21 be able to determine, if in fact on-the-job training
22 took place, any way of memorializing it?
23    A.    Correct.

75

1          MR. WHITE:  Why don't we take a brief
2  break.  Thank you.
3          MR. TAPPLY:  How long?
4          MR. WHITE:  About five minutes at the
5  most.
6          (Recess.)
7  BY MR. WHITE:
8     Q.    So, Tim, we're back on the record.
9          Did you review any documents while you
10 were taking a break?
11    A.    No.
12    Q.    And you're still by yourself in your
13 room?
14    A.    Yes.
15    Q.    Thank you.
16          MR. WHITE:  So can I have the last
17 question read back, please.
18          (Question read.)
19 BY MR. WHITE:
20    Q.    So, Mr. Smith, you had spoken to
21 various people over time about this incident.  What
22 did they tell you about the maintenance that was done
23 to the stairs that day?

76

1     A.    Nothing in particular.
2     Q.    And you've talked to people about --
3  when you say "nothing in particular," so they didn't
4  tell you any particular thing that they did or did
5  not do?
6     A.    Correct.
7     Q.    So as we sit here at this moment, we
8  don't know if any ice melt was put down or ice
9  treatment or anything for that matter?
10    A.    Well, we know -- well, the photos show
11 what I believe to be ice melt.
12    Q.    But you've not been able to
13 independently verify that?
14    A.    Correct.
15    Q.    And you don't know when that was put
16 down?
17    A.    Correct.
18    Q.    And in interviewing these people over
19 the course of this matter, can you tell me the
20 sequence of how people showed up and who they were?
21    A.    How people -- can you repeat the
22 question?
23    Q.    Sure.  It was not a very well-worded

**Page 77**

1  question.

2        Can you tell me, based on the
3  interviews you had with various people, the time line
4  and names of the people who came to this event to
5  help Mr. Fuerst; who came first, who came next?

6    A.    I know that Jen was on scene, and in
7  reading the incident form that you had up earlier,
8  Andrew was also on the scene as a patroller, as the
9  incident report states; other than that, I don't
10  know.

11    Q.    And in talking to people within the
12  company, you don't have any other information that
13  you could share with me as to other people who came
14  on scene?

15    A.    Correct.

16    Q.    And there's no way we could reconstruct
17  that, correct, I assume?

18    A.    Correct.

19    Q.    So if someone put down salt, who was
20  it?

21    A.    It could have been any one of my team
22  members.

23    Q.    Well, I know that it could have been,

**Page 78**

1  but how would we -- how would you or I ever establish
2  whether it happened or not?

3        MR. TAPPLY:  Objection.

4        THE WITNESS:  You wouldn't, wouldn't be
5  able to.

6  BY MR. WHITE:

7    Q.    Isn't that the case, that we can't
8  establish it because there's no -- there's no record
9  of it, correct?

10    A.    There's no --

11        MR. TAPPLY:  Objection, objection.

12  BY MR. WHITE:

13    Q.    Well, you agree with me there's no
14  written record of it, correct?

15    A.    Correct, there's no written record.

16    Q.    And you've not been able to establish
17  in your investigation the name of anybody who put
18  down salt or sand or ice melt?

19    A.    Correct.

20        MR. TAPPLY:  Jack, are you talking
21  about after the incident or --

22        MR. WHITE:  I'm talking the day of,
23  either before or after.

**Page 79**

1        MR. TAPPLY:  Oh, okay.

2  BY MR. WHITE:

3    Q.    What I'm asking, in very simple terms,
4  Mr. Smith, is can you tell me with any knowledge
5  about whether ice melt, sand or salt was actually
6  applied that day and by whom?

7    A.    I can see it in the picture, what I
8  believe to be ice melt.

9    Q.    That's not my question.

10    A.    Can you repeat your question, please?

11        MR. WHITE:  Can you read back the
12  question, please.

13        (Question read.)

14        THE WITNESS:  I don't really agree with
15  the premise of the question.  I believe you're trying
16  to say that it's a very simple question.  I don't
17  believe it is a very simple question.

18  BY MR. WHITE:

19    Q.    I'll break it down.

20        You're the CEO of this company,
21  correct?

22    A.    Correct -- well, no, I'm not, sorry.

23    Q.    I apologize.  You're the general

**Page 80**

1  manager of this company?

2    A.    I'm the general manager, yes.

3        MR. TAPPLY:  We'll accept the
4  promotion, though.

5  BY MR. WHITE:

6    Q.    And you've known about the topics we
7  were going to talk about for months now, correct?

8    A.    Correct.

9    Q.    And so you've done an investigation for
10  this deposition, as well as before this deposition,
11  as to what happened on March 13th involving Glenn
12  Fuerst, correct?

13    A.    Correct.

14    Q.    And what I'm asking is do you know who
15  applied sand or salt, assuming it was applied that
16  day, to those steps that are at issue?

17    A.    No, I do not know who did that.

18    Q.    Do you know what time it was done?

19    A.    No, I do not know what time it was
20  done.

21    Q.    And we have no way of reconstructing
22  that, do we?

23    A.    Correct.

81

1      Q.     During your investigation, did you
2 determine that there was a slippery surface on those
3 stairs near where Mr. Fuerst fell?
4      A.     Not during my investigation, no.
5      Q.     At any time?
6      A.     Well, yes, in the area where he fell,
7 there's the snow. I mean the snow is a slippery
8 surface and that's in that area, so, yes.
9      Q.     So you found areas of the stairs where
10 there was slipperiness, correct?
11      A.     In the area of the stairs, yes, there's
12 multiple different slippery surfaces. We're a ski
13 resort. We make slippery surfaces. That's what
14 they're here for.
15      Q.     The incident report, which is
16 Exhibit 3, states fell down and slipped on ice.
17 That's in Jennifer Shields' writing. Did you notice
18 that in the report?
19      A.     Yes. Can you bring that up again,
20 though?
21      Q.     Sure.
22           MR. WHITE: Exhibit 3, please.
23           MR. TAPPLY: Just for point of

82

1 clarification, it appears to be in the author's
2 handwriting, but it's in the skier's words, per the
3 incident report.
4           THE WITNESS: Correct, that's what I
5 believe that it said on that report. That's why I
6 asked for it to be brought up. In the skier's words,
7 yes, skier's words.
8 BY MR. WHITE:
9      Q.     And below it, it also says, "Patch of
10 ice was in the walkway area." Do you see that?
11      A.     Where is that at?
12      Q.     In that same Description of Incident.
13      A.     "...right hip Patch of ice was in the
14 walkway area," yes, I see that. That's where they
15 landed, is what's that's stating.
16      Q.     Is that what they're -- well, "Patch of
17 ice was in the walkway area," isn't that a new
18 sentence, because there's a capital "patch"?
19      A.     I don't see a period after "right hip."
20      Q.     Don't you see "patch" begins with a
21 capital P?
22      A.     I see a capital P, yes.
23      Q.     So wouldn't that suggest it's the

83

1 beginning of a new sentence?
2      A.     I didn't take it that way.
3      Q.     When you read it now, doesn't that
4 suggest to you that that's Jennifer's statement?
5      A.     No.
6      Q.     You think that's Mr. Fuerst's statement
7 to her?
8      A.     Yes.
9      Q.     And she doesn't put anything on this
10 form to suggest that anything he's saying is not
11 correct?
12      A.     I don't see anything on there that says
13 anything different.
14      Q.     Thank you. So was there any reason why
15 these stairs could not have been shoveled off?
16      A.     Once again, the premise of the question
17 is you're assuming that they weren't shoveled off,
18 and I said they were shoveled off at some point.
19      Q.     Well, going back to Exhibit 3, do you
20 see where it also says "icy"?
21      A.     Where is that? I know it does. It
22 says -- I believe it's in Surface or something down
23 below. You've got to go --

84

1           MR. WHITE: Scroll down further.
2 BY MR. WHITE:
3      Q.     "Surface at Scene: Icy." That's
4 Jennifer's conclusion, correct?
5      A.     Yeah, that's traditionally what the
6 snow surface is like.
7      Q.     But she's describing stairs, isn't she?
8      A.     I don't know.
9      Q.     Well, the accident happened --
10      A.     You can see the rest of the site scene.
11 It says: Powder, Packed Powder, Hard Packed,
12 Variable, Corn, those are all descriptors of snow.
13      Q.     Except for Other is something else,
14 correct?
15      A.     Correct.
16      Q.     And she wrote the word "icy."
17      A.     Correct.
18      Q.     And she's describing the surface on
19 these stairs, correct?
20      A.     I don't know that.
21      Q.     Well, what else would she be describing
22 if she wasn't describing the surface at the scene,
23 stairs?

85

1   A.   Of the snow condition right next to it.
2   Q.   And why would that be helpful in the
3 incident report to describe snow away from the scene
4 of the event?
5   A.   It's asking for the surface of the
6 scene.
7   Q.   And does that -- okay. Let's assume
8 that. So does that look like icy snow to you? Does
9 that look like it's slushy snow?
10   A.   There can be ice and slush at the same
11 time.
12   Q.   Thank you.
13       MR. TAPPLY: Just for the record,
14 Mr. Smith is not being shown the photographs when he
15 was asked that last question.
16       MR. WHITE: Can you bring up Exhibit 4,
17 please.
18       THE REPORTER: Yes. There it is.
19 BY MR. WHITE:
20   Q.   Does that look like soft snow or slushy
21 snow? Can you --
22   A.   Slushy snow.
23   Q.   So if Jennifer was describing that

86

1 snow, would she have checked --
2   A.   I don't know, is that the scene where
3 Jennifer was responding? Is that where she was
4 describing? That's why I reject the premise of the
5 question.
6   Q.   I don't know that you really get to
7 reject the premise of the question.
8   A.   I don't understand what you're asking.
9 It says the scene is icy. To Jennifer, the scene was
10 icy. The scene is that area.
11   Q.   People are trained to fill out the
12 Incident Report Form, correct?
13   A.   Yes.
14   Q.   And when in the left-hand column it
15 says Site Conditions, do you see that, Exhibit 3?
16   A.   It's not on my screen, no.
17       MR. WHITE: Can you pull up Exhibit 3
18 again, please.
19       THE REPORTER: Yes.
20 BY MR. WHITE:
21   Q.   Do you see in the left-hand column,
22 Site Conditions?
23   A.   Site Conditions, correct.

87

1   Q.   What are people told or trained to
2 observe or comment on when they see the word "site
3 conditions" at Waterville Valley?
4   A.   They're responding to what the scene
5 looks like and is observed.
6   Q.   And in this case, is the scene the
7 stairs?
8   A.   Not necessarily.
9   Q.   Well, what does it include, then, if
10 it's not just the stairs?
11   A.   Where the scene was managed. Was the
12 scene at the bottom of the stairs? I don't know.
13 Was the scene at the top of the stairs? I don't
14 know. Was it -- did they get back on the snow
15 surface? They reported with a toboggan, I believe,
16 so. I believe it says "transportation," but it
17 doesn't say "toboggan" -- yeah, it says "toboggan,"
18 right there, transportation. So they were on the
19 snow at one point.
20   Q.   So fair enough. If we go to the top of
21 the form, Describe Specific Location, do you see
22 that?
23   A.   Where is that at?

88

1   Q.   At the very top, top middle.
2   A.   Top middle, Describe Specific Location,
3 correct, "Staircase next to base lodge."
4   Q.   And so we agree that the site is the
5 staircase next to base lodge, correct?
6   A.   We agree that that's Define Specific
7 Location, yes, as stated on the form.
8   Q.   And if we come down to the bottom of
9 the form again, isn't the site conditions referring
10 to the description at the top of the form?
11   A.   It's referring to the site of where the
12 incident was responded to, which I would say is all
13 of that area.
14   Q.   So all of that area is icy, then,
15 apparently?
16       MR. TAPPLY: Objection. Is that a
17 question or is that just a statement?
18       MR. WHITE: I'm just asking him to
19 confirm the statement he has just made.
20       THE WITNESS: I don't agree with that,
21 no.
22 BY MR. WHITE:
23   Q.   We'll move on. Actually, I just

89

1 realized, go back to the top of the form for a
2 second. If you look at Location, it says Premise.
3 Do you see that? It's checked.
4      A.    Yes.
5      Q.    So doesn't that suggest that the scene
6 is not -- it's not on the hill, correct?
7      A.    I don't know exactly what they're
8 referring to as "premise."
9      Q.    Well, isn't premise such as a building
10 or stairway or some sort of structure, something
11 that's been constructed?
12      A.    Premise would be a location in my mind,
13 a location on the premise, it happened somewhere
14 here.
15      Q.    On the grounds, around the building,
16 correct?
17      A.    Yes, correct.
18      Q.    So this happened on the building near
19 -- on the grounds of the building, and if you go down
20 to -- again, to the bottom -- I'm sorry, go back to
21 the top for one second, I apologize, and it says,
22 Describe Specific Location on the premise, "Staircase
23 next to base lodge."

90

1      A.    Are you asking me a question?
2      Q.    Did I read that correctly?
3      A.    Yes.
4      Q.    So isn't Jennifer describing exactly
5 the scene of the event?
6      A.    No, she's describing the scene.
7      Q.    Okay. And the scene is the staircase
8 next to the base lodge?
9      A.    No, no.
10      Q.    Well, then if we use your answer, then
11 why isn't she saying -- use the word "mixed"?
12 Because there's pavement, there's slipperiness,
13 there's dry. I mean where's the scene stop, in your
14 estimation, Mr. Smith?
15      MR. TAPPLY: Objection.
16      THE WITNESS: I am unsure of what she
17 would be thinking. I don't have an explanation of
18 that.
19 BY MR. WHITE:
20      Q.    Okay. And in the training that you
21 provide your employees or Mr. Hayes provides the
22 employees in filling out this Incident Report Form,
23 aren't you asking the author to indicate the

91

1 conditions where the event happened?
2      A.    We're asking them to describe the
3 conditions, correct.
4      Q.    Where the event happened, correct?
5      A.    Where the scene is.
6      Q.    Isn't "scene" synonymous with the
7 "location" of the event?
8      MR. TAPPLY: Objection.
9      THE WITNESS: Yes.
10 BY MR. WHITE:
11      Q.    So you told me you don't know how black
12 ice forms. Does anyone on your staff know?
13      MR. TAPPLY: Objection. I'm sorry,
14 before you answer, I'm objecting because I don't see
15 anywhere within the 30(b)(6) notice the requirement
16 that he have conducted an investigation into the
17 determination as to the scientific process by which a
18 surface that you're describing as black ice is --
19 forms.
20      Now, obviously, I'm all for giving
21 latitude when it comes to a 30(b)(6) notice for a
22 whole host of reasons, but asking him to give a
23 scientific process by which something you're

92

1 referring to as black ice is formed or asking about
2 his staff credentials for making this determination
3 runs, I think, a bit outside the scope, but I'm happy
4 to hear your rationale on the point.
5      MR. WHITE: I'm not asking for a
6 meteorological or scientific explanation. He's
7 acknowledged he's aware of black ice. He's
8 acknowledged he knows it's dangerous, and he's
9 testified that he -- that Waterville takes actions to
10 try to be -- prophylactic measures. I'm just asking
11 him if he doesn't know exactly what causes black ice
12 to form, do people on his staff know how it forms?
13      THE WITNESS: Well, I don't --
14      MR. TAPPLY: Hold on. And I think that
15 that is far outside the 30(b)(6) deposition notice.
16      MR. WHITE: The 30(b)(6), we asked for
17 information concerning the conduct of winter
18 maintenance at Waterville Valley, and winter
19 maintenance clearly does take into account snow and
20 ice on walkways, and so certainly an understanding of
21 what factors cause black ice is well within the
22 confines of this deposition.
23      MR. TAPPLY: Your definition of winter

93

1 maintenance is as follows:  In quotes, means snow
2 and/or ice inspection, removal, remediation,
3 treatment, and/or prevention and related matters, end
4 quote.
5         I don't read anywhere in there that he
6 is required to have tested his staff on their
7 understanding of the physics involved in the creation
8 of something you're referring to as black ice.
9         MR. WHITE:  Tim, I respectfully
10 disagree. It's very simply -- I'm not asking for a
11 scientific definition; I'm asking for a definition as
12 a general manager of a ski area.  The question -- the
13 topic covers prevention.  How can you prevent black
14 ice if you don't know what causes it to form, and he
15 said he doesn't know, but does his staff know?
16         MR. TAPPLY:  I think you're presuming
17 that black ice was present at the scene or that black
18 ice is even an actual thing.  If you want to ask him
19 if, in preparation for this deposition, he polled his
20 staff on their knowledge of how ice conditions are
21 formed, he can certainly answer that question.
22         MR. WHITE:  Tim, I don't think I'm as
23 limited as that.

94

1 BY MR. WHITE:
2      Q.    I'm going to ask the following
3 question: Did you have any discussions or did you or
4 do you have any discussions -- strike that.  Let me
5 rephrase it.
6         As a matter of winter maintenance at
7 Waterville Valley, do you, from time to time, discuss
8 the formation of ice on exterior surfaces?
9      A.    Yes.
10      Q.    And that includes black ice, correct?
11      A.    No.
12      Q.    Okay.  So you're talking about ice in
13 general?
14      A.    Yes.
15      Q.    But you've never talked about the
16 formation of black ice?
17      A.    Correct.
18      Q.    Did you ask anyone on your staff if
19 they have any knowledge in that regard?
20      A.    No.  In regard to black ice?
21      Q.    Yes.
22      A.    No.
23      Q.    Does someone at Waterville Valley check

95

1 weather reports to see if some type of preventive or
2 prophylactic treatment is required?
3      A.    Yes.
4      Q.    And who does that?
5      A.    I do, Barry St. Cyr does, Billy,
6 Charlie, the rest of the team members.
7      Q.    And is that information recorded
8 someplace?
9      A.    No.
10      Q.    So is there any way to reconstruct to
11 see if that was in fact done on March 12th or
12 March 13th?
13      A.    No.
14      Q.    Do you know if it was done?
15      A.    I do not.
16      Q.    Have you asked anybody else if it was
17 done?
18      A.    I have not.
19      Q.    You agree with me that these stairs
20 should not be icy, correct?
21      A.    They shouldn't -- if we had freezing
22 rain, they might be icy.  No, they shouldn't be icy.
23      Q.    And that's not a risk that patrons

96

1 should be responsible for, correct?
2         MR. TAPPLY:  Objection.  You can
3 answer.
4         THE WITNESS:  No.
5 BY MR. WHITE:
6      Q.    Is there any reason why the snow that's
7 shown --
8         MR. WHITE:  Can you bring up Exhibit 4,
9 please.
10         THE REPORTER:  Yes.
11 BY MR. WHITE:
12      Q.    Any reason the snow on these stairs
13 could not have been removed?
14      A.    No.
15      Q.    Do you know why it was not removed?
16      A.    No.
17      Q.    Do you ever put down caution tape or
18 cones or any other sort of warning to patrons that
19 steps might be slippery?
20      A.    Yes.
21      Q.    And how do you make that decision?
22      A.    If we are actively removing a --
23 slippery ice or conditions, we will put out a warning

97

1 of that when we're doing it.  If it is unremovable or
2 may need heavy machinery to remove, we may mark an
3 area off.
4       We constantly are going around the ski
5 area and assessing the hazards that could exist, and
6 we take many different precautionary prescriptions
7 (verbatim) to -- to try to do the best that we can
8 for the snow surface and the ski -- the walking
9 surface and the snow surface, the transition to be as
10 safe as possible.  So, yes, we do use cones and we
11 use different signage for different conditions.
12      Q.   Now, is there a ski trail that's right
13 to the left of Exhibit 4?
14      A.   Yes.
15      Q.   There's a ski trail there?
16      A.   Yes.
17      Q.   Was there ever a handrail that extended
18 further down the stairs?
19      A.   No.
20      Q.   Do you know why?
21      A.   No.
22      Q.   Could you have erected a snow fence
23 here to have prevented the snow from encroaching onto

98

1 the stairs?
2       MR. TAPPLY:  Objection.
3       THE WITNESS:  I don't think a snow
4 fence would have done it.
5 BY MR. WHITE:
6       Q.   And why do you say that?
7       A.   Snow fences aren't that hearty.  They
8 aren't that strong to hold back the snow from the ski
9 slope, and we're also trying to give access to the
10 slope and to the stairs.
11      Q.   Can you think of anything that you
12 could have done to have kept snow from encroaching as
13 much on the stairs as they do?
14      MR. TAPPLY:  Objection.
15      THE WITNESS:  As stated earlier, we
16 could have shoveled more.
17      MR. WHITE:  Let's go to exhibit -- next
18 exhibit, please, which I think is 9.
19      THE REPORTER:  Okay.
20      (Smith Exhibit No. 9 referenced.)
21 BY MR. WHITE:
22      Q.   Do you recognize this picture,
23 Mr. Smith?

99

1       A.   Yes.
2       MR. WHITE:  Can we get this marked as
3 the next exhibit.
4 BY MR. WHITE:
5       Q.   And I'll represent to you this is a
6 photograph that Attorney Tapply's office produced,
7 and do you see the information, as far as the date
8 and time it was taken?
9       A.   March 14th, 2019, at 2:54 p.m.
10      Q.   So this would be about -- roughly 28,
11 29 hours after the event had happened involving
12 Mr. Fuerst, correct?
13      A.   Yes.
14      Q.   And did you take this picture?
15      A.   I did not.
16      Q.   Do you know who did take the picture?
17      A.   I do not.
18      MR. WHITE:  Can you go to the top of,
19 slide it down, please.
20 BY MR. WHITE:
21      Q.   Does it appear that the stairs have
22 been shoveled since the day before?
23      A.   I can't tell.

100

1       Q.   Okay.  Does it appear that the snow on
2 these stairs encroaches more than the snow on the
3 upper sets of stairs?
4       A.   I can't tell.
5       MR. WHITE:  Let's go to the next
6 photograph, please.  Can we have this marked as 10.
7       (Smith Exhibit No. 10 referenced.)
8 BY MR. WHITE:
9       Q.   Do you see that this picture was also
10 taken the next day, around 3:00 in the afternoon?
11      A.   Yes.
12      Q.   Did you take this picture?
13      A.   I did not.
14      Q.   Do you know who did?
15      A.   I do not.
16      MR. WHITE:  Slide it down, please.
17 BY MR. WHITE:
18      Q.   From this picture, does it appear that
19 the bank has been -- on the left-hand side of the
20 photograph, has been shoveled back?
21      MR. TAPPLY:  As compared to the prior
22 day or just in general?
23      MR. WHITE:  Prior day.  Thank you, Tim.

101

1         THE WITNESS:  I can't tell.
2 BY MR. WHITE:
3     Q.    Do you need to see the other photograph
4 to be able to tell better, or what would help you?
5     A.    It would help to see the other
6 photograph, yeah, but it looks like there was
7 significant melting and this was at the end of the
8 next day.
9         MR. WHITE:  Can you bring up Number 4,
10 please -- actually, I'm sorry, Number 5.
11 BY MR. WHITE:
12    Q.    So that's the day, I'll represent to
13 you, of the event and taken about the time of
14 Mr. Fuerst -- shortly after Mr. Fuerst's fall.  Do
15 you want them side by side, Tim, or can you tell by
16 looking at the two?
17    A.    I'd like to see them side by side if we
18 can.
19        MR. WHITE:  Sure.
20        MR. TAPPLY:  Can we take a quick break?
21        MR. WHITE:  Can I have an answer to my
22 question first?
23        MR. TAPPLY:  I'm sorry, I don't think

102

1 there's a question pending.
2         MR. WHITE:  I thought there was.  I was
3 asking him in comparison -- to compare the two
4 photographs.  I think we could drag the tabs down.
5         MR. TAPPLY:  Your last question was,
6 Would it be helpful to you if you were able to look
7 back at the prior photography, and he said, Yes, it
8 would.  So there's a question and an answer, so I'd
9 like to take a break.
10        MR. WHITE:  Fine, Tim, we'll take a
11 break.
12        MR. TAPPLY:  Thank you.
13        (Recess.)
14 BY MR. WHITE:
15    Q.    So, Mr. Smith, going back to my
16 question, can you tell from looking at Exhibit 9 if
17 work has been done to cut back or shovel back the
18 left-hand-side-of-the-stair snowbank?
19    A.    I can't tell.
20    Q.    Now, you testified earlier that Jeff
21 Hayes told you the Fuersts were taking photographs of
22 the scene and that was a red flag.  Do you recall
23 that testimony?

103

1     A.    Yes.
2     Q.    And --
3     A.    Well, no, actually, I don't recall.  I
4 didn't say who it was.  Jeff just said people were
5 taking photos of the scene after the incident, that's
6 all.
7     Q.    And did Jeff say that he saw it or did
8 he say somebody else saw it, or how did --
9     A.    No, he said that other patrollers saw
10 someone taking pictures.
11    Q.    And did he say what -- who the
12 patroller was?
13    A.    He did not.
14    Q.    And do you know when that happened?
15    A.    I do not.
16    Q.    But I presume that means that it was
17 happening at the scene at the time of the event,
18 correct?
19    A.    Yes, it was -- yeah.
20    Q.    Which means that Waterville employees
21 had already arrived on scene, correct?
22    A.    No.  I mean just -- they could have
23 been coming on scene.

104

1     Q.    Okay.  But they were -- for them to see
2 the Fuersts taking photographs, they had to be near
3 or at the scene?
4     A.    Yes.
5     Q.    But we don't know who that employee or
6 employees are, other than they were ski patrol?
7     A.    Correct.
8         MR. WHITE:  Now, if we could bring up
9 the next --
10 BY MR. WHITE:
11    Q.    Well, actually, still looking at this
12 picture, do you see evidence of ice melt in this
13 picture?
14    A.    The white on the side, maybe, there
15 could be a little bit -- it looks like there's a
16 little bit of white, something on the side -- on my
17 view, his right-hand side of the staircase would have
18 been -- I can't tell what it is, though; it could be
19 snow.  No, I can't tell.
20        MR. WHITE:  Sandra, can you blow up the
21 picture, slightly.
22        (Discussion off the record.)
23 BY MR. WHITE:

105

1    Q.    Does that help you, Mr. Smith?
2    A.    It looks the same to me.  It could be
3 ice melt.
4         MR. WHITE:  So let's go to Exhibit 11,
5 please, and scroll down.
6         (Smith Exhibit No. 11 referenced.)
7 BY MR. WHITE:
8    Q.    Do you see, Mr. Smith, this was taken
9 on March 14th about the same, about 3:00 in the
10 afternoon?
11   A.    Yeah.
12   Q.    Did you take this picture?
13   A.    No.
14   Q.    Do you know who did?
15   A.    No.
16         MR. WHITE:  Let's go to the next
17 picture.
18         (Smith Exhibit No. 12 referenced.)
19 BY MR. WHITE:
20   Q.    Again, you'll see this was taken about
21 the same time, on March 14.  Do you see that?
22   A.    Yes.
23   Q.    And did you take this picture?

106

1    A.    No.
2    Q.    Do you know who did?
3    A.    No.
4         MR. WHITE:  Can we have this marked as
5 an exhibit, please.
6 BY MR. WHITE:
7    Q.    And does this picture suggest to you
8 that the snowbank on the right-hand side looking down
9 has been shoveled or cut back?
10   A.    Yes, at some point.
11   Q.    So that would have happened sometime
12 between the time of the event involving Mr. Fuerst
13 and March 14th, correct?
14   A.    No.
15   Q.    If it wasn't in that time frame, when
16 would it have happened?
17   A.    I'm unsure.  It could have happened in
18 that time frame, earlier; it -- I can just tell that
19 someone has cut that back with a shovel, yes.
20   Q.    But so this cutting back happened after
21 Mr. Fuerst had fallen, correct?
22   A.    I don't know, no.
23         THE REPORTER:  Did you answer "I don't

107

1 know"?
2         THE WITNESS:  "I don't know."
3 BY MR. WHITE:
4    Q.    And why don't you know?  What would be
5 another alternative explanation?
6    A.    It could have been cut back earlier in
7 the week.  It could have been cut back throughout the
8 season.  That's an -- obviously a point that we need
9 to maintain, so we maintain that point throughout the
10 ski day and throughout the season.
11   Q.    But we know that the right-hand side
12 looking at this exhibit did not look like this on the
13 morning of March 13th, correct?
14   A.    No, we do not know that.
15   Q.    Oh, so you -- does this right-hand side
16 of these stairs look the same to you as they did on
17 the morning of March 13th, which is Exhibit 4?
18   A.    The pictures don't look the same.
19   Q.    So doesn't that suggest to you that the
20 bank has been cut back since the morning of
21 March 13th?
22   A.    No, the perspective of the picture is
23 different.

108

1    Q.    Isn't this the same set of stairs
2 Mr. Fuerst fell on?
3    A.    Yes.
4    Q.    And you're saying that you can't --
5 that you can't acknowledge that this right-hand side
6 looks different than the same side the morning
7 before?
8    A.    Can you restate that question?
9    Q.    Sure.  I'm just asking you if it looks
10 to you if shoveling or cutting back of the bank has
11 occurred sometime after Mr. Fuerst fell on March 13th
12 until the time this picture was taken on March 14th?
13   A.    I'm unable to say.  I can't tell if
14 it's been cut back or not in that time frame from
15 these pictures.
16   Q.    And why is that?
17   A.    The pictures are taken from different
18 perspectives.
19   Q.    But you agree with me that the bank has
20 been cut back in this picture?
21   A.    I agree with you that the bank was cut
22 back in both pictures.
23   Q.    Do you agree with me that this picture,

109

1  looking at right here, which is Exhibit 12, shows the
2  snow that is encroaching as much on the stairs as
3  Exhibit 4, for example?
4      A.   No, can't tell.
5      Q.   Do you see any ice melt in this
6  picture?
7      A.   I see additional area that could be ice
8  melt. It looks what is one, two -- about mid picture
9  on a stair on the right-hand side, looks like there
10 could be some ice melt right there.
11     Q.   So using that as a reference point, if
12 we count up 12 stairs, do you see the edge of the
13 stair, a straight, linear line there that's black?
14     A.   I'm not sure if that's the edge of the
15 stair or -- I'm not sure what that is from this
16 perspective.
17         MR. WHITE:  Can you blow that picture
18 up?
19 BY MR. WHITE:
20     Q.   Upper right-hand corner, isn't that the
21 edge of the stair, that black straight line?
22     A.   Could be or it just could be the
23 melting, not 100 percent on that.

110

1      Q.   Aren't we also seeing the edge of the
2  stair just above it?
3      A.   I only see one that looks like it could
4  be the edge of the stair; the one below it doesn't
5  look like it at all.
6      Q.   How about the one above it?
7      A.   I'm looking at three concrete stairs.
8  The one in the middle, that looks most likely that it
9  could be the edge, but I'm unsure if that's the edge
10 or if it's just a really clean break from the snow to
11 the concrete.
12     Q.   How about if we come -- the right-hand
13 corner, about a third of the way down the page, do
14 you see there's a right-angle bend of concrete?
15     A.   No, I don't.
16     Q.   Do you see that corner right there,
17 right to the right of the arrow?  Is that the corner
18 of the concrete?
19     A.   I can't be certain, no, I can't be
20 certain.
21     Q.   Okay.  We'll let a jury decide.  That's
22 fine.  Thank you.
23         Last couple of photos.  Can you go to

111

1  the next one, please.  Do you recognize this
2  photograph, Mr. Smith?
3      A.   Yes, I do.
4      Q.   Did you take this photograph?
5      A.   Possibly, yes.
6      Q.   Do you know when you took it?
7      A.   During the spring, as I --
8      Q.   Do you know what year?
9      A.   I do not.
10         MR. WHITE:  Can we mark this next
11 exhibit.
12         (Smith Exhibit No. 13 referenced.)
13         MR. WHITE:  And the next picture,
14 please.
15         (Smith Exhibit No. 14 referenced.)
16 BY MR. WHITE:
17     Q.   Do you recognize this photograph?
18     A.   Yes, I do.
19     Q.   And do you recall when this was taken?
20     A.   In the spring, and I took it, I
21 believe.
22     Q.   You don't know what year?
23     A.   I do not.

112

1      Q.   Would it have been after this
2  accident --
3      A.   Yes.
4      Q.   -- or event?
5      A.   Yes.
6      Q.   And this shows some changed-out hand
7  railings, is that correct?
8      A.   Yes.
9      Q.   And why were the hand railings changed
10 out?
11     A.   We changed out the upper platform, as
12 shown in this picture.  We have a new -- a new
13 platform in between the two stair sets.
14     Q.   But that platform and stair set and
15 handrails, they were all installed before Mr. Fuerst
16 fell, correct?
17     A.   No.
18     Q.   I thought you testified earlier that
19 those stairs had been installed in 2019, before
20 Mr. Fuerst fell?
21     A.   These are different stairs.
22     Q.   Oh, these are different stairs, okay.
23         And why did you -- so let me go back.

113

1 When were these stairs built?
2      A.    I believe the following summer, so that
3 would have been the summer of 2019.
4           MR. TAPPLY:  And just to clarify, we're
5 not talking about the concrete stairs now; we're
6 talking about the stairs above the concrete stairs?
7           THE WITNESS:  Correct.
8           MR. WHITE:  Right.
9 BY MR. WHITE:
10     Q.    So if we go back to Exhibit 9 -- I'm
11 sorry, Exhibit 10, I apologize, Exhibit 10.  So the
12 stairs in the middle of this picture, they have been
13 replaced, correct --
14     A.    Yes.
15     Q.    -- with the new stairs, which are in
16 Exhibit 15, correct?
17     A.    Correct.
18           MR. TAPPLY:  I'm sorry, Jack, you said
19 15.  I think you -- I think we're just on -- still on
20 14; maybe I'm wrong.
21           MR. WHITE:  I thought we were on 15.
22 Sandra, what exhibit are we on?
23           THE REPORTER:  The exhibit I thought we

114

1 were on was the picture showing the summer or spring
2 looking up the length of the stairs, is that --
3           MR. TAPPLY:  I have that as 14.  I
4 apologize if I'm incorrect.
5           MR. WHITE:  No, you're right, it is 14.
6 I apologize, you're right.
7 BY MR. WHITE:
8      Q.    So just to correct the record, the
9 stairs shown in Exhibit 10, the middle of the
10 picture, they have been replaced with the stairs that
11 are shown in Exhibit 14?
12     A.    Correct.
13     Q.    The wood stairs in the middle, correct?
14     A.    Correct.
15     Q.    Do you know why they were -- well, it
16 looks like you also added stairs, looking at
17 Exhibit 14, it looks like there's now four stairs, as
18 opposed to before there was three stairs.  Did I look
19 at that correctly?
20     A.    Yes.
21     Q.    And why was that done?
22     A.    We put a new entryway into the lodge in
23 the summer of 2019.

115

1      Q.    Would the -- I'll refer to them as the
2 older set of stairs.  Were they compliant with the
3 building code?
4      A.    Yes, to my knowledge.
5           MR. TAPPLY:  Objection.  And in fact,
6 I'm going to instruct him not to answer the question.
7           MR. WHITE:  And what's the basis for
8 instructing him not to answer?
9           MR. TAPPLY:  Outside the scope of the
10 30(b)(6) notice.
11           MR. WHITE:  I've asked him about the
12 stairs.
13           MR. TAPPLY:  Construction of stairs and
14 whether they comply with building codes is not within
15 the -- any of the items listed in the 30(b)(6)
16 notice.
17           MR. WHITE:  Well, we'll just take his
18 deposition tomorrow then, Tim, we'll do that.  I'll
19 ask him that question tomorrow.
20           MR. TAPPLY:  No.
21           THE WITNESS:  I don't have time
22 tomorrow.
23           MR. WHITE:  I'll notice it.  We've

116

1 already talked about construction of stairs.
2           MR. TAPPLY:  He's given you the answer
3 -- sorry, I didn't mean to cut you off.  Go ahead.
4 Jack, I'm just going by your 30(b)(6) notice and what
5 I have been asked to produce a witness prepared to
6 address and I just -- Mr. Smith is not prepared to
7 address whether or not stairs meet building codes.
8           MR. WHITE:  Okay.  And that's fine, but
9 we actually noticed him for his deposition this
10 afternoon, following this.
11           MR. TAPPLY:  Yeah.
12           MR. WHITE:  So do you want me to keep
13 going or do it then?
14           MR. TAPPLY:  You can do it then.
15           MR. WHITE:  Thank you.  Why don't we
16 take a break.  This would probably be a good stopping
17 point.
18           (Luncheon recess.)
19 BY MR. WHITE:
20     Q.    So just make sure I understood your
21 prior answers.  From looking at the photograph,
22 you're not sure what work was done to the snowbanks
23 between the time Mr. Fuerst fell, and the time that

117

1 the pictures were offered were taken, the ones from
2 the afternoon of March 14th?
3    A.    Can you repeat that?
4    Q.    Sure.
5         MR. WHITE:  Can you read back the
6 question, please.
7         (Question read.)
8         THE WITNESS:  Correct.
9 BY MR. WHITE:
10    Q.    And you tried, apparently, in
11 preparation for this deposition, to find out what if
12 anything happened, but there's no records or other
13 way to establish what work, if any, was done?
14    A.    Correct.
15    Q.    You testified that you became aware
16 that the Fuersts were taking pictures of these
17 stairs, correct?
18    A.    I was not aware that it was the
19 Fuersts; I was aware that people were taking pictures
20 from my patrol of the area.
21    Q.    And the fact that you were aware of
22 that, did that cause -- did you make a decision not
23 to take pictures?

118

1    A.    No.
2    Q.    If you saw others taking pictures of
3 the stairs, patrons, which you said is a red-flag
4 event, why not?  Did you not take -- poor question.
5         Taking pictures of an event can be a
6 red flag, correct?
7    A.    Correct.
8    Q.    And you're aware of people taking
9 pictures is a reason why you didn't take pictures of
10 the event scene that they were taking pictures of?
11    A.    No.
12    Q.    Would you normally take pictures --
13    A.    No.
14    Q.    -- in that situation?
15         So you're aware at the time that
16 Mr. Fuerst has a broken hip, correct?
17    A.    Correct.
18    Q.    And you're aware that he's fallen on
19 your stairs?
20    A.    Correct.
21    Q.    And you're aware that he says that the
22 steps were slippery, caused him to fall, correct?
23    A.    Correct.

119

1    Q.    Do you know why no pictures were taken
2 that day at all of the scene, the stairs?
3    A.    I am not aware.
4    Q.    Do you know why they waited until the
5 following afternoon or the next day to take pictures?
6    A.    I can only assume.
7    Q.    And what would you assume?
8    A.    I'd assume it was because Jeff reviewed
9 the incident report the next day and spoke to the
10 patrollers the next day, and that's when he was made
11 aware of the -- photography and what happened, what
12 transpired in the incident.
13    Q.    Have you ever told anyone not to take
14 pictures of a scene of an incident?
15    A.    No.
16    Q.    You would agree with me that the
17 pictures the afternoon of a day later do not
18 necessarily depict what the conditions were the day
19 of the event?
20    A.    Yes.
21    Q.    And in fact, you would agree with me
22 the pictures on the day of the event show a different
23 scene than the pictures show taken an afternoon a day

120

1 later?
2    A.    No.
3    Q.    You think it shows the same scene?
4    A.    It shows a different perspective, a
5 different scene, yes, it's different.
6    Q.    What's different between the two sets
7 of pictures, the ones the Fuersts took, the ones that
8 Waterville Valley took?
9    A.    Perspective.
10    Q.    That's all?
11    A.    Well, it's cloudy instead of sunny,
12 looks like the day was more moist on the day after
13 than it was the day of.  There's differences between
14 the day, yes.
15    Q.    Other than differences of the day,
16 sunny versus cloudy, are there any other differences
17 that you see in the two sets of photographs?
18    A.    Yes.
19    Q.    What?
20    A.    Can I see the photographs?
21    Q.    Sure.
22         MR. WHITE:  Why don't you bring up
23 Exhibit 4 and Exhibit 10, or if there's any others

121

1 that you prefer to see, let me know.  That's
2 Exhibit 4 and Exhibit 10.
3        THE WITNESS:  These pictures are so
4 drastically different, it's hard -- I can point out a
5 lot of things that are different in the photos, but
6 they're so drastically different, it's hard to
7 pinpoint everything.
8 BY MR. WHITE:
9     Q.    I'm not looking for everything.  How
10 about the amount of snow on the stairs, do you agree
11 -- do you see any difference between the two pictures
12 and the amount of snow that's on the stairs?
13     A.    I can't tell.  The first picture,
14 Exhibit 4, is very up close, and the second picture,
15 Exhibit 10, is from a distance.  So it's very hard to
16 tell the difference in quantity of snow.
17     Q.    Would it help you if we zoomed in on
18 10, would that help you to see if the sections are
19 being compared?
20     A.    You can try; it's at a different angle,
21 too, but I mean you can try if you'd like.  Make them
22 look --
23        MR. WHITE:  Go back to 4 for a second,

122

1 please.
2        THE REPORTER:  Okay.
3        MR. WHITE:  Off the record for a
4 second.
5        (Off the record.)
6 BY MR. WHITE:
7     Q.    So there's a zoomed-in view of
8 Exhibit 10.  Do you see the difference now --
9     A.    No.
10     Q.    -- in the amount of snow?
11     A.    Can you go back to 4 --
12     Q.    Sure.
13     A.    -- and 10.  There's definitely a
14 difference in the snow.
15     Q.    And Exhibit 10 hasn't -- for example,
16 the wooden stairs halfway up, the ones in the middle
17 of the picture, the ones that have now been replaced,
18 aren't those pretty much free of snow at this point,
19 Exhibit 10?
20     A.    The second one down, I can't be
21 certain; on the third one down and the first one off,
22 doesn't look like it.  The top plate doesn't look
23 like it, but the second one down, yes.

123

1        MR. WHITE:  All right.  Go back to 4,
2 please.
3 BY MR. WHITE:
4     Q.    Do you agree with me that there is more
5 snow encroaching in Exhibit 4 on the stairs than
6 there is in Exhibit 10?
7     A.    No, not on all the stairs, no.
8     Q.    On the stairs that we can see in
9 Exhibit 4?
10     A.    No.
11     Q.    Okay.
12     A.    Just the one stair, it looks like
13 there's maybe a little less snow on that second one
14 down.  The third one down, it looks about the same
15 distance out.
16     Q.    Okay.  Thank you.
17        MR. WHITE:  I think that's all the
18 questions I have regarding the 30(b)(6), unless you
19 want me to transition now -- take a break and just
20 transition right to his deposition.  I don't have a
21 lot of questions.
22        MR. TAPPLY:  That's fine, if you want
23 to transition right in, and then I will reserve my

124

1 right to ask him some questions on all things once
2 you're done.
3        MR. WHITE:  Okay.  So can we go to
4 Exhibit 15.
5        (Smith Exhibit No. 15 referenced.)
6 BY MR. WHITE:
7     Q.    So these are the stairs that you told
8 me were constructed after Mr. Fuerst fell, the wood
9 ones in the middle on the left-hand side.
10     A.    Correct.
11     Q.    And did the elevation of the deck
12 change?
13     A.    Yes, it did.
14     Q.    And how did it change?
15     A.    I'm sorry, in reference to deck, I am
16 specifically speaking of the deck on the left side of
17 the picture with the metal grating on top, that
18 changed.
19     Q.    So if we're looking at the railing that
20 runs from left to right, the long railing, that's the
21 original elevation of the outside deck or walkway?
22     A.    No.
23     Q.    So give me the history.  Did that

125

1 change as well?
2     A.    Yes.  There was a -- where you see
3 Entrance, those doors did not exist the year prior.
4 The entryway to the lodge was where the windows are
5 now, straight in the middle of the photograph.
6     Q.    Yeah.
7     A.    And there was a stair or two up from
8 the ground level up to the deck, the original deck,
9 and then into the entryway.
10     Q.    And the new deck that was added, which
11 I'm looking at these rectangular-shaped piers, do you
12 see those?
13     A.    Yeah, the footers.
14     Q.    The footers, yeah.  So that deck
15 matches the original elevation of the old deck,
16 correct?
17     A.    No, it does not.
18     Q.    It doesn't?
19     A.    No.
20     Q.    So it looks to me like it's the same --
21 they're not parallel?
22     A.    Oh, I'm sorry, the old deck on the
23 right side of the photo matches the new deck on the

126

1 left side of the photo, correct.
2     Q.    Yes, yes, that's what I was asking.
3     A.    Correct.
4     Q.    So that elevation did not change; the
5 deck remained the same elevation?
6     A.    The old deck?
7     Q.    No, the new deck and the old walkway
8 remained -- are parallel to one another?
9     A.    In this photo, yes, but in the old
10 stairs, no.
11     Q.    Okay.  So let's go back to -- let's go
12 to photograph 10, please.  So looking at the picture
13 of the -- middle of the picture, those are the stairs
14 that have now replaced those three steps, correct?
15     A.    Correct.
16     Q.    In the top of those three steps, there
17 was a step to get up or two steps to get up to the
18 walkway elevation?
19     A.    The entryway to the base lodge, yes.
20     Q.    Okay.  So if I was on the walkway and I
21 wanted to come down these stairs, I'd walk towards
22 the mountain and then take a left and take two steps
23 down and then I'd be now on the steps?

127

1     A.    Say that again.
2     Q.    If I'm on the walkway and I'm walking
3 towards the mountain --
4     A.    Yes.
5     Q.    -- and I took a left, I would find
6 myself two steps to get down onto the next landing?
7     A.    A step or two, yes, it would be a step
8 or two.  I can't recall if it was two steps or one
9 step to get onto that landing, but you wouldn't turn
10 left; you'd go straight.  You'd walk off that walkway
11 straight down two steps.  Then you'd find yourself on
12 that landing that's at the top of those three stairs.
13     Q.    And why was that change made?
14     A.    For the new entrance.
15     Q.    No other reason?
16     A.    No, new entrance.
17     Q.    Did you retain measurements or
18 dimensions of the existing stairs --
19     A.    No.
20     Q.    -- the ones that --
21     A.    Oh, wait, say that again.
22     Q.    Did you retain dimensions of the prior
23 stairs?

128

1     A.    Prior stairs, no.
2     Q.    There's no plans that show the old
3 stairs and the new stairs to be added, there's no
4 drawings or plans?
5     A.    No.
6     Q.    Who constructed the new stairs?
7     A.    That would have been Campton Village
8 Construction.
9     Q.    Did they give you a proposal?
10     A.    It was part of the lodge remodel.
11     Q.    And you don't believe there was any
12 sketch or separate diagram for the --
13     A.    Not showing the difference between what
14 was there and what was new.  I know there's sketches
15 of the deck that were drawn.
16     Q.    Would you be able to provide those to
17 us?
18     A.    I'll have to look.
19     Q.    Thank you.  Do you know if the -- what
20 I'm going to call the original or the prior stairs,
21 if they were in compliance with the building codes?
22     A.    I was never aware that they were not.
23     Q.    Have the concrete stairs changed over

129

1  time, to your knowledge?
2      A.    No.
3      Q.    Have any antislip materials ever been
4  applied to them?
5      A.    No.
6      Q.    Are they code compliant?
7      A.    I've never been aware that they're not.
8      Q.    Do the concrete stairs look the same as
9  they did on March 13th, 2019?
10     A.    Yes.
11     Q.    I think I asked you this question, but
12 I just want to make sure that I did get the answer:
13 Do you know, was there ever a railing on either side
14 of the concrete stairs?
15     A.    No.
16     Q.    Do you know why?
17     A.    No.
18     Q.    Do you know why there's a railing on
19 the three wooden stairs?
20     A.    In the summertime, that's elevated and
21 there's a fall hazard off the side.
22     Q.    I see.  And I assume that means there's
23 no fall hazard in the summertime for the concrete

130

1  steps?
2      A.    No, they're at ground level.
3      Q.    So what is Waterville's position as to
4  why Mr. Fuerst fell on these stairs?
5      A.    We don't have a position.
6      Q.    Well, so you acknowledge that he fell?
7      A.    Yes.
8      Q.    And you agree he was lawfully on the
9  premises?
10     A.    Yes.
11     Q.    Was his fall caused by any particular
12 event?
13     A.    Yes.
14     Q.    And what do you say the event was?
15     A.    I don't know.
16     Q.    Has anybody suggested to you during
17 your investigation that these stairs were -- where he
18 fell were slippery?
19     A.    No.
20     Q.    That they were icy?
21     A.    No.
22     Q.    Did you ever talk to Jennifer about
23 this case?

131

1      A.    No.
2      Q.    If she's the one who wrote the report,
3  is there a reason why you didn't interview her?
4      A.    I traditionally speak to Jeff Hayes,
5  the patrol director, and he speaks with his patrol,
6  chain of command.
7      Q.    Do you know if Jeff Hayes interviewed
8  Jennifer about this incident report after it was
9  done?
10     A.    I assume they had conversations.
11     Q.    Do you know anything about the subject
12 of those conversations?
13     A.    The subject was in regards to the
14 incident.
15     Q.    Is it fair to say that Jeff knows more
16 about the incident than you do?
17     A.    Yeah.
18     Q.    Is there a reason why he was not
19 offered to answer the questions about the incident?
20     A.    No.
21            MR. TAPPLY:  Objection.  You don't have
22 to answer that.
23            MR. WHITE:  Tim, let's go off -- let's

132

1  go off the record for a second.
2            MR. TAPPLY:  Sure.
3            (Discussion off the record.)
4  BY MR. WHITE:
5      Q.    Mr. Smith, you said you did not prepare
6  for this deposition talking to Mr. --
7      A.    I'm sorry, I couldn't hear you.
8      Q.    I'll repeat it.  You testified in this
9  case in the beginning that you did not speak to
10 Mr. Smith (verbatim) in preparation for this
11 deposition to obtain information about the
12 investigation of the incident?
13            MR. TAPPLY:  Objection.
14            THE WITNESS:  Are you asking me that
15 question, Jack?
16 BY MR. WHITE:
17     Q.    Yes.  Yes, I am, Tim.
18     A.    Please state that again.
19     Q.    Sure.
20     A.    With the "Tims," I'm getting confused.
21     Q.    Sure.  I'll phrase it slightly
22 differently.
23            I believe your testimony was is that

133

1  you did not speak to anybody in preparation for this
2  deposition, including Mr. Smith -- Mr. Hayes,
3  regarding the investigation that was conducted by
4  Waterville Valley into the incident?
5      A.    Correct, in preparation for this
6  incident -- for this deposition, I did not speak to
7  Jeff Hayes in preparation.
8      Q.    And you also agree that Mr. Hayes is
9  the one who actually conducted the investigation,
10  correct?
11      A.    Correct.
12      Q.    You did not conduct the investigation?
13      A.    Correct.
14          MR. WHITE:  Thank you.  I have no
15  further questions.  I do have one last thing, I
16  apologize.
17  BY MR. WHITE:
18      Q.    Do you know if Waterville Valley has
19  retained any experts to testify in this matter?
20      A.    I do not know.
21      Q.    Will you be offering any expert
22  testimony?
23      A.    I -- if asked.

134

1      Q.    Do you know what opinions you'd be
2  offering or what topics?
3      A.    No.
4          MR. WHITE:  So, Tim Tapply, I would
5  just reserve the right to call and redepose him if
6  he's going to be offering any expert opinions.
7          MR. TAPPLY:  All right.  We can take
8  that up if and when necessary.
9          MR. WHITE:  Thank you.  I'm set.
10          MR. TAPPLY:  Any other questions?
11          MR. WHITE:  No.
12          MR. TAPPLY:  Okay.
13          EXAMINATION
14  BY MR. TAPPLY:
15      Q.    Mr. Smith, is it fair to say you've
16  spoken to Jeff Hayes many times throughout your
17  tenure at Waterville Valley?
18      A.    Absolutely.
19      Q.    All right.  And you spoke to him about
20  this incident as well?
21      A.    Yes, I did.
22      Q.    All right.  So when you said that you
23  have not spoken to him in preparation for this

135

1  particular deposition, that's not to say that you
2  haven't spoken to him about this incident, right?
3      A.    Correct.
4      Q.    You just didn't -- because you had
5  spoken to him many times about this incident, you
6  didn't need to speak to him once again before the
7  deposition, is that right?
8      A.    Correct.
9      Q.    Okay.  Are you aware of anyone else
10  being injured as a result of a slip and fall on the
11  stairs where Mr. Glen Fuerst alleges that he fell?
12      A.    Through our research, we did find one
13  incident in 2016 at the top of the stairs where I
14  believe a gentleman tripped on the top staircase and
15  hit himself with his own snowboard.
16      Q.    Anyone else slipping and falling?
17      A.    No.
18      Q.    Any other reports of the stairs being
19  slippery or dangerous or any patrons complaining
20  about those stairs?
21      A.    I'm sure over time.
22      Q.    But are you aware of them being --
23  those stairs being something about which your patrons

136

1  regularly complain?
2      A.    No.
3      Q.    All right.  Let me ask you this:  In
4  the years that you've been there, have you ever
5  received any specific complaints about those stairs
6  ever being too slippery or anything like that?
7      A.    No.
8      Q.    Thank you.  You described Waterville
9  Valley's snow and ice removal, and you said --
10  correct me if I'm wrong, but basically it starts in
11  the morning when the staff gets there and it
12  continues throughout the day, is that right?
13      A.    Correct.
14      Q.    Fair to say that snow, as a substance,
15  is something that is always moving, always on the
16  move?
17      A.    Yes.
18      Q.    And so your staff is generally or
19  regularly walking around observing the premises,
20  including these stairs, and clearing them throughout
21  the day, is that right?
22      A.    Correct.
23      Q.    All right.  And if there is a protocol,

137

1 if there is a process, that is it; it's constantly
2 reviewing the stairs, right?
3      A.    Correct.
4           MR. TAPPLY:  Sandy, can we please see
5 Exhibit 4.
6           THE REPORTER:  Yes.
7 BY MR. TAPPLY:
8      Q.    Mr. Smith, you were asked a number of
9 questions about whether or not you knew when ice melt
10 or salt was applied to these stairs.  You know that
11 it was applied before this picture was taken
12 obviously, right, because it's right there in the
13 picture?
14     A.    Right, correct.
15     Q.    And you indicated on a number of times,
16 when counsel asked questions, about comparing this
17 picture to the pictures that were apparently taken
18 the next day, and you said it was a matter of
19 perspective.
20          Now, by "perspective," am I taking that
21 to mean that since whoever took this, zoomed in so
22 much on the stairs on the left-hand side of the
23 stairs, since the person who took this zoomed in so

138

1 much on the snow on the left-hand side, it ignores
2 the entire width of the stairs that are completely
3 free of anything but concrete, is that what you mean
4 by "perspective"?
5      A.    Correct.
6      Q.    All right.  And would you agree that
7 had the person wanted to take pictures to show what
8 the stairs actually looked like, it probably would
9 have been better if they had taken pictures of the
10 full width of the stairs?
11     A.    Correct.
12     Q.    All right.  Were you ever made aware
13 that Mr. Fuerst actually got to the top of the
14 stairs, walked out into the snow to put skis on the
15 ski rack, turned around, walked from the snow back
16 out onto the stairs, and then didn't want to wait for
17 people coming up the stairs so walked out into the
18 snow and that's where he fell?  Did you --
19     A.    That's what I read a long time ago, and
20 I've always been curious as to exactly what the --
21 that was actually -- how that actually was done.  I
22 believe that was accurate, what you described.
23          MR. TAPPLY:  All right.  Thank you.  I

139

1 have no further questions.
2           MR. WHITE:  A few questions.
3           EXAMINATION
4 BY MR. WHITE:
5      Q.    Do you have any notes of your meetings
6 with Mr. Hayes?
7      A.    No.
8      Q.    Does he have any notes of your
9 meetings?
10     A.    No.
11     Q.    So you don't have any firsthand
12 knowledge of how this event happened with Mr. Fuerst?
13     A.    No.
14     Q.    Does Waterville Valley keep records of
15 complaints made by customers about slipperiness of
16 the stairs?
17     A.    No.
18     Q.    Are particular people assigned to
19 monitor these stairs or check them?
20     A.    The buildings and grounds crew and the
21 rest of the staff team that uses the stairs
22 periodically throughout the day, all of them are.
23     Q.    That's in addition to their other

140

1 duties, correct?
2      A.    Correct.
3      Q.    But there's nobody specifically that's
4 assigned to walk around the premises and check the
5 walkway and the stairs?
6      A.    The buildings and grounds crew does
7 that, yes.
8      Q.    And that would have been -- that day,
9 would have been Chris Pitmen or Tim Kirwin, correct?
10     A.    Correct.
11     Q.    Mr. Tapply asked you a very lengthy
12 question about how Mr. Fuerst walked up, put his skis
13 down, then walked back through some snow and walked
14 down these stairs; and you said -- he asked you if
15 that sounded to be a correct explanation of what
16 happened.  And you said, Yeah, that's -- I read
17 that's how that happened.  Where did you read that,
18 Mr. Smith?
19     A.    Complaint letter, I believe.
20     Q.    Complaint letter, okay.
21     A.    Wasn't there a letter, a complaint or
22 something along those lines?
23     Q.    I don't know.  But who sent the

141

1  complaint letter?
2          MR. TAPPLY:  Your office did.
3          THE WITNESS:  Your office.
4  BY MR. WHITE:
5      Q.    So that's where your recollection of
6  how this happened is coming from?
7      A.    No, that was just a different opinion
8  of how it could have happened.
9      Q.    Okay.
10     A.    I am unclear exactly how it happened.
11     Q.    Looking at Exhibit 4 that we've got up
12  here on the screen, do you see ice on the stairs, as
13  we're looking at this picture?
14     A.    I see slush.  I see what could be ice,
15  could be water, could be -- it's hard to say.
16     Q.    So you do see where there could be ice
17  on several of the steps, correct?
18     A.    Sure.
19         MR. WHITE:  Thank you.  I have no
20  further questions.
21              EXAMINATION
22  BY MR. TAPPLY:
23     Q.    Tim, you see where it could be ice

142

1  because you're looking at an image that's through a
2  computer screen, and neither Attorney White nor
3  myself nor the court reporter can see what you can
4  see on your end, right?
5      A.    Correct.
6          MR. TAPPLY:  Okay.  That's it.  Thank
7  you.
8          MR. WHITE:  Well, I'll follow up --
9  that question up.
10              EXAMINATION
11  BY MR. WHITE:
12     Q.    If that is in fact ice, would you have
13  expected your people to have treated it with sand or
14  salt or ice melt?
15     A.    Yes.
16     Q.    It doesn't look like it's treated to
17  you, does it?
18     A.    It does look like it's treated.
19     Q.    So I'm looking at the bottom picture,
20  bottom stair on the lower part of the picture.
21     A.    Yeah.
22     Q.    Do you see any ice melt in that large
23  section of --

143

1      A.    I see what could be ice or it could be
2  water.
3      Q.    How about the next step up, what looks
4  white-ish?
5      A.    That could be ice, it could be water.
6      Q.    Yeah.
7      A.    Could be melting ice.
8      Q.    Well, we know the temperature was
9  around freezing, correct?
10         MR. TAPPLY:  Objection.
11         THE WITNESS:  We know between 30 and
12  32, according to Jen's report.
13  BY MR. WHITE:
14     Q.    I thought it said between zero and 32,
15  according to Jen's report?
16     A.    Sorry, zero and 32, correct.
17     Q.    So that's a freezing temperature,
18  right?
19     A.    No, radiant heat could heat those
20  stairs up.
21     Q.    It would heat the snow first, wouldn't
22  it?
23     A.    No, snow's white; stairs are dark.

144

1  Radiant heat affects darkness more than it affects
2  the white snow.
3      Q.    The steps had been cooled all night,
4  correct?
5      A.    We don't know when this picture was
6  taken.
7      Q.    I'll represent to you it was taken
8  around 10:00 or 10:30 the morning of Mr. Fuerst's
9  fall.
10     A.    Is there a question?
11     Q.    Yeah.  I'm asking you those steps --
12  that concrete mass was exposed to cold all night.
13  Isn't it going to hold its temperature longer than
14  the snow holds its temperature?
15         MR. TAPPLY:  Objection.  He's not -- I
16  don't think anyone's certified Tim, despite his
17  extensive knowledge, as a weather expert.  So I'm not
18  sure he'd be able answer the impact of the concrete
19  stairs being exposed to some unknown temperature over
20  some unknown period of time the previous night.
21         MR. WHITE:  He just testified that the
22  snow would melt faster from radiant heat than the
23  concrete, and I was just asking him if that -- is

145

1  that still true, the fact that those --
2           THE WITNESS:  No, concrete doesn't
3  melt.
4           MR. WHITE:  Okay.  That's fine.  Thank
5  you, Mr. Smith.
6           (Deposition concluded at 1:48 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

147

1                   C E R T I F I C A T E
2        I, Sandra Day, a Licensed Court
3  Reporter of the State of New Hampshire, do hereby
4  certify that the foregoing is a true and accurate
5  transcript of my stenographic notes of the deposition
6  of Timothy Smith, who was first duly sworn on the
7  date hereinbefore set forth.
8        I further certify that I am neither attorney
9  nor counsel for, nor related to or employed by any of
10  the parties to the action in which this deposition
11  was taken, and further that I am not a relative or
12  employee of any attorney or counsel employed in this
13  case, nor am I financially interested in this action.
14      THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
15  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
16  MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
17  DIRECTION OF THE CERTIFYING REPORTER.
18
19
20           SANDRA DAY, LCR
             N.H. Licensed Court Reporter
             No. 27 (RSA 310-A:161-181)
21
22
23

146

1                   CERTIFICATE OF WITNESS
2        I, Timothy Smith, do hereby swear/affirm that
3  I have read the foregoing transcript of my testimony,
4  and further certify that it is a true and accurate
5  record of my testimony (with the exception of the
6  corrections listed below):
7  Page      Line                 Correction
8
9
10
11
12
13
14
15
16
17
18                     Timothy Smith
19     Subscribed and sworn to before me this      day
20  of,              20__.
21
22        Notary Public/Justice of the Peace
23        My Commission Expires:

# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

Glenn Fuerst, et al

Plaintiff

v.                                    Civil Action No. 1:20-cv-00369-AJ

WVSR, LLC.

Defendant

## AFFIDAVIT OF TIMOTHY SMITH

1. My name is Timothy Smith.

2. The following is within my personal knowledge.

3. I have been employed at Waterville Valley (WVSR, LLC) since 2014.

4. I am currently the President and General Manager and have been so since 2016.

5. At Waterville Valley we have utilized reusable hard plastic ticket cards for a number of years.  They are commonly referred to as RFID cards.

6. The RFID cards were in use at Waterville Valley during the 2018/2019 ski season.

7. The Senior Ticket RFID card used during the 2018/2019 season is attached as Exhibit 1.

8. Exhibit 1 is a true and accurate representation of the card that the plaintiffs purchased on March 12, 2019 and were issued on March 13, 2019.

9. All Senior Tickets in 2018/2019 were identical.

10. At Waterville Valley we also have signage placed throughout the area, including a the ticket booth and Guest Services Counter where guests are able to pick up their ski tickets.

11. In 2018/2019 the sign depicted in Exhibit 2 attached hereto was placed at the ticket booth and Guest Services Counter.

12. The image in Exhibit 2 is the exact sign that was in place on March 13, 2019 when the plaintiffs visited Waterville Valley.

13. I am familiar with the stairs where the plaintiff claims he had fallen as I have walked them countless times since my arrival at Waterville Valley. The image attached as Exhibit 3 is a picture of the stairs.

14. The image of Exhibit #3 is a fair and accurate representation of the exterior stairs at Waterville Valley where plaintiff claims to have been injured.

15. The photograph contained as Exhibit #3 was taken on March 14, 2019.

16. I have reviewed the incident reports going back through at least 2017 and identified no other persons having been injured on the stairs depicted in Exhibit #3.

17. Additionally, I am not aware of anyone else who has been injured on the stairs depicted in Exhibit #3.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ____ DAY OF JUNE, 2021.

TIMOTHY SMITH